No. 20-3289

United States Court of Appeals for the Sixth Circuit

Nicholas K. Meriwether,

Plaintiff-Appellant,

v.

THE TRUSTEES OF SHAWNEE STATE UNIVERSITY—Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra Hash, Robert Howarth, George White, and Wallace Edwards—in their official capacities; JEFFREY A. BAUER, in his official capacity; ROBERTA MILLIKEN, in her official capacity; JENNIFER PAULEY, in her official capacity; TENA PIERCE, in her official capacity; DOUGLAS SHOEMAKER, in his official capacity; and MALONDA JOHNSON, in her official capacity,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 1:18-cv-00753-SJD
The Honorable Susan J. Dlott

## Brief of Plaintiff-Appellant Nicholas K. Meriwether

David A. Cortman
Travis C. Barham
Alliance Defending Freedom
1000 Hurricane Shoals Road N.E.,
 Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774

Thomas W. Kidd, Jr.
Kidd & Urling, LLC
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone: (513) 733–3080

Kristen K. Waggoner
John J. Bursch
Alliance Defending Freedom
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
jbursch@ADFlegal.org

Tyson C. Langhofer
Alliance Defending Freedom
20116 Ashbrook Place, Suite 250
Ashburn, Virginia 20147
Telephone: (480) 388–8205

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 6th Cir. R. 26.1, Dr. Meriwether makes the following disclosure:

1.  He is not a subsidiary or affiliate of a publicly owned corporation.

2.  There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................. x

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF ISSUES ..................................................................... 2

INTRODUCTION ................................................................................ 3

STATEMENT OF THE CASE ................................................................ 5

    I.    Nature of the dispute .............................................................. 5

    II.   Facts ....................................................................................... 7

        A.    Dr. Meriwether's speech ................................................ 7

        B.    The University's speech restrictions ............................. 9

        C.    The University retaliates .............................................. 13

    III.  Proceedings .......................................................................... 14

STANDARD OF REVIEW .................................................................... 16

SUMMARY OF THE ARGUMENT ........................................................ 17

ARGUMENT ..................................................................................... 18

    I.    The district court erred by dismissing Dr. Meriwether's free-speech claims. ...................................................................... 19

        A.    Dr. Meriwether stated a plausible claim of compelled speech in violation of the First Amendment. ................... 19

        B.    Dr. Meriwether's status as a public-university professor does not eviscerate First Amendment protections ..... 23

            1.    Dr. Meriwether spoke "as a citizen" when he was teaching his university class ................................... 23

                a.   *Garcetti*'s "official duties" test does not apply to faculty speech "related to teaching." ........................................................ 24

b. The content and context of Dr. Meriwether's speech show that he spoke "as a citizen." ...... 29

2. Dr. Meriwether addressed matters of public concern. .................................................... 31

C. Dr. Meriwether also stated plausible claims for First Amendment retaliation, unconstitutional conditions, and content and viewpoint discrimination. ...................... 38

II. The district court erred by dismissing Dr. Meriwether's free-exercise claim. ............................................................ 45

A. The University's restrictions violate the Free Exercise Clause even if they were neutral and generally applicable. .......................................................... 45

1. The University's restrictions curtail Dr. Meri-wether's right to communicate consistently with his faith. .................................................. 45

2. The University's restrictions require Dr. Meri-wether to renounce his religious beliefs to preserve his job. ......................................... 47

B. The University's restrictions are not neutral or generally applicable. .......................................... 48

III. The district court erred in dismissing Dr. Meriwether's Fourteenth Amendment due-process claims. ............................ 54

IV. The University's restrictions do not satisfy strict scrutiny. ...... 55

CONCLUSION AND REQUESTED RELIEF ........................................ 57

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS 59

RULE 32(G)(1) CERTIFICATE OF COMPLIANCE .............................. 62

CERTIFICATE OF SERVICE ................................................................. 63

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Trustees of the University of North Carolina-Wilmington,*
    640 F.3d 550 (4th Cir. 2011) ............................................. 23, 26, 38

*Agency for International Development v.*
    *Alliance for Open Society International, Inc.,*
    570 U.S. 205 (2013) ......................................................................... 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................... 16

*Axson-Flynn v. Johnson,*
    356 F.3d 1277 (10th Cir. 2004) ...................................................... 53

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................. 49, 53

*Bonnell v. Lorenzo,*
    241 F.3d 800 (6th Cir. 2001) .......................................................... 35

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ......................................................................... 48

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) .................................................................. 48, 53

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ........................................................................... 54

*City of Lakewood v. Plain Dealer Publishing Co.,*
    486 U.S. 750 (1988) ......................................................................... 42

*Cockrell v. Shelby County School District,*
    270 F.3d 1036 (6th Cir. 2001) ........................................................ 33

*Corlett v. Oakland University Board of Trustees,*
    958 F. Supp. 2d 795 (E.D. Mich. 2013) .............................. 15, 33, 34

*Cressman v. Thompson,*
    798 F.3d 938 (10th Cir. 2015) ........................................................ 37

*Dambrot v. Central Michigan University,*
    55 F.3d 1177 (6th Cir. 1995) .................................................... 20, 41

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014) ................................................... 26, 38

*Doe v. Baum,*
    903 F.3d 575 (6th Cir. 2018) ........................................................ 16

*Doe v. University of Michigan,*
    721 F. Supp. 852 (E.D. Mich. 1989) ............................................. 20

*Employment Division v. Smith,*
    494 U.S. 872 (1990) .................................................. 45, 46, 47, 53

*Evans-Marshall v. Board of Educacion of*
*Tipp City Exempted Village School District.,*
    624 F.3d 332 (6th Cir. 2010) ...................................... 24, 26, 27, 33

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ..................................................................... 9

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ......................................................... 41, 42, 44

*Fox v. Traverse City Area Public Schools Board of Education,*
    605 F.3d 345 (6th Cir. 2010) ....................................................... 29

*Freedom from Religion Foundation v. Abbott,*
    955 F.3d 417 (5th Cir. 2020) ....................................................... 42

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ................................................ 15, 23, 24, 25

*Givhan v. Western Line Consolidated School District,*
    439 U.S. 410 (1979) .................................................................... 37

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .................................................................... 54

*Handy-Clay v. City of Memphis,*
    695 F.3d 531 (6th Cir. 2012) ................................................. 29, 35

*Hardy v. Jefferson Community College,*
    260 F.3d 671 (6th Cir. 2001) ........................................ 7, 31, 33, 34

*Healy v. James,*
    408 U.S. 169 (1972) .................................................................... 29

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012) ................................................................45, 47

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ...........................................3, 5, 22, 36

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) ..............................................43, 53

*Janus v. American Federation of State, County & Municipal Employees,*
    138 S. Ct. 2448 (2018) ....................................19, 20, 32, 34

*Jenkins v. Rock Hill Local School District,*
    513 F.3d 580 (6th Cir. 2008) ...........................................38

*Johnson-Kurek v. Abu-Absi,*
    423 F.3d 590 (6th Cir. 2005) .........................7, 27, 28, 30

*Kastl v. Maricopa County Community College District,*
    2004 WL 2008954 (D. Ariz. Jun. 3, 2004) ......................32

*Kerr v. Hurd,*
    694 F. Supp. 2d 817 (S.D. Ohio 2010)......................24, 33

*Keyishian v. Board of Regents of the University of the State of New York,*
    385 U.S. 589 (1967) .........................................17, 24, 25

*Kissinger v. Board of Trustees of Ohio State University,*
    5 F.3d 177 (6th Cir. 1993) ...............................................46

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ........................................................54

*Koontz v. St. Johns River Water Management District,*
    570 U.S. 595 (2013) ........................................................39

*Lee v. York County School Division,*
    484 F.3d 687 (4th Cir. 2007) ...........................................24

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    138 S. Ct. 1719 (2018) ....................46, 48, 50, 52, 53, 55

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) .........................................5, 43, 53

*Mayhew v. Town of Smyrna,*
    856 F.3d 456 (6th Cir. 2017) ....................................23, 31

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974) ...................................................22

*National Institute of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ............................................22

*National Socialist Party of America v. Village of Skokie,*
    432 U.S. 43 (1977) .................................................55

*Pahssen v. Merrill Community School District,*
    668 F.3d 356 (6th Cir. 2012) ..............................13

*Papish v. Board of Curators of the University of Missouri,*
    410 U.S. 667 (1973) ...............................................55

*Parate v. Isibor,*
    868 F.2d 821 (6th Cir. 1989) .......................3, 21

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ...............................................39

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ...............................................40

*R.S.W.W., Inc. v. City of Keego Harbor,*
    397 F.3d 427 (6th Cir. 2005) ..............................39

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ...............................................37

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .................................40, 44, 55, 56

*Riley v. National Federation of the Blind of North Carolina,*
    487 U.S. 781 (1988) ...........................................21, 40

*Rodgers v. Banks,*
    344 F.3d 587 (6th Cir. 2003) ..............................31

*Rosenberger v. Rector & Visitors of the University of Virginia,*
    515 U.S. 819 (1995) ...............................................41

*Russo v. Central School District No. 1,*
    469 F.2d 623 (2d Cir. 1972) ................................20

*Savage v. Gee,*
    665 F.3d 732 (6th Cir. 2012) ..............................27

*Scarborough v. Morgan County Board of Education,*
470 F.3d 250 (6th Cir. 2006) ....................................................31, 32

*Scoble v. Detroit Coil Co.,*
611 F.2d 661 (6th Cir. 1980) ............................................................57

*Shelton v. Tucker,*
364 U.S. 479 (1960) ...................................................................17, 24

*Shuttlesworth v. City of Birmingham,*
394 U.S. 147 (1969) ...................................................................42, 43

*Smock v. Board of Regents of the University of Michigan,*
353 F. Supp. 3d 651 (E.D. Mich. 2018)............................................28

*Snyder v. Phelps,*
562 U.S. 443 (2011) .............................................................31, 32, 55

*Southworth v. Board of Regents of the University of Wisconsin System,*
307 F.3d 566 (7th Cir. 2002) ...........................................................42

*Spence v. Washington,*
418 U.S. 405 (1974) ...................................................................36, 37

*Sweezy v. New Hampshire,*
354 U.S. 234 (1957) .............................................................17, 24, 25

*Telescope Media Group v. Lucero,*
936 F.3d 740 (8th Cir. 2019) .....................................................46, 55

*Texas v. Johnson,*
491 U.S. 397 (1989) ...................................................................37, 55

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
137 S. Ct. 2012 (2017) ........................................................45, 47, 48

*Turner Broadcasting System, Inc. v. FCC,*
512 U.S. 622 (1994) .........................................................................17

*United States v. Varner,*
948 F.3d 250 (5th Cir. 2020) ...........................................5, 32, 43, 57

*United States v. Virginia,*
518 U.S. 515 (1996) .........................................................................21

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982) .........................................................................54

*Ward v. Polite,*
667 F.3d 727 (6th Cir. 2012) ...............................................28, 29, 37

*West Virginia State Board of Education v. Barnette,*
319 U.S. 624 (1943) ...................................................3, 5, 17, 21, 46

*Wittmer v. Phillips 66 Co.,*
915 F.3d 328 (5th Cir. 2019) ...........................................................33

*Wooley v. Maynard,*
430 U.S. 705 (1977) ...............................................................3, 5, 19

**Statutes**

28 U.S.C. § 1291...............................................................................1

28 U.S.C. § 1331...............................................................................1

28 U.S.C. § 1343...............................................................................1

42 U.S.C. § 1983...............................................................................1

**Other Authorities**

Cecilia Dhejne, *et al.,*
*Long-Term Follow-Up of Transsexual Persons Undergoing Sex*
*Reassignment Surgery*, PLoS ONE (Feb. 22, 2011),
http:/bit.ly/2KnhuoE .......................................................................6

Genesis 1:27–28 .............................................................................47

Rachael Revesz,
*University of Michigan Student Changes Name to "His Majesty"*
*Following New "Inclusive" Pronoun Policy*, INDEP. (Sept. 30, 2016),
https://bit.ly/2X2SnxB.....................................................................53

Ryan T. Anderson,
*Sex Change: Physically Impossible, Psychologically Unhelpful, and*
*Philosophically Misguided*, PUBLIC DISCOURSE (Mar. 5, 2018),
https://bit.ly/2VxAgiw......................................................................6

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant Nicholas K. Meriwether respectfully requests oral argument. Shawnee State University officials gave Dr. Meriwether no way to speak without endorsing philosophies that he believes are false and that violate his religious beliefs. This case presents important constitutional questions addressing (1) whether professors at public universities retain First Amendment protections when engaged in speech related to teaching and scholarship; (2) whether a public university may force a philosophy professor to espouse ideological beliefs that he believes to be false and that violate his religious beliefs; and (3) whether a public university may stifle expression of different beliefs—on and off campus—on issues that are sparking debate in academic, political, legal, and cultural contexts. Because the case implicates important constitutional liberties and presents nuanced disputes, oral argument will assist the Court.

## STATEMENT OF JURISDICTION

Plaintiff's amended complaint raises federal questions under the U.S. Constitution and 42 U.S.C. § 1983. 1st Am. V. Compl. ("Compl.") ¶ 6, R.34, PageID.1459. The district court exercised original jurisdiction under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction). *Id.* ¶ 7.

Appellate jurisdiction exists under 28 U.S.C. § 1291. On February 12, 2020, the district court granted Defendants' and Defendants-Intervenors' motions to dismiss. Order, R.60, PageID.2404. The same day, it rendered judgment disposing of Plaintiff's claims. Judgment, R.61, PageID.2405. On March 12th, Plaintiff filed a timely notice of appeal from both the February 12th order and judgment. Notice of Appeal, R.62, PageID.2406.

## STATEMENT OF ISSUES

Dr. Nicholas Meriwether—a well-respected philosophy professor with a spotless record at Shawnee State University—respectfully declined to refer to a male student as a woman. Because he desired to adhere to his conscience while showing courtesy to the student, he offered to use the student's preferred name and avoid using titles and pronouns entirely with this student. That way, Dr. Meriwether could honor the student's wishes without saying things that contradicted Dr. Meriwether's philosophical and religious beliefs. But University officials rejected that accommodation and punished him for violating their *Non-discrimination Policies*. They gave him no way to speak without endorsing philosophies that he believes are false and violating his religious beliefs. Yet the district court granted the officials' motion to dismiss.

This appeal presents two issues that this Court reviews *de novo*:

1.    Whether Dr. Meriwether pleaded "plausible" First and Fourteenth Amendment violations after University officials punished him for expressing his views and ordered him to say things that violate his philosophical and religious beliefs.

2.    Whether the First Amendment protects Dr. Meriwether's classroom speech as a public-university professor.

# INTRODUCTION

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), the Supreme Court held that a school violated the First Amendment when it disciplined students who declined to salute or pledge allegiance to the American flag because of their faith. The outcome would have been identical if a college had compelled a professor to recite orthodoxy that contradicted his philosophical and religious beliefs. Officials cannot compel faculty "to conform to a belief and a communication to which [they do] not subscribe." *Parate v. Isibor*, 868 F.2d 821, 830 (6th Cir. 1989). And the government cannot compel speech, whether involving a classroom pledge, *Barnette*, 319 U.S. at 642, a license-plate slogan, *Wooley v. Maynard*, 430 U.S. 705, 713–17 (1977), or an LGBT banner in a parade, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568–81 (1995).

That's this case in a nutshell. Shawnee State University established its orthodoxy for "gender identity," defined as "a person's innermost concept of self as male or female or both or neither." Later, its officials interpreted this policy to require faculty to refer to males who identify as female as women (and *vice versa*). When Dr. Meriwether learned of this, he objected. He wants to show courtesy to every student; he also has a philosophical and religious belief in the reality of sex—one shared by billions—and he speaks consistent with that belief when teaching. But officials told him that professors "must respond to a student's demand to use a pronoun that reflects that student's self-

3

asserted gender identity" or be "disciplined." That is, speak the University's gender orthodoxy or be punished.

Dr. Meriwether teaches his philosophy courses Socratically, referring to students by their last names and a title (*e.g.*, "Mr." or "Ms.") or as "sir" or "ma'am," and—unsurprisingly—he frequently uses pronouns. In January 2018, Dr. Meriwether responded to a question from a male student—named "Doe" here—by saying, "Yes sir." After class, Doe told Dr. Meriwether that Doe identifies as female, demanding to be addressed with female pronouns and titles. When Dr. Meriwether paused to think about this, Doe became belligerent, berating Dr. Meriwether and announcing, "Then I guess this means I can call you a cunt." Promising to get Dr. Meriwether fired, the student filed a complaint.

After thinking the matter through, Dr. Meriwether sought to accommodate Doe by simply using Doe's desired first or last name. University officials approved; Doe did not. So the officials recanted and insisted that Dr. Meriwether use individually preferred pronouns and titles for every student or purge them from his vocabulary completely. Both options violate Dr. Meriwether's beliefs; the latter conflicts with the University's own policy of requiring professors to use student-chosen pronouns, and it subjects Dr. Meriwether to punishment for every pronoun mistake he makes. Dr. Meriwether respectfully declined. Officials then issued a formal letter for his employment file, finding that by using pronouns in accord with standard English, Dr. Meriwether

discriminated and created a hostile environment. Officials warned him that future such expression would prompt more punishment, and they denied his grievance, precipitating this lawsuit. The district court then dismissed all of his claims.

Dr. Meriwether's position is simple. Both he and University officials care for their students. But government officials cannot compel him to speak what he does not believe about a subject of deep public debate—human sexuality. Their policies are alarmingly intolerant and unconstitutional. Dr. Meriwether should be allowed to prove so.

## STATEMENT OF THE CASE

### I.   Nature of the dispute

This case is about whether the government—a public university no less—can end a contentious debate simply by forcing one side to speak the other's message. The answer is "no." *Barnette*, 319 U.S. at 642; *Wooley*, 430 U.S. at 713–17; *Hurley*, 515 U.S. at 568–81. The "proudest boast of our free speech jurisprudence" is that the First Amendment protects *all* freedom of expression. *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (plurality). And "no authority supports the proposition that [courts] may require . . . anyone . . . to refer to gender-dysphoric [individuals] with pronouns matching their subjective gender identity." *United States v. Varner*, 948 F.3d 250, 254–55 (5th Cir. 2020).

Certainly, in 2020, what it means to be "male" or "female" is hotly debated. The University claims a person's sex is "assigned" at birth but

what really matters is gender identity, the "innermost concept of self as male or female or both or neither—how individuals perceive themselves and what they call themselves." Compl. ¶ 64, R.34, PageID.1465. A person might identify as male or female, neither, both, in between, or some combination. *Id.* ¶ 68, PageID.1466. And this identity can fluctuate. *Id.* ¶ 71. From this perspective, it is vital to affirm a person's gender identity, and "misgendering" is harmful.

Others, like Dr. Meriwether, understand a person's sex as being fixed at conception and revealed by physiology as male or female, something that does not change based on feelings or actions. *Id.* ¶ 89, PageID.1469. They believe in compassionately helping those experiencing gender dysphoria to align their minds with their bodies, not *vice versa*, in the same way we assist people with anorexia and body-integrity dysphoria. And they reasonably believe it is profoundly harmful to affirm a person's false views, especially when this can mean enabling a life-long dependency on unproven, often detrimental medical interventions. *See generally* Ryan T. Anderson, *Sex Change: Physically Impossible, Psychologically Unhelpful, and Philosophically Misguided*, PUBLIC DISCOURSE (Mar. 5, 2018), https://bit.ly/2VxAgiw; Cecilia Dhejne, *et al.*, *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery*, PLOS ONE (Feb. 22, 2011), http:/bit.ly/2KnhuoE.

This Court cannot and need not resolve this on-going debate. But by dismissing this case, the district court cut that debate short. And it

made two fundamental legal errors. First, it ruled that public-university faculty have no free-speech rights when they speak in class. But professors do not "leave their First Amendment rights at the campus gates." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 594 (6th Cir. 2005). The notion that they "have no First Amendment rights when teaching . . . is totally unpersuasive." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001). Second, the district court held that Dr. Meriwether's speech did not involve a matter of *public* concern, comparing his choice of pronouns to a student's *individual* "expressions of lust for" a teacher. That, too, was wrong.

Once these errors are corrected, all that remains are Dr. Meriwether's plausible claims alleging that University officials compelled his speech based on content, viewpoint, and religious hostility. This Court should reverse the district court's dismissal.

## II. Facts

### A. Dr. Meriwether's speech

In January 2018, Dr. Meriwether—maintaining a spotless record over 21 years of teaching philosophy at Shawnee State University, Compl. ¶¶ 93–95, 105, R.34, PageID.1469–71—returned to the classroom after a sabbatical. *Id.* ¶ 125, PageID.1474. During his first political philosophy class, Dr. Meriwether respectfully answered a question from a male student, Doe, by saying, "Yes, sir." *Id.* ¶¶ 128–32.

After class, Doe informed Dr. Meriwether that Doe "was trans-gender" and "demanded that Dr. Meriwether refer to him as a woman." *Id.* ¶ 140, PageID.1475. When Dr. Meriwether paused to think about that request, Doe became belligerent, physically circling Dr. Meri-wether, saying, "Then I guess this means I can call you a cunt." Doe promised to get him fired. *Id.* ¶¶ 141–44.

Doe's demand posed a conflict of conscience for Dr. Meriwether: speaking as Doe demanded would require him to affirm metaphysical and ontological presuppositions that go against the heart of his scholarship. It would require him to teach what he does not believe.

As a well-respected scholar and teacher, Dr. Meriwether focuses on ethics, including the promotion of "human flourishing, natural law, and the split between pre-modern and modern approaches to ethics." *Id.* ¶¶ 98–100, PageID.1470. Philosophers, including Dr. Meriwether, have long debated between views grounded in natural law—where the mind and body are inseparable—and those grounded in modern and post-modern philosophy—where the two are independent entities. When a person's desires conflict with his physical nature, these two schools of philosophy respond in opposite ways.

Plato, Aristotle, and other natural law philosophers would say these desires are vices to be resisted. Modern and post-modern philoso-phers see them as expressions of individual autonomy to be celebrated. Gender identity represents a recent, novel venue for these metaphysical

debates. *Id.* ¶¶ 294, 297, PageID.1492–93. As both an Aristotelian natural-law philosopher and a Christian, Dr. Meriwether believes that "God created human beings as either male or female, that this sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Id.* ¶ 89, PageID.1469. That is, the body manifests whether the person is male or female. The University and other advocates of transgender ideology disagree. *Id.* ¶¶ 64–72, PageID.1465–66.

When Dr. Meriwether uses sex-based titles or pronouns, he "communicates his own views on" gender identity and transgenderism. *Id.* ¶¶ 204, 310, PageID.1481, 1495. To call a man a woman, he must endorse metaphysical positions he believes are false. University officials are compelling him to communicate their ideas about sex and gender as his own. As a philosopher whose calling is to search for truth and as a Christian, he cannot do this. *Id.* ¶¶ 3, 90, 92, 217–18, PageID.1458, 1469, 1483.

### B. The University's speech restrictions

Doe complained to the University, as did Dr. Meriwether's department chair, Defendant Pauley, prompting an inquiry from his dean, Defendant Milliken. *Id.* ¶¶ 146, 152–53, PageID.1476. Dr. Meriwether clarified his desire to treat Doe with dignity by using Doe's last name rather than a title or pronouns. *Id.* ¶¶ 91, 157, PageID.1469, 1477. *See Farmer v. Brennan*, 511 U.S. 825, 843, 847 (1994) (using a similar

approach of referring to a transgender inmate as "Petitioner" and avoiding pronouns, while still using them for others).

Milliken approved—until Doe objected. Compl. ¶¶ 158, 160–61, R.34, PageID.1477. Then she rejected Dr. Meriwether's proposed solution, threatening to punish him under the *Nondiscrimination Policies. Id.* ¶ 163. These policies prohibit "[n]egative or adverse treatment based on . . . gender identity" when "the treatment denies or limits the individual's ability to obtain the benefits of Shawnee State's programs or activities." *Id.* ¶ 63, PageID.1465. Per these policies— "gender identity" is subjective, may or may not differ from one's sex, is "internal" and "not necessarily visible to others," and encompasses an infinite range of possibilities. *Id.* ¶¶ 64–72, PageID.1465–66. They also prohibit creating a hostile environment: "any situation in which there is harassing conduct that limits, interferes with[,] or denies educational benefits or opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint." *Id.* ¶¶ 77–78, PageID. 1467–68. And they "regulat[e] all interactions professors have with students," *id.* ¶ 83, PageID.1468, including off-campus interactions that officials later decide "could reasonably create a hostile environment or be detrimental to the University," Ex. 2, R.34-2, PageID.1512. Faculty who do not comply can be punished, even terminated. Compl. ¶ 85, PageID.1468–69. Milliken made clear that if Dr. Meriwether did not comply with Doe's demands, he would violate these policies. *Id.* ¶ 163,

10

PageID.1477.

While Doe continued to apply pressure, University officials conferred and directed Milliken to take next steps. *Id.* ¶¶ 166–67, PageID. 1478. When Milliken followed up, Dr. Meriwether asked if he could use the University's compulsory language with a disclaimer in his syllabus, "noting that he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity." *Id.* ¶ 170. She said no. *Id.* ¶ 171. So Dr. Meriwether again offered to use Doe's preferred first or last name with no titles; he simply could not refer to a male student "as a woman." *Id.* ¶ 172. Milliken responded with threats of punishment. *Id.* ¶¶ 174–75.

Within days, Milliken launched a formal investigation, responding to "another complaint" from Doe. *Id.* ¶¶ 184–90, PageID.1479–80. In her investigation, Milliken faulted Dr. Meriwether for referring to Doe by last name "while other students are addressed as Ms. __ or Mr. __," *id.* ¶ 194, PageID.1480, and for using masculine pronouns when referring to Doe, *id.* ¶ 195. That was something that had occurred very rarely, entirely inadvertently, and that Dr. Meriwether had immediately corrected by using only Doe's last name. *Id.* ¶ 165, PageID.1477–78; Ex. 11, R.34-11, PageID.1706–07.

Dr. Meriwether reminded Milliken of his "philosophical[ ] and ethical concerns" about endorsing gender identity. Ex. 11, PageID.1707. He explained his religious beliefs, recounted his proposed, but rejected,

accommodation, *id*.; Compl. ¶¶ 208–09, R.34, PageID.1482, then inquired about another: referring to *all* students by their last names only, avoiding pronouns for Doe, but using sex-acknowledging pronouns for other students. Compl. ¶¶ 210–11; Ex. 11, PageID.1707. Milliken rejected that compromise, too. Compl. ¶¶ 212–15, PageID.1482–83.

Thus, University officials gave Dr. Meriwether no way to speak at all. He either had to speak the University's message either by using titles and pronouns consistent with gender identity rather than sex, or by using no pronouns at all—contrary to the University's policy of mandating use of student-chosen pronouns. *Id.* ¶¶ 216–18, PageID. 1483. Both options required him to endorse philosophies he believes false, and the latter would have turned every slip into grounds for more punishment. *Id.* ¶¶ 165, 195, PageID.1477–78, 1480.

Despite Doe's complaints, Doe remained in the class. *Id.* ¶ 176, PageID.1479. Dr. Meriwether called on Doe often, like other students. *Id.* ¶ 177. Doe freely expressed personal views and participated as much as any other student. *Id.* ¶¶ 178–80. And Doe earned a high grade, reflecting Dr. Meriwether's assessment that Doe did "very good work" with "frequent participation." *Id.* ¶¶ 181–83.

### C.     The University retaliates

Milliken concluded that Dr. Meriwether's speech "created a hostile environment" in violation of the *Nondiscrimination Policies*, so she recommended a "written warning." *Id.* ¶¶ 238–40, PageID.1486. Defendant Bauer, the University's provost, reviewed her recommendation. *Id.* ¶ 20, PageID.1461.

Dr. Meriwether reiterated that he treated all students the same, that he desired to accommodate Doe, that he never treated Doe differently in any other way, and that Doe's "access to educational benefits and opportunities was never jeopardized." *Id.* ¶¶ 242–43, PageID.1486. Yet Defendant Bauer ratified Milliken's decision and directed her to provide the warning. *Id.* ¶¶ 244–45, PageID.1487. The letter told Dr. Meriwether to change his expression "to avoid further corrective actions," *id.* ¶¶ 246–48, including suspension without pay or termination, *id.* ¶¶ 85, 164, 251, 263, 287–90, PageID.1469, 1477, 1487, 1489, 1491–92. No one ever explained how Dr. Meriwether's speech "limit[ed], interfere[d] with[,] or denie[d]" anyone's "educational benefits and opportunities"—which is what the University's policies and federal law require. *Id.* ¶ 77, PageID.1467–68; *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 363 (6th Cir. 2012) (finding physical assaults and obscene requests and gestures did not violate Title IX because they did not jeopardize educational benefits).

Dr. Meriwether sought relief via a union grievance. *Id.* ¶¶ 250–53, PageID.1487–88. But when his union representative explained to Bauer how this punishment threatened Meriwether's "religious convictions, his academic freedom, and his free speech rights," Bauer "did not want to hear it," and "openly laughed" at Dr. Meriwether's plight. *Id.* ¶¶ 256–59, PageID.1488; Ex. 24, R.34-24, PageID.1780. Like Milliken, Bauer rejected alternate accommodations. Compl. ¶¶ 260–61, R.34, PageID.1488–89. Bauer's hostility was so palpable the union representative "was not able to present the grievance." *Id.* ¶ 262, PageID.1489.

Bauer denied Dr. Meriwether's grievance, as provost, *id.* ¶ 264, and as interim president, *id.* ¶¶ 265–70. He equated Dr. Meriwether's beliefs with ethnic and sex supremacists—"faculty" with religious beliefs that "one national origin is superior to another national origin, or one sex is inferior to the other." *Id.* ¶ 279, PageID.1490. The reprimand, with its threats, remains in Dr. Meriwether's file, chilling his expression and besmirching his reputation. *Id.* ¶¶ 285–98, PageID.1491–93.

## III. Proceedings

In November 2018, Dr. Meriwether sought legal relief, raising claims under the First and Fourteenth Amendments, the unconstitutional conditions doctrine, and the Ohio Constitution, plus a breach of contract claim. Pl.'s V. Compl., R.1, PageID.1–46; Compl., R.34, PageID. 1457–1508. Defendants and Defendants-Intervenors (Doe plus an advocacy group) moved to dismiss. Defs.' Mot. to Dismiss ("MTD"), R.36,

PageID.1869–97; Defs.-Intervenors' MTD, R.44, PageID.1974–96.

In September 2019, the magistrate judge recommended dismissing all federal claims and declining supplemental jurisdiction over the state claims. R. & R., R.49, PageID.2095–2157. The magistrate correctly recognized that Dr. Meriwether's use of titles and pronouns is "speech." *Id.*, PageID.2114. But rejecting other circuits' precedent, the magistrate concluded that public-university faculty speaking in the classroom have no free-speech protection. *Id.*, PageID.2113–19 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Alternatively, said the magistrate, though Dr. Meriwether's speech "related to gender identity, it did not implicate the broader social concerns surrounding the issue." *Id.*, PageID.2123. In the magistrate's view, using titles and pronouns that correspond with sex is merely "self-expression," analogous to a recent case involving a student's individual "expressions of lust for" a teacher. *Id.*, PageID.2125–26 (discussing *Corlett v. Oakland Univ. Bd. of Trs.*, 958 F. Supp. 2d 795, 809 (E.D. Mich. 2013)). Thus, all of Dr. Meriwether's speech-based claims necessarily failed. *Id.*, PageID.2113–38.

For the other claims, the magistrate recommended dismissal of (1) the free-exercise count because University officials applied neutral and generally applicable policies in nondiscriminatory ways, *id.*, PageID.2138–45, (2) the Fourteenth Amendment due-process count because the University officials' policy gave notice of what was prohibited, was not vague, and would not chill Dr. Meriwether's future speech,

*id.*, PageID.2146–53; and (3) the equal-protection count because there was no disparate treatment, *id.*, PageID.2153–55.

After Dr. Meriwether timely objected, the district court adopted the magistrate judge's recommendations in a three-page opinion without additional analysis. Order, R.60, PageID.2402–04. It agreed that Dr. Meriwether's speech "was not protected under the First Amendment," that he did not "plead facts sufficient" to show a "departure from religious neutrality," and that he "failed to state a claim" under the Constitution. *Id.*, PageID.2403–04. The same day, the court rendered judgment. Judgment, R.61, PageID.2405.

## STANDARD OF REVIEW

This Court reviews decisions to grant a motion to dismiss *de novo*, accepting all factual allegations as true and drawing all reasonable inferences in favor of the non-moving party. *Doe v. Baum*, 903 F.3d 575, 580–81 (6th Cir. 2018). "If it is at all plausible (beyond a wing and a prayer) that a plaintiff would succeed if he proved everything in his complaint, the case proceeds." *Id.* at 581. This plausibility requirement is not "akin to a 'probability requirement'" and instead asks merely for "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under *de novo* review, the Court may independently reverse and remand for errors of law.

## SUMMARY OF THE ARGUMENT

The First Amendment guarantees that every person decides for himself "the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Shawnee State University officials denied Dr. Meriwether that right. Whether under a compelled-speech theory or another First or Fourteenth Amendment theory, the Constitution prohibits officials from forcing him to communicate their ideas about sex and gender as if they were his, *i.e.*, to refer to a male student as a woman in violation of his philosophical and religious beliefs. For "no official . . . can prescribe what shall be orthodox . . . or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642.

The district court bypassed that analysis by holding that free-speech rights do not apply to faculty at a public university, the "market-place of ideas," *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967), where the "vigilant protection of constitutional freedoms is nowhere more vital," *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). But universities cannot "impose any strait jacket" upon faculty, the "intellectual leaders in our colleges and universities." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Like other circuits, this Court should hold that public-university faculty have free-speech rights in teaching and scholarship. What's more, it should hold that Dr. Meriwether stated plausible constitutional claims.

# ARGUMENT

This case is about government officials compelling a professor to speak support for their preferred ideology, then punishing him when he declined. Dr. Meriwether pleaded plausible constitutional claims based on that compulsion and punishment. But the district court sidestepped all this by recasting the case as a mere pedagogical dispute—as if a philosophy professor being forced to deny the basic sexual binary of humanity was of no consequence, and administrators scripting his speech was mere educational administration.

No one doubts Dr. Meriwether taught the assigned curriculum, and the University is not punishing him for his formality, which he offered to modify. Compl. ¶¶ 210–15, R.34, PageID.1482–83. Rather, University officials enforced their policies to declare that the standard English, biology-reflecting, and still largely unquestioned use of masculine and feminine terms to refer to a person's sex *always* constitutes discrimination and creates a hostile environment, even off campus. And they demanded that Dr. Meriwether either use identity-based terms or—contrary to their own policy of compelling student-chosen titles and pronouns—purge all references to anyone's sex from his speech. This demand was unconstitutional.

# I. The district court erred by dismissing Dr. Meriwether's free-speech claims.

## A. Dr. Meriwether stated a plausible claim of compelled speech in violation of the First Amendment.

The government cannot force someone "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley*, 430 U.S. at 715. Such compulsion—as the University engages in here—"violates that cardinal constitutional command." *Janus v. Am. Fed'n of State, Cty. & Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018).

Dr. Meriwether patiently explained, repeatedly, his views on gender identity, how the University's demands force him to violate those beliefs, and several ways he was willing to accommodate Doe's requests. Everyone involved understood his speech conveyed a message about gender ideology. Compl. ¶¶ 204, 310, R.34, PageID.1481, 1495 (noting Dr. Meriwether's message about gender identity); *id.* ¶¶ 112, 116, PageID.1472–73 (mandating identity-based terms to communicate that "students have a right to be referred to by their self-asserted gender identity"); *id.* ¶¶ 140–44, PageID.1475 (noting Doe's objection and demand that Dr. Meriwether affirm Doe's gender identity); *id.* ¶¶ 163, 170–71, 212–15, 234, 239, 244, 260–61, 264, 270, 276, 278, 282, PageID.1477–78, 1482–83, 1485–91 (noting University officials' findings that his speech and proposed accommodations created a hostile environment, constituted discrimination, and violate their policies).

Yet officials punished him for refusing to express their preferred message. *E.g.*, *id.* ¶¶ 239–40, PageID.1486 (faulting him for "repeatedly

refus[ing] to change the way he addressed [Doe]"). If he does not say what they want, they threaten "further corrective actions," *id.* ¶ 248, PageID.1487, including suspension without pay or termination, *id.* ¶¶ 251, 263, 287–90, PageID.1487, 1489, 1491–92. They seek to "coerce[ ] [him] into betraying [his] convictions" and endorsing ideas he finds objectionable, which is "always demeaning." *Janus*, 138 S. Ct. at 2464.

As explained in section I.B, it makes no difference that Dr. Meriwether spoke as a teacher in a classroom. Otherwise, though a public school cannot force a student to recite the Pledge of Allegiance, it could force a teacher to do so. The Constitution prohibits this. *Russo v. Cent. Sch. Dist. No. 1*, 469 F.2d 623, 633 (2d Cir. 1972) (a high school teacher "may not be dismissed for refusing to pledge allegiance to the flag").

Nor does it matter that University officials were purportedly enforcing an anti-discrimination policy. Universities are prohibited from establishing such policies if they have "the effect of prohibiting certain speech because [the University] disagree[s] with ideas or messages sought to be conveyed." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (citing *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989)). Universities cannot "proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people." *Id.* (quoting *Doe*, 721 F. Supp. at 863). They "ha[ve] [no] legitimate need to demand that [faculty] recite words with which [they] disagree." *Janus*, 138 S. Ct. at 2473.

Finally, it is irrelevant that officials purportedly gave Dr. Meriwether "choices" as to what he must say. R. & R., R.49, PageID.2129. "In the context of protected speech, the difference between compelled speech and compelled silence 'is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say.'" *Parate*, 868 F.2d at 828 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796–97 (1988)). When the government says, "You must speak this way or that way," it is still compelling speech.

Here, officials demanded that Dr. Meriwether either use identity-based or indeterminate sexual terms for all students. *See, e.g.*, Compl. ¶¶ 210–18, R.34, PageID.1482–83. Either option affirms views he rejects: that feelings determine sex. *Id.* ¶¶ 89, 217–18, PageID. 1469, 1483. What's more, officials would force Dr. Meriwether to speak as if the "enduring" distinction between the sexes that "remain[s] cause for celebration," *United States v. Virginia*, 518 U.S. 515, 533 (1996), were *verboten*, and in a way where inadvertent miscues would prompt more punishment. Compl. ¶¶ 165, 189–90, 195, PageID.1477–78, 1480.

If such "Hobson's choices" excused government-compelled speech, then a multitude of Supreme Court cases must be wrongly decided. After all, the Barnettes could have left the public schools to avoid the Pledge of Allegiance. *Barnette*, 319 U.S. at 650 (Frankfurter, J., dissenting). The *Miami Herald* could have stopped criticizing candidates to

avoid the "right of reply" statute. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 244 (1974). Parade organizers could have cancelled their parade to evade the public accommodations statute. *Hurley*, 515 U.S. at 560–61. HIV/AIDS organizations could have continued their work without seeking the federal funding that required them to condemn prostitution or formed affiliates to espouse the mandated message. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 208, 219 (2013). Pro-life pregnancy resource centers could have closed their doors instead of advertising the state's abortion resources. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2369–70 (2018). The mere existence of these "choices" did not condemn any of those compelled-speech claims. And rightly so.

The "option" the University gave Dr. Meriwether—to purge all pronouns from his oral speech—is difficult to implement and would have placed him at continuing risk of scrutiny and future punishment based on inadvertent pronoun miscues. More to the point, that "option" would silence him from using an entire category of standard, grammatical terms—and compelled silence is still compelled speech. This "option" merely set him up for failure and likely termination.

In sum, Dr. Meriwether pled a plausible claim for compelled speech, and the district court did not disagree with any of this analysis.

## B. Dr. Meriwether's status as a public-university professor does not eviscerate First Amendment protections.

Dr. Meriwether's speech is constitutionally protected because, for First Amendment purposes, (1) he was speaking "as a private citizen" (since his speech was related to teaching), (2) on "matters of public concern," and (3) his interest in speaking outweighed the University's interest "in promoting the efficiency of [its] public services." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017). The district court ruled against Dr. Meriwether on the first two points, and those rulings were erroneous.

### 1. Dr. Meriwether spoke "as a citizen" when he was teaching his university class.

When public employees speak "pursuant to their official duties," they are typically "not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. But this "official duties" test does not apply to faculty speech "related to . . . teaching." *Id.* at 425. Thus, for First Amendment purposes, Dr. Meriwether spoke "as a citizen." *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 564–65 (4th Cir. 2011) (because the "official duties" test does not apply to speech related to teaching, a professor's speech "was clearly that of a citizen" and thus protected by the First Amendment).

By rejecting the faculty-speech distinction, the district court placed itself in conflict with *Garcetti* and other circuits that have addressed faculty-speech rights. And it adopted a position that leaves professors bereft of First Amendment protection where they most need it.

### a. *Garcetti*'s "official duties" test does not apply to faculty speech "related to teaching."

Under *Garcetti*, the First Amendment protects a government employee's speech only if he spoke "as a citizen" while addressing "a matter of public concern." 547 U.S. at 423; *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 343 (6th Cir. 2010). But university faculty are not ordinary government employees. As *Garcetti* recognized, "expression related to academic scholarship or classroom instruction implicates additional constitutional interests" beyond the "customary employee-speech jurisprudence." 547 U.S. at 425. That is why *Garcetti* declined to extend the "official duties" test to faculty: "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* Until the Supreme Court decides that this "new threshold requirement" *does* apply to them, *Evans-Marshall*, 624 F.3d at 343, the *status quo ante* continues and the "official duties" test does not apply, *e.g.*, *Lee v. York Cty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007); *Kerr v. Hurd*, 694 F. Supp. 2d 817, 843 (S.D. Ohio 2010) (same).

This exception tracks the Supreme Court's long history of protecting professors. *Keyishian*, 385 U.S. at 603; *Shelton*, 364 U.S. at 487; *Sweezy*, 354 U.S. at 250. By declining to extend the "official duties" test to faculty speech related to teaching or scholarship, the *Garcetti* Court left these well-established precedents intact. *Garcetti*, 547 U.S. at 425;

*id.* at 438–39 (Souter, J., dissenting) (citing these cases).

For example, six decades ago, a professor was punished for refusing to answer questions about his Marxist views. *Sweezy*, 354 U.S. at 238–45. The Supreme Court invalidated that punishment, saying: "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id.* at 250. "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers . . . must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.* When the government inquired into the contents of the professor's lectures, this "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression." *Id. Accord Keyishian*, 385 U.S. at 599–600, 602 (voiding a statute barring employment of anyone who "'advocates, advises or teaches the doctrine' of forceful overthrow of government" because it could "prohibit the employment of one who merely . . . informs his class about the precepts of Marxism or the Declaration of Independence").

The district court did not mention these decisions. Instead, it adopted a position that effectively overturned them. By skirting this precedent—which *Garcetti* acknowledged and respected—it broke ranks with the Fourth and Ninth Circuits and diverged from this Court too.

The Fourth Circuit has held that *Garcetti* does "not apply in the academic context of a public university." *Adams*, 640 F.3d at 562. While *Garcetti*'s restrictions "may apply" to faculty when "declaring or administering university policy," it does *not* when they are engaged in "scholarship and teaching." *Id.* at 563. Otherwise, "many forms of public speech or service a professor engaged in during his employment" would be "beyond the reach of First Amendment protection." *Id.* at 564. "That would not appear to be what *Garcetti* intended." *Id.*

Similarly, the Ninth Circuit has recognized that "teaching and academic writing are at the core of the official duties of teachers and professors" and are "a special concern of the First Amendment." *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014). "[I]f applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court." *Id.* Thus, "*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor." *Id.* at 412. That speech is instead "protected." *Id.*

In two decisions, this Court similarly recognized First Amendment protections for faculty speech related to scholarship or teaching. In *Evans-Marshall*, a high school did not renew a teacher's contract after she used some controversial books. 624 F.3d at 334–36. This Court noted that *Garcetti* applied because she taught at a high school, *not* "at

a 'public college[ ]' or 'university,'" and "constitutional rules applicable in higher education do not necessarily apply in primary and secondary schools." *Id.* at 343–44 (cleaned up).

Later, a university librarian faced criticism after recommending books for a freshman reading program. *Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012). This Court held that he could not invoke the *Garcetti* exception because his speech "was not related to classroom instruction and was only loosely, if at all, related to academic scholarship." *Id.* at 739.

The district court discounted both cases because neither "indicate[d]" "that *Garcetti* does not apply to the speech of teachers at public universities and colleges." R. & R., R.49, PageID.2116. That's true; neither involved a university professor's claim that classroom teaching was protected speech. But both cases *did* involve First Amendment protections in academic settings. And both panels carefully crafted their holdings to preserve First Amendment protection for professors' speech. This Court's *de novo* review of the district court's faulty reasoning can build on this, making clear for future cases that *Garcetti* does not apply to the scholarship and teaching of public-university faculty.

*Johnson-Kurek*, 423 F.3d at 594, on which the district court relied, R. & R., PageID.2117, does not change this result. The opinion preceded *Garcetti* by eight months and does *not* give universities *carte blanche* in anything pedagogical. *Johnson-Kurek*, 423 F.3d at 594. The

case involved a professor who refused to clarify her expectations of students; in fact, she "was *not* required to communicate the ideas . . . of others as if they were her own." *Id.* at 595 (emphasis added). In contrast, University officials *are* compelling Dr. Meriwether to communicate their ideas about sex and gender as if they were his.

The district court also relied on *Smock v. Board of Regents of University of Michigan*, 353 F. Supp. 3d 651 (E.D. Mich. 2018). R. & R., R.49, PageID.2117. But *Smock* involved a professor who "made inappropriate jokes and had conversations of a sexual nature with" students. 353 F. Supp. 3d at 654. Disciplining a professor for sexual banter with students is not comparable to demanding that a professor reject the objective binary of sex. Indeed, *Smock* reiterated: "public universities may not force professors to endorse or eschew specific viewpoints." *Id.* at 659.

Finally, the district court mentioned the importance of treating "students with civility." R. & R., PageID.2117. Dr. Meriwether agrees. That is why he treated Doe with utmost civility—as he does for all students, Compl. ¶¶ 138–44, R.34, PageID.1475—and why he proposed multiple ways to accommodate Doe. Here, University officials masquerade their mandated ideology as a mere matter of etiquette and civility. In reality, they are requiring Dr. Meriwether to say or avoid certain words to convey approval of their substantive view that sex is a matter of subjective self-perception rather than physiology, contrary to his beliefs. No precedent justifies that result. *Ward v. Polite*, 667 F.3d 727,

735 (6th Cir. 2012) ("Tolerance is a two-way street. Otherwise, the rule mandates orthodoxy, not antidiscrimination.").

### b. The content and context of Dr. Meriwether's speech show that he spoke "as a citizen."

Shunning *Garcetti*, *Adams*, *Demers*, *Evans-Marshall*, and *Savage*, the district court analyzed whether Dr. Meriwether's classroom speech deserves First Amendment protection by assessing its "content and context." R. & R., R.49, PageID.2117–19. Relevant factors include "'the impetus for [his] speech, the setting of [his] speech, the speech's audience, and its general subject matter.'" *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012). But the court misapplied these factors to conclude Dr. Meriwether's speech was not protected. R. & R., PageID.2119, 2122–27.

First, Dr. Meriwether's speech occurred in a classroom as a university professor. *Id.*, PageID.2119. This context is nothing like the ordinary government workplace, such as a department or agency office; it "is peculiarly the marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180 (1972) (cleaned up). It is not an "enclave[ ] immune from the sweep of the First Amendment," *id.*—though that is what it will become if this Court upholds the district court's paltry view of university teaching.

Second, Dr. Meriwether's audience was his students. They are nothing like workplace peers, superiors, and subordinates. *Handy-Clay*, 695 F.3d at 540; *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010). Dr. Meriwether has an obligation to his

students to approach subjects from diverse perspectives. Yet rather than encouraging a healthy dialogue about gender identity, University officials shut down the discussion, even forbidding Dr. Meriwether from explaining his views in his own syllabus.

Third, this was not a matter of Dr. Meriwether's chosen "pedagogical tool." *Contra* R. & R., R.49, PageID.2119. University officials were happy to allow him to continue using that tool *if* he conformed to their view by using language consistent with students' professed gender rather than sex. They are punishing him for refusing to advance their ideology in his classroom—not for refusing to promote civility or decorum, or to change his pedagogy (such as explaining classroom expectations for students, *Johnson-Kurek*, 423 F.3d at 594–95), or even to eschew Socratic teaching. Everyone involved understood that Dr. Meriwether's speech conveyed a message about gender ideology. Compl. ¶¶ 204, 310, R.34, PageID.1481, 1495 (noting Dr. Meriwether's message about gender identity); *id.* ¶¶ 112, 116, PageID.1472–73 (mandating identity-based terms to communicate that "students have a right to be referred to by their self-asserted gender identity"); *id.* ¶¶ 140–44, PageID.1475 (noting Doe's objection to Dr. Meriwether's message and demand that he affirm Doe's gender identity); *id.* ¶¶ 163, 170–71, 212–15, 234, 239, 244, 260–61, 264, 270, 276, 278, 282, PageID.1477–78, 1482–83, 1485–91 (noting officials' findings that his speech and proposed accommodations created a hostile environment, constituted

30

discrimination, and violate their policies). Those allegations must be accepted as true, and the First Amendment applies.

> ### 2. Dr. Meriwether addressed matters of public concern.

Alternatively, the district court held that Dr. Meriwether did not address "matters of public concern," *Mayhew*, 856 F.3d at 462, when he expressed his views on whether an individual with an X and a Y chromosome who self-identifies as female should be considered and called "female," R. & R., R.49, PageID.2119–27. This holding conflicts with precedent from the Supreme Court and this Court, and it contradicts the verified allegations that Doe and University officials understood Dr. Meriwether's speech to communicate views about gender identity.

1. The Supreme Court's "broad conception of 'public concern,'" *Hardy*, 260 F.3d at 679, encompasses anything that "can be fairly considered as relating to any matter of political, social, or other concern to the community," or "of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). In contrast, matters of private concern are "only of personal interest," *Scarborough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 256 (6th Cir. 2006), such as "internal personnel disputes or complaints about an employer's performance," *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). To satisfy this test, only some of Dr. Meriwether's speech had to address public concerns. *Scarborough*, 470 F.3d at 257. Dr. Meriwether's speech

on gender identity generally, and on how to refer to transgender individuals specifically, easily fits within this category. Yet University officials prohibited him from even explaining these views in a syllabus.

To begin, the Supreme Court has already recognized that "gender identity" is "undoubtedly [a] matter[ ] of profound 'value and concern to the public.'" *Janus*, 138 S. Ct. at 2476. It did so while listing the "controversial subjects" public employee unions can address. *Id.* When it listed "sexual orientation and gender identity," the Court cited an article on how to teach LGBT issues in first grade. *Id.* at 2476 n.20. And it indicated that speech regarding gender identity (and other issues) is of "profound 'value and concern to the public,'" occupying "the highest rung of the hierarchy of First Amendment values" and meriting "special protection." *Id.* at 2476 (quoting *Snyder*, 562 U.S. at 452–53).

2.     Before *Janus*, this Court ruled that a high school principal's "speech on his religious views and on homosexuality are matters of public concern." *Scarborough*, 470 F.3d at 256. Other federal courts have also held that a transgender professor's "expression of her gender and change of gender" was a matter of public concern. *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, 2004 WL 2008954, at *9 (D. Ariz. Jun. 3, 2004). And litigants cannot compel courts to use preferred pronouns. *Varner*, 948 F.3d at 254–55. As the district court recognized, the "gender identity" issue is "undoubtedly"  "of profound 'value and concern to the public.'" R.  &  R., R.49, PageID.2123 (quoting *Janus*, 138 S. Ct. at 2476).

Additionally, this Court has repeatedly ruled that a professor's in-class speech is a matter of public concern. Because the "essence of a teacher's role is to prepare students for their place in society," the professor "that can do that *without* covering topics of public concern is rare indeed, perhaps non-existent." *Evans-Marshall*, 624 F.3d at 339 (citing similar cases). That is why "classroom instruction will often fall within the Supreme Court's broad conception of 'public concern.'" *Hardy*, 260 F.3d at 679.

In conducting the public concern analysis, this Court has surveyed the media, community groups, and political leaders to see if a topic "has made news" or "become an issue of contentious political . . . debate." *Cockrell v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1051 (6th Cir. 2001); *Kerr*, 694 F. Supp. 2d at 842–43 (surveying media). Dr. Meriwether's speech easily qualifies. The debate over sex and gender "affects virtually every school, college, dormitory, athletic activity, and locker room in America." *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337–38 (5th Cir. 2019) (Ho, J., concurring). Dr. Meriwether's speech on these issues addressed a public concern.

Against the weight of these authorities, the district court analogized Dr. Meriwether's situation to *Corlett*, 958 F. Supp. 2d 795. R. & R., R.49, PageID.2121. It involved student discipline, not faculty speech, and established that a student's "expressions of lust for" his teacher and "descriptions of her physical appearance" in writing assignments were

not speech of a public concern. 958 F. Supp. 2d at 809. The cases could not be more dissimilar, especially given the Supreme Court's comments about the public importance of discussing gender identity. *Janus*, 138 S. Ct. at 2476.

3. The caselaw's one-sided treatment of Dr. Meriwether's speech as "public" leaves only the district court's contrary suppositions. But those suppositions contradict the Verified Complaint.

For example, the district court characterized Doe as the focus of Dr. Meriwether's speech. R. & R., R.49, PageID.2124. Not so. Dr. Meriwether declines to use pronouns that do not reflect biological reality because he believes that sex and gender are determined by objective biology, not subjective feelings, and that to state or imply otherwise would disserve his students and could even harm them. The matter is much larger than Doe. And a professor's "in-class speech does not itself [have to] constitute pure debate" to address a public concern. *Hardy*, 260 F.3d at 679.

The district court said a secondary purpose of the speech was conveying "personally-held beliefs." R. & R., PageID.2124. Dr. Meriwether did decline to speak as officials demanded because to do so would "communicate views regarding human nature and gender identity that he does not hold, that he does not wish to communicate, and that would contradict (and force him to violate) his sincerely held Christian beliefs." *E.g.*, Compl. ¶ 3, R.34, PageID.1458. But the "argument that an individual's *personal* motives for speaking may dispositively

determine whether that individual's speech addresses a matter of *public* concern is plainly illogical and contrary to the broader purposes of the First Amendment." *Handy-Clay*, 695 F.3d at 544; *accord Bonnell v. Lorenzo*, 241 F.3d 800, 813 (6th Cir. 2001). Indeed, such a standard would all but eliminate any conscience-based speech claims, for what is conscience but the reason for objecting in such cases?

Dispositively, Dr. Meriwether's allegations demonstrate that others understood that much more than his personal views were at stake. Doe objected to a simple, "Yes, sir," because Doe identified as female. And this statement—especially when Dr. Meriwether declined to use feminine terms—communicated views or facts about gender identity that bothered Doe. Compl. ¶¶ 128, 140–44, R. 34, PageID.1474–75. University officials understood the same because they required professors to convey another message: that "students have a right to be referred to by their self-asserted gender identity." *Id.* ¶ 116, PageID. 1473; *accord id.* ¶¶ 239–40, PageID.1486.

The district court criticized Dr. Meriwether for not "explain[ing] to students his reasons for referring to Doe as a male," R. & R., R.49, PageID.2123–24, accusing him of "not sharing ideas or inviting discussion," *id.*, PageID.2125. But Doe was the first student to demand that Dr. Meriwether suspend his beliefs and use only the language of those on the other side of the gender-ideology debate. Dr. Meriwether faced harassment and discrimination complaints the first week of class.

Compl. ¶¶ 128, 150–53, R.34, PageID.1474, 1476. When he proposed an accommodation that included explaining his views on human sexuality in the class syllabus, University officials turned him down flat three times, *id.* ¶¶ 170–71, 260–61, 282, PageID.1478, 1488–89, 1491, even though the Supreme Court has said that compelling speech but allowing an explanation still unlawfully compels speech, *Hurley*, 515 U.S. at 576.

Alternatively, the district court posited that Dr. Meriwether "did not convey a particularized message" that was likely to be understood. R. & R., R.49, PageID.2125 (citing *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)). That cannot be. If he was not conveying a message, there would have been no dispute. Defendant Milliken quickly said that Dr. Meriwether's purportedly message-less speech violated University policies, Compl. ¶ 163, PageID.1477, as would expressing his views by disclaimer, *id.* ¶¶ 170–71, 260–61, 282, PageID.1478, 1488–89, 1491. So would dropping all titles but using sex-acknowledging pronouns for everyone except Doe. *Id.* ¶¶ 210–15, PageID.1482–83.

Defendant Johnson said Dr. Meriwether's speech "created a hostile environment" and constituted discrimination, *id.* ¶ 230, PageID. 1485, something Defendant Milliken echoed, *id.* ¶ 234, and later adopted, *id.* ¶ 239, PageID.1486. She admitted Dr. Meriwether's speech reflected "his views on transgender people." *Id.* Defendant Bauer enthu-siastically agreed it represented discrimination. *Id.* ¶¶ 244, 264, 270,

276, 278, PageID.1487, 1489–90. It is nonsensical to say Dr. Meriwether's pronoun choices communicated nothing when those choices triggered this litany of hostile, retaliatory acts.

What's more, *Spence* applies to "expressive conduct," not "the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 403–04 (1989); *Spence*, 418 U.S. at 409. The "First Amendment protection accorded to pure speech is not tethered to whether it conveys any particular message—*i.e.*, the speech at issue could mean different things to different people." *Cressman v. Thompson*, 798 F.3d 938, 961–62 (10th Cir. 2015). So the district court applied the wrong test.

Finally, the district court said that Dr. Meriwether's speech was confined to "members of a captive audience who were not free to leave his class or decline to participate." R. & R., R.49, PageID.2125. *But see Ward*, 667 F.3d at 734 ("university students . . . are not forced to be there"). The implication is that speech in a college setting can never involve matters of "public concern." But as noted above, a university classroom is a classic forum for public speech. What's more, freedom of speech is not "lost to the public employee who arranges to communicate privately . . . rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 416–17 (1979); *Rankin v. McPherson*, 483 U.S. 378, 386 n.11 (1987) ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern."). That Dr. Meriwether's

speech took place in a college classroom was a reason to protect that speech, not a reason to abrogate his constitutional rights.

In sum, the First Amendment fully protects Dr. Meriwether's speech. Because he has stated a plausible claim that University officials unconstitutionally compelled him to speak, this Court should reverse the order granting dismissal and remand.

### C.    Dr. Meriwether also stated plausible claims for First Amendment retaliation, unconstitutional conditions, and content and viewpoint discrimination.

The district court's justification for dismissing Dr. Meriwether's remaining First Amendment claims rests almost entirely on the court's mistaken conclusion that Dr. Meriwether's classroom speech receives no constitutional protection. This Court's *de novo* review should correct that legal error and remand these claims for further proceedings, too.

1.    Dr. Meriwether pleaded a plausible First Amendment retaliation claim because the Complaint shows he "engaged in a constitutionally protected activity." *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008). Having wrongly decided Dr. Meriwether did not speak "as a citizen" or "on a matter of public concern," the district court dismissed this claim without analysis. R. & R., R.49, PageID.2127 n.7; Order, R.60, PageID.2403. This Court should reverse and remand to consider the remaining elements. *Adams*, 640 F.3d at 565 (remanding with such instructions after concluding the professor spoke as a citizen on a public concern); *Demers*, 746 F.3d at 417 (same).

2.    Regarding unconstitutional conditions, the government "may not deny a benefit . . . on a basis that infringes [one's] constitutionally protected interests—especially . . . freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Dr. Meriwether alleges that University officials punished him for exercising his right to free speech (among others) and threaten to do so again. At the motion-to-dismiss stage, these allegations establish a plausible claim.

The district court doubted that "the Supreme Court or the Sixth Circuit recognizes an 'unconstitutional conditions' claim." R. & R., R.49, PageID.2138. Yet both do. *E.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right,'" and describing this as "the unconstitutional conditions doctrine"); *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) ("Under the unconstitutional conditions doctrine, a state actor cannot constitutionally condition the receipt of a benefit . . . on an agreement to refrain from exercising one's constitutional rights . . . .") (cleaned up). Both trace the doctrine to *Perry*, which applied it to rule for a college professor who was punished for his speech. *Koontz*, 570 U.S. at 604; *R.S.W.W., Inc.*, 397 F.3d at 434. The district court erred in dismissing this claim.

3.     The district court dedicated seven pages to Dr. Meriwether's viewpoint- and content-discrimination claims but discussed only overbreadth—with a passing reference to unbridled discretion. R. & R., R.49, PageID.2130–36. It sidestepped Dr. Meriwether's claims that University officials reviewed and sought to alter the content of his speech, tried to silence his viewpoint, and exercised unbridled discretion. Compl. ¶¶ 318–20, 326, R.34, PageID.1496. This is error, as Dr. Meriwether plausibly pleaded all these claims, and government officials cannot limit even unprotected speech in content- or viewpoint-based ways. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381–96 (1992).

a.     *Content-based regulation.* A policy or action is "content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015), or "alters the content of the speech," *Riley*, 487 U.S. at 795. The University's policies do both. Its officials regulate faculty speech if it involves a student's gender identity. Compl. ¶¶ 125–44, PageID. 1474–75. They demand that professors alter the content of their speech if it conflicts with the officials' orthodoxy. *Id.* ¶¶ 154, 162–63, 168–75, PageID.1476–78. They even mandated *how* Dr. Meriwether must change his speech. *Id.* ¶¶ 212–18, 269–84, PageID.1482–83, 1489–91. In sum, they punished him "because of . . . the idea or message [he] expressed," *Reed*, 135 S. Ct. at 2227, and tried to alter his speech, *Riley*, 487 U.S. at 795. This is content-based regulation.

University officials also punished Dr. Meriwether because one student complained. Compl. ¶¶ 128–32, 140–44, R.34, PageID.1474–75 (Doe objected); *id.* ¶ 154, PageID.1476 (in response, officials told Dr. Meriwether to change his speech); *id.* ¶¶ 157–58, 161–62, PageID.1477 (after first accepting a compromise, officials recanted because "Doe was not satisfied"); *id.* ¶¶ 166–75, PageID.1478 (punishment began because Doe complained again). "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). Such heckler's vetoes are odious to free speech.

Given these facts, which must be taken as true, Dr. Meriwether pleaded a plausible content-discrimination claim.

b. *Viewpoint discrimination.* Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject"—"when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). University officials punished Dr. Meriwether because he used biology-acknowledging terms. They do not punish faculty speech consistent with their transgender orthodoxy. This is textbook viewpoint discrimination. *Dambrot*, 55 F.3d at 1183 (universities "could not . . . establish an anti-discrimination policy which had the effect of prohibiting certain speech because [they] disagree[ ] with [the] ideas or messages sought to be conveyed . . . [or] because [the speech] was

41

found to be offensive"). It also states a plausible claim.

c. *Officials' discretion.* The First Amendment prohibits vesting officials with "unbridled discretion." *Forsyth Cty.*, 505 U.S. at 133; *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969). Rules that do so are strong evidence of viewpoint-based regulation. *E.g.*, *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002) ("[T]he prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement."); *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) (noting "broad agreement" among circuits that "investing government officials with boundless discretion . . . violates the First Amendment"); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988) (vague criteria allow decisions based on "the content of the speech or viewpoint of the speaker"). If policies involve the "appraisal of facts, the exercise of judgment, and the formation of an opinion," the danger of censorship is too great. *Forsyth Cty.*, 505 U.S. at 131. Instead, rules must contain "narrow, objective, and definite standards to guide" officials. *Shuttlesworth*, 394 U.S. at 150–51.

The University's policies grant officials unbridled discretion by including the imprecise, subjective, and indefinite class of gender identity. Compl. ¶¶ 58, 64, 66, R.34, PageID.1465–66. Each person can identify as "neither woman or man, both woman and man, somewhere

in between, or is some combination." *Id.* ¶ 68, PageID.1466. That identity is not visible and can change. *Id.* ¶¶ 69–70. With uncertainty comes varying pronouns, *id.* ¶¶ 72–74, PageID.1466–67, which the University requires professors to use, *id.* ¶¶ 112, 195, PageID.1472, 1480. Thus, the number of permutations facing a professor is staggering and may fluctuate. *Varner*, 948 F.3d at 256–57 (given many dozens of recognized gender identities, mandated use of "preferred pronouns [is] more complex than at first it might appear" because "gender identity is not binary but rather a three-dimensional 'galaxy'"). Punishing faculty under such an ephemeral restriction violates the First Amendment's mandate for "narrow, objective, and definite standards." *Shuttlesworth*, 394 U.S. at 150–51. Worse, the University decides how to proceed based on who is offended, Compl. ¶¶ 161, 166–68, R.34, PageID.1477–78, a "highly subjective" and viewpoint-based standard. *Matal*, 137 S. Ct. at 1756 n.5, 1763; *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) ("[A] law disfavoring 'ideas that offend' discriminates based on viewpoint. . . .").

Trying to cabin that discretion, the district court referenced the policies' "reasonable person" standard. R. & R., R.49, PageID.2133–35. But Dr. Meriwether did not challenge this standard; he challenges "the inclusion of 'gender identity' . . . because this . . . grants Defendants unbridled discretion." Compl. ¶ 58, PageID.1465. A "reasonable person" standard does not cure the subjectivity and transience of "gender identity."

Making matters worse, everyone acknowledges that the University's policies extend beyond the classroom, R. & R., R.49, PageID. 2135, to off-campus events and circumstances that University officials determine, in their discretion, "could reasonably create a hostile environment or be detrimental to the University,'" *id.*, PageID.2136, whatever that means. They "regulate all interactions professors have with students, whether in the classroom or out of it." Compl. ¶ 83, R.34, PageID.1468; *accord id.* ¶ 108, PageID.1472.

The University officials cannot evade this problem by arguing they did not abuse their discretion here. To begin, just the *potential* for abuse condemns their policies. *Forsyth Cty.*, 505 U.S. at 133 n.10. They punished Dr. Meriwether by imposing an indeterminate-sex requirement that appears nowhere in their policies or federal law.

Finally, the off-campus reach unconstitutionally "delegates overly broad discretion" to officials and "penaliz[es] a substantial amount of speech that is constitutionally protected." *Id.* at 129–30. His off-campus speech with students enjoys constitutional protection, yet it remains punishable. And the officials' motive in enacting these restrictions is legally irrelevant. *Contra* R. & R., PageID.2136. Content- or viewpoint-based restrictions are "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228. This overbroad delegation is fatal to the policies.

## II. The district court erred by dismissing Dr. Meriwether's free-exercise claim.

### A. The University's restrictions violate the Free Exercise Clause even if they were neutral and generally applicable.

The district court glossed over recent developments in free exercise jurisprudence. The magistrate judge never analyzed them, skipping to the test in *Employment Division v. Smith*, 494 U.S. 872, 879 (1990), and relying, with one passing exception, on no cases decided after 2012. R. & R., R.49, PageID.2139–40. The district court gave these developments a fraction of a sentence. Order, R.60, PageID.2403–04. Both erred.

#### 1. The University's restrictions curtail Dr. Meriwether's right to communicate consistently with his faith.

*Smith* expresses the default rule that a facially neutral law will generally survive a free-exercise analysis. But government practices at odds with our nation's history and traditions are not subject to *Smith*'s neutrality and general-applicability rule. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012) ("The contention that *Smith* forecloses recognition of" well-established historical precepts "rooted in the Religious Clauses has no merit."); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017) (refuting the notion "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause"). That is why the government cannot use even neutral, generally applicable nondiscrimination laws to compel clergy "to

perform" a same-sex wedding. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018).

Our nation's history and traditions have long outlawed compelled speech in violation of religious beliefs. *Barnette*, 319 U.S. at 642. No government official could, by a facially neutral policy, compel someone to confess that Jesus Christ was not fully human or not fully God. This makes sense because the freedom to communicate one's beliefs—and to decline to contradict them—is a core component of the right to "profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877.

At a minimum, Dr. Meriwether's claim "falls into the class of 'hybrid situations' in which 'the Free Exercise Clause *in conjunction* with other constitutional protections, such as freedom of speech,' can 'bar application of a neutral, generally applicable law.'" *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 759 (8th Cir. 2019) (quoting *Smith*, 494 U.S. at 881–82) (cleaned up). In other words, Dr. Meriwether may use his "'Free Exercise Clause concerns' to 'reinforce'" his "free-speech claim." *Id.* (quoting *Smith*, 494 U.S. at 882) (cleaned up); *but see Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993) (questioning *Smith's* hybrid-rights doctrine).

These principles illuminate how the University officials' application of their policies is a greater afront to the Constitution than simply forcing someone to speak. Dr. Meriwether takes seriously the Bible's teaching that God created humans in His own image, "male" and

"female," and instructed them to be "fruitful and multiply." Gen. 1:27–28. The Complaint details how he communicates these beliefs; how University officials punished him for "refusing to change" his message, *e.g.*, Compl. ¶ 239, R.34, PageID.1486; and how they mandated he use identity-based or indeterminate terms that violate his beliefs. Officials even banned him from professing his views by disclaimer. All this violates his right to "profess whatever religious doctrine [he] desires," *Smith*, 494 U.S. at 877, and to "communicat[e]" these views, *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). This Court should give Dr. Meriwether a chance to develop this claim on remand.

> ### 2. The University's restrictions require Dr. Meriwether to renounce his religious beliefs to preserve his job.

The Free Exercise Clause prohibits government from requiring citizens to renounce their religious beliefs to obtain public benefits. So Missouri could not exclude a church-operated preschool from a playground safety-grant program due to its religious nature or require the preschool "to renounce its religious character in order to participate in an otherwise generally available public benefit program." *Trinity*, 137 S. Ct. at 2024. To do so "imposes a penalty on the free exercise of religion that must be subjected to the most rigorous scrutiny." *Id.* (cleaned up).

University officials punished Dr. Meriwether for expressing his religious views about human nature. Compl. ¶¶ 86–92, 239–40, 246–49, R.34, PageID.1469, 1486–87, 1469. If he continues, he risks suspension

without pay or termination. *Id.* ¶¶ 164, 246–49, 263, 287–90, PageID. 1477, 1487, 1489, 1491–92. The only way to remove this threat is to renounce his beliefs by expressing ideas that he does not believe and that contradict his faith. These allegations establish plausible claims that the University's actions violate the free exercise of religion and "cannot stand." *Trinity*, 137 S. Ct. at 2025. That some dislike Dr. Meriwether's views is more reason, not less, to protect his freedoms. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000).

**B. The University's restrictions are not neutral or generally applicable.**

1. *Hostility.* Any government act "not neutral" toward religion "or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Here, University officials failed to act neutrally by displaying hostility to religious people and their beliefs. *Masterpiece*, 138 S. Ct. at 1729–31; *Lukumi*, 508 U.S. at 534.

The district court said Dr. Meriwether did not provide enough evidence for this claim. Order, R.60, PageID.2403–04. But the "Free Exercise Clause bars even '*subtle* departures from neutrality' on matters of religion," and it applies "upon even *slight* suspicion that . . . state [actions] stem from animosity to religion or distrust of its practices." *Masterpiece*, 138 S. Ct. at 1731 (cleaned up, emphasis added). Where lack of neutrality boils over into hostility, the government violates this Clause, and courts need not apply strict scrutiny. *Id.* at 1729–32.

The district court faulted Dr. Meriwether for not showing that the University "generated or enforced" its policies "based on hostility to his religious beliefs." R. & R., R.49. PageID.2142. This is an issue for discovery. All Dr. Meriwether need do here is "raise a reasonable expectation that discovery will reveal evidence" of it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). And he did. He has taught at Shawnee State since 1996, Compl. ¶ 93, R.34, PageID.1469, and until 2018, was never disciplined, *id*. ¶ 105, PageID.1471. During that time, he referred to students the same way. *Id*. ¶¶ 133–35, PageID.1474–75.

University officials first tried to alter this in 2016. *Id*. ¶¶ 106–24, PageID.1471–73. Though their policies already included gender identity, they had not interpreted them to mandate that professors use identity-based terms. *Id*. ¶ 124, PageID.1473. If this shift simply reflected the federal government's guidance, it should have receded when the federal government "decided to withdraw and rescind" its parallel guidance. *Id*. ¶ 106, PageID.1471–72. Instead, University officials used their policies to target expression that violated nothing, rejecting Dr. Meriwether's proposal to accommodate Doe despite no evidence or explanation how such an accommodation would offend a reasonable person. *Id*. ¶ 77, PageID.1467–68 (quoting Ex. 2 ¶ 18.6.2.2, R.34-2, PageID.1522–23).

2. *Non-neutrality*. The University also failed "to proceed in a manner neutral toward and tolerant of [Dr. Meriwether's] religious

beliefs." *Masterpiece*, 138 S. Ct. at 1731. Defendant Pauley, his chair, demeaned Christians as being "motivated out of fear," derided their teachings as "harmful," and insisted they should not be allowed to teach their beliefs. Compl. ¶¶ 117–22, R.34, PageID.1473. She participated in the disciplinary process, *id.* ¶ 146, PageID.1476, highlighting his use of sex-acknowledging terms, Ex. 13, R.34-13, PageID.1720, terms that reflect and express his religious beliefs, Compl. ¶¶ 86–92, PageID.1469 (outlining religious basis); *id.* ¶¶ 204, 310, PageID.1481, 1495 (noting message conveyed).

The district court downplayed these facts because Pauley made these anti-religious comments "more than one year" before Dr. Meriwether's punishment. R. & R., R.49, PageID.2142. But she did so while "discuss[ing] . . . transgenderism and gender identity," Compl. ¶ 117, PageID.1473, right after the 2016 effort to dictate faculty speech, *id.* ¶¶ 106–16, PageID.1471–73. Nothing suggests her views have changed.

The district court claimed Defendant Pauley was not involved in Dr. Meriwether's discipline. R. & R., PageID.2142. But that's not true. She reported Dr. Meriwether to Dr. Scott, Compl. ¶ 146, PageID.1476, and highlighted Dr. Meriwether's use of sex-reflecting terms. Ex. 13, R.34-13, PageID.1720. Doubtless, discovery will show that Dr. Meriwether's dean and chair—Defendants Milliken and Pauley—conferred about him during the months-long disciplinary process. For now, it suffices that the Complaint plausibly states she was involved.

The district court also saw "no connection" between Defendant Pauley's comments and Dr. Meriwether's reprimand-sparking speech. R. & R., R.49, PageID.2142. But her contempt for traditional Christian doctrines, Compl. ¶ 119, R.34, PageID.1473, extends to other Christian beliefs unpopular in academia, like those on gender identity. If Pauley has so much disdain for traditional Christians views that she's willing to say publicly that they are "primarily motivated out of fear" and that their religion "oppresses students" and is "counterproductive," *id.* ¶¶ 118, 121, that disdain impacted her decision to report Dr. Meriwether. Likewise, if Pauley feels unconstrained to say that certain traditional Christian views should not be expressed, if she finds them "harmful," *id.* ¶¶ 119–20, it is reasonable to infer she acted on her beliefs when reporting a Christian professor for expressing his disfavored Christian beliefs.

Defendant Bauer—who reviewed Dr. Meriwether's punishment three times—also "displayed open hostility towards Dr. Meriwether and his religious beliefs." *Id.* ¶ 259, PageID.1488. Again, the district court minimized the allegations, including Bauer openly laughing when Dr. Meriwether's union representative tried to explain how officials were applying the policies to infringe Dr. Meriwether's religious convictions. R. & R., PageID.2143. But Bauer's behavior throughout the meeting— from the interruptions, to the disinterest, to the laugh—mocked those views, thereby displaying hostility. If a union representative concluded Bauer's actions rendered the meeting futile, Compl. ¶ 262, R.34,

PageID.1489, the hostility was palpable. At a minimum, this is evidence of at least "subtle departures from neutrality," *Masterpiece*, 138 S. Ct. at 1731, and it states a plausible claim at this early stage of litigation.

The district court suggested that this religious hostility does not matter because Defendant Milliken imposed the punishment. R. & R., R. 49, PageID.2144. Not so. The Complaint says Milliken "recommended punishing Dr. Meriwether." Compl. ¶ 240, PageID.1486; Ex. 17, R.34-17, PageID.1742. To whom did the recommendation go? "Provost Jeff Bauer." Ex. 17, PageID.1741. He then "agreed with [her]," "approved her recommended disciplinary action," and asked her "to 'provide [him] with a letter of warning.'" Compl. ¶¶ 244–45, PageID. 1487. Indeed, it was Bauer who "formally notified Dr. Meriwether" of the reprimand. *Id.* ¶ 249.

On his second round of review, Bauer refused to accommodate Dr. Meriwether, instead comparing Dr. Meriwether's religious beliefs to ethnic supremacism and saying that the University could not accommodate hypothetical "faculty members with sincerely held religious beliefs that, e.g., *one national origin is superior to another national origin*, or one sex is inferior to the other sex." *Id.* ¶ 279, PageID.1490 (emphasis added). To the district court, this looked like an "intention to apply the policies in a neutral manner." R. & R., PageID.2143. To the Supreme Court, this is patent hostility, like saying "religion has been used to justify all kinds of discrimination throughout history." *Masterpiece*, 138

S. Ct. at 1729. Again, this "raise[s] a reasonable expectation that discovery will reveal evidence of" more religious hostility. *Twombly*, 550 U.S. at 556.

3.  *Individualized assessments.* The Constitution's ban on "subtle departures from neutrality" is implicated by "a system of individualized governmental assessment of the reasons for the relevant conduct," *Lukumi*, 508 U.S. at 534, 537, which is not generally applicable, *Smith*, 494 U.S. at 884. The district court demanded proof of explicit or past exemptions, R. & R., R.49, PageID.2145, yet dismissed the case before discovery could begin. And exemptions *must* exist. Otherwise, the University would force professors to refer to a student as "Your Majesty," if the student announced a "regagender" identity. *See* Rachael Revesz, *University of Michigan Student Changes Name to "His Majesty" Following New "Inclusive" Pronoun Policy*, INDEP. (Sept. 30, 2016), https://bit.ly/2X2SnxB. University officials must dismiss demands they consider mockery, proving that their rules are not generally applicable.

The district court also ignored how governments establish "a system of individualized exemptions" when they apply "a subjective test" on a "case-by-case" basis to assess if particular conduct is forbidden. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). One such "highly subjective" and viewpoint-based test is an offensiveness standard. *Matal*, 137 S. Ct. at 1756 n.5, 1763; *Iancu*, 139 S. Ct. at 2301 ("disfavoring 'ideas that offend' discriminates based on viewpoint").

The Complaint details how the University uses this standard. Dr. Meriwether offered to use Doe's name, showing courtesy to Doe while also allowing Dr. Meriwether to adhere to his conscience. Compl. ¶ 157, R.34, PageID.1477. Defendant Milliken initially approved this reasonable approach. *Id.* ¶ 158. But "Doe was not satisfied." *Id.* ¶ 161. The University allowed Doe's offense to curb Dr. Meriwether's rights, creating a system of individualized exemptions. Thus, strict scrutiny applies.

## III. The district court erred in dismissing Dr. Meriwether's Fourteenth Amendment due-process claims.

Restrictions are vague if they (1) fail to give fair notice of prohibited conduct; (2) lack "explicit standards for those who apply [them]," inviting arbitrary, discriminatory enforcement; or (3) chill constitutional freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *City of Chi. v. Morales*, 527 U.S. 41, 56 (1999). "[A] more stringent vagueness test should apply" when policies "interfere[] with the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

This doctrine prevents the government from defining misconduct expansively and then letting enforcers decide for themselves who to punish. *Kolender v. Lawson,* 461 U.S. 352, 358 n.7 (1983). Yet the University officials' enforcement of their policies has chilled expression. Compl. ¶¶ 286–97, R.34, PageID.1491–93. And those same acts reveal the unbridled discretion their policies confer. For example, nothing in the policies require University faculty to refer to students by identity-

based pronouns. But that is how University officials interpret and apply those policies. So those policies fail to give fair notice of what they prohibit and require. Dr. Meriwether pleaded a plausible vagueness claim.

## IV. The University's restrictions do not satisfy strict scrutiny.

For all the reasons noted above, the University officials' policies, both facially and as applied, must survive strict scrutiny, "which requires the [University] to prove that [its] restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231 (quotation omitted).

The University officials cannot satisfy that heavy burden. "[R]egulating speech because it is [allegedly] discriminatory or offensive is not a compelling state interest, however hurtful the speech may be." *Telescope Media*, 936 F.3d at 755 (citing *Johnson*, 491 U.S. at 414; *Masterpiece*, 138 S. Ct. at 1731; *Snyder*, 562 U.S. at 448–49, 460–61; *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43–44 (1977) (per curiam)). "It is a 'bedrock principle . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable,'" *id.* (quoting *Johnson*, 491 U.S. at 414), including on campus. *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam) ("[D]issemination of ideas . . . on a state university campus may not be shut off in the name alone of 'conventions of decency.'").

Moreover, University officials can pursue their goal of tolerance

without infringing First Amendment rights. *Reed*, 135 S. Ct. at 2231–32 (discussing narrow-tailoring requirement). As the Complaint alleges, Dr. Meriwether offered an accommodation that involved calling Doe by a preferred first or last name rather than any sex-acknowledging pronouns or titles. Yet when Doe objected, the University did too. Forcing Dr. Meriwether to violate his philosophical and religious convictions may have been Doe's preference. But it was not the least restrictive means of ensuring that Doe was treated respectfully, which was Dr. Meriwether's goal all along. Accordingly, the officials cannot satisfy strict scrutiny, and Dr. Meriwether's claims must be reinstated.

The University officials' extreme reaction to the use of standard English in the classroom demonstrates that the mandated use of gender-identity-driven pronouns is intended to settle an ongoing societal debate and enforce orthodoxy. That orthodoxy necessarily prohibits Dr. Meriwether from critiquing the notion of gender identity as a false social construct. If officials prohibit him from discussing his views even in a class syllabus, Compl. ¶ 171, R.34, PageID.1478, they would certainly forbid him from giving an extended lecture—or lectures—explaining at length why transgender beliefs do not reflect biological and metaphysical reality, and how these ideas have the potential to harm those who hold them. They would even stop him from espousing a view—held by most Americans—that allowing males who identify as female to compete in women's sports denies women equal opportunities.

In sum, this case is about University officials squashing an emotional and good-faith debate over what best promotes human flourishing, in a philosophy class, by demanding that the debate be carried on using ideological terms unique to one viewpoint—the gender orthodoxy demanded by University officials. Rarely do cases place in such perilous danger both citizens' First Amendment rights and the fundamental need of American society to speak and pursue the truth.

## CONCLUSION AND REQUESTED RELIEF

As the Fifth Circuit has already concluded for judicial use of pronouns when speaking to litigants, "no authority supports the proposition that [government] may require . . . anyone . . . to refer to gender dysphoric [individuals] with pronouns matching their subjective gender identity." *Varner*, 948 F.3d at 254–55. This Court should not be the first Circuit to endorse such compelled speech or to strip professors of all First Amendment protections when teaching and researching.

Accordingly, Dr. Meriwether respectfully requests that this Court reverse, reinstate all his claims—including his pendent state-law claims, *see Scoble v. Detroit Coil Co.*, 611 F.2d 661, 662 (6th Cir. 1980), but excluding his equal-protection claim—and remand for further proceedings.

May 27, 2020

David A. Cortman
Travis C. Barham
Alliance Defending Freedom
1000 Hurricane Shoals Road N.E.,
    Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

Thomas W. Kidd, Jr.
Kidd & Urling, LLC
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone: (513) 733–3080
Facsimile: (513) 577–7393
tkidd@kiddurlinglaw.com

_/s/ John J. Bursch_
Kristen K. Waggoner
John J. Bursch
Alliance Defending Freedom
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

Tyson C. Langhofer
Alliance Defending Freedom
20116 Ashbrook Place, Suite 250
Ashburn, Virginia 20147
Telephone: (480) 388–8205
Facsimile: (202) 347–3622
tlanghofer@ADFlegal.org

*Attorneys for Plaintiff-Appellant*

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

| Record | Description | Page.ID Range |
|--------|-------------|---------------|
| 34 | First Amended Verified Complaint (Redacted). | 1457–1508 |
| 34-1 | Compl. Ex. 1: Shawnee State University's *Non-Discrimination/Sexual Harassment Policy* | 1509–10 |
| 34-2 | Compl. Ex. 2: Shawnee State University's Policy Entitled *Reporting & Investigating Sexual Assault, Sexual Misconduct & Other Forms of Discrimination* | 1511–26 |
| 34-3 | Compl. Ex. 3: The LGBTQIA Webpage from Shawnee State University's Campus Counseling Services Office | 1527–36 |
| 34-4 | Compl. Ex. 4: The *Collective Bargaining Agreement* between Shawnee State University & Shawnee Education Association. | 1537–1688 |
| 34-5 | Compl. Ex. 5: Correspondence between Dr. Clifford Poirot and Shawnee State University Faculty Members, Sept. 2016. | 1689–98 |
| 34-6 | Compl. Ex. 6: Correspondence between Defendant Roberta Milliken and Dr. Meriwether, Nov. 2016. | 1699 |
| 34-7 | Compl. Ex. 7: Correspondence from Dr. Marc Scott to Defendant Douglas Shoemaker, Jan. 10, 2018. | 1700 |
| 34-8 | Compl. Ex. 8: Correspondence from Dr. Meriwether to Ms. Marcie Simms, Jan. 11, 2018. | 1701 |
| 34-9 | Compl. Ex. 9: Correspondence from Defendant Roberta Milliken to Dr. Meriwether, Feb. 13, 2018. | 1702 |
| 34-10 | Compl. Ex. 10: Correspondence from Defendant Roberta Milliken to Dr. Meriwether, Feb. 16, 2018. | 1703 |

| Record | Description | Page.ID Range |
|--------|-------------|---------------|
| 34-11 | Compl. Ex. 11: Correspondence between Defendant Roberta Milliken and Dr. Meriwether, Feb. 23–Mar. 12, 2018. | 1704–08 |
| 34-12 | Compl. Ex. 12: Correspondence between Defendant Jeff Bauer and Dr. Meriwether, Mar. 12, 2018. | 1709–15 |
| 34-13 | Compl. Ex. 13: Defendant Malonda Johnson's Investigation Report for Defendant Roberta Milliken, Apr. 12, 2018. | 1716–30 |
| 34-14 | Compl. Ex. 14: Correspondence from Defendant Roberta Milliken to Dr. Meriwether regarding the Investigation Report, Apr. 18, 2018. | 1731 |
| 34-15 | Compl. Ex. 15: Correspondence among Defendants Roberta Milliken, Douglas Shoemaker, and Malonda Johnson and Dr. Meriwether, Apr. 17–21, 2018. | 1732–33 |
| 34-16 | Compl. Ex. 16: Correspondence from Dr. Meriwether to Defendant Roberta Milliken regarding the Investigation Report, May 8, 2018. | 1734–40 |
| 34-17 | Compl. Ex. 17: Defendant Roberta Milliken's Report of the Findings of the Formal Investigation of Dr. Meriwether, May 29, 2018. | 1741–65 |
| 34-18 | Compl. Ex. 18: Correspondence involving Defendants Jeff Bauer and Roberta Milliken, as well as Dr. Meriwether and Dr. Eugene Burns, May 29–Jun. 1, 2018. | 1766–68 |
| 34-19 | Compl. Ex. 19: Defendant Jeff Bauer's Decision on Formal Disciplinary Action and Related Correspondence, Jun. 14, 2018. | 1769–70 |
| 34-20 | Compl. Ex. 20: Shawnee State University's Written Warning to Dr. Meriwether, Jun. 22, 2018. | 1771 |

| Record | Description | Page.ID Range |
|:---:|:---|:---:|
| 34-21 | Compl. Ex. 21: Correspondence from Defendant Jeff Bauer to Dr. Meriwether regarding Shawnee State University's Written Warning, Jun. 25, 2018. | 1772 |
| 34-22 | Compl. Ex. 22: Correspondence between Dr. Chip Poirot and Dr. Meriwether, Jul. 2, 2018. | 1773–74 |
| 34-23 | Compl. Ex. 23: Shawnee Education Association's Grievance Form, as Completed by Dr. Meriwether, Aug. 16, 2018. | 1776–79 |
| 34-24 | Compl. Ex. 24: Dr. Chip Poirot's account of His Meeting with Defendant Jeff Bauer and Dr. Meriwether, Aug. 22, 2018. | 1780–81 |
| 34-25 | Compl. Ex. 25: Defendant Jeff Bauer's Decision on Dr. Meriwether's Level 2 Grievance and Related Correspondence, Sept. 5, 2018. | 1782–84 |
| 34-26 | Compl. Ex. 26: Correspondence between Dr. Chip Poirot and Dr. Meriwether Regarding the Level III Grievance Meeting, Sept. 17, 2018. | 1785–86 |
| 34-27 | Compl. Ex. 27: Shawnee Education Association's Grievance Form, reflecting Defendant Jeff Bauer's Decision on Dr. Meriwether's Level III Grievance, Oct. 4, 2018. | 1787–1830 |
| 49 | Report & Recommendation, Sept. 5, 2019. | 2095–2157 |
| 60 | Order Adopting Report & Recommendation, Feb. 12, 2020. | 2402–04 |
| 61 | Judgment in a Civil Case, Feb. 12, 2020. | 2405 |
| 62 | Notice of Appeal, Mar. 12, 2020. | 2406–08 |

## RULE 32(G)(1) CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 6th Cir. R. 32(b), this document contains 12,955 words accord ing to the word count function of Microsoft Word 365.

2.    This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ John J. Bursch*
John J. Bursch
Alliance Defending Freedom
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
jbursch@ADFlegal.org

*Attorney for Plaintiff-Appellant*

Date: May 27, 2020

# CERTIFICATE OF SERVICE

Under FED. R. APP. P. 31 and 6th Cir. R. 31, I hereby certify that on May 27, 2020, a digital copy of the brief was filed electronically with the Court using the its electronic filing system, which automatically sends an electronic notification to all attorneys of record.

*/s/ John J. Bursch*
John J. Bursch
Alliance Defending Freedom
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
jbursch@ADFlegal.org

*Attorney for Plaintiff-Appellant*

Date: May 27, 2020