No. 20-3289

## United States Court of Appeals for The Sixth Circuit

NICHOLAS K. MERIWETHER

Plaintiff – Appellant

v.

FRANCESCA HARTOP, et al.,

Defendants – Appellees

JANE DOE, et al.

Intervenor Defendants – Appellees

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 1:18-cv-00753-SJD
The Honorable Susan J. Dlott

## NATIONAL ASSOCIATION OF SCHOLARS' AMICUS CURIAE BRIEF SUPPORTING PLAINTIFF-APPELLANT AND URGING REVERSAL OF THE LOWER COURT

|  | Gary S. McCaleb |
|  | Law Offices |
|  | 11990 Glodia Drive |
|  | Flagstaff, AZ 86004 |
|  | (480) 250-0932 |
|  | mccgsm@gmail.com |
|  | Counsel for Amicus Curiae |
|  | Dated: June 3, 2020 |

## CORPORATE DISCLOSURE STATEMENT

The National Association of Scholars is a private non-profit organization that has no parent company or stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Table of Authorities ............................................................................... iv

Identity of Amicus Curiae ....................................................................... 1

Argument ................................................................................................ 1

I. Spoken language—including pronouns—is the basic medium of college instruction. ........................................................................ 5

    A. Pronouns have been drafted into politics to convey meaning far beyond their size .............................................. 6

    B. Pronouns convey public meanings and are not a private language. ....................................................................... 10

    C. Pronouns communicate metaphysics and serve as tools to change—or preserve—social values. ............................. 13

II. Academic freedom protects the professor's choice of pronouns. ........................................................................... 16

    A. A student's personal offense does not override professorial judgment ............................................................ 19

    B. The professor exercises duties correlated to his academic freedom to protect that freedom. ......................... 20

    C. University administrators must respect classroom discourse to preserve professors' academic freedom. .......... 22

    D. Pronouns are among the most stable units of language that are firmly grounded in human physiology ................. 24

    E. Pronouns embed and communicate ontological meaning. ................................................................................. 27

Conclusion ................................................................31

Certificate of Compliance ........................................33

Certificate of Service ..............................................34

# TABLE OF AUTHORITIES

## Cases

*Corlett v. Oakland Univ. Bd. of Trustees,* 958 F. Supp. 2d 795 (E.D. Mich. 2013)................................................................21

*Epperson v. Arkansas*, 393 U.S. 97 (1968)...........................................2, 4

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)...........................................3, 4

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967). ...................................2

*Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989) .....................................2, 3

*Shelton v. Tucker*, 364 U.S. 479 (1960)...................................................2

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957)......................................3

## Other Authorities

*1984* ..........................................................................................23

*A Wrinkle in Time* ........................................................................28

*American Association of University Professors 1915 Declaration of Principles* ........................................................ 16, 17, 18, 21

*Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression*......................................15

*Free Speech and Parrhesia*...............................................................5

*Principles of Transgender Medicine and Surgery* .................................15

*The Knight's Tale* ........................................................................24

*The Miraculous Journey of Edward Tulane* .........................................28

## Rules

Federal Rule of Appellate Procedure 29 .................................................5

## Constitutional Provisions

U.S. Constitution art. I, § 9, cl. 8 ............................................................ 10

## IDENTITY OF AMICUS CURIAE

The National Association of Scholars is a non-profit organization that seeks to reform higher education. Founded in 1982 as Campus Coalition for Democracy and known since 1987 as the National Association of Scholars, it is a leading advocate for academic freedom, disinterested scholarship, and excellence in American higher education.

The Association lodges this brief contemporaneously with its motion seeking the Court's leave to file the brief per Fed. R. App. P. 29(a). And per Fed. R. App. P. 29(a)(4)(E) the Association states that no counsel for any party authored this brief in whole or in part, and no person or entity, including amicus and its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

## ARGUMENT

In a more ideal world, Defendants-Appellants Shawnee State University officials (collectively, "University") would have exercised restraint and ensured that their own professor's academic freedom was respected by the administration he served and the students he taught. After all, because "the university must remain independent and

autonomous to enjoy academic freedom, the federal courts are reluctant to interfere in the internal operations of the academy." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989). Generally, federal courts "do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems…." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

But every rule has its limits, and federal courts properly intervene in university affairs when cases "directly and sharply implicate basic constitutional values." *Id*. Because the University failed to restrain its urge to compel a professor's speech—and instead mandated gender identity orthodoxy in Professor Meriwether's conversations with his students—First Amendment protections are directly impacted.

Indeed, the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). And the Supreme Court has instructed that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

Importantly, this Circuit has long aligned with these authorities to protect academic freedom for universities corporately and for professors individually. *Parete*, 868 F.2d at 827. *Parete* drives the individual protection point home, saying that the courts have "afforded substantial protection to the First Amendment freedoms of individual university professors." *Id.* And there is good reason for this, as "the Supreme Court concluded that '[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.'" *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)).

Although the University might broadly agree with those crucial principles, it nonetheless dismisses classroom use of gender-based titles and pronouns as trivial ministerial acts of no constitutional moment— mere conduct which merits no First Amendment protection. Alternatively, the University argues that *Garcetti v. Ceballos*, 547 U.S. 410 (2006) puts Professor Meriwether under its thumb—that as a public employee, the good professor must speak the pronouns and titles as he is told—or not speak such words at all.

Professor Meriwether deftly and properly argues that he falls into the "private citizen" exception to *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and should thus be free to speak titles and pronouns of his choice in the course of teaching his class.

But we scholars hold that *Garcetti* doesn't govern here. Indeed, this Court's respect for free inquiry in the university classroom—recognized in *Parete* 17 years before *Garcetti*—provides a sound rationale as to why the *Garcetti* Court explained that "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 547 U.S. at 425. And as shown below, pronouns in this context are very much related to scholarship and teaching.

Further, resorting to *Garcetti's* complex and rather subjective "private citizen" exception to protect professors thrusts federal courts deeply into academic affairs, contra *Epperson's* caution against such intrusions. Better to take the Supreme Court at its word, and not apply *Garcetti* to the facts in this case.

With that, we turn to the key question: is a personal pronoun or title used in the course of teaching a philosophy class somehow mere conduct, devoid of expressive content and unworthy of Constitutional protection?

We scholars answer emphatically: "No."

Here's why.

## I.  Spoken language—including pronouns—is the basic medium of college instruction.

Pronouns and titles are part of our spoken language, and spoken language is the basic medium of college instruction. Other media may play important secondary roles—lecture notes, chalkboards, videos, physical movement, etc.—but the college classroom is primarily a place where the professor speaks and prompts students to speak in turn. This practice of dialogue stretches back to the birthplace of Western Civilization in ancient Athens, a city known for its *parrhesia*, or "freedom of speech." Daniel Unruh, *Free Speech and Parrhesia*, Historiai, (Dec. 28, 2017), https://bit.ly/Historiai_Parrhesia (describing origin and application of parrhesia (παρρησία)).

As with any freedom, this one carries with it responsibilities which distinguish the exercise of this freedom from mere license: a

professor's freedom to speak and teach carries with it the responsibility and the authority to control his speech.

This control extends to the content of his sentences, and to his manner of speaking. He may choose to speak with authority, or self-effacingly. He may fill the room to the furthest corner with loud declarations or entice listeners to lean in to hear. He may pepper his students with rapid-fire questions or ask one big question and wait in silence as students turn it over and search for an answer. He may even coach his students in debates, asking them to play "devil's advocate" by arguing for a position with which they may not agree. All these choices are within the realm of practical rhetoric that a college instructor deploys as part of the craft of teaching.

And these choices include the professor's use of pronouns—words whose size belies their weight. But Professor Meriwether's case reveals pronouns for what they are: profoundly powerful, political terms.

## A. Pronouns have been drafted into politics to convey meaning far beyond their size.

Pronouns are ubiquitous and often little noticed in English speech, attracting attention only when contemporary politics draft them to

political purposes. They have become more salient as they have been enlisted to serve sexual politics.

Consider the pronoun "he." For about 1,000 years, "he" quietly served as the third person nominative singular generic pronoun in English, denoting either male or female. But starting in the 1970s, feminist activists launched the revolutionary claim that "he" in this sense embedded a sexist presumption. This criticism persuaded some speakers and writers to avoid "he" as the third person singular generic and replace it with "he or she"; employ "she" as the generic; randomly mix up "he" and "she" in successive sentences; use "it" or "one;" or substitute the plural "they." While such expedients have become somewhat familiar usages, none have supplanted the Standard English use of "he" in this context.

More recently—and more radically—a frontal assault in this pronominal revolution was launched using novel third person pronouns, both masculine and feminine, singular and plural. This assault has been led by the transgender and "gender queer" movements. Both reject the Standard English practice of referring to biological males with male pronouns and biological females with female pronouns.

These standard usages—grounded in the objective reality of being male or female—had some exceptions, such as attempts to demean individuals by calling them by their opposite sex pronouns, or cases such as drag queens or actors playing opposite sex parts. These exceptions, however, do not vitiate the general rule that the pronoun matches the biological sex of the person it refers to. The transgender and gender queer movements repudiate this rule, for reasons that we will come to in moment.

Whatever the merits of these views, we must observe that intellectual freedom made possible these political assaults, first on "he," and then on "he," "she," and "they," as well as their objective cases (him, her, and them). But that is as it should be when intellectual freedom holds true, and that same freedom protects resistance to manhandling pronouns.

For example, when the journal of the National Association of Scholars receives a manuscript in which the author has employed a nonstandard pronoun, we correct it. Our doing so is a political statement in that it rejects the misguided notion that generic "he" is offensive or obsolete. Rejecting such innovations is one way of refuting

an implied argument. And, again, doing so is an exercise in intellectual freedom.

Where we do agree with feminist, transgender, and gender queer activists is in this: pronouns are significant and have cultural consequences. The attempt to dictate new pronouns or new patterns of pronoun usage is an attempt to change culture. That attempt is necessarily coercive. While speakers of Standard English can allow for nonstandard usages, proponents of the new terms and usages demand conformity. That is because they aim not just to feel better about themselves as individuals but impose their views on the culture by reforming the language.

The generic "he" can no longer be an invisible part of the background of spoken or written English because it has been indicted by these activists. Those of us who reject this indictment choose to maintain the Standard English usage not merely for tradition's sake but also because we take those novel forms as outward signs of loyalty, and, most importantly, submission to an ideology we do not accept.

## B. Pronouns convey public meanings and are not a private language.

This recognition—that intellectual freedom wilts when language is coerced—illustrates that the way we address one another is in fact a significant matter of public importance. And that has been true since our founding: recall that our founders forbade Congress from granting titles of nobility. U.S. Const. art. I, § 9, cl. 8. This was in accord with the American Revolution's emphasis on social equality.

Other nations and movements have used terms of address to inculcate their worldview and establish political ascendancy. Examples readily spring to mind: the French revolutionaries used "citizen" and the Communists "comrade." In the religious sphere, movements such as the Quakers enlisted the archaic pronouns "thee" and "thy" as the respectful form of speaking to strangers. They did so to express their view of human equality across all lines of class, race, and sex, which is to say "thee" and "thou" in the speech of Quakers exemplify yet another political use of pronouns.

In this case, the Magistrate's Report and Recommendation, which was adopted without further legal analysis by the District Court, said that Professor Meriwether's use of pronouns "did not touch on a matter

of public concern," Rep. & Rec'n., RE 49, PageID 2123; would not have been understood by others to be an expression of his "broader views on gender identity," *id.* at PageID 2125; "did not serve the purpose of advancing viewpoints," *id.* (citations omitted); and was not "compelled speech," *id.* at PageID.2129.

These conclusions are inaccurate and inconsistent with history. Pronouns, like all other forms of public address, have public meaning and their deployment as coercive political tools certainly rises to the level of a public concern.

In the United States, we are free to name and re-name ourselves and for that matter, choose to use such pronouns as we may desire or design. But that is very different than compelling other people to address us by honorific titles or non-standard pronouns.

In the latter case, pronouns announce commitment to a particular ideology—and Americans are alert to those social cues. Pronouns are not, in philosopher Ludwig Wittgenstein's term, a "private language." They enunciate public meanings and those meanings are widely recognized and understood.

In Wittgenstein's widely influential analysis, "private language" is nonsensical. For language to be meaningful, it must be subject to public standards and criteria of correctness. "Words" that exist only in reference to private thoughts are not language, though the speaker of such words may aspire to making himself understood by insisting that others learn his code.

Society rightly resists such innovations by demanding that they prove their worth as transparently meaningful, rule-governed expression. Every person who demands his own self-chosen pronoun simply violates the necessary parsimony of language.

No public university that values intellectual freedom should arrogate the authority to step into the controversies among proponents of different ideologies and dictate that the social code of one faction—and the language used to affirm and advance it—should prevail over the social codes of other factions. To do so cuts to the very substance of the dispute.

Instead, the public university should be viewpoint neutral in these matters. Otherwise it becomes a partisan precisely on "a matter of public concern," that deals with "broader views on gender identity" and

settles the matter via the constitutionally odious approach of "compelled speech."

## C. Pronouns communicate metaphysics and serve as tools to change—or preserve—social values.

When feminist activists attacked the generic use of "he," they were not altering the rule that a pronoun matches the biological sex of the person. The transgender and gender queer movements repudiate this rule. These movements assert that an individual's subjective sense of "gender identity" is grounds for using pronouns that do not match his biological sex. A metaphysical claim is embedded in this assertion: the idea that one's "real" identity arises from an inward conviction, not from empirical reality.

If a biological male feels that he is inwardly female, according to this metaphysics, somehow he really is female. In most circumstances, we would say this person is at best confused. Psychological disturbances of this sort, however, occur with some frequency and specialists have extensively studied these disturbances as a form of what they call "body dysmorphia."

But the transgender and gender queer movements do not rest with making a metaphysical claim or asserting personal, inward

convictions. These movements have a second key feature: they demand that everyone else affirm their metaphysics. It is not enough that X, born male and chromosomally male in every cell in his body, believes that he is actually female. He also demands that others accommodate and affirm his personal belief. Some may choose to do so. But others may decline.

Professor Meriwether's case deals with the sex-binary masculine/feminine pronouns, yet he confronts a theory asserting that something called "gender" is nonbinary. The word "gender" in this sense is a twentieth century neologism that has displaced the word "sex" in some contexts. Behind it lies the argument that sex roles are socially constructed.

The original formulations of this argument had an element of truth. Sex roles vary to some degree historically and across cultures, but the actual degree of variation is very much a matter of social, scientific, and biological controversy—and moving from the initial idea that gender is a social construct to the idea that gender is nonbinary jumps over several intermediate steps and has virtually no scientific basis.

This theory of gender may be fairly described as everyone falling somewhere within a subjectively discerned, malleable continuum ranging from masculine to feminine to something else: "Other categories of transgender people include androgynous, multigendered, gender nonconforming, third gender, and two-spirit people. Exact definitions of these terms vary from person to person and may change over time but often include a sense of blending or alternating genders." Am. Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* 2 (3rd ed. 2014), https://bit.ly/APA_GEID_Answers.

But even the notion that there are male or female endpoints bracketing the continuum is too much for many gender identity advocates. As one leading advocate puts it, "[g]ender identity can be conceptualized as a continuum, a mobius, or patchwork." Randi Ettner, et al., *Principles of Transgender Medicine and Surgery* 43 (Routledge 2nd ed. 2016) (internal citations omitted). A mobius is, of course, a single endless loop.

Thus, to claim that a gender falls somewhere on an infinite continuum, mobius, or patchwork of subjectively perceived, malleable

genders that may not even be related to masculinity or femininity is to claim something that lacks sound foundation in genetics, anthropology, or social history.

Humans are a sexually binary species. Gender identity theory, which opposes these plain realities, is in respect to titles and pronouns, simply an attempt to rationalize a "private language." There is no academic or societal warrant to force all others to affirm every individual's perceived gender by using their preferred private language.

## II. Academic freedom protects the professor's choice of pronouns.

A university professor who declines to accede to such a demand is acting well within the boundaries of academic and intellectual freedom. His decision is about how best to instruct his class. This falls squarely within an instructor's prerogative as set forth in the *1915 Declaration of Principles on Academic Freedom and Academic Tenure* of the American Association of University Professors (AAUP), the founding document of American academic freedom.

The AAUP has revisited and revised its view of academic freedom several times in the last one hundred years, shortening its explanations and extending its scope, but the National Association of Scholars has

consistently upheld the original *1915 Principles* as the fullest and best-grounded account of what academic freedom entails. And the Association has issued its own synoptic view in *The Architecture of Intellectual Freedom* (2016) as well as tracing the history of the relevant debates in *Charting Academic Freedom* (2018).[1]

The *Declaration of Principles* has three key passages. The first refers to the duty of the university to avoid becoming a mere weathervane for popular opinion: it is "a distinctive duty of the university" to conserve "the genuine elements of value in the past thought and life of mankind which are not in the fashion of the moment." *Decl. of Principles* 297, https://bit.ly/AAUP_1915_Principles. When a professor decides to "conserve" traditional English pronoun usage against the spirit of a social movement that appeared on the scene less than five years earlier, he acts fully within the scope of this principle.

Second, the *Principles* emphasize how important a professor's principled stand is to effective instruction. "No man can be a successful

_____

[1] *Architecture* is available at https://bit.ly/NAS_Arch_Intell_Freedom, and *Charting* is available at https://bit.ly/NASCharting_Acad_Freedom.

teacher unless he enjoys the respect of his students, and their confidence in his intellectual integrity." *Id.* at 296. Indeed, the *Principles* tell us that even the "suspicion on the part of the student that the teacher is not expressing himself fully or frankly," then the "virtue of the instruction as an educative force is incalculably diminished." *Id.*

The AAUP saw in 1915, and the National Association of Scholars strongly agrees today, that a professor "must give the student the best of what he has and what he is." *Id.* That in turn requires the professor to employ the English language forthrightly and to the best of his ability.

A professor who can be forced by campus bureaucrats into using false pronouns fails this test. The bureaucrats may be persuaded by the metaphysics of the transgender and gender queer movements, or they may be merely accommodating idle and quarrelsome students, but they cannot impose their fictions on an instructor who is manifestly acting on his open and honest judgments about how best to address his students without abandoning the basic principles of academic freedom.

The third and most important of the relevant passages in the *Declaration of Principles* refers to the special nature of the classroom setting, in which professors often design discussions "to provoke opposition or arouse debate." *Id.* at 299.

A professor who declines to conform to the University's mandate to pretend via titles or pronouns that a member of one sex is actually a member of another may indeed "provoke opposition or arouse debate," but this is perfectly appropriate within his classroom, a space where his judgment should be decisive within broad limits.

## A. A student's personal offense does not override professorial judgment.

That means that when students take offense at some forms of a professor's speech, then their legitimate recourse is to debate the point—not to invoke administrative or judicial coercion so that the professor's speech conforms to their individual beliefs. Students may and often will lose such debates, if only because they are challenging a more experienced and educated opponent. Or the discussion may lead to an impasse in which the professor may exercise his judgment and move the class on. In that situation the student must swallow the offense and get on with the task at hand.

Part of that task might well be to learn how and when to swallow a seeming offense, and perhaps to learn that it was, in the end, not an offense at all. A professor can teach these lessons only if his freedom to teach according to his own lights is respected by his institution. Students brought up in a world in which they have been trained to expect that they need never hear, let alone endure and respond maturely to, language they dislike, may well chafe under these conditions, but that is all the more reason why the institution should forebear interfering with the professor's pedagogy.

"Taking offense" may also be a power play on the part of students; mere rebellion against perceived authority; or as a claim (valid or not) of psychological distress. The student who has recourse to administrative injunctions against his professor's well-considered practices within the privileged confines of his classroom is invited to diminish the rightful intellectual authority of his teacher.

## B. The professor exercises duties correlated to his academic freedom to protect that freedom.

In this light it may be fairly said that strong offense and vigorous debate are fundamental aspects of college education. And there are safeguards as to how much offense may come into play: our social codes

provide sound boundaries to the freedom of a professor to offend through speech. Racial and sexual epithets, patent insults, and bullying are not appropriate speech and belong in a realm that the *Declaration of Principles* marks as outside the protection of academic freedom. *See, e.g., Corlett v. Oakland Univ. Bd. of Trustees,* 958 F. Supp. 2d 795 (E.D. Mich. 2013) (dismissing student's claim to First Amendment protection for sexual comments regarding his female professor). Refraining from using such terms is proper professorial restraint.

Yet it remains that the *Principles* strongly affirm that the liberty of the scholar is to "to set forth his conclusions, be they what they may," so long as they "the fruits of competent and patient and sincere inquiry." *Id.* at 298.

Where a professor relies on objective biology and Standard English, he demonstrates his competence. And the record from the lower court in this case amply demonstrates Professor Meriwether's patience and sincerity. Dignity, courtesy, and temperateness of language are not compromised by maintaining Standard English pronouns.

### C. University administrators must respect classroom discourse to preserve professors' academic freedom.

The University too must recognize its duties. Too often, public universities are tempted to go beyond the processes of vetting the qualifications of faculty who are proposing new academic courses. These processes are legitimate forms of supervision, but they do not warrant an effort to dictate the content of classroom discourse. For very good reasons, universities generally do not require instructors to address students in any way the student wishes; that would lead to absurd results.

Again, the principle of restraint comes into play: had the University simply let the sex versus gender debate play out in Professor Meriwether's philosophy classes without directing him to adopt gender identity terminology, that would have permitted the robust exchange of ideas inside a university classroom without crossing constitutional lines. Simply put, this case would not be in this Court.

But instead the University dictated what forms of address would be permissible and which pronouns may be used. This is similar to the lists of words and phrases that are declared on some campuses to be "microaggressions," i.e. words or phrases that are forbidden based on

the idea that they encode subtle social attitudes of condescension to members of various social categories. The whole notion of microaggressions is rejected by many observers, and by others treated as an exaggeration of matters better left to the give-and-take of ordinary social interaction. Those college administrators who issue edicts against microaggressions are rightly seen as taking a political and ideological stand. The same is true of any college administration that attempts to police an instructor's use of pronouns and titles.

Linguists have long pointed us to the degree that language shapes thought (e.g. the Sapir-Whorf hypothesis), a concept that George Orwell memorably employed in his novel *1984*, coining the term "newspeak" for a totalitarian regime's efforts to stem independent thought by controlling vocabulary. Newspeak emptied words of deep meaning, sidelined free speech, and thereby enabled the fictitious Big Brother to establish and maintain authoritarian control. George Orwell, *1984* 52 (New American Library 1949).

Certainly, Shawnee State is not Oceana, yet both entities manipulate words to circumscribe freedom and assert improper authority over individuals. Perhaps linguists and Orwell may have

exaggerated the degree of social control that can be achieved by manipulating language, but they are right to recognize the intent and the risk.

Thwarting that intent and avoiding that risk is the very reason that universities ought to be on the side of intellectual freedom, not dictating the terms of the debate nor imposing one side's orthodoxy on the classroom.

### D. Pronouns are among the most stable units of language that are firmly grounded in human physiology.

Of course, pronouns do change over time. Very few Americans use old pronouns such as "thee" and "thy," though we recognize them and know what they mean. Yet pronouns remain among the most conservative elements in English—and throughout history have been squarely grounded in the human biological facts of being male or female. Consider these lines from Chaucer's *The Knight's Tale*, composed around 1369-1372:

> Whilom, as olde stories tellen us,
> Ther was a duc that highte Theseus.
> Of Atthenes he was lord and governour,
> And in his tyme swich a conquerour
> That gretter was ther noon under the sonne.
> Ful many a riche contree hadde he wonne;
> What with his wysdom and his chivalrie,

He conquered al the regne of Femenye,
That whilom was ycleped Scithia,
And weddede the queene Ypolita,
And broghte hire hoom with hym in his contree.

*The Geoffrey Chaucer Page*, https://bit.ly/Chaucer_KnightsTale.

With a little work, the modern reader can make out most of the meaning in this passage, but the pronouns "he," "his," "her" and "him" (spelled *hire* and *hym*) stand out as solid rocks in the moving stream of English. These words, meaning then what they mean today, mark both the stability of the language and the permanence of the underlying ideas. The sexes differ; the difference is essential; and the language captures that in both large gestures (knights and queens) and in the very small ones we call pronouns.

Perhaps some may reckon it a small cost if Chaucer's Middle English becomes even less understandable in a world where fluid and infinite genders supplant sex, but the far larger cost is estranging students from one another and from their essential human nature. The cultural price of erasing these distinctions is severe.

Higher education is, or ought to be, always open to debate, and those who wish to dispute the fundamental biological fact that humanity has now and has always had only two sexes are welcome to

make their case. Likewise, those who dispute the essential complementarity of the sexes ought to have the freedom to argue whatever facts they can muster. So too those who wish to argue that "nature" is a mere social construct that can be disposed of or revised according to contemporary insight, as well as any who argue that the interests of social justice override the objective reality of nature.

A university can hold the door wide open to those who are eager to declare such beliefs. But permitting individuals or groups to declare and advocate for those beliefs does not erase a university's obligation to uphold the rights of others who stick with biological facts or standard usages. Nor does a willingness to entertain new "gender" theories dispose of the institutional obligation to respect and protect the teacher's intellectual and academic freedom to speak in his own voice and according to his own understanding of anthropological realities.

The same freedom that gives individual students, activists, or "gender studies" professors the right to advocate for linguistic inventions also gives professors who dispute the validity, utility, or rationality of these innovations the right to speak consistently with their understanding and ethics.

### E.    Pronouns embed and communicate ontological meaning.

Grammarians speak of "relative pronouns," which are the words that link a clause to the noun it modifies, e.g. *which, that, whose, whoever, whomever, who, and whom*. Native speakers of English often have trouble with these words because they demand attention to relationships we often overlook. Should that be "which" or "that"? "Who" or "whom"?  Standard English provides rules to answer that question, yet some are often disobeyed, such as the rule that "who" belongs only with a clause that is a person or a sentient being.

We wouldn't ordinarily say "The rock who fell off the cliff…" and it sounds wrong to say, "I turned my paper into Professor X that gave me a good grade on my last assignment…."  "The rock which fell off the cliff" and the "Professor X who" are Standard English. These examples point to a worldview embedded in our language, one in which we distinguish between animate and inanimate objects and presuppose an important difference between sentient and insentient things. One readily infers that the professor acted with intent and reason, while the rock insensibly responded to outside physical forces. To choose the wrong relative pronoun is to signal a metaphor, such as when we want

to treat an inanimate, insentient thing as if it were animate and sentient:

> "Once, in a house on Egypt Street, there lived a rabbit who was made almost entirely of china."

Kate DiCamillo, *The Miraculous Journey of Edward Tulane* 3 (Candlewick Press. 2006). We also make such distinctions between subjects and objects (who vs. whom) though this is fading from spoken American English:

> "Charles said[,] 'Who do you report us to?'"
> "To whom do I report you?"
> "Well, to whom, then. I'm not on the second-grade level yet."

Madeleine L'Engle. *A Wrinkle in Time* 130-31 (Crosswicks, Ltd. 1962).

These pronouns have yet to become objects of controversy, no doubt because the distinctions they encode have no connection to sexual identity. But they still inform the pronoun issue because, like "he" and "she," they communicate distinct ontological meaning. They whisper of a world in which there is a difference between human subjects and non-human objects and communicate the distinction between something that acts and something that is acted upon.

In philosophy, obliterating these distinctions may lead to mystagogical animism, the belief that all things are ensouled.

Politically, mindful of the technological and political trends of the last century, the obliteration of these distinctions may well lead to crushing tyranny, in which one or a few self-anointed rulers treat all other human beings as mere things, objects of their use or pleasure.

No word is utterly innocent of such meanings. For the University to claim that forcing a professor to utter any word is merely a ministerial act, one must find a word that is almost devoid of meaning and without consequence in communication.

Pronouns are not such words. Their inherent and implicit meanings are part of what makes language possible. They build a bridge of shared assumptions between the speaker and the listener. They cannot be eliminated from any human language, and the effort to take them out only results in confusion or worse. Language must be mutually comprehensible. Allowing some individuals to opt out of this basic fact by choosing their own pronouns defeats the purpose of language. It invites incomprehension and confusion.

Some advocates for some forms of social change welcome such confusion. They seek "to queer" (a verb) the language. Advocates for other forms of social change merely want to replace one set of

underlying premises with a different set of conventions. The essence of freedom is that some will disagree with these agendas and seek to hold the line against them—a line in which pronouns play their small but crucial part.

Languages are malleable, and English especially so. But however malleable a language may prove to be, it should be shaped by the exchange of ideas, not by the edicts of authorities. The French Academy has done its best to police the French language, yet people find the words that best convey share meanings. Thus, you will be understood in Paris if you speak of the *week-end* or *email*.

Likewise, a university can try to impose a novel vocabulary on its community, but it faces a most challenging task if it thinks that its pronoun constabulary can actually change the way men and women refer to themselves and each other. The shared meaning of sexual difference will likely prevail over such social engineering, and that should come from free debate rather than being shortstopped by the University's mandate.

Calling males "females" and vice versa by misusing pronouns may signal institutional allegiance to a "woke" sensibility of gender fluidity,

but it will leave the world with the same sexual binaries we have had all along. Where today's gender activists want to charge Professor Meriwether with "misgendering" a student, he should have the freedom to respond that he cannot in good conscience "mis-sex" a student

Pragmatically, the university's actions against Professor Meriwether may well prove futile as far as changing those underlying realities, but they cause a great deal of collateral harm. Compelled speech undermines the marketplace of ideas and open debate that defines the university classroom. The debate and discontent that arose in this case does not evidence wrongful, invidious discrimination against an individual—but instead typifies the best of advanced education: adults confronting challenging ideas and testing the truth without being ordered to affirm that which they cannot in good conscience agree to.

## CONCLUSION

Surely, it is for the courts to apply the law to the facts of this case. But as an association of professors from diverse political backgrounds and professional disciplines, we urge that the court understand pronouns and titles for what they are: icons of power that have been

deployed by feminists, revolutionaries, superpower nations, masters of literature, and yes, gender identity proponents to advance their causes.

These small words used in such large roles fall far outside the realm of mindless, meaningless ministerial duties. And that merits this Court reversing the lower court and remanding the case with directions to treat pronouns for what they are: spoken language, fraught with meaning and worthy of strong First Amendment protection.

Respectfully submitted,

*/s/ Gary S. McCaleb*

Gary S. McCaleb
Law Offices
11990 Glodia Drive
Flagstaff, AZ 86004
mccgsm@gmail.com

Dated June 3, 2020

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the length limitation of Fed. R. App. P. 29(a)(5) because it consists of 5,844 words, which is less than one-half of the word count permitted for the party's principal brief. This amicus brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ Gary S. McCaleb*
Gary S. McCaleb
Counsel for Amicus Curiae
Dated: June 3, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2020, the foregoing amicus brief was sent electronically to the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit for uploading to the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Gary S. McCaleb*
Gary S. McCaleb