Case No. 20-3289

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

NICHOLAS K. MERIWETHER,
*Plaintiff-Appellant*

v.

THE TRUSTEES OF SHAWNEE STATE UNIVERSITY, *et al.,*
*Defendant-Appellees*

_____

On Appeal from the U.S. District Court for the Southern District of Ohio,
Case No. 1:18-cv-753 (Hon. Susan J. Dlott)
_____

BRIEF OF *AMICUS CURIAE* WOMEN'S LIBERATION FRONT
IN SUPPORT OF PLAINTIFF-APPELLANT

Jennifer C. Chavez
1800 M Street, NW, Unit 33943
Washington, DC  20033
jennifer.c.chavez@outlook.com
(540) 918-0186
*Counsel for Amicus Curiae*
*Women's Liberation Front*

Dated: June 3, 2020

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states it is a non-profit 501(c)(3) organization. *Amicus curiae* has no corporate parent and is not owned in whole or in part by any publicly-held corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ........................................................................................ iii

TABLE OF AUTHORITIES ................................................................................. iv

INTEREST OF AMICUS CURIAE ........................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 7

ARGUMENT ...................................................................................................... 11

I.  THE DECISION BELOW IS INCOMPATIBLE WITH WOMEN'S FREEDOM OF THOUGHT AND FREEDOM FROM COMPELLED SPEECH. ...................................................................................................... 11

II.  MANDATORY "GENDER IDENTITY" POLICIES HARM THE INTERESTS OF WOMEN AND GIRLS IN EDUCATION. ........................ 14

III.  STATE ENFORCEMENT OF GENDER IDEOLOGY UNDERMINES OTHER RIGHTS AND INTERESTS OF WOMEN AND GIRLS ............... 19

    A.  Women's Medical Services .................................................................. 19

    B.  Women's Emergency Shelters .............................................................. 20

    C.  Women's Prisons .................................................................................. 21

    D.  Vital Government Statistics ................................................................. 22

IV.  THIS COURT SHOULD NOT ENFORCE WHAT AMOUNTS TO A POLITICAL RELIGION. .......................................................................... 23

CONCLUSION ................................................................................................... 26

CERTIFICATION OF COMPLIANCE ............................................................... 28

CERTIFICATE OF SERVICE ............................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Doe v. Boyertown Area Sch. Dist.*,
No. 17-3113 (3d Cir. 2018) ...............................................................................1

*Downtown Soup Kitchen v. Municipality of Anchorage*,
406 F. Supp. 3d 776 (D. Alaska 2019)..............................................................21

*Employment Div., Dep't of Human Res. of State of Or. v. Smith*,
485 U.S. 660, 670 (1988) ..................................................................................12

*Geduldig v. Aiello*,
417 U.S. 484, 497 (1974) ....................................................................................3

*Gloucester County School Bd. v. G.G.*,
137 S. Ct. 1239 (2017)........................................................................................1

*McGee v. Poverello House*, Mem. Decision and Order,
2019 WL 5596875, at *2 (E.D. Cal. Oct. 30, 2019) ..........................................2

*Palko v. Connecticut*, 302 U.S. 319 (1937) (overruled on unrelated grounds by
*Benton v. Maryland*, 395 U.S. 78 (1969)).........................................................12

*R.G. & G.R. Harris Funeral Homes Inc. v. Equal Empt. Opp. Comm'n*,
(Sup. Ct. No. 18-107) .........................................................................................1

*Smock v. Bd. of Regents of Univ. of Michigan*,
353 F. Supp. 3d 651 (E.D. Mich. 2018) ............................................................10

*Soule, et al. v. Connecticut Assoc. of Schools, Inc. et al.*,
3:20-cv-00201-RNC (D. Conn.)....................................................................6, 15

*United States v. Virginia*,
518 U.S. 515, 536 n.9 (1996) ............................................................................18

*Women's Liberation Front v. U.S. Dept. of Justice, et al.*,
No. 1:16-cv-00915 (D.N.M. Aug. 11, 2016).......................................................1

**Statutes**

20 U.S.C. § 1681 *et sec.*, Title IX of the Civil Rights Act .....................................15

42 U.S.C. § 2000e(k), Pregnancy Discrimination Act of 1978,
Pub. L. No. 95-555, 92 Stat. 2076 (codified at (2012)..........................................3

**Other Authorities**

Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of
Women's Issues and the Legal Danger of "Brain-Sex" Language*,
17 Nev. L.J. 667, 707 (2017)...................................................................... 2, 3, 10

Angela C. Wild, Lesbians at Ground Zero - How transgenderism is
conquering the lesbian body (March 2019),
http://www.gettheloutuk.com/attachments/lesbiansatgroundzero.pdf ...................2

Chase Strangio, *These Hate Groups Want the Supreme Court to Erase Trans
People*, Out Magazine, Aug. 28, 2019.................................................................5

Cyril Hovorun, *Ideology and Religion*,
Kyiv-Mohyla Humanities Journal 3 (2016) .................................................23

David M. Neff, *Denial of Title VII Protection to Transsexuals:
Ulane v. Eastern Airlines, Inc.*, 34 DePaul L. Rev. 553 (1985)...........................8

Dept. of Justice Fed'l Bureau of Investigation, 2015 Crime in the United States,
Table 33, Ten-Year Arrest Trends by Sex, 2006–2015.,
https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-33
(last visited June 1, 2020). .................................................................................23

Fayette County Public Schools, *Girls STEM School*,
https://www.fcps.net/girlsstem (last visited May 31, 2020).................................15

Gender Justice League, *Petition to Seattle Public Library* (2020),
https://www.genderjusticeleague.org/spl_action....................................................4

HUD EXCHANGE, *Young Women's Christian Association (YWCA) –
Nashville and Middle Tennessee*, https://www.hudexchange.info/grantees/young-
women-s-christian-association-ywca-nashville-and-middle-tennessee/ ..............20

Jacob T. Levy, *Authoritarianism and Post-Truth Politics*,
Niskanen Center (Nov. 30, 2016) ...................................................................24

Jenny Gathright, The Guidelines For Protection Of Transgender Prisoners
Just Got Rewritten, Texas Public Radio (May 12, 2018),
https://www.tpr.org/post/guidelines-protection-transgender-prisoners-
just-got-rewritten ...................................................................................................21

Jessica A. Clarke, *They, Them, and Theirs*,
132 HARV. L. REV. 894, 895 (2019) .....................................................................24

Karen Finlay, *Transgender Advocates Harass and Assault Women Attending
Women's Rights Event in Seattle*, WOMEN ARE HUMAN news archive (Feb. 2,
2020), https://www.womenarehuman.com/transgender-advocates-harass-and-
assault-women-attending-womens-rights-event-in-seattle/ ...................................4

M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to
Reflect Modern Medical Science Is Key to Transgender Rights*,
39 VT. L. REV. 943, 955 (2015)..........................................................................25

Matt Masterson, *Lawsuit: Female Prisoner Says She Was Raped by
Transgender Inmate*, WTTV NEWS (Feb. 19, 2020),
https://news.wttw.com/2020/02/19/lawsuit-female-prisoner-says-she-was-raped-
transgender-inmate ...............................................................................................21

Natasha Chart, *Trans Activists' Threats To Execute Women Sure Don't
Look Like Social Justice*, THE FEDERALIST (July 24, 2018),
https://thefederalist.com/2018/07/24/trans-activists-threats-execute-women-sure-
dont-look-like-social-justice/...................................................................................4

Nazia Parveen, *Karen White: how 'manipulative' trans-gender inmate attacked
again*, THE GUARDIAN (Oct. 11, 2018)
https://www.theguardian.com/society/2018/oct/11/karen-white-how-
manipulative-and-controlling-offender-attacked-again-transgender-prison........22

Ohio University Housing and Residence Life, *Specialized Living Experience*,
https://www.ohio.edu/housing/sle (last visited June 1, 2020).............................16

*Papanicolaou test*, *cervix uteri*, and *vagina*, MILLER-KEANE ENCYCLOPEDIA AND
DICTIONARY OF MEDICINE, NURSING, AND ALLIED HEALTH (7th ed. 2003).........19

Sax, Leonard, *"How Common Is Intersex? A Response to Anne Fausto-Sterling."*
THE JOURNAL OF SEX RESEARCH, v.39 no. 3 174-78 (2002) ..................................8

*Sex*, *Male*, and *Female*, Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health (7th ed. 2003) ....................................7

Shawnee State University, Using the Clinic, https://www.shawnee.edu/health/using-clinic....................................................19

Tennessee State University, *Wilson Hall*, http://www.tnstate.edu/housing/wilson.aspx......................................................16

U. Mich. Housing, *Helen Newberry*, https://housing.umich.edu/residence-hall/helen-newberry/.....................................................................................16

U.S. Dept. of Justice, Bureau of Justice Statistics, Campus Climate Survey Validation Study Final Technical Report 85, January 2016, https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf ...............................................17

Whitman-Walker Health and HRC, Safer Sex for Trans Bodies 4 (2016).............................................................19

*X chromosome*, and *SRY gene - sex determining region Y*, Nat'l Inst. for Health Genetics Home Reference........................................8

YWCA Nashville and Middle TN, https://www.ywcanashville.com/ ....................20

## Constitutional Provisions

U.S. Const. amend. I..............................................................................................14

U.S. Const. amend. XIX .......................................................................................18

## Books

A. James Gregor, Totalitarianism and Political Religion, An Intellectual History 3 (2012) ...............................................................................................24

Dawkins, R., The Ancestor's Tale, A Pilgrimage to the Dawn of Evolution 135 (2005)...........................................................................................................8

Dr. Julia Long, *Transgenderism and the Power of Naming* (2016) *in* FEMALE ERASURE: WHAT YOU NEED TO KNOW ABOUT GENDER POLITICS' WAR ON WOMEN, THE FEMALE SEX, AND HUMAN RIGHTS, Ruth Barrett, ed. (2016)...................................................................................................2

Mary Daley, *Beyond God the Father: Toward a Philosophy of Women's Liberation* 8 (New paperback ed. 1985) ...............................................7

Rita Mae Brown, *Starting from Scratch: A Different Kind of Writers' Manual* (2011) .......................................................................7

Sheila Jeffreys, *Gender Hurts* 1-2 (2014)............................................................9

## Administrative Orders

*In re Connecticut Interscholastic Athl. Conf., et al.,* U.S. Dept. of Educ. OCR, Letter of Impending Enforcement Action (May 15, 2020).......................15

# INTEREST OF AMICUS CURIAE[1]

Women's Liberation Front ("WoLF") is an organization of radical feminists dedicated to the liberation of women by ending male violence, protecting women's sexual and reproductive sovereignty, preserving woman-only spaces, and abolishing gender and sex discrimination. WoLF has nearly 800 members who live, work, and attend or teach in public schools across the U.S. and abroad.

WoLF's interest in this case stems from its interest in preserving women's sex-based civil rights and liberties, including the rights of free speech and freedom from coerced speech for our organization and its members, and indeed all women and girls. These interests are thwarted by the ruling below.

WoLF has filed pleadings or amicus briefs in a number of cases presenting questions similar to those presented in this matter, including *Women's Liberation Front v. U.S. Dept. of Justice, et al.*, No. 1:16-cv-00915 (D.N.M. Aug. 11, 2016) (voluntarily dismissed as moot); *Gloucester County School Bd. v. G.G.*, 137 S. Ct. 1239 (2017); *Doe v. Boyertown Area Sch. Dist.*, No. 17-3113 (3d Cir. 2018); and *R.G. & G.R. Harris Funeral Homes Inc. v. Equal Empt. Opp. Comm'n*, (Sup. Ct. No. 18-107).

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. Counsel for all parties have consented to the filing of this brief.

WoLF agrees that "each culturally and legally disadvantaged group must be able to address its disadvantages with linguistic specificity. To that end, women need woman-specific language, especially in an area of such linguistic precision as the law." Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of Women's Issues and the Legal Danger of "Brain-Sex" Language*, 17 Nev. L.J. 667, 707 (2017). "Gender identity," by contrast, is a direct "attack on women's freedom to name reality." Dr. Julia Long, *Transgenderism and the Power of Naming* (2016).[2] If the law cannot see sex, it cannot perceive sex-stereotyping, address pernicious sex-discrimination, or protect the rights and dignity of women in those circumstances where sex is of central importance. Among these circumstances are those where women and girls seek the right to maintain women-only spaces for safety and respite from male violence or sexual abuse,[3] where lesbians and bisexual women seek redress for discrimination or harassment on the basis of their same-sex attraction; and when women seek to form associations and spaces based on sex or sexual orientation.[4]

---

[2] *In* FEMALE ERASURE: WHAT YOU NEED TO KNOW ABOUT GENDER POLITICS' WAR ON WOMEN, THE FEMALE SEX, AND HUMAN RIGHTS, Ruth Barrett, ed. (2016).

[3] *See McGee v. Poverello House*, Mem. Decision and Order, 2019 WL 5596875, at *2 (E.D. Cal. Oct. 30, 2019) (involving residents of women's homeless shelter sexually harassed after being forced to shower with male who "identifies as" female.).

[4] *See* Angela C. Wild, LESBIANS AT GROUND ZERO - HOW TRANSGENDERISM IS CONQUERING THE LESBIAN BODY (March 2019), http://www.gettheloutuk.com/attachments/lesbiansatgroundzero.pdf.

In 1974 the Supreme Court held that a policy discriminating on the basis of pregnancy did not amount to sex discrimination, because such policy merely "divides [people] into two groups—pregnant women and nonpregnant persons." Orwoll, *supra* at 668, discussing *Geduldig v. Aiello*, 417 U.S. 484, 497 (1974), superseded by statute, Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k) (2012)). De-sexing the language made it "impossible to articulate that the group of 'nonpregnant persons' consists itself of two distinct groups: men, who cannot become pregnant, and women, who can." Orwoll, *Pregnant "Persons"* at 668. Given the potential for such errors to be repeated, WoLF seeks to ensure that legislatures and the judiciary are able to perceive and articulate – not erase – essential facts about sex.

To achieve its mission, WoLF disseminates educational material and engages in speech aimed at persuading the public and all three branches of government in the U.S. to reject policies and practices that harm women and girls, *i.e.* females. Key to its success is the ability to accurately name the class of people whose interests WoLF seeks to advance, and the ability of others in society to receive and further discuss those ideas openly. But because WoLF points out that "gender identity" has no useful or coherent meaning under the law, and rejects the notion that some men can legitimately "identify as" women under the law, the organization and its members are punished socially and financially. A number of

members have lost employment and been threatened with violence because they publicly questioned the validity of legal claims and social demands founded on "gender identity."[5] Gender activists have pressed public institutions to cancel WoLF's speaking events, by claiming that women's speech about the loss of their sex-based rights amounts to "discriminatory harassment."[6] At one recent event, hundreds of gender activists surrounded the venue, necessitating the diversion of several dozen armed police and a bomb-sniffing dog; some brandished signs implying that women who share WoLF's views should be exterminated, one was filmed physically assaulting an attendee, and others intimidated invited speakers by banging on the windows of their vehicle.[7] A prominent attorney with the American Civil Liberties Union has labeled WoLF a "hate group" solely on the basis that its

[5] Natasha Chart, *Trans Activists' Threats To Execute Women Sure Don't Look Like Social Justice*, THE FEDERALIST (July 24, 2018), https://thefederalist.com/2018/07/24/trans-activists-threats-execute-women-sure-dont-look-like-social-justice/. Ms. Chart serves as board chair of *amici* Women's Liberation Front.

[6] Gender Justice League, *Petition to Seattle Public Library* (2020), https://www.genderjusticeleague.org/spl_action.

[7] Karen Finlay, *Transgender Advocates Harass and Assault Women Attending Women's Rights Event in Seattle*, WOMEN ARE HUMAN news archive (Feb. 2, 2020), https://www.womenarehuman.com/transgender-advocates-harass-and-assault-women-attending-womens-rights-event-in-seattle/ (last visited May 26, 2020).

members reject demands to erase the legal significance of sex and replace it with "gender identity."[8]

The district court mistakenly asserts that Dr. Meriwether's "refusal to address a student in class in accordance with the student's gender identity does not implicate broader societal concerns [and] free speech." R.49 at PageID 2126. This could not be further from the truth. Dr. Meriwether's speech – including the honorifics he is prohibited from using or compelled to use when addressing students – concerns an urgent, weighty, and widely-debated issue of broad societal concern. It is the thin end of a wedge that seeks to redefine sex, or at least obfuscate the legal significance of sex, so that any man, for any reason or no reason at all, can claim to "identify as a woman" based only on his subjective "gender identity."

Shawnee State University took a side, interpreting and applying its policy so as to mandate that Dr. Meriwether apply *sex-specific* honorifics and titles to students according to the students' "self-asserted gender identity." Magist. Rep. & Recom., R.49 at PageID 2124. In other words, the University required Dr. Meriwether to replace sex with "gender identity" in his own thought and speech. *Id*. at PageID 2098-2100 (describing the University's policy on "preferred

---

[8] Chase Strangio, *These Hate Groups Want the Supreme Court to Erase Trans People*, OUT MAGAZINE, Aug. 28, 2019.

pronouns"). The district court then obliged the University's use of state power to punish Dr. Meriwether for refusing to obey the mandate. *Id.*

The significance of legal claims made under the auspices of "gender identity" is an important societal concern that potentially affects everyone in society, but WoLF is particularly concerned that it deprives women who appear before the court of the ability to speak accurately about the issues they face as a sex-class. This is not an abstract or speculative concern. It is aptly illustrated in a dispute currently lodged before the U.S. District Court for the District of Connecticut, where attorneys for three girls who attend public high school have been barred by the court from referring to male students as "male," and compelled instead to refer to the males "as 'transgender females.'"[9] If allowed to stand, the decision below has potential legal or practical implications for women far beyond its four corners.

---

[9] Memorandum in Support of Plaintiffs' Motion to Disqualify, ECF 103-1 at 3, *Soule, et al. v. Connecticut Assoc. of Schools, et al.*, No. 3:20-cv-00201-RNC (May 8, 2020).

## INTRODUCTION AND SUMMARY OF ARGUMENT

"Women have had the power of naming stolen from us."

Mary Daly.[10]

"Language exerts hidden power, like a moon on the tides."

Rita Mae Brown.[11]

WoLF maintains that preserving and advancing women's rights, liberties, and other interests necessitates a recognition of sex, consistent with the longstanding meaning of that term: "the fundamental distinction, found in most species of animals and plants, based on the type of gametes produced by the individual," and the resulting classification of human beings into those two reproductive classes: female (women and girls) or male (men and boys).[12]

Sex is observed and recorded (not "assigned") at or before birth by qualified medical professionals, and it is an exceedingly accurate categorization: an infant's sex is easily identifiable based on external genitalia and other factors in 99.982% of all cases; the miniscule fraction of individuals who have "intersex" characteristics (also known as "disorders of sexual development") are also either

---

[10] Mary Daley, BEYOND GOD THE FATHER: TOWARD A PHILOSOPHY OF WOMEN'S LIBERATION 8 (New paperback ed. 1985).

[11] Rita Mae Brown, STARTING FROM SCRATCH: A DIFFERENT KIND OF WRITERS' MANUAL (2011)

[12] See Sex, Male, and Female, MILLER-KEANE ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND ALLIED HEALTH (7th ed. 2003).

male or female; in vanishingly rare cases, individuals are born with a mix of male and female reproductive characteristics, but they do not constitute a third reproductive class.[13]

The meaning of "sex" is both objective and longstanding. Like all mammals, in order to survive, our earliest human ancestors had to be able to distinguish between male and female even before they developed the relevant language.[14] Since then, biologists have developed a more sophisticated understanding of sex, but the basic biological distinctions between the male reproductive class and the female reproductive class remain.[15] In contrast, the earliest appearance of the term "gender identity" in any law review article maintained by the Westlaw legal database appears to have been in 1985.[16]

The concepts of "gender identity" and "preferred pronouns" employed in the ruling below stem from a relatively new belief system whose adherents believe that a person's sex (or "gender") is determined not by their reproductive biology, but

---

[13] Sax, Leonard, *"How Common Is Intersex? A Response to Anne Fausto-Sterling."* THE JOURNAL OF SEX RESEARCH, v.39 no. 3 174-78 (2002).

[14] *See* Dawkins, R., THE ANCESTOR'S TALE, A PILGRIMAGE TO THE DAWN OF EVOLUTION 135 (2005) ("[T]he gene determining maleness (called *SRY*) has never been in a female body, at least since long before we and the gibbons diverged," approximately 17 million years ago).

[15] *X chromosome*, and *SRY gene - sex determining region Y*, NAT'L INST. FOR HEALTH GENETICS HOME REFERENCE (last updated May 20, 2020).

[16] *See* David M. Neff, *Denial of Title VII Protection to Transsexuals: Ulane v. Eastern Airlines, Inc.*, 34 DePaul L. Rev. 553 (1985).

by that "person's *innermost concept of self* as male or female or both or neither – how individuals perceive themselves and what they call themselves." R.49 at PageID 2098 (emphasis added). "Gender identity" is explicitly subjective and impossible for any person other than the one making the claim to detect or verify. The basis on which people might perceive themselves as the opposite sex (or both or neither) invariably involves malignant sex-stereotypes. "'Gender', in traditional patriarchal thinking, ascribes skirts, high heels and a love of unpaid domestic labour to those with female biology, and comfortable clothing, enterprise and initiative to those with male biology." Sheila Jeffreys, GENDER HURTS 1-2 (2014).

This linguistic misdirection is intentional. Through the obfuscating power of "gender identity," males like Intervenor-Defendant Doe can make legal claims and demands in a manner that obscures the very nature of those demands. For example, the Magistrate's findings adopted by the district court assert that "[Dr. Meriwether] continued to ignore or reject **her** requests that [Meriwether] treat **her** the same as **other students who identify as female**. R.49 at PageID 2103 (emphasis added). But "her" refers to a male student, and "other students" do not in fact "identify as female," they simply know they are female by virtue of their sexual reproductive characteristics. The decision below similarly discusses how Shawnee State University staff threatened Dr. Meriwether with punishment for "continuing 'to address [Doe] **differently than others** within the class by calling **her** by **her**

**surname** while other students are addressed as Ms. _ or Mr._.'" Doe. *Id.* at PageID 2104 (emphasis added). Yet treating Doe the same as others in the class would involve using the correct honorific for his sex, *i.e.* "sir" or "Mr. Doe." That is just what Dr. Meriwether attempted to do. *Id.* at PageID 2101. By indulging Doe's demand to be referred to by his "gender identity" and "preferred pronoun," the district court obscured both the facts at hand and the application of the law to the facts.

Perhaps unwittingly, the district court's embrace of this obfuscating language serves the interests of those whose goal is to deprive the words "sex" (or "gender"), "woman," and "female" of any stable meaning.

> The postmodern identity movement's reworking of sex and gender is at least partly to blame for [the] defanging of the feminist movement as a vehicle for women's liberation. At its heart, postmodernism in general "represents a challenge to the fixity of meaning." Specifically with regard to sex and gender, the postmodern identity movement calls into question the ability of human beings to be put into sexed or gendered categories at all.

Orwoll, *supra*, at 693. By destabilizing the language of sex and gender, men bold enough to "identify as" women can make extraordinary claims and demands upon women and society—and public institutions can support them under the mantel of "civility." *See* R.49 at PageID 2117, quoting *Smock v. Bd. of Regents of Univ. of Michigan*, 353 F. Supp. 3d 651, 660 (E.D. Mich. 2018).

As illustrated below, judicially sanctioning this blurring of basic facts will have many grave consequences. It is especially dangerous for women and girls, for whom the ideals of legal equity and freedom from sexual abuse remain elusive. But it is even *more* harmful to women of color, low-income women, and women living with disabilities or mental illness. This is because their life circumstances are more likely to lead them into the prison system, and they are more likely to need public services like emergency shelters or nursing facilities, where living and bathing often occurs in a communal setting. As discussed below, demands based on "gender identity" frequently target facilities that serve vulnerable women.

WoLF urges this Court to consider these implications in developing its ruling, and ultimately to reverse the ruling below and remand to the district court.

## ARGUMENT

## I. THE DECISION BELOW IS INCOMPATIBLE WITH WOMEN'S FREEDOM OF THOUGHT AND FREEDOM FROM COMPELLED SPEECH.

That individuals are permitted to have our own thoughts and beliefs is one of the most closely held principles in American jurisprudence. "[F]reedom of thought and speech . . . is the matrix, the indispensable condition, of nearly every other form of freedom. With rare aberrations a pervasive recognition of this truth can be traced in our history, political and legal." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937) (overruled on unrelated grounds by *Benton v. Maryland*, 395 U.S. 78

(1969)). "So it has come about that the domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states, has been enlarged by latter-day judgments to include liberty of the mind as well as liberty of action." *Id.*

Doe is entitled to hold the belief that he is female, just as people are entitled to believe either that the Earth is flat or that the sun revolves around the Earth. But one person's belief in those things (or many people's, for that matter) does not make any of them true. Further, it is axiomatic that a person's subjective belief about himself confers upon him no power whatsoever to compel others to adopt and voice his beliefs as their own.

Respondents can allow their staff to indulge Doe's demand to be addressed by female pronouns and titles if they wish. What Respondents may not do, without running afoul of the Constitution, is *require anyone else to adopt or voice a political viewpoint that the person does not share*. "Government may neither compel affirmation of a repugnant belief . . . nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities." *Employment Div., Dep't of Human Res. of State of Or. v. Smith*, 485 U.S. 660, 670 (1988) (citations omitted). Dr. Meriwether does not share Doe's belief that Doe is female, and no public institution may compel him to profess such a belief—not even through the subtle mode of honorifics, titles, or pronouns. *Id.*

In ruling against Dr. Meriwether, the district court adopted the precepts of "gender identity" *sotto voce*, then imposed on Dr. Meriwether the burden to demonstrate how speech that contravenes the "gender identity" belief system involves a matter of "public concern." R.49 at 2124, 2126. This had a distorting effect on the district court's analysis. For example, the magistrate's report asserts that Dr. Meriwether "*does not allege that he explained to students his reasons* for referring to Doe as a male or that it would have been appropriate for him to do so in his teaching role." *Id.* (emphasis added).

As with the district court's repeated confusing use of "she" and "her" to refer to the male student as discussed above, this reasoning borders on subterfuge. It is uncontested that "Doe appears male," to such a degree that Dr. Meriwether "believed that no one seeing Doe would have assumed that Doe was 'biologically female.'" R.49 at PageID 2101. It requires pretense to assume that Dr. Meriwether's students required any explanation of why Dr. Meriwether addressed Doe as a male. Indeed, the University's own policy acknowledges that "gender identity" concerns itself with "how individuals perceive themselves *and what they call themselves*." R.49 at PageID 2098. The University's policy mandates language changes through fiat, forcing employees to change their speech to accommodate a political demand. *Id.* Dr. Meriwether chose, through his speech, to actively resist a political idea he considers to be illegitimate and undesirable. *Id.* at PageID 2152.

13

His reason for doing this was readily apparent. It is Doe's demand to be referred to as "she" and "Ms.," enforced through the University's "preferred pronouns" policy, that makes Dr. Meriwether's otherwise-ordinary use of titles and pronouns a matter of public concern.

In any event, the district court ruling sanctions the use of state power to limit and compel speech of a political and controversial nature. Unless this Court reverses the district court ruling, any public employee in Kentucky, Michigan, Ohio, and Tennessee could be disciplined for speech that defines sex as a material biological condition, or that otherwise betrays a lack of belief in "gender identity." The direct and potential indirect consequences of the decision below are not justified by any valid civil rights principles and are contrary to the First Amendment. U.S. CONST. amend. I.

## II.   MANDATORY "GENDER IDENTITY" POLICIES HARM THE INTERESTS OF WOMEN AND GIRLS IN EDUCATION.

Women have been discriminated against in the educational arena for thousands of years, on the basis of sex. Redefining "sex" to mean "gender identity" derails and undermines the efforts of the thousands of publicly-funded schools and colleges to provide educational opportunities and facilities specifically aimed at redressing this discrimination by supporting women and girls.

In November 2019, the Kentucky Department of Education announced a new girls' Science, Technology, Engineering and Math (STEM) program to

prevent and address sex-based educational disparities.[17] If the district court's decision is allowed to stand, it could be cited as grounds to discipline program administrators if they refuse to divert program resources to serving boys who claim to "identify as girls."

Already, similar policies are depriving women and girls of athletic opportunities that are integral to their educational goals. Four Connecticut teenage girls have filed suit because they were required to compete against male athletes who claim to "identify as girls." Complaint at 2, *Soule, et al. v. Connecticut Assoc. of Schools, Inc*. et al., 3:20-cv-00201-RNC (D. Conn.), ECF 1. The U.S. Department of Education's Office for Civil Rights issued findings in a parallel administrative proceeding, concluding that authorities had "treated student-athletes differently based on sex, by denying benefits and opportunities to female students that were available to male students," in violation of Title IX of the Civil Rights Act, 20 U.S.C. § 1681 *et sec*. *See In re Connecticut Interscholastic Athl. Conf., et al.,* U.S. Dept. of Educ. OCR, Letter of Impending Enforcement Action (May 15, 2020). The authorities nonetheless continue to defend their policy in federal court.

Under "gender identity" policies, women and girls who had believed they would have the personal privacy of living only with other females will be surprised

---

[17] Fayette County Public Schools, *Girls STEM School*, https://www.fcps.net/girlsstem (last visited May 31, 2020).

to discover that males will be their roommates and will be joining them in the showers. Ohio University has a female-only residence called Voigt Hall. "Male guests are allowed to visit Voigt Hall, but are prohibited from spending the night in the hall and must adhere to the standard policy."[18] The University of Michigan boasts several women's dormitories, including "all-female" Helen Newberry Residence Hall.[19] Tennessee State University has Mary Wilson Hall, which "provides housing exclusively for First-Year women."[20] If the decision below stands, it will mean that any male student can claim eligibility for placement in one of these dormitories simply by claiming he "identifies as female," and the rights, privacy, and safety of the women who live in them will be put at risk.

Privacy is one thing; violence is another. That any male can justify his presence in any female-only space by saying "I identify as female" will not escape the notice of those who already use their access to public school settings to harass, assault, and rape tens of thousands of women and girls every day. Data shows that more than 10 percent of college women experienced sexual assault in a single academic year, with almost half of those women reporting more than one such

---

[18] Ohio University Housing and Residence Life, *Specialized Living Experience*, https://www.ohio.edu/housing/sle (last visited June 1, 2020).

[19] U. Mich. Housing, *Helen Newberry*, https://housing.umich.edu/residence-hall/helen-newberry/ (last visited June 2, 2020).

[20] Tennessee State University, *Wilson Hall*, http://www.tnstate.edu/housing/wilson.aspx (last visited June 1, 2020).

assault during that time.[21] Moreover, a majority of those assaults were committed by "students, professors, or other employees of the school."[22]

Twenty years ago, the Supreme Court described how women's physiology was used as an excuse to deny them education:

> Dr. Edward H. Clarke of Harvard Medical School, whose influential book, Sex in Education, went through 17 editions, was perhaps the most well-known speaker from the medical community opposing higher education for women. He maintained that the physiological effects of hard study and academic competition with boys would interfere with the development of girls' reproductive organs. See E. Clarke, Sex in Education 38-39, 62-63 (1873); id., at 127 ("identical education of the two sexes is a crime before God and humanity, that physiology protests against, and that experience weeps over"); see also H. Maudsley, Sex in Mind and in Education 17 (1874) ("It is not that girls have no ambition, nor that they fail generally to run the intellectual race [in coeducational settings], but it is asserted that they do it at a cost to their strength and health which entails life-long suffering, and even incapacitates them for the adequate performance of the natural functions of their sex."); C. Meigs, Females and Their Diseases 350 (1848) (after five or six weeks of "mental and educational discipline," a healthy woman would "lose . . . the habit of menstruation" and suffer numerous ills as a result of depriving her body for the sake of her mind).

---

[21] U.S. Dept. of Justice, Bureau of Justice Statistics, CAMPUS CLIMATE SURVEY VALIDATION STUDY FINAL TECHNICAL REPORT 85, January 2016, https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf.

[22] Id. at 104.

*United States v. Virginia*, 518 U.S. 515, 536 n.9 (1996). It is clear that this history of discrimination was premised on women's possession of a female reproductive system, *not* upon their subjective identities. *Id.* Yet the ruling below effectively denies public schools the ability to treat sex as a legal category for purposes of preventing and remediating sex discrimination.

The Nineteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex." U.S. Const. amend. XIX. The U.S. state and federal governments knew what a woman was when their laws prohibited women from voting; at no point were those disenfranchised women asked whether they identified with the sex-stereotypes or social limitations imposed on women at the time. Rather, women as an entire sex-class were *presumed* to be defined by the stereotypes and limitations imposed upon them.

While the class of persons targeted by anti-suffrage laws was delineated on the basis of an immutable characteristic – sex – the stereotypes and social roles imposed thereupon were wholly artificial. Here, in contrast, stereotypes about the female sex-class supply the *only* ostensible basis on which a male could claim that "[s]he [*sic*] identified as female." R.49 at 2101. The University policy here at issue simply eschews the objective nature of biological sex while retaining the repugnant sex-stereotypes.

## III. STATE ENFORCEMENT OF GENDER IDEOLOGY UNDERMINES OTHER RIGHTS AND INTERESTS OF WOMEN AND GIRLS

While this case involves a dispute over sex-specific pronouns and titles in public education settings, the proponents of "gender identity" make demands that extend much further. If the district court's ruling is allowed to stand, its potential legal and practical consequences for women and girls are substantial and broad.

### A. Women's Medical Services

The Shawnee State Student Health and Counseling Center provides free pap smears to eligible students.[23] A pap smear, or Papanicolaou test, is a "test used most commonly to detect cancer of the uterus and cervix," *i.e.*, parts of the female reproductive system that have no counterpart in the male reproductive system.[24]

The Human Rights Campaign (HRC), which describes itself as "the largest [U.S.] lesbian, gay, bisexual, transgender and queer civil rights organization," published a guide stating that "affirming" a person's gender identity requires the use of non-standard and even counter-factual terminology when describing body parts: for example, using "vagina" to refer to male genitals that have been reshaped by plastic surgery, while using "front hole" to refer to an actual vagina.[25]

---

[23] Shawnee State University, Using the Clinic, https://www.shawnee.edu/health/using-clinic (last visited May 31, 2020).

[24] *Papanicolaou test*, *cervix uteri*, and *vagina*, MILLER-KEANE ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND ALLIED HEALTH (7th ed. 2003).

[25] WHITMAN-WALKER HEALTH AND HRC, SAFER SEX FOR TRANS BODIES 4 (2016).

Like the use of "preferred pronouns," that guidance on language use is premised on a desire to show respect and "affirm" an individual's "gender identity." If the decision below stands, it could be interpreted to require all publicly-employed clinicians to submit to demands to use non-standard terms like "front hole," which render medical accuracy impossible when conducting these examinations or counseling women about the results. Clinicians could even be required to perform a simulated "pap smear" on a male who claims to have a "vagina," or risk disciplinary action by government administrators.

## B. Women's Emergency Shelters

The YWCA of Nashville and Middle Tennessee, which receives federal grant funding,[26] has "[f]or 122 years . . . helped women, girls, and families in Nashville and Middle Tennessee build safer, more self-sufficient lives," by operating domestic violence shelters, among other things.[27] If the decision below is allowed to stand, shelter administrators and counselors could be disciplined for refusing to allow men who claim to "identify as" women to share sleeping rooms or communal showers with physically and sexually-battered women. *Cf.*

---

[26] HUD EXCHANGE, *Young Women's Christian Association (YWCA) – Nashville and Middle Tennessee*, https://www.hudexchange.info/grantees/young-women-s-christian-association-ywca-nashville-and-middle-tennessee/ (last visited May 31, 2020).

[27] YWCA Nashville and Middle TN, https://www.ywcanashville.com/ (last visited May 31, 2020).

*Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp. 3d 776, 782

(D. Alaska 2019) (ruling in favor of women's emergency shelter cited for alleged

violations of the municipal code after refusing to allow a man to disrobe and sleep

next to homeless women).

### C.     Women's Prisons

In the U.S., women have been required against their will to share locked

prison cells and communal showers with men who claim to "identify as women."[28]

An Illinois woman is suing the state's Department of Corrections, alleging that she

was raped by a male inmate who "identifies as a woman," and that the Department

not only failed to protect her, but retaliated when she reported the rape.[29] In the

U.K., Karen White, a man who claims to be a woman, who had previously been

convicted of rape, was placed in a women's prison under the prison authority's

policy on "gender identity," where he went on to sexually assault additional

women.[30]

---

[28] *See* Jenny Gathright, The Guidelines For Protection Of Transgender Prisoners Just Got Rewritten, Texas Public Radio (May 12, 2018), https://www.tpr.org/post/guidelines-protection-transgender-prisoners-just-got-rewritten.

[29] Matt Masterson, *Lawsuit: Female Prisoner Says She Was Raped by Transgender Inmate*, WTTV NEWS (Feb. 19, 2020), https://news.wttw.com/2020/02/19/lawsuit-female-prisoner-says-she-was-raped-transgender-inmate.

[30] Nazia Parveen, *Karen White: how 'manipulative' trans-gender inmate attacked again*, THE GUARDIAN (Oct. 11, 2018)

### D.    Vital Government Statistics

Sex is a vital statistic; "gender" and "identity" are not. Governments have many legitimate interests in recording and maintaining accurate information about their residents' sex, for purposes of identification, tracking crimes, determining eligibility for sex-specific programs or benefits, and determining admission to sex-specific spaces, to name just a few examples. In contrast, there is no legitimate governmental interest in recording a person's subjective or unverifiable "identity," or giving that identity legal significance in lieu of sex.

In fact, recording "gender identity" instead of sex would skew government statistics that are crucial in the fight to end violence against women. As demonstrated consistently by the FBI's Uniform Crime Reporting system and similar state systems, women face a dramatically disproportionate statistical risk of violence, rape, assault, or voyeurism, and in the vast majority of cases women suffer these harms at the hands of men. For crimes reported by law enforcement to the FBI in 2015, men committed over 88 percent of all murders, 97 percent of rapes, 77 percent of aggravated assaults, and 92 per-cent of sex offenses other than rape or prostitution.[31]

---

https://www.theguardian.com/society/2018/oct/11/karen-white-how-manipulative-and-controlling-offender-attacked-again-transgender-prison.

[31] Dept. of Justice Fed'l Bureau of Investigation, 2015 CRIME IN THE UNITED STATES, TABLE 33, TEN-YEAR ARREST TRENDS BY SEX, 2006–2015.,

Obscuring sex in these statistics could make them appear more "gender neutral," and lead governments and civil institutions to de-prioritize their focus on *male* violence against women and girls. Giving perpetrators the legal right to demand that their "gender identity" be recorded, rather than sex, could even cripple the ability of law enforcement to identify or investigate crimes.

All of the foregoing examples of harm to women and girls are the logical consequence of forcing society to accept the idea and language of "gender identity."

## IV. THIS COURT SHOULD NOT ENFORCE WHAT AMOUNTS TO A POLITICAL RELIGION.

After citizenries around the world rejected "divine right" as a source of legitimacy for kings and emperors, there emerged in the resulting void numerous different systems of "political religion," which took the form of secular ideology. Cyril Hovorun, *Ideology and Religion* 23-35, KYIV-MOHYLA HUMANITIES JOURNAL 3 (2016).[32] Such ideology "offers a holistic worldview, easily mobilizes masses, and acts with the power of a myth. In this sense, it is a 'secular religion' with its own 'priests'—the intellectuals. Ideology can act as a supplement to

---

https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-33 (last visited June 1, 2020).

[32] Available at: http://ekmair.ukma.edu.ua/bitstream/handle/123456789/11060/Hovorun_Ideology_and_Religion.pdf?sequence=1 (last visited May 26, 2020).

religion, or as its replacement." *Id.* "[S]uch 'religions' are understood to share some properties of generic religion [that are] conceived [as] negative—fanaticism, intolerance, and irrationality." A. JAMES GREGOR, TOTALITARIANISM AND POLITICAL RELIGION, AN INTELLECTUAL HISTORY 3 (2012).

Perhaps the worst feature of totalitarian political religions is that they demand a belief in whatever truth-claims those in power may assert:

> But the great analysts of truth and speech under totalitarianism—George Orwell, Hannah Arendt, Vaclav Havel—can help us recognize this kind of lie for what it is. . . . Saying something obviously untrue, and making your subordinates repeat it with a straight face in their own voice, is a particularly startling display of power over them. . . . Being made to repeat an obvious lie makes it clear that you're powerless; it also makes you complicit. You're morally compromised. Your ability to stand on your own moral two feet and resist or denounce is lost.

Jacob T. Levy, *Authoritarianism and Post-Truth Politics*, NISKANEN CENTER (Nov. 30, 2016).[33]

Pertaining to this case, the ideas surrounding "gender identity" arose in rebellion against the "gender binary," which is more accurately described as the sex binary, *i.e.*, the understanding that human beings can meaningfully be classified into the two sexual reproductive classes, male or female. Jessica A. Clarke, *They, Them, and Theirs*, 132 HARV. L. REV. 894, 895 (2019). Unlike

---

[33] At https://www.niskanencenter.org/authoritarianism-post-truth-politics/.

radical feminism, which works to abolish artificially-imposed sex-roles and sex-stereotypes, the proponents of "gender identity" work to abolish our very ability to perceive and name sex-based distinctions like male and female. *Id.* (noting that early gender theorists posited the legal recognition of two sexual reproductive classes as "a taboo against the sameness of men and women."). According to its proponents, "[g]ender identity is also referred to as the 'brain sex' because it is," so they claim, "hardwired in the brain." M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to Reflect Modern Medical Science Is Key to Transgender Rights*, 39 Vt. L. Rev. 943, 955 (2015).

It is this ideology that informs and purports to legitimize Doe's demand to be recognized as "a woman," as well as the University's policy mandating the use of "preferred pronouns." That policy bears the markers of a political religion. Professors like Dr. Meriwether are not merely required to treat their students with civility and respect, nor are they merely required to foster discussion or study of the concept of "gender identity" as an academic subject. Rather, University employees are compelled to use their speech to affirm any student's subjective, capricious, and unverifiable beliefs about himself, and about "gender identity." The policy departed from the realm of pedagogy the moment it was interpreted to require Dr. Meriwether and his colleagues to lend their voices in support of a

political religion with which they may have serious intellectual and ethical disagreements.

Only by veiling this coercive process as an exercise in "civility and respect," R.49 at PageID 2133-35, was the district court able to declare, for example, that "[Dr. Meriwether] has not alleged that [the University] forced him to espouse or express a view that [Dr. Meriwether] disagreed with or found objectionable." *Id.* at PageID 2129. That is, in fact, exactly what the University did, on pain of disciplinary action.

As demonstrated above, the adverse repercussions for women and girls of this seemingly-limited employment dispute are breathtaking. This Court should not allow institutions backed by the authority of the state, including the federal judiciary, to become tools of the new "gender identity" political religion.

## CONCLUSION

The alleged "discrimination" underlying this case consists entirely of a thoughtcrime, manifested as speech. In no other area of civil rights law does equitable treatment of a group or individual require that others adopt their subjective beliefs. Nor can civil liberties survive under such a formulation. With its mind-over-body dissociation from material reality, and its demands to redefine or displace "sex" under the law, "gender identity" ideology poses an existential threat to women's rights. For the foregoing reasons, Women's Liberation Front urges the

Court to reverse the ruling below and remand to the district court for further

proceedings.

Respectfully submitted this 3rd day of June, 2020.

*/s/ Jennifer C. Chavez*
Jennifer C. Chavez
1800 M Street, NW, Unit 33943
Washington, DC  20033
jennifer.c.chavez@outlook.com
(540) 918-0186
*Counsel for Amicus Curiae*
*Women's Liberation Front*

**CERTIFICATION OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5).

1.  Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 5,981 words.

2.  The brief has been prepared in proportionally space typeface using Microsoft Word in 14-point New Times Roman font. As per by Fed. R. App. P. 32(g)(1), the undersigned has relied on the word count feature of this word processing system in preparing this certificate.


Dated: June 3, 2020

*/s/ Jennifer C. Chavez*
 Jennifer C. Chavez
*Counsel for Amicus*
*Women's Liberation Front*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2020, I filed the foregoing BRIEF OF

AMICUS CURIAE WOMEN'S LIBERATION FRONT IN SUPPORT OF

PLAINTIFF-APPELLANT, using the CM/ECF system, which caused an

electronic notification to be sent to the following attorneys of record:

Paul R. Kerridge
Keating Muething & Klekamp, PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Telephone: (513) 579–6468
Facsimile: (513) 579–6457
pkerridge@kmklaw.com

*Attorneys for Defendants*

Shannon P. Minter
Asaf Orr
Christopher F. Stoll
National Center for Lesbian Rights
870 Market Street Suite 370
San Francisco, California 94102
Telephone: (415) 392–6257
Facsimile: (415) 392–8442
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

Jennifer L. Branch
Gerhardstein & Branch, Co. LPA
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
Telephone: (513) 621–9100
Facsimile: (513) 345–5543
jbranch@gbfirm.com

*Attorneys for Defendant-Intervenors*

Dated: June 3, 2020

*/s/ Jennifer C. Chavez*
Jennifer C. Chavez
*Counsel for Amicus*
*Women's Liberation Front*