No. 20-3289

---

### United States Court of Appeals for the Sixth Circuit

---

Nicholas K. Meriwether,

Plaintiff-Appellant,

v.

THE TRUSTEES OF SHAWNEE STATE UNIVERSITY-Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra Hash, Robert Howarth, George White, and Wallace Edwards - in their official capacities; JEFFREY A. BAUER, in his official capacity; ROBERTA MILLIKEN, in her official capacity; JENNIFER PAULEY, in her official capacity; TENA PIERCE, in her official capacity; DOUGLAS SHOEMAKER, in his official capacity; and MALONDA JOHNSON, in her official capacity,

Defendants-Appellees.

---

On Appeal from the United States District Court
For the Southern District of Ohio
Case No. 1:18-cv-00753-SJD
The Honorable Susan J. Dlott

---

### Brief of *Amici Curiae* Professors of Philosophy, Theology, Law, Political Science, and Medicine in support of Plaintiff-Appellant and urging reversal of the lower court

---

Randall L. Wenger
Jeremy L. Samek
Independence Law Center
23 North Front Street, First Floor
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………… ii

INTERESTS OF AMICI CURIAE…………………………………………... 1

INTRODUCTION………………………………………………………… 1

ARGUMENT……………………………………………………...… 5

I. Background…………………………………………………….. 5

II. Public Concern: The displacement of sex with gender identity has vast social
and philosophical implications……………………………………… 6

    A. The lower court improperly framed the issue………………….…………… 6

    B. The policies mandate a particular (albeit ambiguous) metaphysic...……...…12

        1. The speech policies are totalizing, compelling the displacement of
sex, understood as rooted in the body, with the concept of gender
identity, thereby forcing Dr. Meriwether to speak as though gender
identity were objective,,,…………………………………………..… 12

        2. The policies brook no dissent……………………………….…..… 16

        3. The policies mandate an ambiguous metaphysic..……………………… 17

III. First Amendment and academic freedom: the district court's interpretation
of *Garcetti* may be influenced by its decontextualized understanding of
Dr. Meriwether's speech…………………………………………….... 24

CONCLUSION………………………………………………..… 28

APPENDIX……………………………………………………..……… 29

CERTIFICATE OF COMPLIANCE………………………………….. 32

CERTIFICATE OF SERVICE…………………………………..…….. 33

TABLE OF AUTHORITIES

**Cases**

*Adams v. Trs. of Univ. of N.C.-Wilmington*,
   640 F.3d 550 (4th Cir. 2011) ..................................................................25

*Corlett v. Oakland University Board of Trustees*,
   958 F. Supp. 2d 795 (E.D. Mich. 2013) .................................................9

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) ....................................25

*Evans-Marshall v. Board of Education of Tipp City Exempted Village School
   District*, 624 F.3d 332 (6th Cir. 2010) ..................................................25

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................4, 25

*Janus v. Am. Fed'n of State, County, & Mun. Emps.*,
   138 S. Ct. 2448 (2018) .....................................................................7, 15

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ............................4, 25

*Meriwether v. Trs. Of Shawnee State Univ.*, No. 1:18-cv-753,
   2019 U.S. Dist LEXIS 151494 (S.D. Ohio Sept. 5, 2019) ........... passim

*Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012) .........................................24

*Spence v. Washington*, 418 U.S. 405 (1974) ...........................................7

*United States v. Varner*, 948 F.3d 250 (5th Cir. 2020) ..........................22

**Other Authorities**

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental
   Disorders* (*DSM-5*) (5th ed. 2013) .......................................................19

Ann Oakley, *Sex, Gender, and Society (Toward a New Society)* (Temple Smith, 1972) ....................................................................................................21

David S. Crawford, *Gender Identity and Nihilism: Some Anthropological Implications of Recent Caselaw*, October 7, 2019 ...............................................18

Gayle Salamon, *Assuming a Body: Transgender and Rhetorics of Materiality* (Columbia University Press, 2010) ......................................................22

Jessica Botelho-Urbanski, *Baby Storm five years later: Preschooler on top of the world*, The Star, July 11, 2016 ............................................................21

Judith Butler, *Bodies that Matter* (Routledge, 2011) ............................................21

Judith Butler, *Gender Trouble* (Routledge, 1990)...................................................21

Katherine Timpf, *Wesleyan Now Offering LGBTTQQFAGPBDSM Housing (Not a Typo)*, National Review, Feb. 25, 2015.............................................................22

Lawrence S. Mayer and Paul R. McHugh, *Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences*, New Atlantis, Fall 2016 ....19

S. Elizabeth Malloy, *What Best to Protect Transsexuals from Discrimination: Using Current Legislation or Adopting a New Judicial Framework*, 32 WOMEN'S RTS. L. REP., 283-323 (2010) .................................................. 20, 22

Twelve Leading Scholars, *Philosophers Should Not Be Sanctioned Over Their Positions on Sex and Gender*, INSIDE HIGHER ED., Jul. 22, 2019 .......................26

Whitney Barnes, *The Medicalization of Transgenderism*, Trans Health, July 18, 2001.................................................................................20

# INTERESTS OF *AMICI*[1]

*Amici*, whose names and affiliations are set forth in the attached Appendix, are distinguished professors of philosophy, theology, law, political science, and medicine. As academics and experts in their respective fields, they wish to express their deep concern regarding the implications of the district court's decision for open academic debate concerning politically charged issues and the growing tendency of public university bureaucrats to take sides in what is in fact a complex philosophical issue about which serious thought and reasoned debate have barely begun.

# INTRODUCTION

The district court framed this case, in which university officials threatened and penalized a philosophy professor for his use of sex-specified rather than gender-identity-based titles and pronouns, as one merely concerned with administrative authority to enforce standards of professionalism and civility. This approach barely conceals what everyone in fact knows: the case actually concerns a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no counsel for any party authored this brief in whole or in part, and no person or entity, other than *amici* and its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

It is difficult to think of any feature of human nature more basic than the division of humanity into men and women, the fact that the bodies of men and women correlate, that history, civilization, and indeed the future of the species depend on this correlation, and that these facts mean that our ties of kinship are literally inscribed in our bodies from birth. Academics, like society at large, are engaged in an important and often bitter dispute about these matters. The debate is rooted in differing *philosophical* assumptions (whether conscious or not, whether clearly formulated or articulated or not) concerning the meaning of human sexuality and therefore also human nature itself. At stake is the fundamental philosophical question of the relationship between our embodied existence and our subjective sense of self. This debate has profound implications for academic disciplines as diverse as law, politics, sociology, education, biology, psychology, medicine, and of course, appellant Dr. Nicholas Meriwether's particular field of expertise, *philosophy*.

While the university policies, along with their codification of the concept "gender identity," are presented as providing basic standards of civility, they impose a set of philosophical assumptions with which Dr. Meriwether clearly disagrees. Despite the very reasonable doubts raised by "gender identity's" ambiguities, the policies effectively force dissenters to speak *as if* the concept was unproblematic and *as if* they agreed with it.

The district court treated Dr. Meriwether's use of titles and pronouns as if they were merely private forms of speech, lacking public concern. *Meriwether v. Trs. Of Shawnee State Univ.*, No. 1:18-cv-753, 2019 U.S. Dist LEXIS 151494 at *44-49 (S.D. Ohio Sept. 5, 2019). Yet, nothing a professor says in a classroom is private or narrowly addressed to an individual student. When a professor speaks to one student, he or she is also speaking to every student in the classroom. This simple observation is key. Dr. Meriwether's use of sex-based titles and pronouns demonstrates consistency with and personal commitment to his philosophical position. If he were forced to speak as the policies demand, this consistency and commitment would be shattered. The price of compliance, then, would be hypocrisy.

In fact, the policies' imposition of the language of "gender identity" is oppressive and totalizing, effectively depriving academic discourse of the conceptual category of sex as rooted in the realities of man and woman and replacing it with a very different conceptual category, gender identity.

To make matters worse, the policies imposed on Dr. Meriwether a concept that is both vague and problematic. We can see this in the policies' definition of "gender identity": "a person's innermost concept of self as male or female or both or neither—how individuals perceive themselves and what they call themselves." *Id.* at *7-8. Philosophical, legal, and popular depictions of "gender identity" include

countless variations, and the policies' definition is compatible with any or all of them.

This sort of imposition—so uninterested in rational inquiry, so palpably totalizing, so egregiously ambiguous—is the very antithesis of the rational and scholarly engagement with issues of vital public concern that should characterize the intellectual life of public universities.

****

This brief will address two crucial issues. Part I will address what is really at stake in the forced conformity of university faculty to the concept of "gender identity" in their use of titles and pronouns in the classroom. It will present the reasons why the displacement of sex with the concept, as occurs in the policies, raises issues of vital *public concern*.

In light of these public concerns, Part II will address the question of whether the lower court should have applied the "official duty" test in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), so as to allow the university's institutional bureaucracy to "cast a pall of orthodoxy over the classroom" (*Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

## ARGUMENT

### I. Background

Dr. Meriwether, a professor at Shawnee State University in Ohio, alleges that the defendants—his department superiors, administration officials, and the university trustees—violated his First Amendment rights by their adoption and application of "gender identity" nondiscrimination policies that coerced and penalized his speech on matters of profound public concern. *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *23-24.

Dr. Meriwether resisted defendants' application of their policies after a male student ("Doe") demanded to be addressed as a woman. *Id.* at *12. For the remainder of the semester Dr. Meriwether attempted to accommodate Doe by addressing him by his name and without pronouns, while continuing to use sex-specified titles (Sir, Ma'am, Mr., Ms.) and pronouns (he, she, etc.) for the other students in the class. *Id.* at *13, 38. This compromise was at first accepted and then quickly rejected by the defendants after Doe lodged further complaints. *Id.* at *13-14. Dr. Meriwether offered another compromise: to eliminate titles for all students, avoid pronouns for Doe, and continue using sex-specified pronouns for all other students. Finally and significantly, he offered to use titles and pronouns based on gender identity for all students (including Doe), on the condition that he could place a disclaimer in his syllabus. *Id.* at *14-15. These compromises were also rejected. *Id.* at *15.

With the rejection of these proposed compromises, defendants essentially left Dr. Meriwether with two untenable options: either (1) use titles and pronouns conforming with all students' "gender identities" without a disclaimer or (2) avoid the use of titles and pronouns for any students, again without a disclaimer. *Id*. at \*18. But either of these alternatives would in effect have forced Dr. Meriwether to speak in ways that are inconsistent with his understanding of human sexuality. *Id*. at \*18-19.

The lower court held that Dr. Meriwether's use of titles and pronouns in this case did not constitute protected speech both because it occurred during the course of his duties as a professor and because it did not address a public concern. *Id*. at \*38-39, \*49-50.

## II.   Public Concern: The displacement of sex with gender identity has vast social and philosophical implications.

### A. The lower court improperly framed the issue.

By framing the case as concerned with professional standards of civility, the lower court failed to address the real issues. It granted that Dr. Meriwether's use of titles and pronouns was "speech" for purposes of First Amendment analysis. *Id*. at \*31-32. Yet, it denied that his speech was protected. This judgment was based in part on the conclusion that it did not involve an issue of "public concern." *Id*. at \*32.

This conclusion was enabled by the court's failure to take the actual context of Dr. Meriwether's speech seriously. While it conceded that "'gender identity,' like

many other 'controversial subjects,' is 'undoubtedly [a] . . . matter[] of profound 'value and concern to the public,'" and that "the plaintiff's speech related to gender identity," the court argued that his speech "did not implicate the broader social concerns surrounding the issue." *Id.* at *44 (quoting *Janus v. Am. Fed'n of State, County, & Mun. Emps.*, 138 S. Ct. 2448, 2476 (2018)).

The reason for this puzzling conclusion is that Dr. Meriwether's "speech was limited to titles and pronouns used to address one student." It was "directed to [Doe] and heard only by [his] and [his] fellow students" and could not "reasonably be construed as having conveyed any beliefs or stated any facts about gender identity." *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *44-45. Or again, it could not "be viewed as 'inherently expressive' and 'protected speech' because the surrounding circumstances show it was unlikely that the message would be understood by those exposed to it as expressing the viewpoint that plaintiff now ascribes to the speech." *Id.* at *47 (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)). "Thus, plaintiff's use of male pronouns and titles to address and refer to Doe cannot reasonably be construed as conveying *plaintiff's broader beliefs and views* about gender identity."[2] *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *31-32 (emphasis original).

---

[2] This quotation mischaracterizes Dr. Meriwether's actual response and the precise basis for his bringing this action. According to the court's own report, Dr. Meriwether agreed to refer to Doe without sex-based titles or pronouns, *Meriwether*,

No one believes claims such as these, least of all Dr. Meriwether's students. At best, they indicate a question of fact as to whether a reasonable student, given the larger social and academic context, would understand Dr. Meriwether to be conveying a very definite message. For that reason, this Court should reverse the district court's dismissal for failure to state a claim.

More basically, the district court treats Dr. Meriwether's refusal to follow either of the two options left to him by defendants as though it concerned *only* modes of formal address without substance, such as saying, "Hello." But, as with all speech acts, context is everything. Here, the context is different from that of mere social norms of etiquette or professional and civil forms of communication or mere formal address without substance. Rather, the context is the classroom, filled with students, in which addressing one student (as any professor can testify) is necessarily addressing *all* of the students. The context was also that of education, rational debate, philosophical engagement, and the formation of young people's minds in preparation for life. But much more importantly and pertinently, the context was that of the wider debate over transgenderism and its supporting concept, "gender identity." Yet, the lower court's analysis is hobbled by its assertion that none of this

---

2019 U.S. Dist. LEXIS 151494, at *13, while he continued to refer to the other students with sex-based titles and pronouns, as he always had. *Id. at *37-38*. It was this arrangement, and the differential treatment it entailed, that Doe and then the defendants found unacceptable. *Id*.

larger context was really at play in Dr. Meriwether's use or non-use of sex-specified titles and pronouns. This neglect of the proper contextual field of communication drives the lower court's conclusions.

This fact is made more obvious in the court's comparison of Dr. Meriwether's speech with that considered in *Corlett v. Oakland University Board of Trustees*, 958 F. Supp. 2d 795 (E.D. Mich. 2013). Corlett involved a student's written assignments containing "'expressions of lust for' his teacher," including "descriptions of her physical appearance," which were not accorded First Amendment protection. *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at \*48 (quoting *Corlett*, 958 F. Supp. 2d at 809). The comparison appears to suggest that, like the student's writings in *Corlett*, Dr. Meriwether's speech amounted to individualized harassment lacking public relevance, as though Dr. Meriwether had suddenly and randomly decided, in the midst of class, to hurl abuse at Doe. Here again we see the pattern of a reductive and context-free treatment of the issue.

Significantly, the court grants that the analogy with *Corlett* is at best weak. *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at \*48. In fact, however, it is totally misleading. It is intended to show a lack of "public concern," not because the issues evoked by the roiled debate over transgenderism and "gender identity" lack inherent public concern, but because Dr. Meriwether's mode of address lacked a clear connection to this public concern. Yet, unlike the student's speech in *Corlett*, which

cannot be thought of as addressed to an issue of public concern, Dr. Meriwether's speech acts were motivated by his desire to maintain and communicate consistency to his students in his philosophical position on a matter of great public concern. Asking him to speak otherwise was asking him to speak dishonestly, hypocritically, and in a way that he believes is harmful both to society and his students, including Doe.

The *Corlett* analogy's inaptness illustrates how Dr. Meriwether's use of sex-specified titles and pronouns is nothing like individualized and non-public speech. In fact, to speak in the very public forum of the classroom is to speak to untold numbers of people beyond the classroom's four walls, from the moment class is over to the time when those students become leaders. Were Dr. Meriwether to speak in a manner inconsistent with the reality of sexuality's rootedness in the body, the cognitive dissonance would certainly be noticed, and this would sap his message of the power that can only come with rational consistency and personal commitment. This consistency and commitment, and even the willingness to suffer for them, have been the mark of philosophers since Socrates.

The district court's pattern of decontextualization demonstrates that it missed the entire social context of Dr. Meriwether's use of sex-specified titles and pronouns. To miss this context is to miss the actual issue, which is the subject of an ongoing

political debate, in which the control of language is fundamental, particularly as it applies to titles and pronouns.

Let us assume for a moment, however unrealistically, that the university policies have not entirely chilled any thought of addressing the philosophical issues and ambiguities raised by the forced normalization of the concept of "gender identity" and that Dr. Meriwether therefore remains free to engage these issues as both teacher and scholar. To ask Dr. Meriwether to use the titles and pronouns that accord with "gender identity," or for that matter, as we shall see, to avoid sex-specified titles and pronouns altogether, is to force him to speak *as if* the concept of "gender identity" is an accurate description of what is essential to sexuality and then, from within that *as-if* linguistic framework, to attempt to state his case against the concept of "gender identity." This would be like Athens asking Socrates to defend his teaching on the idea of the good while disallowing use of the words "idea" and "good."

The strategy of the defendants here is clear and has become all too familiar: the language of an opposing position is institutionally delegitimized and stigmatized so that rational debate concerning vital human issues becomes impossible. In a word, it is a strategy for winning the debate without having to go to the trouble of actually debating. This is an abuse the First Amendment precludes.

Given the context of Dr. Meriwether's speech, then, titles and pronouns very clearly are not just a matter of civility; they carry with them a fundamental viewpoint regarding the nature of the sexual difference between men and women, girls and boys.

The lower court's treatment of his speech as merely formal modes of address, empty forms without publicly relevant rational content, is obviously wrong when the speech acts are placed in the wider context of a vexed social and philosophical issue. Of course, that the use of titles and pronouns has become so widely contentious proves that no one actually believes the court's cramped line of argument. Indeed, given the obvious social and political context of Dr. Meriwether's use of titles and pronouns, the *form*, far from being empty, is also the *content*. Or to paraphrase Marshall McLuhan, the mode of address *is* the message.

**B. The policies mandate a particular (albeit ambiguous) metaphysic.**

**1. The speech policies are totalizing, compelling the displacement of sex, understood as rooted in the body, with the concept of gender identity, thereby forcing Dr. Meriwether to speak as though gender identity were objective.**

In addressing the question of compulsion, the district court claims that Plaintiff has not alleged that defendants forced him to espouse a view that plaintiff disagreed with or found objectionable. *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *53.

But of course, the defendants did mandate that he either use titles and pronouns in conformity with gender identity or that he refrain from using titles and pronouns at all.

While the defendants and the lower court present the policies as only concerned with promoting civility and tolerance, they are actually totalizing in the extreme. This fact is laid bare by the rejection of Dr. Meriwether's attempted compromises. It was not enough for Dr. Meriwether to refrain from referring to Doe with titles and pronouns Doe found offensive. The university required Dr. Meriwether to address and refer to *all* of his other students, including those who might disagree with the idea of "gender identity," in a way that Doe would find inoffensive.

Nor was it good enough to allow Dr. Meriwether to use gender-identity-based titles and pronouns, but also allow him to signify his disagreement with the usage in a disclaimer. No, Dr. Meriwether was not allowed even to distance himself from the ideologically freighted decree of university bureaucrats.

One might argue that Dr. Meriwether is authorized under the policies to refer to *most* of his students in accord with their actual sexes, so long as he refers to Doe according to his "identity." Yet doing so is predicated on the other students' sexes happening to correlate with their "identities." In other words, in all cases the exclusive criterion for authorization is "gender identity," never in fact a student's

actual sex. Hence, the students' sexes are not, and in principle cannot be, a basis for personal address or reference, except perhaps as a statistical clue for initial assumptions.

What is shown by this point is that the understanding of man and woman as natural and given realities rooted organically in the body is no longer conceptually available under the policies. The natural and concrete category "sex," which shapes the experiences and lives of countless men and women, girls and boys, from their earliest childhood memories, is completely displaced by the floating concept "gender identity."

This totalizing effect of the policies, their codification of "gender identity," and their displacement of bodily sex, as the central way of conceiving what is deepest or most important in human sexuality, is having and will have vast implications for any sort of academic, reason-centered debate. Of course, it will also have untold implications for how persons are understood and treated, how family ties are understood and children are raised, and how people experience themselves.

The court bolsters its argument that the policies do not compel speech with the observation that Dr. Meriwether could avoid titles and pronouns altogether. *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *53. It is supposed that this alternative would be a way to avoid implying agreement with the category "gender identity." This claim again utterly fails to take into account the fact that Dr.

Meriwether used titles and pronouns to express an issue of public concern with commitment and consistency. Defendants have in effect censored the words necessary for Dr. Meriwether's to do so.

It is a principle of First Amendment jurisprudence that both speaking and not speaking are protected. *Janus*, 138 S. Ct. at 2463. Presumably this is not only because forcing people to mouth what they do not believe is fundamentally wrong, it also suggests recognition that both speaking and not speaking can communicate volumes. Dr. Meriwether, given his options, was forced either to speak or not to speak. In the specific context of his class, a choice "not to speak" by avoiding sex-specified language would obviously be intentional and likely imply his general agreement with, or at least capitulation to, the gender identity movement or the style of language it deems acceptable. This inference would be especially likely in the absence of a disclaimer. And the impression would be magnified for Dr. Meriwether, given his very consistent history of using sex-specified language over decades in the classroom. To subtract all sex-specified referents from one's speech, aside from violating the basic lived structures and natural flow of the language, is to imply that one has conformed to the sexless and even androgynous worldview Dr. Meriwether clearly seeks to resist.

Hence, the two alternatives offered Dr. Meriwether are not really alternatives at all. Either way, the category "sex" is eliminated. The price for using titles and

pronouns at all would be acceptance of the mode of address based on gender identity. The price for refusing to use them would be adoption of an asexual mode of speech, which again implies complicity with the concept of "gender identity."

Even if a hypothetical student were to say, "Dr. Meriwether, I strongly disagree with the conceptual foundation of gender identity. From now on, please be sure to address me only with sex-based titles and pronouns," this demand could only be interpreted under the policies as a demand, paradoxically, for reference according to "gender identity." Not only do the policies fail to include the possibility for natural points of reference, they preclude them by reinterpreting personal "identity" according to the liquid, voluntarist terms that are the substance of "gender identity." The policies have in effect reconceived all members of the university community according to the logic of "transgenderism."

**2. The policies brook no dissent.**

When the district court takes up Dr. Meriwether's claim based on content or viewpoint discrimination, it tells us that "[t]he policies are not designed to punish speech or to suppress a particular viewpoint and are viewpoint neutral. . . ." *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *65. But this case shows that they did, in fact, punish speech not in conformity with the concept of "gender identity." Again, it is highly significant that Dr. Meriwether's proffered compromises were rejected; no distancing from the ideological slant would be allowed.

The issue is therefore raised as to whether state universities can lend their institutional powers to a controversial ideological movement by means of coercively remaking and policing the common, everyday use of language and grammar, in opposition to critical philosophical and political viewpoints.

Of course, the university policies at issue ostensibly seek only to allow students to live according to their claimed identities. So, for example, they claim only to ensure that Doe is treated as a woman if he so desires. But this narrow framing of the issue does not capture the full extent of its demand, which entails also the requirement that professors and others *affirm* his claimed identity. In truth, the university policies imply a requirement that *everyone* in the university community affirm Doe's identity. But to affirm his identity means that all must act, speak, and (in the end) think as though he really were a woman, even if their basic understanding of human nature and reality, not to mention their eyes and ears, tell them otherwise. As in George Orwell's *Nineteen Eighty-Four*, this control and manipulation of language, such that people are not allowed to speak and think what is plain to their eyes, smacks of totalitarianism.

### 3. The policies mandate an ambiguous metaphysic.

The sort of nondiscrimination policies at issue in this case are far from unusual. Yet many professors and other professionals have great reservations about the concept of gender identity, even if they are cowed into silence. The inherent

ambiguity of the concept forms an element of Dr. Meriwether's Complaint under the First Amendment and a basis for his additional Fourteenth Amendment claim. *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *21, *80-81.

Pinning down the exact meaning of gender identity would be impossible, since there is no one such meaning. There are, of course, certain features that are clear. Gender identity's most obvious effect is to suppress or obscure the human body's seemingly central place in our understanding of sex. Indeed, from the standpoint of a more traditional approach, the concept of gender identity expresses a deep-seated hostility to the body, which the movement tends to relegate to a set of functional parts, plasticity, and most recently, social construction. In this way, the concept of gender identity is effectively gnostic.

The policies' definition, which is typical, pegs "gender identity" to an experience of or choice about oneself, referring as it does to one's "concept" or "perception." *Id. at *7-8*. This definition is compatible with a very wide range of meanings currently on offer, with all their inconsistencies and even contradictions. A rapid overview of a few of the endless permutations (both philosophical and popular) will suffice to make the point.[3]

---

[3] The next five paragraphs, discussing variations on the concept of "gender identity," are adapted from David S. Crawford, *Gender Identity and Nihilism: Some Anthropological Implications of Recent Caselaw*, October 7, 2019, https://ssrn.com/abstract=3465628.

First, there is the version many people have in mind when they hear the word "transgender." This first variant treats "gender identity" as a characteristic of one's conscious experience, which may or may not "align" with one's "assigned" gender, that is to say, bodily sex. Psychology used to speak of "gender identity disorder,"[4] and the gender identity movement still speaks of "incongruence,"[5] "non-alignment," and other such phrases. These negations suggest that there is in fact an objective and natural ordination between "identity" and the body's sex, which may be lacking in some individuals. Yet it sees the inner domain of subjective experience as the more real, "natural" element, while bodily sex is reduced to an external, material, and functional one.

It presupposes that a man, for example, who says, "I experience myself as a woman," could, in fact, really know what it is like to experience himself as a woman despite having a man's body. It also assumes that the "transgender man" *really is* a man and the "transgender woman" *really is* a woman, even though their bodies *really*

---

[4] The American Psychiatric Association's current *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-5*) (5th ed. 2013) has removed the term "gender identity disorder." Nevertheless, its definition of "gender dysphoria" still depends on the patient's experience of "incongruence." Lawrence S. Mayer and Paul R. McHugh, *Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences*, New Atlantis, Fall 2016 at 94. *DSM-5* characterizes "gender dysphoria" as an "incongruence between one's experienced/expressed gender and assigned gender" accompanied by a "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *DSM-5*, at 452.

[5] *See, e.g.*, *id.* at 452.

*are* the opposite of their claimed identities. It therefore posits an underlying inner personal truth or nature, which by implication is both sexed and immaterial, a kind of sexually differentiated Cartesian ego or consciousness. Its opposite would then be a separate body, conceived as an outer shell or external expression, characterized only functionally. If there is illness here, paradoxically, it is in the perfectly healthy body's lack of conformity to the mind.

Due to these and other paradoxes, this initial version of the concept is unstable and tends to break down into others. For example, there is a growing chorus of resistance to the "medicalization" of "non-alignment." The implication is that "alignment" and "non-alignment" are nothing more than normal variants.[6] Logically, according to this second view, there is no particular alignment that should be considered "normal" or "normative." After all, who is to say what constitutes "alignment" and "non-alignment"? Hence, the two effectively disappear as categories, since the relationship of body and inner truth are conceived as entirely arbitrary, and the statement that this person is "*really* a man" or "*really* a woman" grows more ambiguous.

---

[6] *See, e.g.*, Whitney Barnes, *The Medicalization of Transgenderism*, Trans Health, July 18, 2001, http://www.trans-health.com/2001/medicalization-of-transgenderism/; S. Elizabeth Malloy, *What Best to Protect Transsexuals from Discrimination: Using Current Legislation or Adopting a New Judicial Framework*, 32 WOMEN'S RTS. L. REP., 283-323 (2010), https://scholarship.law.uc.edu/cgi/viewcontent.cgi?article=1302&context=fac_pubs.

This second possibility invites a third. The debate is often folded into the larger and older claim that "gender" and subjectivity are socially constructed realities, rather than an inner essence or "nature."[7] Rather than positing an inner nature as the opposite of the sexed body, this variant posits a socially constructed one. Of course, the cultural shaping of the subject and his or her sexuality must be granted, but the claim in this third variant rejects any aspect of gender rooted in nature. As with the second possibility, the ideas of "alignment" and "non-alignment" here seem to have little real or intrinsic meaning outside the constructed categories. Presumably, then, if there is illness it is a social one and "reassignment" boils down to tailoring the body to fit social stereotypes.[8]

Yet another variant treats identity as an individual choice. We find an example of this possibility in the case of parents who raise a child as "non-binary" by means of hiding or suppressing the child's sex for the sake of the child's later choices.[9] Alignment or non-alignment seem in this example to be chosen "identities," like other important decisions about the way one seeks to live. Here the body is

---

[7] *See, e.g.,* Ann Oakley, *Sex, Gender, and Society (Toward a New Society)* (Temple Smith, 1972); Judith Butler, *Gender Trouble* (Routledge, 1990).

[8] A more radical variant is Judith Butler's claim that the body itself is a social construction. *See, e.g.*, Butler, *Bodies that Matter* (Routledge, 2011).

[9] *See, e.g.*, Jessica Botelho-Urbanski, *Baby Storm five years later: Preschooler on top of the world*, The Star, July 11, 2016, https://www.thestar.com/news/gta/2016/07/11/baby-storm-five-years-later-preschooler-on-top-of-the-world.html.

externalized and instrumentalized to a certain idea of freedom, sometimes called "indifferent freedom," that views any sort of given order or natural direction as outside of and antagonistic to free acts or decisions.

Finally, the debate sometimes concerns a choice for "gender non-conformity" as an explicit form of transgression of society's "rigid[] binary sex/gender system."[10] Here we have come full circle, and "non-alignment" is treated as a goal, rather than a problem. This last variant can perhaps be seen in the continual multiplication of "identities" represented in the expansion of "LGBT" to "LGBTQ+."[11] Nonconformity, in other words, is liberation. "Gender identity" must be decided on by the individual as a way to subvert the identity that has been imposed by regnant discourses and normative power structures. Stridently rejected, then, is the first variation's idea of an underlying personal truth or nature, a sexually differentiated Cartesian ego or consciousness.

---

[10] Malloy, p. 283. *See, e.g.*, Gayle Salamon, *Assuming a Body: Transgender and Rhetorics of Materiality* (Columbia University Press, 2010).

[11] This tendency toward ever greater fragmentation can be seen in Wesleyan University's offer of "LGBTTQQFAGPBDSM housing, [which] stands for 'lesbian, gay, bisexual, transgender, transsexual, queer, questioning, flexual, asexual, genderf\*\*k, polyamorous, bondage/discipline, dominance/submission, sadism/masochism." Katherine Timpf, *Wesleyan Now Offering LGBTTQQFAGPBDSM Housing (Not a Typo)*, National Review, Feb. 25, 2015, https://www.nationalreview.com/2015/02/weslyan-offering-lgbttqqfagpbdsm-housing-not-typo-katherine-timpf/.

Philosophical, legal, and popular depictions of "gender identity" oscillate among these possibilities and countless variations, and the policies' definition is compatible with any of them. Yet, every one of these variations presents its own set of paradoxes and instabilities. So, Dr. Meriwether is on solid ground in charging that the policies are ambiguous and vague concerning what precisely constitutes a "gender identity" and what precisely he is expected to say and think about it. A warning letter placed in Dr. Meriwether's personnel file speaks of "gender identity" as one of many "traits," *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *20, but the foregoing shows the extreme ambiguity of such a reference.

One of the defendants suggested that university policies do not need to specify which if any of these variants they are codifying. They are concerned only with students' choices and expressions, so that "gender identity" for purposes of the policies is anything a student declares it to be. *Id.* at *10. But here again we find the problem of criteria for distinguishing between valid and invalid forms of declaration. Logically, this interpretation would amount to nothing more than a university-granted right to choose any sort of "identity" a given student might want, and a set of punishments in store for any professor who fails to accept it.

Moreover, this approach is far more complicated in practice than it might seem at first glance. Compelling faculty and others to adopt the style of address and pronouns demanded by students according to their own "concept[s]" or

"perception[s]" (as "male or female or both or neither") would require adoption of the many pronouns already invented and promoted by the gender identity movement and however many more may be invented in the future. *See United States v. Varner*, 948 F.3d 250, 256-7 (5th Cir. 2020).

This last approach is itself haunted by its evident enshrinement of extreme philosophical nominalism and voluntarism as the official state metaphysic, a metaphysic that many prominent and respected philosophers could not endorse by word or action, even tacitly.

## III. First Amendment and academic freedom: the district court's interpretation of *Garcetti* may be influenced by its decontextualized understanding of Dr. Meriwether's speech.

In addition to concluding that Dr. Meriwether's speech did not raise a matter of public concern, the district court found that his speech failed under *Garcetti* because it occurred "pursuant to his official duties as a public employee." *Meriwether*, 2019 U.S. Dist. LEXIS 151494, at *39. The discussion up to now suggests why the district court's faulty resolution of the "public concern" question may have negatively influenced its treatment of the "official duties" test as well.

The Sixth Circuit has not squarely addressed the question of academic freedom in relation to the present factual scenario. *Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012), relied on by the lower court, involved a librarian, rather than a professor of philosophy. As this Court in *Savage* stated, the librarian's "speech as a committee

member commenting on a book recommendation was not related to classroom instruction and was only loosely, if at all, related to academic scholarship." *Id.* at 739. Similarly, *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332 (6th Cir. 2010), which involved a high school teacher and community standards, did not rule on *Garcetti*'s application to a university professor's academic work.

The lower court arrived at its conclusions despite recognizing *Garcetti*'s explicit cautionary qualification "that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Garcetti*, 547 U.S. at 425. Rather than taking its cue from other circuits, *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 564–65 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014), the district court lost sight of the unique role of university professors in the formation of citizens and leaders and the fostering of rigorous debate concerning important public issues. It also lost sight of the demands of the First Amendment, "which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

If the district court's conclusions were intended without qualification, then speech that occurs in the context of university scholarship and teaching would be treated no differently than the speech of any other government employee, from that

of a tax official or librarian to that of an office clerk or receptionist. The facts of this case show us why *Garcetti* should not be read in that way.

First of all, issues of public concern, such as those that arise in the gravitational pull of "gender identity," require rigorous—and especially philosophically rigorous—debate. As we have seen the question of gender identity is a deeply philosophical and even metaphysical question, whose answer will dramatically shape society.

University-level scholarly discourse serves a unique role in society, both in terms of its task in the formation of citizens and future leaders, and just as importantly, in its ability to debate difficult philosophical questions in the most rigorous way possible. In fact, it is only in academic discourse—in teaching, research, writing, debate—that the question can be properly addressed.

A wide number of academics share the view that the concept of "gender identity" needs open academic debate. A recent publication by twelve well-known scholars of varying philosophical outlooks made this very point.[12] The publication defended the academic expression of "skepticism about the concept of gender identity" and "opposition to replacing biological sex with gender identity in

---

[12] Twelve Leading Scholars, *Philosophers Should Not Be Sanctioned Over Their Positions on Sex and Gender*, INSIDE HIGHER ED., Jul. 22, 2019, https://bit.ly/2M7mRt1.

institutional policymaking," views that "cannot reasonably be regarded as . . . hate speech." Censuring or "deplatforming" these scholars would "violate the fundamental academic commitment to free inquiry" and "threaten[] the ability of philosophers to engage with the issues of the day." After all, "[p]olicy makers and citizens are currently confronting such metaphysical questions about sex and gender as What is a man? . . . What makes someone female?" Philosophers should contribute to this debate but cannot if there are "narrow constraints on the range of views receiving serious consideration." Thus, "[a]cademic freedom, like freedom of thought more broadly, should be restricted only with the greatest caution, if ever."[13]

Perhaps, for these reasons, the district court's submission of Dr. Meriwether's speech to the "official duties" test was influenced by its separate judgment that Dr. Meriwether's speech in question was merely an empty form of civility, rather than legitimate academic speech. If so, then weight is thrown back onto our discussion of the "public concern" prong. Yet the foregoing analysis shows how myopic the lower court's decontextualized treatment Dr. Meriwether's use of titles and pronouns was.

The real issue in this case is as vitally important as any today. It is whether, conformably with the First Amendment, a small but potent minority of ideologues can hold an entire society and its culture hostage, through its control of language, in

---

[13] *Id.*

the very government-sponsored and taxpayer-funded institutions that form future generations. If the answer is yes, then we will have lost the precious opportunity to think deeply and carefully about philosophically complex and controversial issues as the wider society presents them. In fact, we will have lost a vital thinking organ of democratic society.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

/s/ Randall L. Wenger
Randall L. Wenger
    **Counsel of Record**
Jeremy L. Samek
Independence Law Center
23 North Front Street, First Floor
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

    Attorneys for *Amici Curiae*

Dated: June 3, 2020

**<u>APPENDIX</u>**

**LIST OF AMICI CURIAE**

1. **J. Budziszewski**, Ph.D.

   *Professor of Government and Philosophy*, University of Texas, Austin

2. **David S. Crawford**, J.D., S.T.D.

   *Associate Professor of Moral Theology and Family Law*, Pontifical John Paul II Institute for Studies on Marriage and Family, Washington, D.C.

3. **G. Kevin Donovan**, M.D., M.A.

   *Director, Pellegrino Center for Clinical Bioethics, Professor*, Georgetown University Medical Center

4. **Justin B. Dyer**, Ph.D.

   *Professor of Political Science*, University of Missouri, Director of Kinder Institute on Constitutional Democracy

5. **Matthew J. Franck,** Ph.D. *Associate Director of the James Madison Program in American Ideals and Institutions, Lecturer in Politics*, Princeton University

6. **John S. Grabowski**, Ph.D.

   *Ordinary Professor of Moral Theology/Ethics,* School of Theology & Religious Studies, The Catholic University of America

7. **Wayne Grudem**, Ph.D.,

   Distinguished Research Professor of Theology and Biblical Studies,

   Phoenix Seminary

8. **Michael Hanby**, Ph.D.

   *Associate Professor of Religion and Philosophy of Science*, Pontifical John

   Paul II Institute for Studies on Marriage and Family, Washington, D.C.

9. **Margaret Harper McCarthy,** S.T.L, S.T.D.

   *Associate Professor of Theological Anthropology*, the Pontifical John Paul II

   Institute for Studies on Marriage and Family, Washington, D.C.

10. **Mellissa Moschella,** Ph.D.

    *Assistant Professor* of Philosophy, The Catholic University of America

11. **Jessica Murdoch,** Ph.D.

    *Associate Professor of Fundamental and Dogmatic Theology*, Villanova

    University

12. **Michael Pakaluk,** Ph.D.

    *Ordinary Professor of Ethics and Social Philosophy*, The Catholic

    University of America

13. **C.C. Pecknold**, Ph.D.

    *Associate Professor of Systematic Theology*, The Catholic University of America; *Fellow*, Institute for Human Ecology; *Chairman*, Academy of Catholic Theology

14. **Daniel Philpott,** Ph.D.

    *Professor of Political Science*, University of Notre Dame

15. **Peter A. Redpath**, Ph.D.

    *Rector and Senior Fellow*, Adler-Aquinas Institute; *Chair of the Graduate Concentration in Thomistic Studies*, Holy Apostles College; *Senior Fellow*, Center for the Study of The Great Ideas; *contributing scholar*, University Abat Oliba Doctoral Philosophy program, Barcelona, Spain

16. **Nathan Schlueter**, Ph.D.

    *Professor of Philosophy and Religion*, Hillsdale College

17. **Adrian Vermeule,** J.D.

    *Ralph S. Tyler Professor of Constitutional Law*, Harvard Law School

18. **Susan Selner-Wright,** PhD.

    *Associate Professor of Philosophy*, St. John Vianney Theological Seminary

19. **Bradford P. Wilson,** Ph.D.

    *Executive Director of the James Madison Program in American Ideals and Institutions, Lecturer in Politics*, Princeton University

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5). This brief contains 6,447 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen (14) point Times New Roman font.

/s/ Randall L. Wenger
Randall L. Wenger
Jeremy Samek
Independence Law Center
23 N. Front St.
Harrisburg, PA 17101
717-657-4990
rwenger@indlawcenter.org

*Attorneys for amici professors of philosophy, theology, law, political science, and medicine*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of June, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Randall L. Wenger
Randall L. Wenger
Jeremy Samek
Independence Law Center
23 N. Front St.
Harrisburg, PA  17101
717-657-4990
rwenger@indlawcenter.org

*Attorneys for amici professors of philosophy, theology, law, political science, and medicine*