No. 20-3289

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

Nicholas Meriwether, *Plaintiff-Appellant*,

v.

The Trustees of Shawnee State University, et al., *Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION
Case No. 1:18-cv-00753-SJD
The Honorable Susan J. Dlott, U.S. District Judge

══════════════════════════════════════════════════

**BRIEF OF DEFENDANTS-APPELLEES: FRANCESCA HARTOP, Trustee of Shawnee State University, in her official capacity; JEFFREY A. BAUER, in his official capacity; ROBERTA MILLIKEN, in her official capacity; JENNIFER PAULEY, in her official capacity; TENA PIERCE, in her official capacity; DOUGLAS SHOEMAKER, in his official capacity; MALONDA JOHNSON, in her official capacity; JOSEPH WATSON, Trustee of Shawnee State University, in his official capacity; SCOTT WILLIAMS, Trustee of Shawnee State University, in his official capacity; DAVID FURBEE, Trustee of Shawnee State University, in his official capacity; SONDRA HASH, former Trustee of Shawnee State University, in her official capacity; ROBERT HOWARTH, Trustee of Shawnee State University, in his official capacity; GEORGE WHITE, Trustee of Shawnee State University, in his official capacity; WALLACE EDWARDS, Trustee of Shawnee State University, in his official capacity**

══════════════════════════════════════════════════

Paul R. Kerridge
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202

Tel: 513.579.6400
Fax: 513.579.6457
Email: pkerridge@kmklaw.com

# Table of Contents

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ........................................... viii

STATEMENT OF ISSUES FOR REVIEW .................................................. 1

STATEMENT OF THE CASE ................................................................. 2

STATEMENT OF FACTS ..................................................................... 2

STANDARD OF REVIEW ..................................................................... 11

SUMMARY OF THE ARGUMENT .......................................................... 12

ARGUMENT .................................................................................... 14

I.  The District Court Correctly Held That Meriwether Had Not Raised A Viable Free Speech Claim. ............................................................. 14

   A.  Meriwether Was Not Speaking As A Citizen. .................................. 16

   B.  Meriwether Was Not Addressing An Issue Of Public Concern. ........ 30

   C.  Even If Meriwether Were Speaking As A Citizen And On A Matter Of Public Concern, This Court Should Still Affirm The District Court's Judgment Because Meriwether's Claims Fail Under The *Pickering* Balancing Test. ................................................. 34

   D.  Meriwether Did Not Suffer An Adverse Employment Action. .......... 36

II.  Shawnee State's Policy Does Not Provide Unbridled Discretion To Administrators. ........................................................................... 39

   A.  Meriwether Waived His Claim That The District Court Erred In Dismissing His Due Process Claim By Failing To Provide This Court With A Reasoned Argument As To Why The District Court Erred. ..................................................................................... 39

   B.  Shawnee State's Policy Does Not Provide Administrators Unbridled Discretion. ..................................................................... 40

i

III.  The District Court Correctly Determined That Meriwether Had Not Pleaded A Plausible Free Exercise Claim. ....................................................43

    A.  Meriwether Does Not Plausibly Allege That Shawnee State Requires Him To Violate His Religious Beliefs. ...............................46

    B.  Shawnee State's Policies Comfortably Withstand Meriwether's Facial Challenge. .............................................................47

    C.  Shawnee State Applied Its Nondiscrimination Policies Neutrally And Respectfully. .............................................................49

    D.  Shawnee State's Policies Are Not Too Subjective. ...........................55

CONCLUSION .....................................................................................56

CERTIFICATE OF COMPLIANCE .......................................................58

# Table of Authorities

**Cases**                                                                                   **Page(s)**

*Adams v. Trs. of the Univ. of N. Carolina-Wilmington,*
   640 F.3d 550 (4th Cir. 2011) ........................................................... 23, 24

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................... 12, 53

*Axson-Flynn v. Johnson,*
   356 F.3d 1277 (10th Cir. 2004) ...................................................... 55-56

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................12

*Benison v. Ross,*
   765 F.3d 649 (6th Cir. 2014) ......................................................... 36, 38

*Bonnell v. Lorenzo,*
   241 F.3d 800 (6th Cir. 2001) ......................................................... 21, 31

*Bostock v. Clayton Cnty.,*
   Nos. 17-1618, 17-1623 and 18-107., 2020 U.S. LEXIS 3252 (June 15, 2020)
   .................................................................................................. 34

*Boulton v. Swanson,*
   795 F.3d 526 (6th Cir. 2015) ............................................................. 16

*Buchanan v. Alexander,*
   919 F.3d 847 (5th Cir. 2019) ............................................................. 32

*Buddenberg v. Weisdack,*
   939 F.3d 732 (6th Cir. 2019) ............................................................. 15

*Casias v. Wal-Mart Stores, Inc.,*
   695 F.3d 428 (6th Cir. 2012) ............................................................. 11

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro,*
   477 F.3d 807 (6th Cir. 2007) ............................................................. 36

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,*
   947 F.3d 342 (6th Cir. 2020) ............................................................. 35

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ............................................................... 44, 45, 49

*Connick v. Myers*,
    461 U.S. 138 (1983)...........................................................15, 28, 31, 32

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ......................................................................... 34

*Delay v. Rosenthal Collins Grp., Inc.*,
    585 F.3d 1003 (6th Cir. 2009) ......................................................... 12

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) ........................................................... 24

*Dixon v. Univ. of Toledo*,
    702 F.3d 269 (6th Cir. 2012) ........................................................... 21

*Dye v. Off. of the Racing Comm'n*,
    702 F.3d 286 (6th Cir. 2012) ........................................................... 37

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018) ........................................34, 35, 46, 47

*Ehrlich v. Kovack*,
    710 F. App'x 646 (6th Cir. 2017) .................................................... 38

*Emp. Div., Dep't of Human Res. Of Ore. v. Smith*,
    494 U.S. 872 (1990) ...................................................... 44, 45, 49

*Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*,
    624 F.3d 332 (6th Cir. 2010) .................................... 14-15, 15, 21, 22

*Farhat v. Jopke*,
    370 F.3d 580 (6th Cir. 2004) ............................................. 31, 32, 33

*Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*,
    605 F.3d 345 (6th Cir. 2010) .................................... 14, 15, 17, 19, 22

*Frieder v. Morehead State Univ.*,
    770 F.3d 428 (6th Cir. 2014) ..................................................... 27, 28

*Fulton v. City of Phila.*,
    922 F.3d 140 (3d Cir. 2019) ...................................................... 51, 55

iv

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .................................................................. 16, 17, 19, 20, 26

*Handy-Clay v. City of Memphis*,
695 F.3d 531 (6th Cir. 2012) ............................................................ 17, 30, 37

*Hardy v. Jefferson Cmty. Coll.*,
260 F.3d 671 (6th Cir. 2001) ............................................................ 21, 26, 29

*Harris v. Detroit Pub. Sch.*,
245 F. App'x 437 (6th Cir. 2007) ............................................................... 38

*Hensley Mfg. v. ProPride, Inc.*,
579 F.3d 603 (6th Cir. 2009) ............................................................ 12, 34, 37

*Holbrook v. Dumas*,
658 F. App'x 280 (6th Cir. 2016) ............................................................... 17

*Janus v. AFSCME, Council 31*,
138 S. Ct. 2448 (2018) ............................................................................. 33

*Johnson-Kurek v. Abu-Absi*,
423 F.3d 590 (6th Cir. 2005) ..................................................................... 20

*Kissinger v. Bd. of Trs. of Ohio State Univ.*,
5 F.3d 177 (6th Cir. 1993) ........................................................................ 45

*Kolender v. Lawson*,
461 U.S. 352 (1983) ............................................................................ 40-41

*Lane v. Franks*,
573 U.S. 228 (2014) ............................................................................ 16, 43

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018) ........................................................................ 44, 45

*Mayhew v. Town of Smyrna*,
856 F.3d 456 (6th Cir. 2017) ..................................................................... 14

*Mertins v. City of Mount Clemens*,
No. 19-1416, 2020 U.S. App. LEXIS 17780 (6th Cir. June 5, 2020) .............. 16

*Peltier v. United States*,
388 F.3d 984 (6th Cir. 2004) ..................................................................... 38

*Pickering v. Bd. of Educ.*,
   391 U.S. 563 (1968) ....................................................................... 13

*Price v. Del. State Police Fed. Credit Union* (*In re Price*),
   370 F.3d 362 (3d Cir. 2004) ............................................................. 31

*Rodgers v. Banks*,
   344 F.3d 587 (6th Cir. 2003)........................................................31, 33

*Savage v. Gee*,
   665 F.3d 732 (6th Cir. 2012) ............................................... 15, 22, 23

*Sensabaugh v. Halliburton*,
   937 F.3d 621 (6th Cir. 2019) ............................................................. 38

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ................................................. 28, 30-31, 31, 33

*Spence v. Wash.*,
   418 U.S. 405 (1974) ........................................................................ 28

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957)........................................................................26

*Thaddeus-X v. Blatter*,
   175 F.3d 378 (6th Cir. 1999) ..................................................... 36-37

*United States v. Brown*,
   819 F.3d 800 (6th Cir. 2016) ............................................................. 39

*United States v. Jenkins*,
   770 F.3d 507 (6th Cir. 2014) ............................................................. 41

*Urofsky v. Gilmore*,
   216 F.3d 401 (4th Cir. 2000) ...................................................... 20-21

*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) ............................................................. 45

*Weisbarth v. Geauga Park Dist.*,
   499 F.3d 538 (6th Cir. 2007) .............................................. 16, 17, 19

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) .............................................. 15-16, 35

vi

*Wozniak v. Adesida*,
   932 F.3d 1008 (7th Cir. 2019) ............................................................ 52

**Federal Statutes**

20 U.S.C. § 1681 (2018) ........................................................................ 3

**Rules**

Fed. R. App. P. 32 ................................................................................ 57

Rule 4(a)(3) of the Rules of Judicial-Conduct and Judicial-Disability ................. 41

## STATEMENT REGARDING ORAL ARGUMENT

This case requires the Court to apply settled legal principles. The district court did so by relying on a well-reasoned Report and Recommendation from the assigned magistrate judge and the record fully supports the district court's judgment. As such, oral argument is not necessary.

# STATEMENT OF ISSUES FOR REVIEW

1. Under the Supreme Court's and this Court's Free Speech jurisprudence, did the district court properly dismiss Meriwether's Free Speech claims when it determined that his teaching-method speech was not speech "as a citizen" and did not address "a matter of public concern"?

2. Under the Supreme Court's and this Court's Due Process jurisprudence, did the district court properly determine that Shawnee State's discrimination policy was not so vague as to provide administrators unfettered discretion in applying the policy?

3. Under the Supreme Court's and this Court's Free Exercise jurisprudence, did the district court properly determine that Shawnee State's discrimination policy was written neutrally and applied neutrally?

## STATEMENT OF THE CASE

Neither Free Speech rights nor Free Exercise rights protect public university professors who discriminate against their students in the classroom. Fighting this axiom, Meriwether and his Amici want this case to be a judicial referendum on the propriety of gender-identity nondiscrimination policies. To be sure, Shawnee State University added a warning letter to Meriwether's employment file because he discriminated against a transgender student, but the legal analysis would be the same if Meriwether had discriminated against a student on any other grounds.

A University can, indeed has an obligation to, protect its students from discrimination. Because Shawnee State permissibly added a warning letter to Meriwether's employment file instructing him to discontinue his discriminatory behavior, this Court should affirm the district court's judgment dismissing the legally non-cognizable and/or implausible allegations Meriwether set forth in his complaint.

## STATEMENT OF FACTS

Plaintiff-Appellant Professor Nicholas Meriwether is a tenured professor at Shawnee State. (Doc. 34, ¶11, PageID #1460.) Defendants-Appellees are individuals who fill or filled many official roles at Shawnee State (collectively "Shawnee State") and the Intervenor-Defendants Jane Doe and Sexuality and Gender Acceptance (SAGA). (*Id.*, ¶¶12–15, 19–52, PageID #1460–64; Doc. 43, PageID #1972.)

*Shawnee State's nondiscrimination policy*

Shawnee State is subject to the mandates of Title IX of the Education Amendments of 1972, 20 U.S.C. 1681. Shawnee State has an obligation, therefore, to protect its students from certain forms of discrimination. In accord with these duties, Shawnee State effected a "Nondiscrimination Sexual Harassment Policy" (Nondiscrimination Policy). (Doc. 34.1, PageID #1509–10; Policy 5.01REV.) That policy "serves to ensure that there are University structures and processes in place that prohibit discrimination against any individual because of . . . gender identity. . . ." (*Id.*, ¶1.2, PageID #1509.)

Shawnee State's related Reporting Policy includes a definition of "Sex and Gender Based Discrimination." Such discrimination includes "[n]egative or adverse treatment based on . . . gender identity . . . [which] denies or limits the individual's ability to obtain the benefits of Shawnee State's programs or activities." (Doc. 34.2, ¶18.3, PageID #1522.) The Reporting Policy defines "Gender Identity" as a "person's innermost concept of self as male or female or both or neither - how individuals perceive themselves and what they call themselves." (*Id.*, ¶18.4, PageID #1522.) The Reporting Policy further provides that "[o]ne's gender identity can be the same or different than the sex assigned at birth." (*Id.*) Under Shawnee State's policies, harassment can take the form of creating a hostile environment that

negatively impacts students' educational opportunities. (*Id.*, ¶ 18.6.2.2, PageID #1522.)

*Meriwether seeks additional information on the policies*

In August 2016, the president of the Shawnee State faculty Union confirmed that faculty could be disciplined by Shawnee State for refusing "to use a [student's] requested name or pronouns." (Doc. 34, ¶¶106–09, PageID #1471–72; Doc. 34.5, PageID #1689.)

A couple of months later, Meriwether and the Acting Dean of the Collee of Arts and Sciences, defendant, Milliken discussed Shawnee State's gender-identity nondiscrimination policies. (Doc. 34, ¶¶110–14, PageID #1472.) Milliken confirmed that Meriwether must use each student's preferred pronoun and that faculty are subject to disciplinary procedures for failing to do so. (*Id.*) Milliken added "students have a right to be referred to by their self-asserted gender identity and faculty must comply or be disciplined." (*Id.*, ¶116, PageID #1473.) Meriwether alleged he also discussed the policy with the department chair, defendant Pauley; according to Meriwether, Pauley criticized some traditional Christian doctrines and suggested higher education should be free of such beliefs.. (*Id.*, ¶¶117–122, PageID #1473.)

*Discrimination complaint against Meriwether*

Meriwether taught a political philosophy course and utilized a Socratic teaching method. (*Id.*, ¶125, PageID #1474.) Meriwether asserted that he calls upon

students using a sex-based title and the student's last name to "to foster an atmosphere of seriousness and mutual respect that is befitting the college classroom." (*Id.*, ¶134–36, PageID #1474–75.) During a class in early January 2018, Meriwether referred to Doe as "sir." (*Id.*, ¶128, PageID #1474.)

After class, Doe informed Meriwether that she is transgender and expressed her desire for Meriwether to address her with feminine titles and pronouns. (*Id.*, ¶140, PageID #1475.) As is common reading Meriwether's various factual recitations, he made what happened next a moving target. According to his complaint, Meriwether responded that he was not sure he could comply with Doe's demand and he was "not sure students can dictate how professors must refer to them." (*Id.*, ¶141, PageID #1475.) According to the facts set forth in his appellate brief, he did not respond but merely paused to think. (Appellant's Brief at p. 4.) Either way, Meriwether alleged that Doe "became belligerent" and used vulgar terms in response to his reply (or lack of reply depending on which version of Meriwether's facts the Court accepts). (Doc. 34, ¶142–44, PageID #1475.)

Meriwether reported Doe's conduct. (*Id.*, ¶145, PageID #1475–76.) Doe also registered a complaint. (*See id.*, ¶152, PageID #1476.) As a result, Dean Milliken met with Meriwether and advised him to change his teaching methods. (*Id.*, ¶154, PageID #1476.) Meriwether suggested he would no longer use sex-based titles with Doe, but would use titles with all other students. (*Id.*, ¶155–57, PageID #1476–77.)

According to Meriwether, Milliken indicated this was acceptable. (*Id.*, ¶158, PageID #1477.)

Approximately two weeks later, Milliken informed Meriwether that Doe was not satisfied with Meriwether's "solution" and had threatened to file a Title IX grievance. (*Id.*, ¶¶160–61, PageID #1477.) Soon thereafter, a Union official told Meriwether he could be suspended or dismissed if he continued to use titles and pronouns that did not reflect each student's "self-asserted gender identity." (*Id.*, ¶164, PageID #1477.)

After Meriwether "inadvertently" referred to Doe using the title "Mr." but "corrected himself" by referring to Doe without using a title, Doe told defendant Pierce, Shawnee State's then-Title IX Coordinator, that the complaint had not been resolved and Doe "threatened to contact a lawyer." (*Id.*, ¶165, PageID #1477–78.) Milliken met with Meriwether again and Meriwether asked Milliken if he could comply with the policy but announce on his syllabus his religious belief that gender is immutable. (*Id.*, ¶170, PageID #1478.) Milliken confirmed that such an announcement would constitute discrimination under Shawnee State's policies. (*Id.*, ¶171, PageID #1478.) Meriwether responded that he would continue to refer to Doe by her last name only but that he would continue to treat her unequally because he would continue to refer to all other students "by their last names and sex-based titles." (*Id.*, ¶¶172–73, PageID #1478.)

Milliken followed up by sending Meriwether a "formal notice" listing Doe's complaints. (*Id.*, ¶185, PageID #1479; Doc. 34.9, PageID #1702.) Milliken advised Meriwether that he was violating Shawnee State's nondiscrimination policies and that he "could be subject to informal or formal disciplinary action" if he continued to discriminate against students. (Doc. 34 ¶187, PageID #1480; Doc 34.9, PageID #1702.)

*Formal investigation and written warning*

Milliken informed Meriwether that she had launched a formal investigation after receiving an additional complaint regarding Meriwether's discriminatory behavior. (Doc. 34 ¶188, PageID #1480; Doc. 34.10, PageID #1703.) Milliken also referred the complaint to defendants Johnson, Shawnee State's Director of Human Resources, and Shoemaker, Shawnee State's Title IX Coordinator. (Doc. 34 ¶192, PageID #1480; Doc. 34.10, PageID #1703.)

Despite the prior notices and information Shawnee State had provided him, Meriwether again requested clarification of Shawnee State's discrimination policy. (Doc. 34 ¶210, PageID #1482; Doc. 34.11, PageID #1704.) Milliken responded by email: "Every student needs to be treated the same in all of your classes. In other words, the policy seeks to ensure that what is done for one student is done for all to avoid issues of discrimination. This regards names, pronoun usage, and most any other matter." (Doc. 34 ¶210, PageID #1482; Doc. 34.11, PageID #1704.)

Meriwether claimed he understood the policy to create at least three obligations: (1) do not refer to Doe using masculine pronouns; (2) do not use sex-based pronouns in reference to all students except Doe; and (3) do not use sex-based titles for all students except Doe. (Doc. 34 ¶216, PageID #1483.) Meriwether added that he concluded he could comply with the policy only by stopping using pronouns or by using pronouns in accord with each student's self-asserted gender identity. (*Id.*, ¶¶217–18, PageID #1483.)

Shawnee State concluded its formal investigation and Johnson and Shoemaker determined that Meriwether "created a hostile environment" for Doe in violation of Shawnee State's nondiscrimination policy. (*Id.*, ¶¶225–26, 230, PageID #1484–85; Doc. 34.13, PageID #1719.) Milliken ultimately issued a report in which she recommended Shawnee State place a written warning in Meriwether's employment file warning him to end his repeated violations of Shawnee State's nondiscrimination policy. (Doc. 34, ¶¶238–40, PageID #1486; Doc. 34.17, PageID #1741–42.)

Defendant Bauer, who was then Shawnee State's Provost (and later became Interim President and eventually permanent President), accepted Milliken's recommendation and agreed that Meriwether had violated Shawnee State's nondiscrimination policy. (Doc. 34, ¶¶244–45, PageID #1487; Doc. 34.19, PageID #1770.) Milliken issued Meriwether a written warning that Shawnee State placed in Meriwether's employment file. (Doc. 34, ¶246, PageID #1487; Doc. 34.20, PageID

#1771.) Meriwether pursued a union grievance related to the warning letter. (Doc. 34, ¶250, PageID #1487; Doc. 34.23, PageID #1776–79.) In his complaint, Meriwether cited notes taken at a meeting addressing the grievance, alleging that Bauer demonstrated hostility to his religious beliefs. (Doc. 34, ¶256–59, PageID #1488 citing Doc. 34.24, PageID #1780.) The notes actually provide that Bauer laughed during the presentation, but do not shed any light as to what caused Bauer to laugh. (Doc. 34.24, PageID #1780.) In any event, Shawnee State denied Meriwether's grievance at the Provost and President levels. (Doc. 34, ¶264, PageID #1489; Doc. 34.25, PageID #1782.) Meriwether's union contract permitted him to demand arbitration to challenge a President's denial of a grievance (Doc. 34.4, PageID #1653–54.) However, Meriwether abandoned the grievance without demanding arbitration.

Meriwether alleged he "has not discussed issues related to gender identity or transgenderism when he otherwise would have done so" for fear he could immediately be suspended without pay or terminated. (Doc. 34, ¶¶290–91, PageID #1492.) Meriwether added he "cannot address a high profile issue of public concern that has significant philosophical implications. . . ." (*Id.* at ¶297, PageID #1493.) Meriwether also set forth his belief that the warning in his file will make it difficult for him to obtain a position "as an adjunct, professor, instructor, consultant, or

administrator at another institution once he retires from" Shawnee State. (*Id.*, ¶298, PageID #1493.)

*Procedural History*

Meriwether filed an Amended Complaint in which he claimed that he has sincerely-held religious beliefs about gender: that he believes gender is determined at conception and cannot change. (Doc. 34, ¶3, PageID #1458.) Meriwether alleged that Shawnee State is forcing him to abide by "a University-mandated ideological message regarding gender identity that he does not believe" and "contradicts (and would force him to violate) his sincerely held religious beliefs." (*Id.*, ¶92, PageID #1469.) Resting on these assertions, Meriwether raised several Free Speech claims, a Free Exercise claim, a Due Process claim, an Equal Protection claim, and some state law claims. (*Id.*, ¶¶308–75, PageID #1494–1503.)

Doe, the student against whom Meriwether discriminated, and SAGA filed a motion to intervene as defendants and the district court granted that motion. (Doc. 18, PageID #488; Doc. 43, PageID #1972.) After Meriwether filed his First Amended Complaint, Shawnee State, Doe and SAGA moved to dismiss. (Doc. 34, PageID #1457; Doc. 36, PageID #1869; Doc. 44, PageID #1974.) Meriwether filed his opposition to each motion. (Doc. 45, PageID #1997; Doc. 46, PageID #2028.) And Shawnee State and Doe each filed a reply. (Doc. 47, PageID #2057; Doc. 48, PageID #2082.)

Magistrate Judge Litkowitz provided the district court a thorough and well-reasoned report and recommendation in which she recommended the district court grant Shawnee State's and Doe's motions to dismiss. (Doc. 49, PageID #2156.) The magistrate judge added that the district court should not exercise jurisdiction over Meriwether's state law claims. (*Id.*, PageID #2155–56.) Over Meriwether's objection, the district court adopted the magistrate judge's recommendations and dismissed Meriwether's complaint. (Doc. 53, PageID #2247; Doc. 60, PageID #2402.)

Meriwether subsequently filed this appeal in which he challenges the district court's dismissal of his Free Speech claims, his Free Exercise claim, and his Due Process claim. Meriwether does not challenge the district court's dismissal of his Equal Protection claim. (*See* Appellant's Brief at p. 57.) Meriwether also requests that this Court reinstate his state law claims, but asks only that the Court reinstate the claims if the Court reverses the district court's dismissal of his federal claims. (*Id.*)

## STANDARD OF REVIEW

Appellate courts review de novo the trial court's decision to grant a motion to dismiss. *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012). The court may "affirm the district court's dismissal of a plaintiff's claims on any grounds,

including grounds not relied upon by the district court." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

To survive a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts the plaintiff pleaded must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "a legal conclusion couched as a factual allegation" need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. *Hensley Mfg.*, 579 F.3d at 609 (quoting *Twombly*, 550 U.S. at 555); *see also Delay v. Rosenthal Collins Group, LLC.*, 585 F.3d 1003, 1005–06 (6th Cir. 2009).

## SUMMARY OF THE ARGUMENT

The district court correctly dismissed Meriwether's complaint.

Regarding Meriwether's Free Speech claims, Meriwether was speaking pursuant to his employment duties and not as a citizen when he called upon his students in class. The First Amendment does not protect such speech. Meriwether's argument that there is an exception for teachers is without merit—there is no such exception, and even if there was, it protects the substance of academic work not teaching methods.

In addition, Meriwether was not addressing a matter of public concern; the public has no interest in the verbiage Meriwether uses when calling upon his students. Even if Meriwether was addressing a matter of public concern, the court merely conducts the balancing test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), and that test as a matter of law plainly weighs in favor of Shawnee State under these facts.

The final fatal flaw in Meriwether's Free Speech allegations is that he was not subject to an adverse employment action. A warning letter, which does no more than warn an employee that failing to abide by a nondiscrimination policy will lead to an adverse employment action, is not in itself an adverse employment action.

Regarding Meriwether's Due Process claim, Meriwether has waived that claim by failing to set forth a developed argument in his initial brief. In any event, it is without merit because Shawnee State's policies are not vague and Shawnee State consistently provided Meriwether clear and concise guidance as to his obligation not to discriminate against his students.

Meriwether's Free Exercise claims fare no better. Shawnee State's policies are neutral and generally applicable, they were not designed to chill religious freedom, and there are no individualized exceptions. To the extent that Meriwether claims those that warned him were hostile toward his religious beliefs, assuming the Court accepts those allegations as true despite the record evidence to the contrary,

Meriwether has not plausibly alleged that the "hostility" had any causal effect on the proceedings—Meriwether has not plausibly alleged that, without the so-called hostility, those that warned him not to discriminate would have abandoned their duty to protect Shawnee State's students from discrimination.

## **ARGUMENT**

### I.    **The District Court Correctly Held That Meriwether Had Not Raised A Viable Free Speech Claim.**

Meriwether raised numerous related Free Speech allegations in his complaint and in this appeal. There is no need to engage in protracted independent discussions regarding Meriwether's Free Speech claims because each variation fails for the same reasons: The district court correctly determined that the speech against which Shawnee State warned Meriwether was not protected speech.

Whether the First Amendment protects a plaintiff's speech is a question of law. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017). A plaintiff asserting a First Amendment Free Speech claim must plausibly allege three elements: (1) the plaintiff engaged in speech that was protected under the First Amendment; (2) the plaintiff suffered an adverse employment action that would deter an individual of "ordinary firmness" from engaging in the action; and (3) the adverse action was at least partially motivated by the plaintiff's exercising of his constitutional right. *Fox v. Traverse City Area Pub. Schs. Bd. Of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (citations omitted); *Evans-Marshall v. Bd. of Educ. of the*

*Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010) (citations omitted). If the plaintiff fails to state any of these three elements, the claim cannot withstand a motion to dismiss. *Evans-Marshall*, 624 F.3d at 337.

When the plaintiff is a government employee, the First Amendment protects the plaintiff's speech only if the speech was made "as a citizen," while addressing "a matter of public concern." *Savage v. Gee*, 665 F.3d 732, 738 (6th Cir. 2012) (quoting *Connick v. Myers*, 461 U.S. 138, 146–47 (1983)); *see also Fox*, 605 F.3d at 349. Even if the plaintiff can meet these requirements, for the First Amendment to protect the plaintiff's speech, the plaintiff must also prove his First Amendment rights outweigh the government's interest in limiting his speech in the relevant situation. *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019) (citations omitted).

This Court should affirm the district court's judgment dismissing Meriwether's various Free Speech claims. As a matter of law, Meriwether was speaking pursuant to his official duties and not as a citizen, and no academic-freedom exception changes that analysis. Further, Meriwether was not addressing a matter of public concern. And given the facts of this case, Shawnee State's powerful interest in protecting its students from discrimination and complying with federal law plainly outweighs Meriwether's negligible interest in on-the-clock discrimination toward transgender students. *See e.g.*, *Whitaker v. Kenosha Unified*

*Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (holding that Title IX's prohibition on sex discrimination prohibits treating a transgender student differently than non-transgender students). Finally, even if Meriwether could overcome these obstacles, the warning letter Shawnee State added to Meriwether's employment file is not an "adverse action" as contemplated in this circuit's Free Speech jurisprudence.

### A. Meriwether Was Not Speaking As A Citizen.

The First Amendment protects a public employee's speech only when the employee is speaking "as a citizen;" the employee's speech is not protected when the employee is speaking "in furtherance of the ordinary responsibilities of [one's] employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015); *see also Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). "[W]hen public employees make statements pursuant to their official duties, the employees are *not* speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421 (emphasis added). "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014); *see also Mertins v. City of Mount Clemens*, No. 19-1416, 2020 U.S. App. LEXIS 17780, at *10 (6th Cir. June 5, 2020).

Courts consider the "content and context" of the speech when determining whether a public employee was speaking as a citizen. *Handy-Clay v. City of Memphis,* 695 F.3d 531, 540 (6th Cir. 2012) (citing *Fox*, 605 F.3d at 348). This Court has identified a number of factors that are relevant to this determination, including "[1] the impetus for [plaintiff's] speech, [2] the setting of h[is] speech, [3] the speech's audience, and [4] its general subject matter." *Id.* (quoting *Weisbarth*, 499 F.3d at 546); *see also Holbrook v. Dumas*, 658 F. App'x 280, 288 (6th Cir. 2016).

If the plaintiff was speaking as a public employee, then, as a matter of law, the plaintiff was not speaking as a citizen, and the plaintiff's speech is not protected. *Weisbarth*, 499 F.3d at 544 (quoting *Garcetti*, 547 U.S. at 421).

### 1. *The Court's Precedent Fully Supports The District Court's Decision.*

The content and context of Meriwether's speech demonstrate overwhelmingly that Meriwether's speech occurred in furtherance of his official duties as an employee at Shawnee State and not "as a citizen." All four of the factors listed in *Handy-Clay* show as much. As an initial matter, however, it is necessary to describe accurately the speech at issue. Despite Shawnee State's instruction that Meriwether address his students without discriminating (either by using all students' preferred sex-based title, by using all students' last names only, or using all students' first names only), Meriwether chose to address Doe and other students in his class unequally. Meriwether chose to use sex-based titles for every student in the class

17

with the exception of Doe, a transgender female, whom Meriwether called upon by her by last name only.

Meriwether's speech, calling on students he was teaching, was in furtherance of his official duties as a professor. The setting of Meriwether's speech was a classroom at Shawnee State in which he was serving that employee function. The audience of Meriwether's speech was the Shawnee State students he was teaching in that class. The impetus and general subject matter of Meriwether's speech are the same: to inform the students which of them was to answer the question Meriwether asked as part of his Socratic method of teaching. Given this content and context of Meriwether's speech, it is difficult to conjure a situation in which an employee's speech is more obviously part of his official duties.

It bears noting that the magistrate judge stated that the subject matter of the speech was "titles and pronouns for addressing students in his classroom." (Doc. 49, PageID #2119.) That determination is not quite accurate. Meriwether *used* titles and pronouns to convey his message, *i.e.*, identify which student he was calling on, the *subject matter* of Meriwether's speech was *not* titles and pronouns. By analogy, Meriwether conveyed his message in English, but the English language was merely the form, not the *subject matter*, of his speech. This nuance, among others, demonstrates why it is so necessary to describe accurately Meriwether's speech.

To some extent, Meriwether accepts that the factors weigh against him. Meriwether adopted Doe's assertion that his speech "'was made in class, in his capacity as a professor,' and 'in connection with ... [a] Socratic dialogue.'" (Doc. 46 at 9, PageID #2036) (alteration in original).

As noted above, if the Court determines as a matter of law that the plaintiff "spoke pursuant to h[is] employment responsibilities" rather than as a citizen, the plaintiff's First Amendment claim cannot stand and the Court need engage in no further discussion. *Weisbarth*, 499 F.3d at 545 ("[E]ven employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties."); *see also Fox*, 605 F.3d at 348. Meriwether was speaking as an employee and "not speaking as [a] citizen [for] First Amendment purposes, and the Constitution does not insulate [his] communications from employer discipline." *See Garcetti*, 547 U.S. at 421. For this reason, the Court should affirm the district court's grant of Shawnee State's motion to dismiss; Meriwether failed to state a First Amendment Free Speech claim.

> 2.    *Under Garcetti And This Court's Precedent, University Professors Do Not Benefit From An Academic-Freedom Exception To Garcetti's "Speaking As A Citizen" Prong.*

Meriwether's chief counter-argument to the above analysis and conclusion is that he fits into a supposed "scholarship and teaching" exception set forth by the United States Supreme Court in *Garcetti*. To paraphrase Meriwether's argument, he

asserts that university professors' scholarship-and-teaching speech is not subject to *Garcetti*'s "speaking as a citizen" test and that he was teaching when he used no title for Doe but sex-based titles for all other students. Meriwether misreads *Garcetti* and its progeny.

In *Garcetti*, Justice Souter wrote a dissent in which he expressed his concern that the majority decision could erode "academic freedom" in universities. *Garcetti*, 547 U.S. at 438. The Supreme Court majority did not follow Justice Souter's lead and exempt any academic speech from *Garcetti*'s test. The majority acknowledged Justice Souter's concern but expressly declined to decide this issue. *Id.* at 425. Despite Meriwether's assertions to the contrary, therefore, the Supreme Court did not create a scholarship-and-teaching exception in *Garcetti*. At best for Meriwether, the Supreme Court left the Circuit Courts to decide whether there should be such an exception.

The Sixth Circuit law on academic freedom is somewhat inconsistent. The Court need not resolve that inconsistency or reconcile the cases here because, under either vision, Meriwether cannot sustain his claim. In one line of pre-*Garcetti* cases, this Court held that "[t]o the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005) (quoting *Urofsky v.*

*Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000)); *see also Evans-Marshall*, 624 F.3d at 344. In another line of pre-*Garcetti* cases, the Court has determined that both universities and individual professors enjoy academic freedom. *See e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001). Those cases demonstrate that, if a district court is required to weigh those competing interests, it should do so as part of the *Pickering* balancing test. *Id.*

Neither understanding of academic freedom helps Meriwether. Plainly, if academic freedom protects universities only, Meriwether cannot benefit. Importantly, neither *Garcetti* nor any other Supreme Court decision overturned this Court's precedent that academic freedom lies with the university and not individual professors. Assuming arguendo that academic freedom benefits both universities and professors, this Court has balanced those competing freedoms when conducting the test set forth in *Pickering*. *See e.g.*, *Bonnell*, 241 F.3d at 821–23. Under *Garcetti* and this Court's precedent, the *Pickering* balancing test is entirely distinct from the issue of whether the plaintiff was speaking as a citizen. *See e.g.*, *Dixon v. Univ. of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012). In other words, under this Court's precedents, the best it gets for Meriwether is that academic freedom is part of the *Pickering* balance test in which courts engage only *after* deciding that the employee was "speaking as a citizen"; academic-freedom rights do not provide a professor an exception to the

"speaking as a citizen" aspect of the analysis. And the worst it gets for Meriwether is that he does not benefit from academic freedom at all.

Even if the Court looks past this precedent, the Court should examine two published cases in which the Court discussed the purported scholarship-and-teaching exception to *Garcetti*. In neither case did the Court find that there is an exception to *Garcetti* for professors.

In *Evans-Marshall*, the Court held that a teacher's curriculum choices are not protected speech because she made the choices in connection with her official duties as a high school teacher. *Evans-Marshall*, 624 F.3d at 339–40. The Court held that Justice Souter's concern for academic freedom was at the college level, not high school level, and therefore, in *Evans-Marshall*, this Court did not consider whether such a scholarship-and-teaching exception exists for professors. *Id.* at 343; *see also Fox*, 605 F.3d at 348–50 (not discussing a scholarship-and-teaching exception and applying *Garcetti*'s test to a teacher's complaint to her supervisor about the number of students assigned to her supervision, and finding that her statements were not entitled to First Amendment protection). Thus, nothing in *Evans-Marshall* disturbs this Court's prior holding that academic freedom is either part of *Pickering*'s test or of no benefit to professors.

In *Savage*, this Court explained that the relevant portion of *Garcetti* was "dicta." 665 F.3d at 739. The Court went on to hold that, "even assuming *Garcetti*

may apply differently, or not at all, in some academic settings," the plaintiff's comments on a book recommendation did not relate sufficiently to classroom instruction or academic scholarship for any purported exception to apply. Thus, the Court found that the plaintiff's speech fell within *Garcetti*'s "speaking as a public employee" realm. *Id.* Importantly for purposes of this case, the Court did not credit the plaintiff's assertion that there is an academic-freedom exception to *Garcetti*.

This Court has never determined that *Garcetti* created an exception to its own rule. And this Court has not independently adopted the exception proposed by Meriwether. In other words, Meriwether's claim that he should benefit from a scholarship-and-teaching exception to *Garcetti*'s "speaking as a public employee" prong is without merit because *Garcetti* did not provide an exception and this Court's precedent puts academic freedom outside of the "speaking as a public employee" analysis.

Meriwether has no compelling argument to overcome these obstacles. He cites two out-of-circuit decisions that he claims treat *Garcetti*'s dicta differently than this Court. Neither of those cases helps Meriwether overcome this Court's precedent. First, in *Adams v. Trs. of the Univ. of N. Carolina-Wilmington*, the Fourth Circuit noted that *Garcetti* left open the possibility of a scholarship-and-teaching exception and suggested that there was such an exception. 640 F.3d 550, 563 (4th Cir. 2011). But the court's holding was not based on that suggestion. The court held that the

plaintiff's speech "was intended for and directed at a national or international audience on issues of public importance unrelated to any of [his] assigned teaching duties." *Id.* at 564. That is to say, the court took a long and winding route to conclude that the plaintiff's speech, plainly unlike the instant case, was "not pursuant his official duties" as an employee and the plaintiff was therefore speaking as a citizen. Even though the court suggested that an exception to *Garcetti* exists, the court did not utilize that exception in resolving the case and the comment was therefore dictum.

Second, in *Demers*, the Ninth Circuit determined that professors have a right to academic freedom. But *Demers* is distinguishable from this case in at least two ways. First, the speech in *Demers* was the substance of the teaching or academic writing, not simply teaching methodology. *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014). (*See Infra Section I.A.3. for a full discussion of the breadth of any scholarship-and-teaching exception*). Second, *Demers* does not hold that the First Amendment prevents a university from requiring professors to adhere to its nondiscrimination policy; in fact, *Demers* does not discuss classroom discrimination at all. *See Id.* at 411–12. In any event, neither the Fourth Circuit's dictum nor Ninth Circuit's distinguishable holding can overrule Sixth Circuit precedent.

In sum, pre-*Garcetti*, this Court has held that the constitution does not provide academic freedom rights for professors. *Garcetti* did not overrule that precedent or

create an academic-freedom exception to the analysis it laid out. In other pre-*Garcetti* cases, this Court has conducted any academic-freedom analysis when performing the balancing test set forth in *Pickering*. And as *Garcetti* and its progeny make clear, that balancing test is applicable only *after* the court has determined the plaintiff was speaking as a citizen. Further, post-*Garcetti*, this court has *not* held that there is a scholarship-and-teaching exception to the "speaking as a public employee" prong set forth in *Garcetti*, even when the Court had the opportunity to do so. Thus, in the Sixth Circuit, professors may not have an individualized right to "academic freedom," and even if they do, that freedom does not have a role in the "speaking as a citizen" discussion.

The district court was correct to determine that Meriwether's speech fell within *Garcetti*'s reach. This Court should therefore affirm the district court's judgment.

3.  *Even If Garcetti Created An Exception, It Would Not Apply Here.*

Assuming arguendo that *Garcetti* created an exception or this Court will adopt such an exception today, it is of no matter because Meriwether's speech falls outside the boundaries of any exception. Any exception protects substantive classroom instruction, not all in-class utterances of those teaching.

Meriwether places much stock in the *Garcetti* dicta arguing that academic freedom protects professors' speech and asserting that "his speech was related to

teaching." (Appellant's Brief at p. 23.) While *Garcetti* uses the term "scholarship or teaching," the language is a paraphrase of its earlier and more precise term "academic scholarship or classroom instruction" and is grounded in "academic freedom." *Garcetti*, 547 U.S. at 425. This case does not involve Meriwether being warned due to his academic scholarship, thus the relevant analysis, assuming a *Garcetti* exception exists and could theoretically apply, is whether Meriwether was engaged in classroom instruction in such a way as to invoke academic freedom. He was not.

Courts addressing concerns related to academic freedom do not understand "academic scholarship" or "classroom instruction" as exceptions for all in-class speech. *See Hardy*, 260 F.3d at 679 (The analysis depends on whether the facts show the professor's speech was "germane to the subject matter of his lecture."). The reasoning set forth by Justice Souter in his dissent makes clear that what he sought to protect was the freedom for professors to engage in substantive discussion. *Garcetti*, 547 U.S. at 439 (Souter, J., dissenting) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("a governmental enquiry into the *contents* of a scholar's lectures at a state university 'unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression. . .'" (emphasis added) (alteration in original)).

This Court has implicitly acknowledged this understanding of the boundaries of Justice Souter's concern. In a post-*Garcetti* published decision, this Court held that a university professor managing his classroom is not speaking as a citizen because "'[t]eaching methods' . . . are not constitutionally protected . . . ." *Frieder v. Morehead State Univ.*, 770 F.3d 428, 430 (6th Cir. 2014). In *Frieder*, the plaintiff university professor raised a First Amendment claim alleging the university retaliated against him for his idiosyncratic teaching methods. *Id.* at 430. The Court cited to a long line of cases holding that "teaching methods" are not constitutionally protected and the university can take adverse action against a professor when the professor's teaching methods do not conform to institutional standards. *Id.*

Meriwether's decision to treat Doe differently than other students was not part of his instruction; it was an unequally applied variation from his teaching methods. As Meriwether himself explains, using gender-based titles in his teaching is a pedagogical choice designed to foster a serious academic environment. (Doc. 34, ¶139, PageID #1475, ¶155, PageID #1467, ¶204, PageID #1481, ¶217, PageID #1483, ¶283, PageID #1491.)

Somewhat inconsistently, however, Meriwether states that his in-class speech served a dual purpose—to communicate who was to answer the question he asked *and* to express his sincerely held beliefs on gender. (*See* Appellant's Brief at pp. 34–35.) Based in part on this assertion, Meriwether argues that the district court applied

the wrong standard when assessing whether he was speaking as a public employee because it was pure speech and not, as Meriwether believes the district court interpreted it, symbolic speech. (*Id.* at p. 36).

It makes no difference to the outcome of this case, but Meriwether is correct on the discrete point that he used words (pure speech) to convey his purported message. However opaque Meriwether's purported message may have been, words constitute pure speech. When examining whether an individual is speaking as a public employee, the employee's pure speech is not subject to *Spence*'s requirement that there is a "great" likelihood "that the message would be understood by those who [heard] it." *Spence v. Wash.*, 418 U.S. 405, 410–11 (1974) (per curiam). That said, the district court utilized *Spence*'s language when addressing whether Meriwether's discrimination addressed a matter of public concern, not whether he was speaking as a public employee. (Doc. 49, PageID #2155.) And as noted below, what could be understood from Meriwether's message *is* relevant in the "matter of public concern" context. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146) (emphasis added). Thus, Meriwether's argument that the district court applied the wrong standard is rooted in highlighting reasoning in one section of the district court's opinion and representing that the reasoning was part of an entirely distinct section.

In any event, the problem for Meriwether is that this purported flaw in the district court's analysis does not alter Meriwether's failure to overcome the threshold hurdle; Meriwether does not plausibly allege that the content—that is the subject matter—of his lecture was gender identity. Thus, Meriwether's speech was not "germane to the subject matter of his lecture" and his speech therefore falls outside the boundaries of any academic-freedom exception. *See Hardy*, 260 F.3d 679. As a matter of law, therefore, Meriwether was not engaged in protected speech when he called upon Doe by her last name only but called upon all other students using sex-based titles and last names.

Moreover, simple examples demonstrate the absurdity of Meriwether's position. Assuming it fits in the curriculum, a professor could discuss diversity in the college admissions context, point to Supreme Court dissents that suggest such admissions policies could conflict with the Equal Protection clause, and set forth his sincerely held belief that the dissenting Justices correctly interpret the constitution. But that professor could not spend the semester referring to white students by their name but minority students by the term "affirmative action student." Similarly, a professor could discuss traditional gender roles in raising children and offer the sincerely held opinion that children are happier when the mother works in the home. That professor could not spend the semester calling upon men by name and women by the term "unfit mother." While Meriwether and many of his Amici ground this

case in discussions regarding gender-identity, for purposes of the legal analysis in this case, the *type* of discrimination is not relevant. The legal issue is whether a public employer can warn employees not to engage in on-the-clock discrimination. The point here is not to compare the words used by Meriwether to those in the above examples, but to demonstrate the parade of horribles that would follow if the Court accepts Meriwether's interpretation of the legal landscape.

Even assuming a *Garcetti* exception exists, it is limited to the content of a professor's lecture. A university administration can warn a professor against engaging in discriminatory behavior, even if that discrimination occurs in the classroom.

### B.    Meriwether Was Not Addressing An Issue Of Public Concern.

Even assuming Meriwether was not speaking pursuant to his official duties and was speaking as a citizen, or that a broad right to academic freedom protects all manner of in-class discrimination, Meriwether's in-class speech is not entitled to First Amendment protection because his speech does not address a matter of "public concern."

Whether speech addresses a matter of "public concern" under the First Amendment is a question of law. *Handy-Clay*, 695 F.3d at 543. Courts define speech on a "matter of public concern" as speech that can "be *fairly* considered as relating to any matter of political, social, or other concern to the community." *Snyder v.*

*Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146) (emphasis added).

In determining whether speech addresses a matter of public concern, the Court must consider the "content, form, and context" of the speech in light of all of the circumstances of the speech, including "[1] what was said, [2] where it was said, and [3] how it was said." *Id.* at 453–54; *see also Farhat v. Jopke*, 370 F.3d 380, 589 (6th Cir. 2004) (quoting *Connick*, 461 U.S. at 147-48). No one of these three factors is dispositive, *Snyder*, 562 U.S. at 454, and the entire speech need not address a matter of public concern, so long as some portion of the speech does. *Farhat*, 370 F.3d at 589 (citing *Connick*, 461 U.S. at 149).

The Sixth Circuit has further refined the "public concern" inquiry by setting forth the following factors that the Court must consider: the "focus" of the speech; the "point of the speech"; the "purpose" to which the employee spoke; and the "intent of the speech" or the "communicative purpose of the speaker." *Id.* at 592 (quoting cases).

In determining the "focus" of the speech, "the proper inquiry is *not* what might be 'incidentally conveyed' by the speech." *Id.* (emphasis in original) (quoting *Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003)). Absent unusual circumstances, the constitution does not afford public employees protection when their speech deals with "matters only of personal interest." *Bonnell*, 241 F.3d at 812

(quoting *Connick*, 461 U.S. at 147). Where the "'focus' or 'point' of the speech advances only a private interest," then "'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern.'" *Farhat*, 370 F.3d at 592–93 (collecting cases). Applying these standards, courts hold that, in the college classroom context, speech that does not serve an academic purpose is not of public concern. *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019).

In this case, Meriwether called upon students using sex-based titles but did not do so when calling upon Doe. Meriwether engaged in this practice in his classroom with the limited and captive audience of his students. The record is thin on *how* Meriwether spoke, but since Meriwether was attempting to abide by his contrived interpretation of Shawnee State's discrimination policy, there is every reason to believe that Meriwether said "Doe" neutrally. Moreover, the focus of Meriwether's speech was completing his ministerial function of identifying which student should answer the question in class. The purpose and intent was the same, to convey to the group which student was to answer the question. While it is true that the entire speech need not address a matter of public concern, so long as some portion of the speech does, *Farhat*, 370 F.3d at 589 (citing *Connick*, 461 U.S. at 149), here no portion of the speech addressed any public concern. There is no public interest in which student will answer specific questions during a university lecture.

As noted above, Meriwether attempts to counter the facts that undermine his position by asserting that the purpose of his speech was twofold: to communicate who was to answer his question and to express his sincerely held beliefs on gender. Even if the Court credits Meriwether's assertion that he was trying to comment on broader issues of gender identity, it is of no matter because the gauge for purposes of the "public concern" inquiry is what the audience would "fairly" understand from Meriwether's statements, not his subjective understanding; "the proper inquiry is *not* what might be 'incidentally conveyed' by the speech" but what the speech actually conveyed. *Farhat*, 370 F.3d at 592 (emphasis in the original) (quoting *Rodgers*, 344 F.3d at 597).

True, gender identity is a matter of public concern. *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2476 (2018) (quoting *Snyder*, 562 U.S. at 453). But to credit Meriwether's position the Court would need to view his speech so expansively that all speech would be a matter of "public concern." Meriwether eviscerates the above-explained standard and replaces it with a "subjective intent of the speaker" standard. That is not the law.

Meriwether's speech cannot "fairly" be understood to touch on a matter of public concern, as such, the district court was correct to dismiss his complaint and this Court should affirm the district court's judgment.

**C.** **Even If Meriwether Were Speaking As A Citizen And On A Matter Of Public Concern, This Court Should Still Affirm The District Court's Judgment Because Meriwether's Claims Fail Under The *Pickering* Balancing Test.**

Assuming arguendo that the Court determines Meriwether was speaking as a citizen and was speaking on an issue of public concern, the Court should apply the balancing test set forth in *Pickering*. The district court did not complete this analysis finding it unnecessary in light of its other determinations. Nonetheless, this Court can affirm the district court's judgment for any reason. *Hensley Mfg.*, 579 F.3d at 609. Meriwether's First Amendment claims cannot stand because Shawnee State has a compelling interest in maintaining its nondiscrimination policy and federal anti-discrimination law.

The Sixth Circuit has held that discrimination against transgender individuals is discrimination on the basis of sex. *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018). This was the law of the Circuit when the underlying events with Meriwether occurred. The Supreme Court recently upheld this decision. *Bostock v. Clayton Cnty.*, 2020 U.S. LEXIS 3252 (U.S., June 15, 2020). Shawnee State has an obvious and powerful interest in complying with these precedents. Indeed, the Supreme Court has expressly recognized that compelling interests can, at times, override religious beliefs—even those that are constitutionally protected. *See Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005).

In light of the Supreme Court's holdings, it is difficult to see how Meriwether could succeed under *Pickering*. Under Sixth Circuit precedent, Shawnee State has a legal obligation to ensure transgender students do not suffer discrimination. *See Harris Funeral Homes*, 884 F.3d at 571; *see also Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 350 (6th Cir. 2020) (noting that the Sixth Circuit's Title VII precedent is often applied in Title IX cases). Shawnee State must, therefore, ensure transgender students will be free to take courses of their choice without fear of discrimination—after all, Shawnee State would fail in this endeavor if it permitted in-class discrimination against certain students on the basis of sex.

Compare Shawnee State's interest with Meriwether's. Meriwether argues that Shawnee State required him to speak against his sincerely held belief that gender is immutable. But Meriwether's Complaint refutes the foundation of his argument. Shawnee State provided Meriwether with three alternatives: (1) refer to all students by their chosen sex-based title; (2) refer to all students by last name without a sex-based title; or (3) refer to all students by their first name. (*See* Doc. 34, ¶ 212, PageID #1482; Doc. 34.11, PageID #1705.) At best for Meriwether, he has a compelling interest in rejecting only one of his three options. It is true that Meriwether's *preference* is to use sex-based titles and last names, but Meriwether is prepared to use last names in certain circumstances—after all, that is what he did when calling upon Doe. All this to say, Shawnee State must enforce its discrimination policy to

comply with federal law. *See e.g.*, *Whitaker*, 858 F.3d 1034. Meriwether wants to use sex-based titles to call on students but has demonstrated that he is prepared to change that practice in certain circumstances. Moreover, Meriwether has made no argument that he has a sincerely held belief that precludes him using last names only or first names only—he merely asserts that doing so is a pedagogical choice.

In sum, Meriwether's interest in inconsistently using gender-based titles to convey opaquely his belief that gender is immutable is plainly outweighed by Shawnee State's compelling interest in complying with this Court's and the Supreme Court's precedent related to the protections against discrimination set forth in federal law. Even if this Court accepts Meriwether's argument that a professor's in-class discrimination is outside *Garcetti*'s reach, the Court should still affirm the district court's judgment because Meriwether's interests are trifling compared to Shawnee State's.

### D. Meriwether Did Not Suffer An Adverse Employment Action.

The next in the litany of fatal flaws undermining Meriwether's Free Speech claims is that he was not subject to a qualifying adverse employment action. To establish an adverse action for First Amendment retaliation purposes, "a plaintiff must show that the action 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807,

822 (6th Cir. 2007)). "It is not necessarily true . . . that every action, no matter how small, is constitutionally cognizable" as an "adverse action." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). In this context, "'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (alteration omitted) (quoting *Handy-Clay*, 695 F.3d at 545).

The district court did not reach this issue finding that the constitution did not protect Meriwether's speech because it was pursuant to his employment duties. If this Court disagrees with the district court's conclusion, the Court should nonetheless affirm the district court's judgment because a warning letter is not a constitutionally cognizable "adverse action." This Court can, after all, affirm the district court's decision for any reason. *Hensley Mfg.*, 579 F.3d at 609.

The warning letter had no negative effect on Meriwether's employment. In fact, he does not and cannot argue otherwise; he remains a tenured Professor at the University's highest faculty rank. Meriwether instead focuses on some hypothetical future difficulty he may have in obtaining other employment should he leave Shawnee State. (Doc. 34, ¶298, PageID #1493.) Shawnee State merely required Meriwether to abide by Shawnee State's policy and warned him that a failure to do so would lead Shawnee State to take an adverse employment action against him in the future. The letter does not include a demand that Meriwether change his beliefs,

does not require him to state that he has changed his beliefs, or even require him to engage in the activity that Meriwether alleges violates his beliefs, *i.e.*, the letter does not warn Meriwether that he must use the sex-based titles to which he objects when calling upon Doe, it merely warns him not to discriminate in his use of sex-based titles. (Doc. 34.20, PageID #1771.)

To the extent that Meriwether alleges that the letter is an adverse action, that allegation is not plausible in light of this Court's precedent. Several panels of this court have determined that a suspension with pay does not constitute an adverse action. *See, e.g.*, *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017) (First Amendment retaliation claim); *Harris v. Detroit Pub. Schs.*, 245 F. App'x 437, 443 (6th Cir. 2007) (same); *Peltier v. United States*, 388 F.3d 984, 988–89 (6th Cir. 2004) (Title VII discrimination claim). It is not plausible to allege that a lesser action—a warning—is a greater adverse action.

Moreover, in *Sensabaugh v. Halliburton*, 937 F.3d 621, 628 (6th Cir. 2019), this Court held that a letter of guidance that "imposed directives that [the plaintiff] had to follow to avoid discipline" was not an adverse action. Similarly here, the letter informed Meriwether what discipline he would face if he continued to violate Shawnee State's nondiscrimination policy.

Even if the Court finds that Meriwether was engaged in protected First Amendment activity, he has not plausibly alleged that an adverse action that he

suffered "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison*, 765 F.3d at 659. For this additional reason, this Court should affirm the district court's judgment dismissing Meriwether's Free Speech claims.

## II.  Shawnee State's Policy Does Not Provide Unbridled Discretion To Administrators.

Meriwether includes an argument that Shawnee State's policy provides too much discretion to administrators and that Shawnee State violated his Free Speech and Due Process rights as a result. (Appellant's Brief at pp. 42–44, 54.) Meriwether's claim relies on his improper conflation of (1) the actual policy with (2) the group of people the policy is designed to protect. In any event, Meriwether's argument is so perfunctory that he waived his Due Process claim. As such, this Court should affirm the district court's dismissal of that claim.

### A.  Meriwether Waived His Claim That The District Court Erred In Dismissing His Due Process Claim By Failing To Provide This Court With A Reasoned Argument As To Why The District Court Erred.

Meriwether waived his Due Process claim by failing to provide a developed argument that the district court erred in dismissing that claim. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived, and it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *United States*

*v. Brown*, 819 F.3d 800, 829 (6th Cir. 2016) (quotations, citations, and alterations omitted).

Meriwether's "argument" is less than 200 words in total. Meriwether summarily asserts that Shawnee State's nondiscrimination policy does not prohibit his specific actions (*i.e.*, the specific kind of discrimination to which he subjected Doe). Meriwether does not discuss the district court's reasoning for dismissing his claim nor does he explain his grounds for disagreeing with that decision. In fact, Meriwether does not mention the district court's decision to dismiss his Due Process claim. Meriwether's conclusory statements require this Court to press pause on its role as arbiter and first advocate for Meriwether by developing arguments on his behalf. For this reason, the Court should deem waived Meriwether's Due Process claim and affirm the district court's dismissal of that claim.

**B.  Shawnee State's Policy Does Not Provide Administrators Unbridled Discretion.**

Even if Meriwether did not waive his "unbridled discretion" claims, the Court should affirm the district court's decision to dismiss those claims. Simply put, Shawnee's nondiscrimination policy is not unconstitutionally vague and did not provide administrators with unbridled discretion.

The Due Process Clause requires "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357

(1983), though it does not require legislating in "encyclopedic terms." *United States v. Jenkins*, 770 F.3d 507, 510 (6th Cir. 2014).

The policy at issue here sets forth sufficient definiteness: "This policy serves to ensure that there are University structures and processes in place that prohibit discrimination against any individual because of race, color, genetic information, religion, age, disability, national origin, ancestry, sex, pregnancy, sexual orientation, *gender identity*, veteran status or military status." (Doc. 34.1, ¶1.2, PageID #1509; Policy 5.01REV) (emphasis added). Indeed, Shawnee State's policy is in good company: Under Rule 4(a)(3) of the rules of judicial-conduct and judicial-disability, improper conduct includes "discrimination on the basis of race, color, sex, gender, *gender identity*, pregnancy, sexual orientation, religion, national origin, age, or disability." (Emphasis added); *see also* Code of Conduct for United States Judges Canon 3B (4); Code Of Conduct For United States Judges, USCOURTS.COM https://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges (last visited Aug. 2, 2020).

Meriwether's chief contention is that he finds the term gender identity "imprecise, subjective, and indefinite . . . ." (Appellant's Brief at p. 42.) It is difficult to understand Meriwether's argument when considered in light of Shawnee State's definition of gender identity: "Gender Identity[:] A person's innermost concept of self as male or female or both or neither—how individuals perceive themselves and

what they call themselves. One's gender identity can be the same or different than the sex assigned at birth." (Doc. 34.2, ¶18.4, PageID #1522.)

Meriwether has not (and could not) make the plausible allegation that the term gender identity is vague in light of this definition. Meriwether apparently disagrees with this definition and/or its value, but that is of no matter. Moreover, in his complaint Meriwether asserted that Shawnee State representatives repeatedly explained the policy to him—August 2016 (Doc. 34, ¶ 107, PageID #1472); October 2016 (*Id.* at ¶ 112, PageID #1472; *Id.* at ¶ 114, PageID #1472); March 2018 (*Id.* at ¶ 215, PageID #1483.)

To counter this flaw, Meriwether argues that it would be impossible to keep up with students' gender identity given the numerous possible title and pronoun preferences. (Appellant's Brief at p. 43.) The problem for Meriwether in making that argument is that it does not attack the policy itself but the nomenclature preferred by individuals in the group that the policy seeks to protect. The policy is not vague merely because Meriwether believes it protects numerous people or because Meriwether disagrees with the nomenclature he must use to abide by the gender-identity nondiscrimination policy. Equally, there are many variations and nuances to people's religious beliefs, but a policy that prohibits religion-based discrimination is not vague. The threshold issue is that *the policy* be so broad as to be vague. Here no such defect exists—the policy is plain on its face. That an

individual has to think before speaking to abide by the policy's terms does not render the policy vague.

Two further points of clarification: First, despite Meriwether's assertions to the contrary, Shawnee State's decision to add a warning letter to Meriwether's employment file was not the result of Meriwether's inadvertent slip-up or mistake but because he failed to stop singling out one student in a discriminatory manner. (Doc. 34.27, PageID #1799.) Second, Meriwether is simply incorrect in his related assertion that Shawnee State has unbridled discretion to sanction employees for discrimination that happens off-campus. (Appellate Brief at p. 44). Meriwether's discriminatory conduct plainly occurred on campus, so it is not clear why Meriwether challenges that provision; more importantly, the appropriate yardstick by which to measure a sanctioned employee's conduct is not the proximity to campus, as Meriwether seems to claim, but whether the employee's speech was within the scope of the employee's duties. *Lane*, 573 U.S. at 240. For these many reasons, this Court should affirm the district court's judgment dismissing Meriwether's "unbridled discretion" claims.

## III. <u>The District Court Correctly Determined That Meriwether Had Not Pleaded A Plausible Free Exercise Claim.</u>

The district court correctly held that Meriwether failed to state a claim that Shawnee State's nondiscrimination policy was not neutral, or that Shawnee State applied the policy to target and suppress his religious beliefs. Shawnee State's

nondiscrimination policy, therefore, does not violate Meriwether's right to exercise freely his religion.

The Free Exercise Clause does not relieve an individual of the basic obligation to comply with generally applicable rules that are facially neutral and applied neutrally. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). An individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate" because "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Emp. Div., Dep't of Human Res. Of Ore. v. Smith*, 494 U.S. 872, 878–79 (1990) (citation omitted), superseded in part by statute.

A law is unconstitutional if "the object of [the] law is to infringe upon or restrict practices because of their religious motivation," or if "the purpose of [the] law is the suppression of religion or religious conduct." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993), superseded in part by statute.

In the Sixth Circuit, there is a three-part analysis to determine whether application of a statute or policy violates an individual's right to exercise freely his religion: (l) whether the statute or policy was generally applicable; (2) whether the statute or policy was aimed at particular religious practices; and (3) whether the policy contained "a system of particularized exemptions." *Kissinger v. Bd. of Trs. of*

*Ohio State Univ.*, 5 F.3d 177, 179 (6th Cir. 1993) (citing *Smith*, 494 U.S. at 877–78). Despite Meriwether's reliance on out-of-circuit cases, in the Sixth Circuit, this analysis is not different where a plaintiff's Free Exercise claim implicates other constitutional rights, such as freedom of speech. *See id.*

In addition, because the government has an obligation to apply the rule or policy neutrally, if the government permits secular exemptions but not religious exemptions to a nondiscrimination policy, and fails "to apply the policy in an even-handed, much less a faith-neutral, manner," the government's application of that policy is unconstitutional. *Ward v. Polite*, 667 F.3d 727, 739 (6th Cir. 2012). The Supreme Court explained in *Masterpiece Cakeshop* that "[f]actors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop*, 138 S.Ct. at 1731 (quoting *Church of Lukumi Babalu Aye*, 508 U.S. at 540). In *Masterpiece Cakeshop* the Court analyzed whether the decision making body was "neutral and respectful" of the individual's religious beliefs. The Court looked to (1) whether the decision making body had demonstrated hostility to the individual's religious beliefs (respectfulness), and (2) the Court compared the outcome in that case with outcomes in other cases with similar facts to determine

whether the decision making body had been even-handed in applying the law (neutrality). It seems, therefore, that courts in this circuit should analyze the three prongs set forth in *Kissinger* when ruling upon the facial validity of the law or policy and must then complete a "neutral and respectful" analysis when ruling on challenges to the government's application of the law or policy.

## A. Meriwether Does Not Plausibly Allege That Shawnee State Requires Him To Violate His Religious Beliefs.

Meriwether's challenge does not get out of the starting blocks here. Before engaging in the above-explained analysis, to determine whether Shawnee's policy violates the Free Exercise clause, the Court must first determine whether the facts of this case even theoretically lend themselves to support such a claim. They do not.

In *Harris Funeral Homes*, this Court ruled that the district court erred in granting the defendant summary judgment based on a Religious Freedom Restoration Act defense. 884 F.3d at 590. The Supreme Court did not review that holding when reviewing other aspects of the decision, thus, it remains the law of the circuit. "Most circuits, including [the Sixth Circuit], have recognized that a party can sincerely believe that he is being coerced into engaging in conduct that violates his religious convictions without actually, as a matter of law, being so engaged." *Id.* at 588. This Court held that continuing to employ a transgender person did not constitute an endorsement regarding the mutability of sex. *Id.* The Court held "as a matter of law," compliance with nondiscrimination laws does not amount to an

endorsement of certain views. *Id.* at 589. Endorsement of such a view occurs only when a person assists or facilitates a person's transition efforts. *Id.* So too here. Shawnee State merely warned Meriwether to treat his students equally. Thus "[a]t bottom, the fact that [the plaintiff] sincerely believes that he is being compelled to make such an endorsement does not make it so." *Id.*

This conclusion is even stronger in light of Shawnee State's accommodation that Meriwether could call all students by their first name or last name only. It is implausible to suggest, as Meriwether does, that Shawnee State forced Meriwether to endorse, facilitate, or even accept on any level that sex is mutable when Shawnee State allowed Meriwether to avoid the titles he finds serve as such an endorsement. The Court need go no further, as a matter of law, Shawnee State did not and does not require Meriwether to endorse a view contrary to his sincerely held beliefs. As such, Meriwether's Free Exercise claim holds no water.

## B. Shawnee State's Policies Comfortably Withstand Meriwether's Facial Challenge.

Assuming arguendo that the Court finds Shawnee State's accommodation to Meriwether that he avoid sex-based titles and pronouns somehow caused him to endorse a view that gender is mutable, it is of no matter. Shawnee State's policies pass every challenge that Meriwether brings.

1. *Shawnee State's Policies Are Facially Neutral And Generally Applicable.*

Shawnee State's policies apply to "all employees, students, visitors, agents, and volunteers" in "all aspects of the University's programs and operations." (Doc. 34.2, ¶ 2.2, PageID #1512.) The policies are encompassing in that they protect those that are part of the Shawnee State community from discrimination in many different forms and where the discrimination is rooted in many different prejudices. This reinforces the conclusion that the policy is neutral. After all, the policy does not bar certain religious-based beliefs but remain silent on secular beliefs.

2. *Shawnee State's Policies Are Not Aimed At A Particular Set Of Religious Beliefs.*

Meriwether raises no argument that Shawnee State's purpose in enacting the policy was to block employees from exercising their religious beliefs or that Shawnee State enacted the policy to discriminate against those with certain religious beliefs. Instead, Meriwether states that whether Shawnee State generated its policy to discriminate against religious beliefs is a matter for discovery. (Appellant's Brief at p. 49.) In so arguing, Meriwether eviscerates the purpose of a motion to dismiss.

Meriwether must present some plausible allegation from which the district court could reasonably infer that Shawnee State enacted the policy for a discriminatory purpose; he fails to do so. Meriwether states that he has taught at Shawnee State for many years and this is the first time he has faced this kind of

discipline. What Meriwether fails to include is an allegation that he previously taught a transgender student or that he or any other professor previously addressed a transgender student by a non-preferred gender title. Moreover, Meriwether does not even attempt to tie his assertion to the process by which Shawnee State enacted their nondiscrimination policy.

### 3. Shawnee State's Policies Have No Individualized Exceptions.

"[I]n circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason." *Church of Lukumi Babalu Aye*, 508 U.S. at 537 (citing *Smith*, 494 U.S. at 884) (internal quotation marks omitted). As written, the policy contains no exemptions at all, let alone a system of individualized exemptions that could reasonably lead a court to the conclusion that the exemptions are designed to target any religious beliefs. Moreover, Meriwether does not allege that the policy, as written, has exceptions.

## C. Shawnee State Applied Its Nondiscrimination Policies Neutrally And Respectfully.

### 1. Neutral Application.

As the district court correctly noted, Meriwether points to no occasion on which Shawnee State created any exception allowing any person to violate its discrimination policy. Meriwether's response is to argue there must be exceptions because there are titles other than sex-based titles with which he disagrees.

(Appellant's Brief at p. 53.) Meriwether's conclusory statements are not sufficient for him to navigate a motion to dismiss. A plaintiff cannot plausibly allege that there are individualized exceptions to a policy by simply stating "there must be exceptions." That is not an allegation but the kind of conclusory statement that courts reject. Thus, Meriwether has failed to allege plausibly that Shawnee State applied its nondiscrimination policy in a less-than-neutral manner. Meriwether provides no evidence or allegation that Shawnee State ever provided anyone an exception to the policy for secular reasons, or any religious reason for that matter. In fact, the record shows that the closest Shawnee State ever came to providing an exception was its suggestion to Meriwether that he avoid using sex-based titles completely rather than use each student's preferred sex-based title.

### 2. *Respectful Application*

Meriwether's also argues that Shawnee State employees were not respectful of his religious beliefs. To Meriwether's mind, at least two individuals were hostile demonstrating this lack of respect.

Reading the facts as Meriwether sets forth in his complaint, Meriwether has not alleged plausibly that Shawnee State's supposed hostility affected the outcome of his disciplinary proceedings. Meriwether claims that Shawnee State failed to provide him an accommodation that was tolerant of his religious beliefs. The facts set forth in his complaint refute his claim. Upon Meriwether's presentation of his

religious objection to using sex-based titles and pronouns based on each student's gender identity, Shawnee State offered Meriwether the alternatives of using all students' first names only or last names only—*i.e.*, he could avoid sex-based terms. Meriwether declined to take up this offer but provided no religious-based rationale for doing so. Meriwether states repeatedly that using sex-based pronouns is a teaching choice; he does not allege that using first names or last names violates his religious beliefs. And as is obvious, the Free Exercise clause protects Meriwether's religious convictions, not his pedagogical preferences.

Thus, on the issue of Shawnee State's purported lack of respect for Meriwether's religious beliefs, the proof is in the metaphorical pudding: Shawnee State provided Meriwether alternatives that allowed Meriwether to avoid using terms in a way that offended his religious beliefs. This is exactly the kind of respectful consideration that the Free Exercise jurisprudence requires. *See e.g.*, *Fulton v. City of Phila.*, 922 F.3d 140, 157 (3d Cir. 2019). That Meriwether declined to take up those options for non-religious reasons is not attributable to Shawnee State. The Free Exercise clause does not provide individuals carte blanche authority to disobey laws or policies for non-religious reasons.

Meriwether also alleges that defendants Pauley and Bauer demonstrated hostility to his religious beliefs. Assuming arguendo that Meriwether accurately describes the events in his complaint and attached documentation, it is of no matter

because Meriwether has not plausibly alleged that the "hostility" affected Shawnee State's decision to enforce its nondiscrimination policy.

First, Meriwether alleges that his department chair, defendant Pauley, who did not make the decision to add the warning letter to his employment file, criticized his religious beliefs more than a year before he discriminated against Doe. Meriwether adds that Pauley participated in the disciplinary process by "highlighting" his unequal use of sex-based terms. If by "highlighting" Meriwether means accurately relayed, then that is true. Because Pauley was not the final arbiter of Meriwether's punishment, his allegations regarding Pauley are irrelevant. *See e.g.*, *Wozniak v. Adesida*, 932 F.3d 1008, 1011 (7th Cir. 2019). Moreover, Meriwether fails to allege plausibly that Pauley's purported hostility had any effect on her decision to relay accurately what Meriwether said or on Shawnee State's ultimate decision to add a warning letter to his employment file. Meriwether cannot merely state that Pauley was hostile to his religious beliefs *and* that she was involved in the disciplinary process—Meriwether must plausibly allege that Pauley was hostile to his religious beliefs and that hostility *affected* the disciplinary process. He has not done so because it is implausible to suggest that, but for Pauley's hostility, Shawnee State would have abandoned its duty to protect its students from the unequal treatment Meriwether finds appropriate.

Second, Meriwether alleges that then-Provost Bauer was hostile toward his religious beliefs because Bauer laughed during a union grievance meeting. Again, Meriwether points to facts that, if true, have no impact. As a starting point, Shawnee State added the letter to Meriwether's file before Bauer's alleged hostility. Additionally, the documents upon which Meriwether bases his claim, notes documenting his union grievance meeting, do not support his conclusion. The notes reflect that Bauer laughed at some point during the presentation, but nothing connects that notation to any discussion regarding Meriwether's religious beliefs. (Doc. 34.24, PageID #1780.) Thus, the notes do not allow a court to infer that Bauer's laughter was related to Meriwether's explanation of his religious beliefs. Further, Meriwether would need to allege plausibly that Bauer could and would have granted Meriwether an individualized exception had Bauer not been hostile toward Meriwether's beliefs. Phrased another way, Meriwether would need to allege plausibly that Bauer would have abandoned his duty to protect students from discrimination and ignored this Court's precedent that discrimination on the basis of gender identity violates federal law. Such an allegation beggars belief in a way that the U.S. Supreme Court has warned against. *See Iqbal*, 556 U.S. at 679.

In reality, the extensive documentation attached to Meriwether's Amended Complaint illustrates that Shawnee State was not hostile toward Meriwether's religious beliefs. To be sure, Shawnee State investigated Doe's claims, but Shawnee

State consistently provided Meriwether a fair process. (*See* Doc. 34.12, PageID #1712 (highlighting that Milliken identified options for Meriwether that allowed him to comply with Shawnee State's policies while not using the sex-based pronouns with which he disagrees); *see also*, Doc. 34.9, PageID #1702; Doc. 34.10, PageID #1703; Doc. 34.14, PageID #1731; Doc. 34.17, PageID #1743; Doc. 34.20, PageID #1771 (all Dean Milliken); *see* Doc. 34.25, PageID #1784 ("When provided with options to avoid discrimination and opposition to his religious beliefs, Dr. Meriwether chose to continue his disparate treatment of the student."); Doc. 34.12, PageID #1709; Doc. 34.18 PageID #1767; Doc. 34.19, PageID #1770; Doc. 34.21, PageID #1772 (all Interim President Bauer); *See* Doc. 34.13, PageID #1719 (highlighting that it is Meriwether's discriminatory use of pronouns that violates the policy but making no assertion that his belief system must change); *see also*, Doc. 34.13, PageID #1716–22 (Human Resources Director Johnson)). During the disciplinary and grievance processes, Shawnee State decision makers respectfully referenced Meriwether's right to hold the religious beliefs of his choice but balanced that right against the clear mandates of the nondiscrimination policy. (*Id.*) Importantly, Shawnee State's last word on the written warning came from Bauer's designee, Dave Zender, following a grievance meeting. Zender noted "Dr. Meriwether acknowledged that he refused to stop singling out the student because of her gender identity after receiving notice of the policy's requirements *and options*

*to accommodate his religious beliefs*." (Doc. 34.27, PageID #1799) (emphasis added). Zender also pointed out how Shawnee State was respectful of Meriwether's beliefs:

> The University's non-discrimination policy does not require such individuals to change their sincerely held beliefs or adopt different beliefs. The policy does require that employees, including faculty members not single out in a negative way individuals whose traits they hold in lower regard because of religious beliefs . . . Dr. Meriwether was not required to espouse a belief with which he disagreed.

(*Id.*) This is exactly the kind of respectful treatment of Meriwether's religious beliefs that courts require. *See Fulton*, 922 F.3d at 157. Despite disagreeing with him, Shawnee State did not disparage Meriwether's beliefs during the disciplinary process nor was disagreement with Meriwether's beliefs the driving force behind the disciplinary process. Shawnee State merely acknowledged the irrefutable reality that Meriwether's beliefs directly conflict with its nondiscrimination policy and that, despite attempts to accommodate Meriwether and find verbiage that Meriwether could use that was not discriminatory, Meriwether insisted that functionally endorsing his discriminatory behavior was Shawnee State's only option. For these reasons, Meriwether's "hostility" arguments do not withstand scrutiny.

### D. Shawnee State's Policies Are Not Too Subjective.

Meriwether's final throw of the dice is to complain that Shawnee State bases its system on too subjective of a standard. Meriwether misreads the case law and the policy. In making his argument, Meriwether relies on *Axson-Flynn v. Johnson*, 356

F.3d 1277 (10th Cir. 2004) out of the Tenth Circuit. In *Axson-Flynn* the court cited its prior case law for the proposition that exceptions to a generally applicable rule cannot be based on subjective case-by-case determinations. *Id.* at 1296–97. The court did not come close to stating, as Meriwether appears to suggest, that enforcing a rule that includes a subjective component is a forbidden violation of the Free Exercise clause.

Meriwether's main contention appears to be that Shawnee State's nondiscrimination policy is unreasonably subjective because Doe did not acquiesce when Meriwether changed the form of his discrimination. *i.e.*, Meriwether replaced discriminating against Doe by referring to her as male with discriminating against Doe by refraining from using sex-based titles when referring to her while continuing to use sex-based titles when referring to all other students. It is hardly a surprise that Doe was not satisfied. In any event, Shawnee State's policy plainly prohibits conduct that is hostile "from both a subjective . . . *and an objective* . . . viewpoint." (Doc. 34.2, ¶18.6.1, PageID #1522.) Given the objective component of the standard, Meriwether's argument is wholly without merit. For these reasons, this Court should affirm the district court's judgment dismissing Meriwether's Free Exercise claim.

## CONCLUSION

For the above-stated reasons, Shawnee State respectfully requests that the Court affirm the district court's judgment.

Respectfully submitted,

DAVE YOST
ATTORNEY GENERAL OF OHIO

/s/ Paul Kerridge
Paul R. Kerridge
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Tel: 513.579.6400
Fax: 513.579.6457
Email: pkerridge@kmklaw.com

*Special Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the word-processing system used to prepare the brief, Microsoft Word, indicates that this brief contains 12,928 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Paul Kerridge*
Paul R. Kerridge

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2020, I electronically filed the foregoing

Brief of Appellees with the Clerk of the Court for the United States Court of Appeals

for the Sixth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be

accomplished by the appellate CM/ECF system.


*/s/ Paul Kerridge*
Paul R. Kerridge

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to 6 Cir. R. 28(b)(1)(A)(i) and 30(g)(1), Appellees have designated

the following docket entries from the district court below:

| Doc. # | Description | Page ID # Range |
|--------|-------------|-----------------|
| 18 | Motion to Intervene. (Dec. 24, 2018). | 488 |
| 34 | First Amended Verified Complaint (Redacted). (Feb. 5, 2019). | 1457, 1458, 1460-1464, 1467, 1469, 1471-1472, 1475-1476, 1480, 1481, 1482, 1483, 1484-1485, 1486, 1487, 1488, 1489, 1491, 1492, 1493, 1494-1503 |
| 34.1 | Compl. Ex. 1: Shawnee State University's *Non-Discrimination/Sexual Harassment Policy.* | 1509-1510 |
| 34.2 | Compl. Ex. 2: Shawnee State University's Policy Entitled *Reporting & Investigating Sexual Assault, Sexual Misconduct & Other Forms of Discrimination.* | 1512, 1522 |
| 34.4 | Compl. Ex. 4: The *Collective Bargaining Agreement* between Shawnee State University & Shawnee Education Association. | 1653-1654 |
| 34.5 | Compl. Ex. 5: Correspondence between Poirot and Shawnee State University Faculty Members. (Sept. 2016). | 1689 |
| 34.9 | Compl. Ex. 9: Correspondence from Milliken to Meriwether. (Feb. 13, 2018). | 1702 |
| 34.10 | Compl. Ex. 10: Correspondence from Milliken to Meriwether. (Feb. 16, 2018). | 1703 |
| 34.11 | Compl. Ex. 11: Correspondence between Milliken and Meriwether. (Feb. 23–Mar. 12, 2018). | 1704, 1705 |
| 34.12 | Compl. Ex. 12: Correspondence between Bauer and Meriwether. (Mar. 12, 2018). Correspondence | 1709, 1712 |

| | between Milliken and Meriwether. (Feb. 26–Mar. 1, 2018). | |
|---|---|---|
| 34.13 | Compl. Ex. 13: Johnson's Investigation Report for Milliken. (Apr. 12, 2018). | 1716-1722 |
| 34.14 | Compl. Ex. 14: Correspondence from Milliken to Meriwether regarding the Investigation Report. (Apr. 18, 2018). | 1731 |
| 34.17 | Compl. Ex. 17: Milliken's Report of the Findings of the Formal Investigation of Meriwether. (May 29, 2018). | 1741-1742, 1743 |
| 34.18 | Compl. Ex. 18: Correspondence involving Bauer, Milliken, Meriwether, Burns and Otworth. (May 29–Jun. 1, 2018). | 1767 |
| 34.19 | Compl. Ex. 19: Bauer's Decision on Formal Disciplinary Action and Related Correspondence. (Jun. 14, 2018). | 1770 |
| 34.20 | Compl. Ex. 20: Shawnee State University's Written Warning to Meriwether. (Jun. 22, 2018). | 1771 |
| 34.21 | Compl. Ex. 21: Correspondence from Bauer to Meriwether regarding Shawnee State University's Written Warning. (Jun. 25, 2018). | 1772 |
| 34.23 | Compl. Ex. 23: Shawnee Education Association's Grievance Form, as Completed by Meriwether. (Aug. 16, 2018). | 1776-79 |
| 34.24 | Compl. Ex. 24: Poirot's unsigned purported account of his Meeting with Bauer and Meriwether. (Aug. 22, 2018). | 1780 |
| 34.25 | Compl. Ex. 25: Bauer's Decision on Meriwether's Level 2 Grievance and Related Correspondence. (Sept. 5, 2018). | 1782, 1784 |
| 34.27 | Compl. Ex. 27: Shawnee Education Association's Grievance Form, reflecting Zender's Decision on Meriwether's Level III Grievance. (Oct. 4, 2018). | 1799 |
| 36 | Defendants' Motion to Dismiss. (Feb 11, 2019). | 1869 |
| 43 | Order granting Intervenors' Motion to Intervene. (May 9, 2019). | 1972 |
| 44 | Intervenors' Motion to Dismiss. (May 10, 2019). | 1974 |
| 45 | Meriwether's Opposition to Defendants' Motion to Dismiss. (May 30, 2019). | 1997 |

| 46 | Meriwether's Opposition to Intervenors' Motion to Dismiss. (May 31, 2019). | 2028, 2036 |
|----|---|---|
| 47 | Defendants' Reply in Support of Motion to Dismiss. (Jun. 13, 2019) | 2057 |
| 48 | Intervenors's Reply in Support of Motion to Dismiss. (Jun. 14, 2019). | 2082 |
| 49 | Report & Recommendation. (Sept. 5, 2019). | 2119, 2155, 2156 |
| 53 | Meriwether's Objections to the Magistrate Judge's Report and Recommendation. (Oct. 4, 2019). | 2247 |
| 60 | Order Adopting Report & Recommendation. (Feb. 12, 2020). | 2402 |