No. 20-3289

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

NICHOLAS K. MERIWETHER,

*Plaintiff-Appellant*,

v.

THE TRUSTEES OF SHAWNEE STATE UNIVERSITY—Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra Hash, Robert Howarth, George White, and Wallace Edwards—in their official capacities; JEFFREY A. BAUER, in his official capacity; ROBERTA MILLIKEN, in her official capacity; JENNIFER PAULEY, in her official capacity; TENA PIERCE, in her official capacity; DOUGLAS SHOEMAKER, in his official capacity; and MALONDA JOHNSON, in her official capacity,

*Defendants-Appellees*,

and

JANE DOE AND SEXUALITY AND GENDER ACCEPTANCE,

*Intervenors-Appellees*.

---

On Appeal from the United States District Court
for the Southern District of Ohio, Western Division
Case No. 1:18-cv-753
Hon. Susan J. Dlott

---

## BRIEF OF INTERVENORS-APPELLEES JANE DOE
## AND SEXUALITY AND GENDER ACCEPTANCE

Jennifer L. Branch #0038893
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100 (tel)
(513) 345-5543 (fax)
Jbranch@gbfirm.com

Shannon P. Minter
Asaf Orr
Christopher F. Stoll
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street Suite 370
San Francisco, California 94102
(415) 392-6257 (tel)
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

Adam G. Unikowsky
Noah B. Bokat-Lindell
JENNER & BLOCK LLP
1099 New York Avenue, NW #900
Washington, DC 20001
(202) 639-6000 (tel)
(202) 639-6066 (fax)
aunikowsky@jenner.com

*Attorneys for JANE DOE and
SEXUALITY AND GENDER
ACCEPTANCE*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to 6th Cir. R. 26.1, Jane Doe and Sexuality and Gender Acceptance make the following disclosures:

1. Neither Jane Doe nor Sexuality and Gender Acceptance is a subsidiary or affiliate of a publicly owned corporation.

2. There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome in this case.

## STATEMENT REGARDING ORAL ARGUMENT

The District Court dismissed Plaintiff's complaint without oral argument. In Defendant-Intervenors' view, this case is sufficiently straightforward that it can be resolved without oral argument. However, if the Court schedules oral argument, Defendant-Intervenors respectfully request the opportunity to participate in oral argument.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT...................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES ...............................................................v

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES ................................................................1

STATEMENT OF THE CASE .............................................................1

SUMMARY OF ARGUMENT ..............................................................8

STANDARD OF REVIEW ...............................................................12

ARGUMENT ................................................................................13

I.      The District Court Correctly Held That Plaintiff Has Not Stated a Free-Speech Claim. .........................................................................13

        A.      *Garcetti* Bars All of Plaintiff's Free Speech Claims...........................14

                1.      *Garcetti* controls this case..........................................14

                2.      Plaintiff cannot avoid *Garcetti* by characterizing this case as a "compelled speech" case. ...................................19

                3.      Plaintiff's role as a professor does not exempt him from *Garcetti* or Shawnee's nondiscrimination policies...................22

                        a.      There is no "academic speech" exception to *Garcetti*. .........................................................22

                        b.      Even if there were an academic-speech exception to *Garcetti*, this case would not implicate such an exception because it presents no threat to academic freedom. .........................................................28

                        c.      Even if this were an academic-freedom case, this Court's precedents would still require dismissal of Plaintiff's claim under *Garcetti*......................................31

B.    Plaintiff's Speech Was Not on a Matter of Public Concern. ..............35

C.    Even Under *Pickering* Balancing, Plaintiff's Claim Fails. ................40

D.    All of Plaintiff's Free Speech Claims Should Be Dismissed..............42

II.   The District Court Correctly Held That Plaintiff Has Not Stated a Free Exercise Claim...........................................................................................46

A.    *Smith* Resolves This Case. ................................................................47

B.    Shawnee's Adoption and Enforcement of its Policy Shows No Hostility to Religion. ..........................................................................49

III.  The District Court Correctly Dismissed Plaintiff's Due Process Claim. .......54

CONCLUSION .....................................................................................................54

# TABLE OF AUTHORITIES

**CASES**

*A'la v. Cobb*, 208 F.3d 212 (6th Cir. 2000) ............................................................51

*Adams v. Trustees of the University of North Carolina-Wilmington*, 640 F.3d 550 (4th Cir. 2011) ................................................................23, 24

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) ................................................17

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) .........................................11, 18

*Chisholm v. St. Marys City School District Board of Education*, 947 F.3d 342 (6th Cir. 2020) ............................................................ 18-19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)............................................................................47, 53

*Cole v. Richardson*, 405 U.S. 676 (1972) ................................................................27

*Connick v. Myers*, 461 U.S. 138 (1983).......................................................14, 35, 36

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)....................................................31

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) ............................................................................18, 36

*Employment Division v. Smith*, 494 U.S. 872 (1990) .................................12, 46, 47

*Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332 (6th Cir. 2010) ..................... 23, 25, 32, 33, 40, 44

*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) ......................................................38

*Gamel v. City of Cincinnati*, 625 F.3d 949 (6th Cir. 2010) ...................................54

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......................................................*passim*

*Hall v. Callahan*, 727 F.3d 450 (6th Cir. 2013).....................................................12

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012)..................................................................................40

*Janus v. American Federation of State, County & Municipal Employees Council 31*, 138 S. Ct. 2448 (2018) ................................................................. 20

*Johnson-Kurek v. Abu-Absi*, 423 F.3d 590 (6th Cir. 2005) ............................... 25, 33

*Keyishian v. Board of Regents of University of State of New York*, 385 U.S. 589 (1967) ................................................................................ 26, 27, 34

*Kissinger v. Board of Trustees of Ohio State University, College of Veterinary Medicine*, 5 F.3d 177 (6th Cir. 1993) ........................................ 49, 53

*Lane v. Franks*, 573 U.S. 228 (2014) ................................................................ 35

*Mallory v. Ohio University*, 76 F. App'x 634 (6th Cir. 2003) ........................... 40-41

*Mayhew v. Town of Smyrna*, 856 F.3d 456 (6th Cir. 2017) ................................... 35

*Moody v. Michigan Gaming Control Board*, 847 F.3d 399 (6th Cir. 2017) ....................................................................................................... 13

*Nair v. Oakland County Community Mental Health Authority*, 443 F.3d 469 (6th Cir. 2006) ........................................................................... 38

*Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003) ............................................... 38

*Sahm v. Miami University*, 110 F. Supp. 3d 774 (S.D. Ohio 2015) ...................... 41

*Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012) ................................................. 23, 29

*Shelton v. Tucker*, 364 U.S. 479 (1960) ........................................................ 26, 34

*Sweezy v. New Hampshire ex re. Wyman*, 354 U.S. 234 (1957) ......................... 26, 34

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) ............................................................................................................... 48

*Vasquez v. City of Hamtramck*, 757 F.2d 771 (6th Cir. 1985) ............................. 51

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ...................................................... 46

*Westmoreland v. Sutherland*, 662 F.3d 714 (6th Cir. 2011) ................................. 38

*Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017) .......................................... 19

## STATUTES

18 U.S.C. § 249(a)(2) ...........................................................45

20 U.S.C. § 1681(a) ............................................................18

28 U.S.C. § 1367(a) ............................................................54

Iowa Code § 216.6(1)(a) ......................................................45

Mass. Code ch. 151B, § 3 ....................................................45

Me. Code § 4772 ................................................................45

Me. Code § 4553 ................................................................45

## STATEMENT OF JURISDICTION

Plaintiff's Statement of Jurisdiction (Pl. Br. 1) is complete and correct.

## STATEMENT OF ISSUES

Defendant Shawnee State University enforces a nondiscrimination policy that requires employees to respect students' gender identity while doing their jobs. The policy does not restrict professors or any other employees from expressing their views on any issue, but instead ensures that transgender students have access to a university education free from discrimination. The issues are:

1. Whether Plaintiff states a claim that Shawnee's nondiscrimination policy, as applied to him, violates the Free Speech Clause.

2. Whether Plaintiff states a claim that Shawnee's nondiscrimination policy, as applied to him, violates the Free Exercise Clause.

3. Whether Plaintiff states a claim that Shawnee's nondiscrimination policy, as applied to him, violates the Due Process Clause.

## STATEMENT OF THE CASE

Defendant Shawnee State University ("Shawnee") is a public, four-year college in the University System of Ohio. Am. Compl., R. 34, PageID.1464 ¶ 53. Shawnee enforces written nondiscrimination policies that apply to all Shawnee employees. *Id.* at PageID.1464-1465 ¶¶ 55, 61; Am. Compl. Ex. 1, R. 34-1, at PageID.1509-1510; Am. Compl. Ex. 2, R. 34-2, PageID.1511-1512. Among other policies, Shawnee prohibits "Sex and Gender Based Discrimination," including

"adverse treatment on based on . . . gender identity," which is defined as treatment that "denies or limits [an] individual's ability to obtain the benefits of Shawnee State's programs or activities." Am. Compl. Ex. 2, PageID.1522.

Plaintiff Nicholas Meriwether is a professor at Shawnee. Am. Compl. ¶¶ 93-95, PageID.1469-1470. Like other employees, he is required to comply with Shawnee's nondiscrimination policy. Am. Compl. Ex. 2, PageID.1512. In 2016, Plaintiff received guidance that Shawnee's nondiscrimination policy barred discrimination against transgender students. To comply with the policy, employees were required to address transgender students—like all other students—in accordance with their gender identity. Am. Compl. ¶¶ 106-112, 114, 124, PageID.1471-1473.

Defendant-Intervenor Jane Doe is a Shawnee student who anticipates graduating from Shawnee in May 2021. Declaration of Jane Doe in Support of Motion to Intervene, R. 18-2, PageID.514, 516. She is a transgender woman who has obtained a legal name change and corrected the gender marker on her Ohio driver's license. *Id.* at PageID.515. At Shawnee, she is listed as female in her student records. *Id.* at PageID.515-16.

Defendant-Intervenor Sexuality and Gender Acceptance is a student-led organization dedicated to promoting diversity and understanding by giving a voice to LGBTQ students at Shawnee. Declaration of Jae Ezra Keniston in Support of

Motion to Intervene, R. 18-3, PageID.521-22.  SAGA has thirty members, including nine transgender members, all of whom are Shawnee students.  *Id.* at PageID.521.  Jane Doe is a member of SAGA.  *Id.*

On January 9, 2018, Plaintiff began teaching a course in Political Philosophy at Shawnee.  Am. Compl.  ¶ 125, PageID.1474.  Among the students in his class was Doe.  *Id.* ¶ 128, PageID.1474.  During the first class session, Plaintiff referred to Doe as "sir."  *Id.*  After class, Doe approached Plaintiff to inform him that she is female and to request that Plaintiff refer to her using female honorifics and pronouns.  *Id.* ¶¶ 140-141, PageID.1475.  Plaintiff refused to do so.  *Id.* ¶ 141, PageID.1475.[1]  In subsequent class periods, Plaintiff singled out Doe by referring *only* to her by her surname, while continuing to use honorifics for other students.  *Id.* ¶¶ 153-154, PageID.1476.  Despite being singled out in this stigmatizing manner, Doe was required to continue answering questions when called upon by Plaintiff.  *Id.* ¶ 127, PageID.1474 (noting that "participation component of the course" requires students to be "prepared to give his or her answers to the assigned study questions when

---

[1] Plaintiff alleges that Doe became "belligerent, berating Dr. Meriwether."  Pl. Br. 4.  Although the Court must take the complaint's allegations as true in the current posture of this case, Doe states for the record that she vigorously disputes that allegation.  Declaration of Jane Doe in Support of Motion to Intervene, R. 18-2 PageID.516-17 ("Professor Meriwether's assertion in his complaint that I 'became belligerent,' 'circl[ed] around' him, or '[got] in his face in a threatening fashion,' is false.  I was not 'belligerent' and did not invade his personal space or threaten him in any way whatsoever.").

called upon to do so").

Doe complained to Shawnee officials about Plaintiff's disparate treatment of her in the classroom. Am. Compl. ¶ 152, PageID.1476. Plaintiff's refusal to comply with Shawnee's nondiscrimination policy led to an investigation. In that investigation, Shawnee determined that Plaintiff was discriminating against Doe both by "address[ing] [her] differently than others within the class by calling her by her surname while other students are addressed as Ms. __ or Mr. __," and by using male pronouns when referring to her. *Id.* ¶¶ 194-95, PageID.1480. Defendant Milliken explained that Plaintiff's refusal to address Doe—and only Doe—in accord with her gender identity was inconsistent with Shawnee's nondiscrimination policy: "[T]he policy seeks to ensure that what is done for one student is done for all to avoid issues of discrimination." *Id.* ¶¶ 214-15, PageID.1482-83.

Following the investigation, Plaintiff was found to have violated Shawnee's nondiscrimination policy by discriminating against Doe because she is transgender. *Id.* ¶ 239, PageID.1486 (explaining that "the way he treated Ms. [Doe] was deliberately different than the way he treated others in the class"). Defendant Milliken issued a written warning, and advised Plaintiff to comply with Shawnee's nondiscrimination policies when addressing students. *Id.* at PageID.1487 ¶¶ 246-248. Plaintiff then filed a union grievance against Shawnee, which was denied, *id.* at PageID.1489 ¶ 264, and this lawsuit followed.

After Plaintiff filed suit, Doe and SAGA moved to intervene as defendants. R. 18. In addition, because Plaintiff's complaint initially identified Doe by her actual name, Doe filed a motion to proceed under a pseudonym. R. 19.

Doe submitted declarations in support of both motions attesting to the serious harm she experienced as a result of Plaintiff's conduct. She explained that Plaintiff's in-class conduct was a grave breach of her privacy: "Being transgender is an important part of who I am, but it is an aspect of my identity that I keep private. Disclosing that information reveals highly personal information about me and my medical history. As a result, I am very selective about to whom I share that information and have taken steps to prevent that information from being public." R. 19-1, PageID.542. She further elaborated that she is "not 'out' as transgender to the entire world," and has "chosen not to speak openly or publicly about [her] transgender status." *Id.* at PageID.543.[2] Yet, Plaintiff's insistence on discriminating against her in class had the effect of "outing" her: "When Professor Meriwether refused to use female honorifics to refer to me, he interfered with my ability to keep my transgender status private. By treating me differently than the other females in

---

[2] The Complaint is consistent with Doe's declaration. The Complaint does not allege that Doe openly shared her transgender status with Plaintiff. Nor does it allege that Doe authorized Shawnee to share that information with Plaintiff. To the contrary, Plaintiff alleges that he "received no information from the University indicating Doe's sex or gender identity." Am. Compl. ¶ 132, PageID.1474.

class, Professor Meriwether signaled to those around me that I am not female; this was particularly true when he incorrectly referred to me using male honorifics and pronouns." *Id.* She explained that this breach of privacy caused her significant distress and anxiety, which was exacerbated by Plaintiff's decision to publicize her name in his complaint. *Id.* at PageID.543-44.

Doe also explained the harmful effect of Plaintiff's discriminatory conduct. Although she continued to participate in class, she did so only "because I felt like I had to; in-class participation counted for a portion of our final grade." R. 18-2, PageID.517. "Every time I raised my hand, I dreaded what Professor Meriwether would say to call on me." *Id.* Further, "[o]n numerous occasions, my peers copied Professor Meriwether and referred to me using male honorifics and pronouns." *Id.* Plaintiff's discriminatory conduct made her in-class experience so intolerable that she could never take Plaintiff's class again: "[B]ecause of my experience with Professor Meriwether, I will not take any of his classes unless he agrees to treat me like all other female students. If he did that, it would open additional class options for me because Professor Meriwether teaches several other courses that interest me." *Id.* at PageID.518.

Not only did Plaintiff's discrimination created an intolerable atmosphere in class, but it harmed her outside of class, as well. "I became increasingly anxious that my peers and others at Shawnee would begin mistreating and disrespecting me

because I am transgender. That anxiety caused me significant distress. I would regularly have crying spells and was emotionally exhausted all the time. Further, Professor Meriwether's actions exacerbated my gender dysphoria, which became severe and debilitating in a way that I had not experienced since before my transition. Completing my schoolwork sapped most of the energy I had. Over the course of the semester, I withdrew from friends and stopped participating in student groups and only attended one event on campus." *Id.* atPageID.517-18. As Doe explained, upholding Shawnee's nondiscrimination policy is crucial to her ability to obtain a college education: "I cannot risk having to go through another semester like the one I had in spring 2018, especially if Shawnee is prevented from enforcing its anti-discrimination policies to ensure that I am treated like all other female students and have equal access to all the educational opportunities Shawnee has to offer. Keeping Shawnee's anti-discrimination policy is critical to my success at Shawnee and wherever my goals lead me next." *Id.* atPageID.519.

SAGA's president also submitted a declaration in support of SAGA's motion to intervene, explaining how enforcement of the nondiscrimination policy was necessary to ensure that all transgender students have equal access to a Shawnee education. The declaration explained that this was not the first time Plaintiff had discriminated against a transgender student: in a prior semester, Plaintiff had insisted on referring to a transgender male student with female pronouns and honorifics,

causing the student to drop the course. R. 18-3, PageID.522. As a result, "SAGA's transgender members are still unwilling to take any classes with Professor Meriwether because they don't want to be singled out or mistreated. That has limited the number of classes available to transgender students." *Id.* atPageID.523.

The Court granted Doe's motion to proceed under a pseudonym, as well as Doe and SAGA's motion to intervene. R. 32, 43. All defendants moved to dismiss. As explained further below, the Magistrate Judge issued a comprehensive report recommending that the motions to dismiss be granted. R. 49. After Plaintiff filed objections, the district court adopted the report and recommendation. Order, R. 60.

## SUMMARY OF ARGUMENT

Shawnee's nondiscrimination policy does not violate the Free Speech Clause, Free Exercise Clause, or Due Process Clause.

I.       Plaintiffs' free speech claims fail for three independent reasons.

A.       First, *Garcetti v. Ceballos*, 547 U.S. 410 (2006), holds that the First Amendment does not "protect[] a government employee from discipline based on speech made pursuant to the employee's official duties." *Id.* at 413. *Garcetti* controls this case. Plaintiff's statements while leading a Socratic discussion in class were pursuant to his official duties. Therefore, the First Amendment does not protect him from discipline based on his violation of Shawnee's nondiscrimination policy. Applying *Garcetti* to this case would be consistent with *Garcetti*'s rationale: public

employers should be able to enforce workplace policies so that they may fulfill their public missions. Here, Shawnee's nondiscrimination policy ensures that Shawnee can fulfill its mission of ensuring that all students, including transgender students, have equal access to a quality education.

Plaintiff cannot escape *Garcetti* by recasting this as a compelled speech case. The Supreme Court has made clear that *Garcetti* applies in the same way to speech compulsions as it does to speech restrictions. In any event, Shawnee did not compel Plaintiff to say anything. Rather, it merely barred Plaintiff from discriminating against Doe by referring to her—and only her—by her last name only while using pronouns and honorifics when referring to all other students.

Plaintiff does not seriously dispute that his speech was pursuant to his official duties as a professor. Instead, he contends that the Court should create an exception to *Garcetti* for academic speech. This Court has repeatedly declined to create such an exception, and it should adhere to its precedents. The Court should treat professors like other public employees: free to express their opinions on the issues of the day, but still subject to employer policies regulating how they do their jobs.

Even if there might be an academic-speech exception to *Garcetti* in a hypothetical case, it would not apply in this case. Any academic-speech exception to *Garcetti* would apply to policies that restrict the content of professors' scholarship and teaching. Shawnee's nondiscrimination policy, however, affects neither

Plaintiff's scholarship nor the content of his teaching. It merely affects how Plaintiff may refer to his students while in class. Plaintiff attempts to characterize his use of pronouns and honorifics as a matter of academic freedom. But Plaintiff's insistence on referring to Doe as a man or by her last name only does nothing to enhance anyone's academic experience. Moreover, Shawnee's policy cannot implicate any academic exception to *Garcetti* because it applies equally to *all* Shawnee employees in *all* official-capacity interactions.

Alternatively, if Plaintiff is correct that Shawnee's nondiscrimination policy limits his academic freedom, he would lose this case for a different reason: this Court has already held that academic freedom belongs to the university, not to individual professors. Plaintiff thus cannot challenge a university's policy in the name of academic freedom.

B.      Even if *Garcetti* did not bar Plaintiff's free speech claims, they would still fail because Plaintiff's speech was not on a matter of public concern. The honorifics and pronouns Plaintiff employed conveyed no message about Plaintiff's views on public issues; they merely informed students that Plaintiff was about to call on them. Moreover, Plaintiff's use of male honorifics and pronouns had the effect of "outing" Doe as a transgender woman—further confirming that they were not on a matter of public concern. Plaintiff protests that his *motive* for mis-gendering Doe was to express his personal views about gender, and that those personal views relate

to matters of public importance. But as this Court has repeatedly held, public-concern analysis turns on the content of speech, not the speaker's motives.

C.     Even if Plaintiff could show that *Garcetti* did not bar his free speech claims *and* that his speech was on a matter of public concern, his free speech claims would still fail. Shawnee's interests in maintaining a discrimination-free environment outweigh Plaintiff's interests in referring to Doe as a man or by her last name only. Shawnee has a duty under Title IX—confirmed by the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020)—to prevent students' disparate treatment on the basis of transgender status. Moreover, even if Title IX had never been enacted, Shawnee would have been entitled to enact a nondiscrimination policy to ensure that its transgender students have equal access to a quality education. Plaintiff, by contrast, has only a weak interest in referring to students by particular honorifics or pronouns.

D.     The foregoing three arguments establish that all of Plaintiff's free speech claims must be dismissed. Because Plaintiff's speech is unprotected, it cannot be the basis for a free speech claim, regardless of whether that claim is cast as a claim of retaliation, unconstitutional conditions, content and viewpoint discrimination, or overbreadth. Plaintiff's overbreadth claim also fails because Shawnee does not have unbridled discretion to enforce its policy, and Plaintiff has not shown the policy forbids a substantial amount of constitutionally-protected

conduct.

II.     Plaintiff's free exercise claim fares no better than his free speech claims.  Under *Employment Division v. Smith*, 494 U.S. 872 (1990), Shawnee may enforce a neutral and generally applicable policy against Plaintiff even if it interferes with Plaintiff's religious beliefs.  Shawnee's policy is neutral and generally applicable.  Plaintiff's efforts to challenge that policy contradict binding Supreme Court and circuit precedent.

The district court also rightly rejected Plaintiff's claim that Shawnee adopted and applied its policy on a discriminatory basis.  Plaintiff alleged no facts suggesting that Shawnee adopted its policy out of religious animus.  Nor does Plaintiff plead any plausible allegations that Shawnee officials applied the policy to him based on anti-religious motives.  To the contrary, Plaintiff's allegations show that Shawnee personnel sought to apply the university's policy neutrally.

III.     Finally, Plaintiff's due process claim fails.  The district court correctly found that Plaintiff had notice of Shawnee's policy and that his actions violated that policy.

## STANDARD OF REVIEW

This Court reviews motions to dismiss *de novo*.  *Hall v. Callahan*, 727 F.3d 450, 453 (6th Cir. 2013).  The Court "accepts the plaintiff's factual allegations as true and views the complaint in the light most favorable to the plaintiff, but is not

required to accept legal conclusions or unwarranted factual inferences as true."
*Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017).

## ARGUMENT

Shawnee's nondiscrimination policy requires that when its employees address a student, they respect the student's gender identity. The policy does not restrict any professor from teaching any subject or voicing any opinion in class. Nor does it restrict any professor from expressing any opinion on any issue, in scholarly articles or otherwise. All it does is bar employees, while doing their jobs, from singling out transgender students for different treatment. Plaintiff may disagree with this workplace policy, but it does not violate the Constitution. A public employer, like a private employer, may require that its employees adhere to a nondiscrimination policy when undertaking job-related duties.

## I. The District Court Correctly Held That Plaintiff Has Not Stated a Free-Speech Claim.

Plaintiff brings four free-speech claims: "Retaliation" (Count One), "Content & Viewpoint Discrimination" (Count Two), "Compelled Speech" (Count Three), and "Unconstitutional Conditions" (Count Five). Each claim boils down to the same theory: the Free Speech Clause prevents Shawnee from enforcing its nondiscrimination policy against Plaintiff.

Plaintiff's Free Speech claims fail for three independent reasons. First, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), Shawnee does not violate the Free Speech

Clause by requiring its employees to adhere to workplace policies when acting in their capacity as employees. Here, because Plaintiff's in-classroom speech plainly occurred in his capacity as an employee, it is unprotected under *Garcetti*. Second, even for speech made as a citizen rather than an employee, the First Amendment protects public employees' speech only when it addresses a matter of "public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). The only speech at issue here—the use of honorifics and pronouns in class directed toward one particular student—does not meet the "public concern" requirement. Third, even if Plaintiff's speech was on an issue of public concern, the First Amendment permits Shawnee to establish and enforce a nondiscrimination policy to ensure that its transgender students have an equal opportunity to get a university education.

## A. *Garcetti* Bars All of Plaintiff's Free Speech Claims.

The District Court correctly concluded that Plaintiff's free speech claims are barred by *Garcetti*.

### 1. Garcetti *controls this case.*

In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421.

*Garcetti* is controlling here. Plaintiff's speech is clearly "pursuant to [his]

official duties." *Id.* Plaintiff alleges that he "regularly calls on students to answer questions about the assigned readings and to participate in class discussions." Am. Compl. ¶ 126, PageID.1474. "To him, using the Socratic method of instruction is fundamental to teaching philosophy." *Id.* Plaintiff's use of male pronouns in addressing Doe, which led to this dispute, occurred in connection with those Socratic dialogues. *Id.* ¶ 128, PageID.1474. Thus, Plaintiff's speech was made in class, in his capacity as a professor. As the District Court put it: "Given plaintiff's employment duties (university professor), the setting of plaintiff's speech (a university classroom), the audience (the students in his Political Philosophy class), the impetus for the speech (to address students in a manner that plaintiff considered to be an important pedagogical tool), and the general subject matter of the speech (titles and pronouns for addressing students in his classroom), … plaintiff spoke pursuant to his official duties." Report and Recommendation ("R&R"),[3] R. 49, PageID.2119.

Under *Garcetti*, that resolves this case. When, as here, an employee is "simply performing his or her job duties," there is "no warrant" for a "delicate balancing of the competing interests surrounding the speech and its consequences." *Garcetti*, 547

---

[3] Throughout this brief, when referring to the District Court's decision, Defendant-Intervenors will cite the Magistrate Judge's Report and Recommendation (R. 49). The District Court adopted the Magistrate Judge's Report and Recommendation in its entirety while offering little independent analysis (R. 60).

U.S. at 423. Plaintiff's status as facilitator of classroom discussions "owe[d] its existence to [Plaintiff's] professional responsibilities," and therefore Shawnee's enforcement of a nondiscrimination code placing certain limits on that interaction "does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22; *see also id.* at 422 (the First Amendment does not give public employees "a right to perform their jobs however they see fit").

Indeed, not only did Plaintiff act in his capacity as a public employee, but he exercised authority over Jane Doe as a direct result of his official position as a Shawnee employee.[4] In his capacity as professor, Plaintiff decides which students may speak, what questions they must answer, and how the student's participation will affect the student's grade. Public institutions that confer authority are entitled to regulate the exercise of that authority, including to ensure that students are treated fairly and respectfully and are able to participate in and benefit from their courses. Shawnee employs Plaintiff as a professor and grants the authority to call upon students in class and to grade them on their classroom participation. The Free Speech Clause does not give Plaintiff a right to exercise that authority on behalf of

---

[4] To be clear, *Garcetti* applies even when an employee is not exercising such authority—for instance, in *Garcetti* itself, the plaintiff was a whistleblower, writing a memorandum to get his supervisor's attention. 547 U.S. at 414. Here, however, Plaintiff *is* exercising authority, making the claim for immunity from workplace rules even weaker.

the university in whatever manner he sees fit.

Applying *Garcetti* to this case would be consistent with *Garcetti*'s rationale. The premise of *Garcetti* is that courts must "respect the needs of government employers attempting to perform their important public functions." 547 U.S. at 420. Here, Plaintiff's refusal to abide by Shawnee's nondiscrimination policy makes it impossible for Shawnee to perform its public function.

Shawnee's mission is to provide all its students—including its transgender students—with access to a quality education. To fulfill that mission, a college must ensure that students will "learn in a hostil[ity]-free environment." *Bonnell v. Lorenzo*, 241 F.3d 800, 823-24 (6th Cir. 2001). "Speech that rises to the level of harassment—whether based on sex, race, ethnicity, or other invidious premise—and which creates a hostile learning environment that ultimately thwarts the academic process, is speech that a learning institution has a strong interest in preventing." *Id.* at 824.

Here, it is obvious how exempting Plaintiff from Shawnee's nondiscrimination policy would impede Doe's education. Doe is a transgender woman. Having her professor call her "Sir" and "Mr. Doe" is humiliating and it "outs" her as a transgender woman to her classmates against her will. Plaintiff's purported compromise—"using Doe's last name rather than a title or pronouns," Pl. Br. 9—is just as bad. Discriminating against Doe by singling her out as the sole

student not worthy of honorifics is also humiliating and creates the exact same risk of outing her to her classmates against her will. Plaintiff cannot reasonably expect Doe to learn and thrive in his class if he insists on personally humiliating her every class session.

It is no answer that Doe can simply drop Plaintiff's course and take a different course. One of Shawnee's core public functions is to ensure that all students have an *equal* opportunity to get an education, free from sex discrimination. Indeed, this mission is enshrined in federal law. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As the Supreme Court has recently held, discrimination against transgender individuals is discrimination "on the basis of sex" in violation of Title VII. *Bostock v. Clayton County*, 140 S. Ct. at 1747 ("[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex."); *see EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 574-75 (6th Cir. 2018) ("[D]iscrimination on the basis of transgender and transitioning status violates Title VII."). Title IX similarly prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Discrimination against transgender individuals therefore violates Title IX as well. *See Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342,

349–50 (6th Cir. 2020) ("In crafting our framework for analyzing Title IX claims, we have looked to the Title VII landscape for guidance, as both statutes prohibit discrimination on the basis of sex."); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017) (school policy that "punishes that individual for his or her gender non-conformance . . . violates Title IX"). If Doe is effectively forced to drop Plaintiff's course because she is transgender, then Shawnee will fail in its mission to provide all students with equal access to a college education.

Shawnee's nondiscrimination policy advances its public function of providing all of its students with equal access to a college education. *Garcetti* ensures that a professor cannot use the First Amendment as a basis for preventing a public employer from carrying out that function. The Court should therefore apply *Garcetti* and hold that Shawnee can prevent its employee from discriminating against transgender students while on the job.

> 2. *Plaintiff cannot avoid* Garcetti *by characterizing this case as a "compelled speech" case*.

Plaintiff opens his brief by offering an extended argument that this is a case about "compelled speech." According to Plaintiff, Shawnee is forcing him "'to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.'" Pl. Br. 19 (citation omitted). These assertions are both legally irrelevant and inconsistent with the factual allegations in the complaint.

First, Plaintiff's assertion that Shawnee's policy purportedly compels speech is irrelevant to the legal question at issue: whether Plaintiff was speaking as an employee or as a citizen. In *Janus v. American Federation of State, County & Municipal Employees*, 138 S. Ct. 2448 (2018), the Supreme Court made clear that the *Garcetti* principle applies even when an employee brings a "compelled speech" claim: "[I]f the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* at 2473 (citing *Garcetti*, 547 U.S. at 421-22). Shawnee, like a private employer, is entitled to regulate how its own employees do their job, which includes setting a policy that requires employees to address all students in a respectful and nondiscriminatory manner. Because Plaintiff's speech occurred in the course of doing his job, his disagreement with Shawnee's nondiscrimination policy does not give rise to any First Amendment claim—regardless of whether he frames his claim as being compelled to use one set of pronouns, being barred from using another set of pronouns, or any other framing.

Second, Plaintiff's argument is inconsistent with his own allegations in the complaint, which make clear that Shawnee's policy did not require him to use female pronouns and honorifics when addressing Doe. Although Shawnee could have enforced such a policy consistent with the First Amendment, Shawnee did not in fact do so. Rather, Shawnee gave him the option of referring to Doe and all other

students using first names or last names.   Am. Compl. ¶¶ 154, 162, 212, PageID.1476, 1477, 1482.   Therefore, as the District Court explained, Shawnee's policy did not compel Plaintiff to "espouse or express a view that plaintiff disagreed with or found objectionable."  R&R, PageID.2129.

The dispute in this case arose because Plaintiff sought to refer to all *other* students with honorifics and pronouns, while singling out Doe as the sole student for whom he would not use honorifics or pronouns.   Am. Compl. ¶¶ 173-74, PageID.1478; *id.* ¶ 214, PageID.1482-83.   Shawnee rejected this proposal as inconsistent with its nondiscrimination policy.  Am. Compl. ¶ 215, PageID.1483 ("Defendant Milliken replied: 'Every student needs to be treated the same in all of your classes.  In other words, the policy seeks to ensure that what is done for one student is done for all to avoid issues of discrimination.  This regards names, pronoun usage, and most any other matter.'").  As the District Court explained, Shawnee's enforcement of its nondiscrimination policy did not even arguably compel speech: "[D]efendants' requirement that plaintiff address Doe and the other students in plaintiff's class in a consistent manner, whether by their first or last names only, did not force plaintiff to express a belief on 'gender identity' that he did not personally hold or endorse."  R&R, PageID.2129.  Plaintiff's effort to cast this as a "compelled

speech" case is therefore not only legally irrelevant, but also factually incorrect.

       3. *Plaintiff's role as a professor does not exempt him from* Garcetti *or Shawnee's nondiscrimination policies.*

Plaintiff does not seriously dispute that he spoke as an employee. Rather, he contends that this Court should create a new exception to *Garcetti* for academic speech.

The Court should reject that contention. This Court has never recognized an academic-speech exception to *Garcetti*, and it should adhere to its case law and decline to recognize one here. The Court should hold that there is no academic-speech exception to *Garcetti*; employers may regulate the on-the-job speech of their employees, whether those employees are professors or anyone else. Alternatively, even if there were some theoretical case in which an academic-speech exception to *Garcetti* might apply, this is not that case. Shawnee's nondiscrimination policy is far removed from the sort of speech restriction that would even arguably warrant creating a novel academic-speech exception to *Garcetti*.

      a.  There is no "academic speech" exception to *Garcetti*.

In *Garcetti*, Justice Souter's dissent expressed concern that the majority's holding would "imperil First Amendment protection of academic freedom in public colleges and universities." 547 U.S. at 438 (Souter, J., dissenting). In response, the majority stated that it was not deciding whether its analysis "would apply in the same manner to a case involving speech related to scholarship or teaching." 547 U.S. at

425.  Plaintiff relies on that dictum in support of his proposed academic-speech exception to *Garcetti*.

This Court, however, has never recognized an academic-speech exception to *Garcetti*.  *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 343 (6th Cir. 2010) (declining to recognize academic-speech exception to *Garcetti* and pointing out that "[t]he majority disclaimed any intent to resolve the point"); *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (characterizing *Garcetti*'s statements regarding academic speech as "dicta").  The Court should not do so here.

*Garcetti*'s reasoning applies in the same way to faculty members as it does to anyone else.  "An employee does not lose 'any liberties the employee might have enjoyed as a private citizen' by signing on to work for the government, but by the same token, the government, just like a private employer, retains 'control over what the employer itself has commissioned or created': the employee's job."  *Evans-Marshall*, 624 F.3d at 342.  *Evans-Marshall* involved a high school teacher, but the same principle applies to college professors.  Having created Plaintiff's job, the government may enforce basic workplace-conduct requirements, including directing him to follow a nondiscrimination policy when calling on students in class.

Plaintiff claims that an academic-speech exception to *Garcetti* is necessary to protect academic freedom, relying on *Adams v. Trustees of the University of North*

*Carolina-Wilmington*, 640 F.3d 550 (4th Cir. 2011). To the contrary, *Adams* demonstrates that *Garcetti* is perfectly compatible with robust protection of academic freedom. In *Adams*, a professor alleged that the University of North Carolina-Wilmington (UNCW) discriminated against him based on off-campus scholarship and teaching, such as speeches "to conservative organizations and at universities, as well as radio and television interviews." *Id.* at 554-55. The Fourth Circuit held that *Garcetti* did not bar the professor's claim. Crucially, however, the Fourth Circuit did *not* create an academic-speech exception to *Garcetti*. Rather, it held that *Garcetti* did not apply on its own terms because the professor's speech was not employee speech under *Garcetti*. The court stated that "the scholarship and teaching in this case, Adams' speech, was intended for and directed at a national or international audience on issues of public importance unrelated to any of Adams' assigned teaching duties at UNCW or any other terms of his employment found in the record." *Id.* at 563-64. It emphasized that "none of Adams' speech was undertaken at the direction of UNCW, paid for by UNCW, or had any direct application to his UNCW duties." *Id.* at 564. The court therefore reaffirmed the principle that "no individual loses his ability to speak as a private citizen by virtue of public employment." *Id.*

In this case, applying *Garcetti* would not strip Plaintiff of his ability to speak as a private citizen by virtue of his public employment—the concern that drove the

Fourth Circuit's decision in *Adams*. Plaintiff is perfectly free to give speeches to political organizations, appear on TV, and do all the things that the plaintiff did in *Adams*. He must simply adhere to a nondiscrimination policy while he is teaching his students. As this Court stated in *Evans-Marshall*, professors cannot challenge such a policy in the name of academic freedom. Academic freedom "does not insulate a teacher's curricular and pedagogical choices from the school board's oversight, as opposed to the teacher's right to speak and write publicly about academic issues outside of the classroom." 624 F.3d at 344; *accord Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 595 (6th Cir. 2005) ("While the First Amendment may protect Johnson-Kurek's right to express her ideas about pedagogy, it does not require that the university permit her to teach her classes in accordance with those ideas.").

Plaintiff also speculates that an academic-speech exception to *Garcetti* is necessary to protect against policies forcing employees to recite the Pledge of Allegiance. Pl. Br. 20. Such a policy is not remotely similar to Shawnee's nondiscrimination policy; but in any event, Plaintiff's concern is misplaced. *Garcetti*, by its terms, would not permit public employers to condition employment on reciting a loyalty oath or otherwise endorsing a particular political viewpoint. *Garcetti* gives public employers the right to "ensure that their employees' official communications . . . promote the employer's mission," 547 U.S. at 422-23—that is,

to regulate only employee speech *that is part of doing their job*. *Garcetti* did not disturb the longstanding line of Supreme Court cases protecting teachers from loyalty oath requirements that are not part of their job duties.

For instance, in *Shelton v. Tucker*, 364 U.S. 479 (1960), the Supreme Court invalidated an Arkansas statute compelling "every teacher, as a condition of employment in a state-supported school or college, to file annually an affidavit listing without limitation every organization to which he has belonged or regularly contributed within the preceding five years," *id.* at 480. The Court explained that "there can be no question of the relevance of a State's inquiry into the fitness and competence of its teachers." *Id.* at 485. But the statute improperly "require[d] him to list, without number, every conceivable kind of associational tie—social, professional, political, avocational, or religious. Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness." *Id.* at 488. The Court emphasized that "[s]cholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate." *Id.* at 487 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)). Likewise, in *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967), the Supreme Court invalidated a statute disqualifying Communist Party members from public employment as teachers, explaining that "the stifling effect on the academic mind from curtailing freedom of association in such manner

is manifest." *Id.* at 607.

As these cases show, a state could not condition employment as a professor on mandatory recitation of the Pledge of Allegiance or any other loyalty oath. Here, however, Shawnee is not conditioning employment on employees pledging fealty to any particular political viewpoint. It is simply regulating the manner in which employees address particular students in the course of their employment.

Moreover, even if a public employer attempted to adopt such a mandatory Pledge of Allegiance recitation policy, Plaintiff's proposed academic-speech exception to *Garcetti* would not solve that problem, because it would imply that the employer could impose such an obligation on all public employees *except* professors. The Supreme Court has held that *all* public employees—not just teachers—are protected from mandatory loyalty oath requirements. *See Cole v. Richardson*, 405 U.S. 676, 680 (1972) ("We have made clear that neither federal nor state government may condition employment on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendments respectively, as for example those relating to political beliefs."). Nothing in *Garcetti* disturbed that principle. Even after *Garcetti*, all public employees, not just teachers, remain protected from mandatory loyalty oaths. The correct way to protect the conscience of public employees is to apply *Garcetti* according to its terms, rather than by creating a novel

academic-speech exception to *Garcetti*.

      b. <u>Even if there were an academic-speech exception to *Garcetti*, this case would not implicate such an exception because it presents no threat to academic freedom.</u>

Even if the Court were to hold that an academic-speech exception to *Garcetti* might apply in a theoretical case, this is emphatically not that case. The evenhanded application of a nondiscrimination policy does not implicate any academic freedom concerns that would warrant creating a new exception to *Garcetti*.

*Garcetti* declined to decide whether its analysis "would apply in the same manner to a case involving speech related to scholarship or teaching." 547 U.S. at 425. Here, however, Shawnee's policy does not inhibit scholarship or teaching. Nothing in Shawnee's nondiscrimination policy prevents Plaintiff from conducting any research or publishing any article on any topic. Nor does anything in Shawnee's nondiscrimination policy affects the substance of what is taught in class. It merely ensures that transgender students can attend class without professors treating them differently from other students and breaching their personal privacy. Even if there were an exception to *Garcetti* for teaching and scholarship, it should be limited to a university policy that actually inhibits teaching and scholarship. At a minimum, such an exception should not extend to permitting disparate treatment of individual students in the classroom.

Plaintiff attempts to transform this into an academic-freedom case by

suggesting that how he refers to a particular student implicitly conveys his own personal attitudes about transgender people. *E.g.*, Pl. Br. 24-27; Am. Compl. ¶¶ 202, 204, PageID.1481. But such personal references have no significant educational content for students. It is spurious to suggest that by repeatedly referring to Doe as a man or by her last name only, Plaintiff is somehow enhancing Doe's educational experience. And it is equally implausible that other students are having their educational experience enhanced because they are within earshot when Plaintiff addresses Doe in class. *See infra at* 36-40 (explaining that honorifics and pronouns are not statements on a matter of public concern). Enforcing a nondiscrimination policy to ensure that all students are able to participate in and benefit from their courses does not infringe upon Plaintiff's scholarly freedom, any more than similar rules requiring professors to hold classes on time, post office hours, or avoid subjecting students to harassing speech or behavior. *See Savage*, 665 F.3d at 739 (speech that "was only loosely, if at all, related to academic scholarship . . . does not fall within the realm of speech that might fall outside of *Garcetti*'s reach").

Moreover, it makes little sense to characterize Shawnee's policy as inhibiting "scholarship or teaching," given that the speech at issue—pronouns and honorifics— could be made in any public workplace setting. When *Garcetti* suggested that there might be an exception for "scholarship and teaching" given the "additional constitutional interests" at stake, 547 U.S. at 425, the Court was presumably

referring to the intellectual exchange of ideas that distinctively occurs in universities and not in other public workplace settings. Yet there is nothing distinctively academic about the use of pronouns and honorifics. All employees—professors, police officers, secretaries, custodians, and everyone else—initiate conversations with students and use pronouns. The phrase "Mr. Doe" or the word "he" is something *any* employee could use in *any* conversation. Notably, Shawnee's policy treats *all* such interactions in the exact same way. Shawnee's policy applies identically to Plaintiff as it does to every other Shawnee employee, *see* Am. Compl. Ex. 2, PageID.1512, and to all official-capacity interactions, not just classroom interactions, *see* Am. Compl. ¶ 108, PageID.1472. This illustrates that Shawnee's policy cannot reasonably be viewed as an attack on academic freedom.

Plaintiff also alleges that Shawnee's policy violates his "sincerely held religious beliefs as a Christian . . . related to gender identity." Am. Compl. ¶ 208, PageID.1482. This allegation does not warrant creating an academic-speech exception to *Garcetti*. Campus police officers, secretaries, and custodians may have equally sincere religious beliefs. Yet Plaintiff does not appear to dispute that under *Garcetti*, Shawnee can require those employees, while on the job, to adhere to its nondiscrimination policy. Plaintiff's status as a professor does not elevate his "sincerely held religious beliefs as a Christian" over the sincerely held religious

beliefs of his co-workers.

Plaintiff relies on *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), in which the Ninth Circuit recognized an academic-speech exception to *Garcetti*—a step this circuit has never taken. But the stark factual differences between *Demers* and this case merely go to show that this case would not implicate such an exception even if it existed. In *Demers*, the Ninth Circuit held that *Garcetti* did not bar a professor's claim that the university retaliated against him for distributing a "proposal . . . [that] would have substantially altered the nature of what was taught at the school, as well as the composition of the faculty that would teach it." *Id.* at 415. In *Demers*, the speech at issue was speech about the actual substance of what is taught in class. And it was distinctively *academic* speech—debating course offerings and the composition of a university faculty is the type of speech that has no analog in other public workplaces. That is nothing like this case, where Shawnee is evenhandedly applying a nondiscrimination policy to all employees.

c. Even if this were an academic-freedom case, this Court's precedents would still require dismissal of Plaintiff's claim under *Garcetti*.

Even if Plaintiff could cast Shawnee's nondiscrimination policy as a restriction on academic freedom, his effort to evade *Garcetti* would still fail. Plaintiff's argument would run headlong into this Court's binding precedents establishing that academic freedom belongs to the university, not faculty members, and that faculty members therefore cannot use academic freedom as a basis for

preventing universities from enforcing their own policies.

In *Evans-Marshall*, a high school teacher sued a school board, alleging that the school board "had retaliated against her 'curricular and pedagogical choices,' infringing her First Amendment right 'to select books and methods of instruction for use in the classroom without interference from public officials.'" 624 F.3d at 336. This Court held that *Garcetti* barred the teacher's claim. The Court reasoned that school leadership, not individual teachers, decide what is taught in class, and that an individual teacher's disagreement with the school board's policy is not a basis for bringing a First Amendment claim. As the Court explained:

> When educators disagree over what should be assigned, as is surely bound to happen if each of them has a First Amendment right to influence the curriculum, whose free-speech rights win? Why indeed doesn't the principal, Wray, have a right to defend the discharge on the ground that he was merely exercising his First Amendment rights in rejecting Evans-Marshall's curricular choices and methods of teaching? Placing the First Amendment's stamp of approval on these kinds of debates not only would "demand permanent judicial intervention in the conduct of governmental operations," *Garcetti*, 547 U.S. at 423, . . . but it also would transform run-of-the-mine curricular disputes into constitutional stalemates.

624 F.3d at 341. Although *Evans-Marshall* involved a high school teacher, this Court stated that the same principles apply in the university setting:

> It is the educational institution that has a right to academic freedom, not the individual teacher. Academic freedom implicates the freedom of a university to make its own judgments as to education, requiring deference to a

university's academic decisions. In the context of in-class curricular speech, this court has already said in the university arena that a teacher's invocation of academic freedom does not warrant judicial intrusion upon an educational institution's decisions: "The First Amendment concept of academic freedom does not require that a nontenured professor be made a sovereign unto himself." *Parate*, 868 F.2d at 827. A school "may constitutionally choose not to renew the contract of a nontenured professor" when that professor's "pedagogical attitude and teaching methods do not conform to institutional standards." *Id.* Just so here.

*Id.* at 344 (quotation marks and citations omitted); *accord Johnson-Kurek*, 423 F.3d at 595 ("The freedom of a university to decide what may be taught and how it shall be taught would be meaningless if a professor were entitled to refuse to comply with university requirements whenever they conflict with his or her teaching philosophy.").

Thus, as *Evans-Marshall* makes clear, if Plaintiff could show that Shawnee's policy burdened his academic freedom, that would simply mean he loses this case for a different reason: "[T]his court has already said in the university arena that a teacher's invocation of academic freedom does not warrant judicial intrusion upon an educational institution's decisions." 624 F.3d at 344.

Indeed, consider Plaintiff's own arguments for asserting that *Garcetti* should not apply. "First, Dr. Meriwether's speech occurred in a classroom as a university professor," which "is peculiarly the marketplace of ideas." Pl. Br. 29 (citation omitted). "Second, Dr. Meriwether's audience was his students," and he "has an

obligation to his students to approach subjects from diverse perspectives." *Id.* at 29-30. Third, "[e]veryone involved understood that Dr. Meriwether's speech conveyed a message about gender ideology." Pl. Br. 30. These arguments are wrong: as explained above, Plaintiff's insistence on discriminating against a transgender student did not have the slightest effect on the "marketplace of ideas" or provide any "diverse perspectives" for Doe or any other students who were in earshot. In addition, *Evans-Marshall* shows they fail for an independent reason: these are the exact types of arguments that a professor cannot make in a suit against a university.[5] Holding otherwise invites judicial oversight into the minutiae of university

---

[5] Following *Evans-Marshall* would not necessarily close the door to an academic-freedom exception to *Garcetti*. *Evans-Marshall* does not foreclose the possibility of an academic-freedom exception when state officials not associated with the university impose the speech restriction. Notably, in Plaintiff's discussion of "the Supreme Court's long history of protecting professors," every case cited by Plaintiff involved state laws imposed *on* universities and their professors, rather than policies imposed *by* universities. Pl. Br. 24-25; *see Keyishian*, 385 U.S. at 597, 602-04, 609-10 (striking down state-law provisions that prohibited educators from expressing "subversive" views or being members of the Communist Party, and which obligated school authorities to swiftly dismiss any such teachers); *Shelton*, 364 U.S. at 487-88 ("The question is whether the State can ask every one of its teachers to disclose every single organization with which he has been associated over a five-year period."); *Sweezy*, 354 U.S. at 250 (rejecting state legislature's attempt at coercing disclosure in legislative investigation of professor under loyalty statute). *Evans-Marshall* does not rule out the possibility of an academic-freedom exception to *Garcetti* in those settings, but it does rule out the possibility of such an exception where, as here, the purported restriction on academic freedom is imposed by the university itself.

operations, a result *Evans-Marshall* expressly disclaimed.

In sum, the case falls squarely within *Garcetti*'s rule that speech falling within a public employee's official duties is constitutionally unprotected. Further, any academic-freedom exception to *Garcetti* could not possibly apply on the facts of this case, where a professor is challenging workplace rules concerning the treatment of individual students, not the content of teaching or scholarship, and when those workplace rules are imposed by the university. The Court should affirm for that reason alone.

## B. Plaintiff's Speech Was Not on a Matter of Public Concern.

Even if *Garcetti* did not bar Plaintiff's claims, they would still fail because referring to a student in calling upon her in class is not speaking on a "matter[] of public concern." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017). As such, Shawnee may respond to that speech without "intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146.

Speech addresses a matter of public concern if it relates to a "matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citations and internal quotation marks omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given

statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48.

The speech at issue here—pronouns and honorifics when addressing a particular student in class—is not speech on a matter of public concern. The purpose of that speech is merely to refer to one particular private citizen, and alert her that she was being called upon to answer a question. It does not convey any opinions on any political or social issue. As the District Court explained: "The speech here occurred in the context of plaintiff's employment; it was limited to titles and pronouns used to address one student in plaintiff's class; the speech was directed to plaintiff and heard only by her and her fellow students; and absent any further explanation or elaboration, the speech cannot reasonably be construed as having conveyed any beliefs or stated any facts about gender identity." R&R, PageID.2123-24. Indeed, a reasonable listener would understand the use of female pronouns to reflect nothing more than the ordinary civility that would be expected in any interaction between a professor and a student. *See, e.g., R.G. & G.R.*, 884 F.3d at 566 n.1 ("We refer to Stephens using female pronouns, in accordance with the preference she has expressed through her briefing to this court.").

The effect of Plaintiff's statement was not to convey any political or social opinions, but to "out" Doe as a transgender woman to those who heard Plaintiff call

upon her in class.[6] This confirms that Plaintiff's speech was not on a matter of public concern. Whether a person is transgender is the antithesis of information of "public concern"—it is intensely private, personal information, as the district court acknowledged in its Order granting Doe's motion to proceed pseudonymously. Order, R. 32, at PageID.1081-1082. There is a fundamental difference between gender as a general matter—a matter of public concern—and a particular person's transgender status—a matter of private concern. Conveying the latter information does not transform Plaintiff's speech into information of public concern merely because the speaker is motivated by opinions about gender, any more than publicly disclosing a specific person's pregnancy or cancer diagnosis is a matter of "public concern" because the speaker intends to send a message about overpopulation or to educate the public that cancer diagnoses are widespread.

Plaintiff emphasizes that the *reason* he wants to use male pronouns and honorifics when referring to Doe is that he holds a particular set of personal views on gender identity. But that contention misapplies the "public concern" test. The purpose of that test is to encourage discourse on "issues about which information is

---

[6] Nothing in the Complaint suggests that Doe was publicly "out" as a transgender woman. To the contrary, the Complaint states that no one at Shawnee ever told Plaintiff that Doe is a transgender woman. *Supra*, at 5 n.2. Doe submitted declarations in this case confirming that she was not publicly "out" as a transgender woman. *Supra*, at 5-6.

needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). Thus, whether speech is on a matter of "public concern" turns on the *information* that the speech imparts—which requires an analysis of what was *said*, rather than the internal motivations of the speaker. *See id.* at 591 ("the pertinent question is not *why* the employee spoke, but *what* he said"). The argument that "subjective motivations are dispositive when determining whether . . . speech addresses a matter of purely personal concern is in direct conflict with the Supreme Court's holding in *Connick.*" *Id.* at 591-92 (citation omitted).

For example, a letter to the editor denouncing government corruption is of "public concern," regardless of the writer's subjective motivation. *See, e.g.*, *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (statements about public safety were on matters of public concern, even if motivated by plaintiff's own financial losses); *Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003) ("Although Plaintiff's underlying motive in writing the memo might have been to complain about incompetent management, our duty is not to discern her underlying motive, but rather to evaluate her point as it is presented in the speech."). Conversely, a statement of private concern is not transformed into a statement of public concern even if it is motivated by broader public considerations. *See, e.g.*, *Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 479-80 (6th Cir. 2006) (subjective

motivations for authoring letter were irrelevant when letter itself did not touch on issue of public concern). Here, Plaintiff's self-reported subjective motives for using male pronouns and honorifics do not transform those utterances into speech on a matter of public concern.

Plaintiff insists that Doe's reaction to his statement, and Shawnee's subsequent application of its nondiscrimination policy, constitutes proof that he spoke on a matter of public concern. Pl. Br. 37 ("It is nonsensical to say Dr. Meriwether's pronoun choices communicated nothing when those choices triggered this litany of hostile, retaliatory acts."). That cannot be correct. By this logic, a professor's use of an anti-religious slur in referring to a particular student would also be on a matter of "public concern": It too would provoke extreme offense, would likely violate a nondiscrimination policy, and might reflect the speaker's personal views on a matter of public concern—*i.e.*, religion. Defendants-Intervenors do not mean to suggest that Plaintiff's utterances were the equivalent of anti-religious slurs, but rather that the "public concern" requirement cannot be satisfied merely by showing that a statement provoked offense.

If Plaintiff's argument were correct, then public employees could convert any refusal to comply with a workplace policy into speech on a matter of public concern simply by claiming that their violation is intended to "send a message" about some broader issue. For example, a professor who believes that second marriages are

sinful could claim a free-speech right to refuse to use a student's married name in order to convey that belief. Or a professor who believes that a particular religion or nationality is "a lie" could claim a free speech right to convey that belief by refusing to refer to a student by a name that signals adherence to that religion or nationality. Neither this Court nor any other court has adopted such extreme reasoning.

## C. Even Under *Pickering* Balancing, Plaintiff's Claim Fails.

Even if Plaintiff were speaking as a citizen rather than as an employee, *and* his statements were on a matter of public concern, his Free Speech claim would fail. Plaintiff's "interests . . . in commenting upon matters of public concern" do not outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Evans-Marshall*, 624 F.3d at 338 (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). Here, although the District Court did not reach this alternative basis for dismissal, Shawnee's interest in maintaining its nondiscrimination policy far outweighs Plaintiff's interest in addressing Doe using particular honorifics.

Shawnee has a powerful interest in maintaining its nondiscrimination policy. As explained above, Title IX requires Shawnee to maintain its policy protecting transgender people from discrimination. *Supra*, at 18-19. A university violates Title IX when its officials in positions of authority "had actual notice of, and [were] deliberately indifferent to, the misconduct." *Mallory v. Ohio Univ.,* 76 F. App'x

634, 638 (6th Cir. 2003); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015). Shawnee would likely be liable under that standard if it knowingly allowed its employees to discriminate against transgender students. Shawnee has a compelling interest in complying with federal nondiscrimination law.

Even if federal law did not require Shawnee to maintain and enforce its nondiscrimination policy, Shawnee has every right to enact a nondiscrimination policy more protective than federal law. As explained previously, Shawnee has a powerful interest in ensuring that its students receive the education they pay for, and it was entitled to conclude that protecting transgender students from discrimination is necessary for those students to learn and thrive. *Supra*, at 17-18.

The interests on the other side of the ledger are weak. Plaintiff is free to teach and write scholarship on whatever he wants. Requiring Plaintiff to adhere to the nondiscrimination policy would have no adverse effect on the free exchange of ideas. Moreover, under the policy, Plaintiff is free to call all students by their first or last names. Although Plaintiff may think that this practice "would undermine the serious pedagogical environment he seeks to create," Am. Compl. ¶ 155, PageID.1476, that interest should not override Shawnee's interest in ensuring all students have fair access to all educational offerings.

Accepting Plaintiff's position would have far-reaching implications. For instance, a professor who believes that women should not be pursuing higher

41

education could refuse to call upon them in class, or call men by their surnames and refer to all women by their first names or simply as "woman." A professor who believes that married women must be subservient to their husbands could insist on calling all married women by their husband's surnames even if they have not changed their surnames after marriage. And he could declare that the college is powerless to stop him because such statements "communicate[] his own views on these subjects." Am. Compl. ¶ 204, PageID.1481. Likewise, a professor hostile to a student's religion could refuse to use names associated with a particular religion or even refer to the student as a "heathen" in class—and declare that the Constitution affords him the right to do so because he personally believes the student to be a heathen. The Constitution does not require that college classrooms be free from evenhanded applications of nondiscrimination policies that simply seek to ensure that all students are able to participate in and benefit from their courses.

### D. All of Plaintiff's Free Speech Claims Should Be Dismissed.

Plaintiff brings his Free Speech claim under multiple labels: "retaliation," "unconstitutional conditions," and "content and viewpoint discrimination." Whatever the label, the foregoing analysis requires dismissal of all of Plaintiff's claims as a matter of law.

*Retaliation*. Plaintiff appears to concede that this claim cannot succeed in light of the District Court's rulings that Plaintiff did not speak as a citizen on a matter

of public concern.  Pl. Br. 38.

*Unconstitutional conditions.*  The District Court correctly determined that neither the Supreme Court nor this Court has ever recognized a freestanding "unconstitutional conditions" claim.  R&R, PageID.2137-38.  Plaintiff points out that in some cases, courts have characterized conditions as unconstitutional.  Pl. Br. 39.  But "unconstitutional conditions" reflects an interpretation of the substantive scope of First Amendment; there is no freestanding cause of action labeled "unconstitutional conditions."  In any event, as the District Court correctly determined, "Plaintiff has not shown how his claim . . . differs in any respect from his First Amendment retaliation claim."  R&R, PageID.2138.  For the reasons stated above, the Constitution permits Shawnee to enforce its nondiscrimination policy, regardless of whether that policy is cast as "retaliation" for Plaintiff's speech or a "condition" on Plaintiff's speech.

*Content and viewpoint discrimination.*  Plaintiff contends that because Shawnee's nondiscrimination policy prevents Plaintiff from referring to Doe as "Mr. Doe" and "He," but does not prevent Plaintiff from referring to Doe as "Ms. Doe" or "She," Shawnee's policy discriminates on the basis of content and viewpoint.  Pl. Br. 40-42.  For the reasons given above, the mere utterance of "Mr. Doe" or "he" when referring to a particular student cannot reasonably be considered "content" or a "viewpoint" protected from discrimination by the First Amendment, especially

given that Shawnee's policy permits professors to state whatever opinions they want on gender identity. But the Court need not reach that question. If Plaintiff's speech is unprotected, it cannot be the basis for a Free Speech Clause claim regardless of legal label. Plaintiff cannot invalidate a policy as "content" or "viewpoint" discrimination when the content of the speech is not protected. *See Evans-Marshall*, 624 F.3d at 340 ("[I]f it is the school board that hires that speech, it can surely regulate the content of what is or is not expressed" (citation and quotation marks omitted)).

**Unbridled discretion / Overbreadth.** Plaintiff claims that Shawnee's policy violates the Free Speech Clause because it gives school officials "unbridled discretion by including the imprecise, subjective, and indefinite class of gender identity." Pl. Br. 42-43. He also insists that Shawnee's policy is overbroad because it could potentially apply to off-campus events. Pl. Br. 43-44.

As the District Court explained, however, Plaintiff cannot assert these claims because—for the reasons given above—his speech is not protected. "[P]laintiff can only demonstrate that he was harmed by application of the policies to him if his speech was protected. Otherwise, his First Amendment rights were not violated by application of the policies to his speech. Because plaintiff's speech in this instance was not protected under the First Amendment, the policies were not applied to him

in violation of his First Amendment rights." R&R, PageID.2135.

In any event, the District Court correctly held that Shawnee's policy neither permits "unbridled discretion" nor is overbroad. The District Court addressed Plaintiff's claim of "unbridled discretion" in the course of rejecting his due process claim, which Plaintiff renews in passing on appeal (Pl. Br. 54-55). As the District Court explained, Plaintiff had "ample notice that: (1) the nondiscrimination policies require professors to address and refer to students by pronouns and titles consistent with their gender identities; and (2) using male pronouns and titles to address and refer to Doe, and addressing and referring to Doe in a different manner than he addressed and referred to other students in his class, did not comply with the nondiscrimination policies." R&R, PageID.2149-50.

Indeed, Plaintiff does not allege that he was unaware that Doe's gender identity is female. Rather, Plaintiff appears to contend that any law that bars discrimination on the basis of gender identity is so "subjective" that it is unconstitutional. But the Supreme Court has just held that discrimination on the basis of gender identity violates Title VII, and a plethora of federal and state laws explicitly refer to gender identity. *E.g.*, 18 U.S.C. § 249(a)(2) (criminalizing hate crimes committed because of "gender identity"); Iowa Code § 216.6(1)(a) (barring employment discrimination on the basis of gender identity); Me. Code §§ 4772, 4553 (same); Mass. Code ch. 151B, § 3 (same). Perhaps in certain cases an observer may

be unable to discern another person's gender identity, but that may also happen with respect to religion, disability, or other protected characteristics. And neither Shawnee nor Defendant-Intervenors suggest that unintentional miscues when referring to a student with gendered language would result in discipline. Shawnee does not violate the Constitution by barring discrimination against transgender students.

As for Plaintiff's overbreadth claim: as the District Court explained, Shawnee's policy extends off campus only to "University sponsored-functions and employees' official duties outside the classroom." R&R, PageID.2136. Thus, "[P]laintiff has alleged no facts showing how the policies reach a substantial amount of constitutionally-protected speech." *Id.* Indeed, to the extent the policy applies only to employee speech under *Garcetti*, Shawnee's policy does not reach *any* constitutionally protected speech. Plaintiff therefore has not stated an overbreadth claim.

## II. The District Court Correctly Held That Plaintiff Has Not Stated a Free Exercise Claim.

The District Court correctly held that Plaintiff failed to plead a Free Exercise claim. The court carefully examined the nondiscrimination policy and found that it was a neutral and generally applicable policy within the meaning of *Employment Division v. Smith*, 494 U.S. 872 (1990). The District Court also correctly held that Plaintiff failed to allege facts to suggest that the policy "targeted particular religious

practices or views as applied." R&R, PageID.2142.

## A. *Smith* Resolves This Case.

Under the Free Exercise Clause, "public authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012). An individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate," because "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Smith*, 494 U.S. at 878-79 (citation omitted). Therefore, neutral, generally applicable laws do not violate the Free Exercise Clause unless "the object of [the] law is to infringe upon or restrict practices because of their religious motivation," or if "the . . . purpose of [the] law is the suppression of religion or religious conduct." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533 (1993).

Here, the District Court correctly concluded that Shawnee's nondiscrimination policy is neutral and generally applicable. "The nondiscrimination policies apply to 'all employees, students, visitors, agents, and volunteers' in 'all aspects of the University's programs and operations.'" R&R, PageID.2141. The policy says nothing about religion and applies with identical force to employees of all religious beliefs. Therefore, it is enforceable under *Smith*.

47

Plaintiff asserts that the policy falls within an exception to *Smith* for "government practices at odds with our nation's history and traditions." Pl. Br. 45. Plaintiff does not substantiate his assertion that nondiscrimination policies are "at odds with our nation's history and traditions." Indeed, as the Supreme Court recently held in *Bostock*, Title VII—a seminal statute in this nation's history—bars discrimination against transgender people. Moreover, Plaintiff identifies no authority showing that Shawnee's policy falls within an exception to *Smith*. Plaintiff's cited cases are far afield. *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), did not interpret the Free Exercise Clause, but instead held that the Establishment Clause protects religious entities from employment discrimination lawsuits brought by ministers of the faith. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), invalidated a state law that facially discriminated against religious institutions, and distinguished the *Smith* line of cases from cases involving laws that "expressly discriminate[] against otherwise eligible recipients . . . solely because of their religious character." 137 S. Ct. at 2021. Neither of these cases, nor any other case cited by Plaintiff, casts any doubt on *Smith*'s application to a neutral policy like Shawnee's nondiscrimination policy.

Plaintiff also asserts a "hybrid rights" claim, theorizing that even if his Free Speech claim and Free Exercise fail on their own terms, he may assert a claim based

on the conjunction of the two. Pl. Br. 46. This argument conflicts with circuit precedent. *Kissinger v. Bd. of Trustees of Ohio State U., College of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993) ("We do not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the Free Exercise Clause if it did not implicate other constitutional rights."). At a minimum, the "hybrid rights" doctrine should not apply where, as here, the speech is unprotected under the First Amendment.

## B. Shawnee's Adoption and Enforcement of its Policy Shows No Hostility to Religion.

On its face, Shawnee's policy is neutral and generally applicable. Nevertheless, Plaintiff speculates that Shawnee's adoption of the policy, or enforcement of the policy as to him, reflected religious hostility, such that the policy is not neutral or generally applicable under *Smith*. The District Court carefully scrutinized Plaintiff's allegations and correctly concluded that "he has not alleged facts to show defendants generated or enforced Shawnee State's nondiscrimination policies based on hostility to his religious beliefs." R&R, PageID.2142.

First, Plaintiff asserts that Shawnee's policy reflects "hostility." Pl. Br. 48-49. None of Plaintiff's allegations give the slightest indication of any hostility toward religion. Plaintiff points to the fact that he has taught at Shawnee since 1996 but was never disciplined until the incident with Doe. Pl. Br. 49. This powerfully cuts against Plaintiff's claim by showing that Shawnee does not target religious

believers, but instead enforces its nondiscrimination policy only when employees violate it. Plaintiff also points to Shawnee's decision to maintain its policy despite a change in guidance by the Trump administration. *Id.* This does not remotely show hostility toward religion. Instead, it demonstrates Shawnee's conclusion that protecting transgender students from discrimination is necessary to comply with Title IX—a conclusion ratified by *Bostock*.

Plaintiff also alleges that Shawnee did not enforce its policy neutrally, Pl. Br. 49-53, but fails to engage with the District Court's exhaustive explanation of why his allegations do not state a claim. First, Plaintiff alleges that Defendant Pauley, the department chair, expressed "hostility" to his religious beliefs when she made comments critical of Christianity and Christian doctrines regarding hell. Pl. Br. 50-51. But as the District Court explained, this discussion occurred in November 2016, well over a year before Doe even took his class and lodged a Title IX complaint, and Plaintiff "draws no connection between Pauley's comments about Christianity and Christian doctrine and the issues surrounding the manner in which plaintiff addressed Doe." R&R, PageID.2142; *see* Am. Compl. ¶¶ 119-121, PageID.1473.

Moreover, "Plaintiff does not allege that Defendant Pauley was involved in the decision to apply the policies to him." R&R, PageID.2142. Contrary to Plaintiff's misleading characterization, the complaint simply alleges that Plaintiff reported Doe's behavior to Defendant Pauley, who then relayed *Plaintiff's concern*

*regarding Doe* to the president of the faculty senate. Am. Compl. ¶¶ 145-46, PageID.1465-1476. Nowhere does the complaint allege that Defendant Pauley was "involved" in the disciplinary process of *Plaintiff*, nor was Defendant Pauley the person who contacted Shawnee's Title IX coordinator. *See* Ex. 13, R. 34-13, PageID.1720. Plaintiff speculates that "[d]oubtless, discovery will show" that Pauley was involved in discipline (Pl. Br. 50), but that is insufficient to survive a motion to dismiss when there is no such allegation in the complaint.

Second, Plaintiff alleges that Defendant Bauer demonstrated hostility toward Plaintiff's religious beliefs because he allegedly laughed during a meeting with a union representative who explained the nondiscrimination policy violated Plaintiff's religious beliefs. Pl. Br. 51-52. As the District Court observed, however, the summary of the meeting merely stated that he laughed "*[a]t one point*" during the meeting—which "covered considerably more than plaintiff's religious beliefs and church teachings on transgenderism." R&R, PageID.2143. In any event, a single instance of laughter is not sufficient to plausibly state a claim of animus or constitutional violations. *See A'la v. Cobb*, 208 F.3d 212, *2 (6th Cir. 2000) ("*De minimis* events simply do not state constitutional claims"); *Vasquez v. City of Hamtramck*, 757 F.2d 771, 773 (6th Cir. 1985) ("A citizen does not suffer a constitutional deprivation every time he is subject to the petty harassment of a state agent.").

Moreover, as the District Court pointed out, "even assuming that Bauer laughed at [the] discussion of plaintiff's religious beliefs, Bauer's conduct is insufficient to support a finding that the nondiscrimination policies were aimed at plaintiff's religious beliefs," because "[t]he meeting with Bauer occurred after Milliken had initiated disciplinary proceedings against plaintiff and had issued a written warning to him under the nondiscrimination policies." R&R, PageID.2144. "There is no allegation that Milliken harbored any animus toward plaintiff's religious beliefs." *Id.*

Third, Plaintiff next points to the fact that Bauer approved the proposed discipline, reasoning that the University could not accommodate "faculty members with sincerely held religious beliefs that, e.g., *one national origin is superior to another national origin*, or one sex is inferior to the other sex." Pl. Br. 52. The District Court correctly rejected this contention: "Defendant Bauer's expressed intention to apply the policies in a neutral manner, without making an exception that would allow plaintiff or any other employee to discriminate against individuals under the nondiscrimination policies, does not support plaintiff's claim that Shawnee State's nondiscrimination policies were aimed at him in order to suppress his religious beliefs and practices." R&R, PageID.2143.

As Defendant Bauer recognized, public officials should not decide which religious beliefs are good and which are bad—such distinctions are repugnant to the

Free Exercise Clause, which requires the state to be neutral between religions and "forbids subtle departures from neutrality." *City of Hialeah,* 508 U.S. at 534. If Plaintiff were entitled to an exemption from nondiscrimination laws based on his religious beliefs, other professors would be, too—even if those professors' religious beliefs mandated other forms of discrimination on the basis of race or sex. Defendant Bauer's expression of this elementary principle of neutrality did not *violate* the Free Exercise Clause.

Finally, Plaintiff cannot state a free-exercise claim based on the conclusory allegation that the nondiscrimination policy represents "a system of individualized assessments." Am. Compl. ¶ 337, PageID.1498. As the District Court stated, "Plaintiff has not alleged any facts to support his conclusory allegation that Shawnee State's Policies 'contain a system of individualized assessments.'" R&R, PageID.2145. In particular, Plaintiff does not allege that Shawnee has ever, or will ever, grant any exemption from its policy that transgender students must be treated in conformance with their gender identity. *See Kissinger*, 5 F.3d at 179 (finding that plaintiff failed to show that the school had a system of exemptions that allowed students to graduate without completing the required surgical coursework). Speculating that "exemptions *must* exist" cannot save Plaintiff's claim. Pl. Br. 53. Plaintiff faults Shawnee for declining to accept Plaintiff's purported "compromise" of referring *only* to Doe by her first and last name (Pl. Br. 54), but Shawnee's refusal

to authorize explicit discrimination against transgender students demonstrates adherence to, rather than exemptions from, the policy.

## III. The District Court Correctly Dismissed Plaintiff's Due Process Claim.

Finally, the District Court correctly found that Plaintiff Meriwether has failed to state a due process claim. The District Court exhaustively analyzed the amended complaint and concluded that Plaintiff received "ample notice that: (1) the nondiscrimination policies require professors to address and refer to students by pronouns and titles consistent with their gender identities; and (2) using male pronouns and titles to address and refer to Doe, and addressing and referring to Doe in a different manner than he addressed and referred to other students in his class, did not comply with the nondiscrimination policies." R&R, PageID.2149-50. Although Plaintiff offers the conclusory assertion that Shawnee's policies "fail to give fair notice of what they prohibit and require," Pl. Br. 55, he does not address the District Court's well-reasoned analysis.[7]

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

---

[7] Plaintiff asks this Court to reinstate his pendant state-law claims. Pl. Br. 57. District courts have broad discretion to decide whether to exercise jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a); *see Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). The district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Plaintiff's state law claims after dismissing his federal claims. *Id.*

Date: August 17, 2020                    Respectfully Submitted,

/s/ *Adam G. Unikowsky*
Adam G. Unikowsky
Noah B. Bokat-Lindell
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6000 (tel)
(202) 639-6066 (fax)
aunikowsky@jenner.com

Jennifer L. Branch #0038893
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100 (tel)
(513) 345-5543 (fax)
Jbranch@gbfirm.com

Shannon P. Minter
Asaf Orr
Christopher F. Stoll
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street Suite 370
San Francisco, California 94102
(415) 392-6257 (tel)
(415) 392-8442 (fax)
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

*Attorneys for JANE DOE and SEXUALITY
AND GENDER ACCEPTANCE*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

1.      This Brief complies with type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because, according to the word count function of Microsoft Word 2016, the Brief contains 12,918 words excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b)(1).

2.      This Brief complies with the typeface and type style requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font for the main text and 14-point Times New Roman font for footnotes.


Dated: August 17, 2020

                                        /s/ *Adam Unikowsky*
                                        Attorney for Jane Doe & Sexuality
                                        and Gender Acceptance

## CERTIFICATE OF SERVICE

I, Adam Unikowsky, hereby certify that on August 17, 2020, I electronically

filed the foregoing document through the court's electronic filing system, and that it

has been served on all counsel of record through the court's electronic filing system.

Dated: August 17, 2020

/s/ *Adam Unikowsky*
Attorney for Jane Doe & Sexuality
and Gender Acceptance

**DESIGNATON OF RELEVANT DISTRICT COURT DOCUMENTS**

**Southern District of Ohio, Case No. 1:18-cv-753**

| Docket Number | Description | Page ID |
|---|---|---|
| 18 | Motion to Intervene | 488-505 |
| 18-2 | Declaration of Jane Doe in Support of Motion to Intervene | 514-20 |
| 18-3 | Declaration of Jae Ezra Keniston in Support of Motion to Intervene | 521-24 |
| 19 | Motion to Proceed Pseudonymously | 525-41 |
| 19-1 | Declaration of Jane Doe in Support of Motion to Proceed Pseudonymously | 542-45 |
| 32 | Order Granting Motion to Proceed Pseudonymously | 1078-86 |
| 34 | Amended Complaint | 1457-1508 |
| 34-1 | Amended Complaint, Exhibit 1 | 1509-10 |
| 34-2 | Amended Complaint, Exhibit 2 | 1511-26 |
| 34-13 | Amended Complaint, Exhibit 13 | 1716-30 |
| 43 | Order Granting Motion to Intervene | 1944-73 |
| 49 | Report and Recommendation | 2095-2157 |
| 60 | Order Adopting Report and Recommendation | 2402-04 |