No. 20-3289

United States Court of Appeals for the Sixth Circuit

Nicholas K. Meriwether,

Plaintiff-Appellant,

v.

The Trustees of Shawnee State University—FRANCESCA HARTOP,
JOSEPH WATSON, SCOTT WILLIAMS, DAVID FURBEE, SONDRA
HASH, ROBERT HOWARTH, GEORGE WHITE, AND WALLACE
EDWARDS—in their official capacities; JEFFREY A. BAUER, in his
official capacity; ROBERTA MILLIKEN, in her official capacity;
JENNIFER PAULEY, in her official capacity; TENA PIERCE, in her
official capacity; DOUGLAS SHOEMAKER, in his official capacity; and
MALONDA JOHNSON, in her official capacity,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 1:18-cv-00753-SJD
The Honorable Susan J. Dlott

## Reply Brief of Plaintiff-Appellant Nicholas K. Meriwether

David A. Cortman
Travis C. Barham
Alliance Defending Freedom
1000 Hurricane Shoals Road N.E.,
    Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774

Kristen K. Waggoner
John J. Bursch
Alliance Defending Freedom
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
jbursch@ADFlegal.org

Thomas W. Kidd, Jr.
Kidd & Urling, LLC
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone: (513) 733–3080

Tyson C. Langhofer
Alliance Defending Freedom
20116 Ashbrook Place, Suite 250
Ashburn, Virginia 20147
Telephone: (480) 388–8205

*Attorneys for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ...................................................................................... 1

REPLY ARGUMENT ................................................................................ 3

I.    Dr. Meriwether stated plausible free-speech claims. ..................... 3

        A.    *Garcetti* did not alter this Circuit's precedent about public-university faculty speech rights. ................................ 3

        B.    Dr. Meriwether's speech is protected speech ......................... 7

        C.    Dr. Meriwether addressed an issue of public concern. ........ 11

        D.    If this Court engages in a *Pickering* analysis, Dr. Meriwether satisfies its balancing test. ............................. 12

        E.    Defendants' treatment of Dr. Meriwether would chill a person of ordinary firmness. ................................................ 17

        F.    Defendants fail to respond to Dr. Meriwether's unconstitutional-conditions and content- and viewpoint-discrimination arguments .................................................... 19

II.    Dr. Meriwether stated a plausible due-process claim. .................. 20

III.    Dr. Meriwether stated a plausible free-exercise claim. ............... 23

CONCLUSION AND REQUESTED RELIEF ....................................... 28

RULE 32(G)(1) CERTIFICATE OF COMPLIANCE ............................. 30

CERTIFICATE OF SERVICE .................................................................. 31

# TABLE OF AUTHORITIES

C̲ASES̲

*Adams v. Trustees of the University of North Carolina-Wilmington*,
640 F.3d 550 (4th Cir. 2011) ..........................................................5

*Bell v. Johnson*,
308 F.3d 594 (6th Cir. 2002) ........................................................18

*Benison v. Ross*,
765 F.3d 649 (6th Cir. 2014) ..................................................17, 18

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) ...............................................1, 3, 11

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) ..................................................................13

*Boulton v. Swanson*,
795 F.3d 526 (6th Cir. 2015) ..........................................................9

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019) ........................................................11

*Burwell v. Hobby Lobby*,
573 U.S. 682 (2014) ......................................................................24

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ..................................................................20, 21

*Cockrel v. Shelby County School District*,
270 F.3d 1036 (6th Cir. 2001) ......................................................15

*Dambrot v. Central Michigan University*,
55 F.3d 1177 (6th Cir. 1995) ........................................................19

*Demers v. Austin*,
746 F.3d 402 (9th Cir. 2014) ......................................................4, 5

*EEOC v. R.G. & G.R. Harris Funeral Homes*,
884 F.3d 560 (6th Cir. 2018) ........................................................23

*Ehrlich v. Kovack*,
710 F. App'x 646 (6th Cir. 2017) ..................................................18

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ........................................................ 24

*Evans-Marshall v. Board of Education of Tipp City Exempted*
    *Village School District,*
    624 F.3d 332 (6th Cir. 2010) ........................... 4, 6, 11, 13

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ........................................................ 19

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ...................................................... 1, 3

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .................................................. 20, 22

*Hardy v. Jefferson Community College,*
    260 F.3d 671 (6th Cir. 2001) ................................ passim

*Harris v. Detroit Public Schools,*
    245 F. App'x 437 (6th Cir. 2007) .................................. 18

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012) ........................................................ 24

*Hurley v. Irish-American Gay, Lesbian, & Bi-Sexual Group of*
    *Boston,*
    515 U.S. 557 (1995) .......................................................... 7

*Janus v. American Federation of State, County & Municipal*
    *Employees,*
    138 S. Ct. 2448 (2018) ................................................ 2, 11

*Johnson-Kurek v. Abu-Absi,*
    423 F.3d 590 (6th Cir. 2005) .......................................... 5

*Keyishian v. Board of Regents of University of State of New York,*
    385 U.S. 589 (1967) .................................................... 4, 13

*Lee v. York County School Division,*
    484 F.3d 687 (4th Cir. 2007) .................................. 1, 3, 6

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020) .................................................... 23

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    138 S. Ct. 1719 (2018) .................................................... 26

*Minarcini v. Strongsville City School District,*
    541 F.2d 577 (6th Cir. 1976) ............................................ 4

*Peltier v. United States,*
    388 F.3d 984 (6th Cir. 2004) .......................................... 17

*Pickering v. Board of Education of Township High School
    District 205,*
    391 U.S. 563 (1968) ................................................ 12, 13

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .................................................. 19

*Savage v. Gee,*
    665 F.3d 732 (6th Cir. 2012) ............................................ 6

*Sensabaugh v. Halliburton,*
    937 F.3d 621 (6th Cir. 2019) .......................................... 18

*Terminiello v. City of Chicago,*
    337 U.S. 1 (1949) ......................................................... 15

*Tinker v. Des Moines Independent School District,*
    393 U.S. 503 (1969) ................................................ 15, 16

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) ............................................ 24, 25

*United States v. Varner,*
    948 F.3d 250 (5th Cir. 2020) ...................................... 2, 14

*United States v. Virginia,*
    518 U.S. 515 (1996) ..................................................... 14

## OTHER AUTHORITIES

ACLU, 11/19/19 Tweet, https://bit.ly/3lJz4CU ...................................... 16

J. Peter Byrne, *Academic Freedom: A "Special Concern of the First
    Amendment,"* 99 YALE L.J. 251 (1989) ............................................. 4

## INTRODUCTION

Defendants do not contest that the government cannot compel speech, particularly when it forces an individual to contradict his beliefs. They nonetheless advance two reasons why they can reject all of Dr. Meriwether's proposed compromises and compel him to use identity-based titles and pronouns or no titles and pronouns at all: public-university professors lack free-speech rights, and sex-reflecting pronouns and titles communicate nothing meaningful about any issue of public concern. But the law and common sense run the opposite way.

This Court has already characterized the first argument as "totally unpersuasive." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001). "This [C]ircuit, following Supreme Court direction, has . . . held that a teacher's in-class speech deserves constitutional protection." *Id.* (citing *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001)). That holding remains binding after *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which reserved for another day whether its official-duties test "would apply in the same manner to a case involving speech related to scholarship or teaching," *id.* at 425.

Until the Supreme Court says *Garcetti* applies to public-university faculty, the *status quo ante* continues, and the "official duties" test does not apply. *Lee v. York Cty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007). In this Circuit, that means public-university professors have free-speech rights. And that precedent is correct. Otherwise, a public university can require professors to profess anything.

On the second point, "no authority" suggests that courts may require anyone to use pronouns matching an individual's "subjective gender identity." *United States v. Varner*, 948 F.3d 250, 254–55 (5th Cir. 2020). And if Defendants did not believe Dr. Meriwether was conveying a message, the parties wouldn't be here. Defendants admit that Dr. Meriwether's speech reflected his "views." 1st Am. V. Compl. ("Compl.") ¶ 239, R.34, PageID.1486. They claim that the content of that (purportedly message-less) speech violates their policies; they even prohibited him from expressing his views in his philosophy syllabus. *Id.* ¶¶ 163, 170–71, 260–61, 282, PageID.1477, 1478, 1488–89, 1491.

Defendants cannot have it both ways. In punishing Dr. Meriwether, Defendants declared that his use of titles and pronouns in accord with biological sex—or even refraining from titles or pronouns, paired with a syllabus explanation—communicates a message sufficiently offensive to warrant punishment. Now, Defendants say that same speech means nothing at all. Both propositions cannot be true.

Defendants effectively ask the Court to disregard Circuit precedent, create at least two circuit splits, and squash free expression in college classrooms, including on a topic—"gender identity"—that the Supreme Court recently held was of "profound" public concern. *Janus v. Am. Fed'n of State, Cty. & Mun. Emps.*, 138 S. Ct. 2448, 2476 (2018). This Court should respectfully decline that invitation and reverse.

**ARGUMENT**

## I.  Dr. Meriwether stated plausible free-speech claims.

### A.  *Garcetti* did not alter this Circuit's precedent about public-university faculty speech rights.

Defendants argue that *Garcetti*'s official-duties test does not except classroom speech by public-university faculty. Defs.' Br. 19–25; *accord* Intervenors' Br. 14–31. But *Garcetti* specially noted that the free-speech analysis is different in academia than other public-employee contexts. "[E]xpression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for" by the Court's decision. 547 U.S. at 425. Accordingly, the Supreme Court made clear that it was not applying its *Garcetti* holding to classroom instruction: "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.*

So where does that leave things? As the Fourth Circuit held, it means the *status quo ante* continues and *Garcetti*'s "official duties" test does not apply to public-university faculty. *Lee*, 484 F.3d at 694 n.11. And the *status quo ante* in the Sixth Circuit is clear: "a teacher's in-class speech deserves constitutional protection." *Hardy*, 260 F.3d at 680 (citation omitted). A "professor's rights to academic freedom and freedom of expression are paramount in the academic setting." *Bonnell*, 241 F.3d at 823. And the "First Amendment's protection of academic

freedom" applies to teachers' in-class discussion. *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976).

Such holdings reflect that "universities occupy a special niche in our constitutional tradition." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 344 (6th Cir. 2010) (quotation omitted). That "academic freedom 'was conceived and implemented in the university' out of concern for 'teachers who are also researchers or scholars.'" *Id.* at 343–44 (quoting J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment*," 99 YALE L.J. 251, 288 n.137 (1989)). This Court should not overrule these precedents.

In rejecting the same argument Defendants advance here, the Ninth Circuit articulated similar reasons: "teaching and academic writing" "are 'a special concern of the First Amendment.'" *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967)). After canvassing Supreme Court opinions paying homage to "the importance of protecting academic freedom under the First Amendment," *id.* at 411–12, the Ninth Circuit correctly concluded "that *Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor," *id.* at 412.

Defendants urge this Court to part ways with its own precedents—and those of the Fourth and Ninth Circuits—for two dubious reasons.[1] First, they cite *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005), for the proposition that, to the extent there is any academic-freedom right, it "inheres in the University, not in individual professors." Defs.' Br. 20–21; *accord* Intervenors' Br. 31–35. But *Johnson-Kurek* involved a university that required a nontenured lecturer to communicate more clearly the class requirements, and the Court's comment was not directed toward the lecturer's free-speech claim but an independent "academic freedom" claim that Dr. Meriwether does not assert. 423 F.3d at 593–95. The opinion disclaimed that the lecturer was "required to communicate the ideas or evaluations of others as if they were her own." *Id.* at 595. So it has no relevance to Dr. Meriwether's free-speech claims.

---

[1] Defendants try to distinguish the Fourth and Ninth Circuit precedents. Defs.' Br. 23–24. But they criticize the wrong Fourth Circuit case (*Adams v. Trustees of the University of North Carolina-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011), rather than *Lee*). And as to *Adams*, they say the Fourth Circuit applied *Garcetti*'s "official duties" test and concluded the professor passed it. Not so. *Adams*, 640 F.3d at 562 ("We are also persuaded that *Garcetti* would not apply in the academic context of a public university as represented by the facts of this case."). Defendants' primary distinguishing point for *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014), is that the case involved substance, "not simply teaching methodology." Defs.' Br. 24. As explained below, the use of sex-based pronouns and titles in a Socratic philosophy class is not mere methodology.

Second, Defendants urge the Court to "examine" *Evans-Marshall* and *Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012). Defs.' Br. 22. "In neither case," say Defendants, "did the Court find that there is an exception to *Garcetti* for professors." *Id.* at 22. But those decisions didn't have to do that. *Evans-Marshall* involved a high school teacher's First Amendment claim. And this Court explained that the *Garcetti* caveat for college professors does not apply to K-12 teachers. 624 F.3d at 344. *But see Lee*, 484 F.3d at 694 n.11 (recognizing that the *Garcetti* caveat also applies to high school teachers). Similarly, the *Savage* Court emphasized that a university librarian could not invoke the *Garcetti* exception because his speech "was not related to classroom instruction and was only loosely, if at all, related to academic scholarship." 665 F.3d at 739. Both cases show that this exception applies to Dr. Meriwether—a university professor engaged in classroom instruction.

Defendants conclude by asserting that "pre-*Garcetti*, this Court has held that the constitution does not provide academic freedom rights for professors." Defs.' Br. 24. But Defendants' cited cases do not say that, and *Hardy*, *Bonnell*, and *Minarcini* hold the exact opposite. As *Garcetti* said nothing in conflict with those rulings, the *status quo ante* is that public-university faculty have free-speech rights when speaking about matters of public concern in class. If the Court is inclined to revisit its precedents, it should follow the logic other circuits have consistently adopted: that public-university faculty have free-speech

rights in the classroom. Amicus Curiae Br. of Found. for Indiv. Rights in Educ. ("FIRE *Amicus* Br.") 6–10. Accordingly, Dr. Meriwether's claims must be analyzed under the controlling precedent of *Hardy*, not *Garcetti*, with all factual conflicts and inferences resolved in his favor.

**B.    Dr. Meriwether's speech is protected speech.**

Defendants say that even if the Court declines their novel *Garcetti* theory, Dr. Meriwether's speech receives no First Amendment protection because it amounts to mere "in-class utterances" or pedagogy and has no substantive meaning. Defs.' Br. 25–30. That argument fails for multiple reasons.

To begin, Defendants do not seek only to compel Dr. Meriwether to use subjective, identity-based pronouns and titles with which he disagrees, but also to bar him from explaining his beliefs. Dr. Meriwether asked about avoiding *any* use of pronouns or titles if he could explain his position on human sexuality and gender. While allowing this would not have immunized Defendants' actions—the government "cannot require speakers to affirm in one breath that which they deny in the next," *Hurley v. Irish-Am. Gay, Lesbian, & Bi-Sexual Grp. of Bos.*, 515 U.S. 557, 576 (1995)—University officials turned him down cold, three times. Compl. ¶¶ 170–71, 260–61, 282, R. 34, PageID. 1478, 1488–89, 1491.

If this were simply a dispute over "pedagogical choice," allowing a syllabus explanation was an easy accommodation. By rejecting it, the only reasonable inference is that Dr. Meriwether was communicating something substantive about the sexed nature of the body, a meta-physical point at the heart of philosophical discussion over what it means to be a person. Br. of *Amici Curiae* Professors of Philosophy, Theology, Law, Political Science, and Medicine ("Profs.' *Amicus* Br.") 6–24; Br. of *Amicus Curiae* Ryan T. Anderson, Ph.D. 1–23.

Second, this Court has refused to distinguish between substance and pedagogy. The *Hardy* Court, for example, did not say the college professor's "classroom *instruction*" was protected, but rather his "in-class *speech*." 260 F.3d at 679–80 (emphasis added). And that dispute was all about pedagogy: the *Hardy* professor did not have to use offensive words like "n*gger" and "b*tch" to communicate "how language is used to marginalize minorities and other oppressed groups." *Id.* at 674–75. That pedagogical decision did not diminish the First Amendment's protection of his word choice.

Third, while disparaging Dr. Meriwether's beliefs as mere "teaching method," Defendants confuse the issue and ignore the pronouns component. Defendants did not punish Dr. Meriwether for maintaining a formal class environment (*i.e.*, for using titles and last names), but for using sex-based terms rather than identity-based ones. After all, he offered to change his classroom formality by dropping all

titles for everyone, a proposal Defendants rejected because he would have used sex-reflecting pronouns for students other than Doe. Compl. ¶¶ 201–15, R.34, PageID.1482–83. It is the use of *sexed* titles and pronouns that communicates Dr. Meriwether's beliefs and prompted Defendants' punishment. *Id.* ¶¶ 204, 310, PageID.1481, 1495.

Defendants' conduct also betrays that using sex-based pronouns and titles communicates a message of public significance. Defendants characterize Dr. Meriwether's belief that sex is immutable as a "decision to treat Doe differently than other students." Defs.' Br. 27. But Dr. Meriwether desired to treat Doe *the same* as others—by using pronouns and titles consistent with *every* student's sex. It is only differential treatment if one ends the debate and assumes the conclusion—as Defendants do—that a subjective state of mind is the more profound truth about an individual than immutable biological fact, a question of decided public significance.

As for Intervenors, they observe that pronouns and titles can be used in any workplace setting, not just academia. Intervenors.' Br. 29. They're right. And that reality shows that such speech does not owe "its existence to a public employee's professional responsibilities." *Boulton v. Swanson*, 795 F.3d 526, 532–33 (6th Cir. 2015).[2]

---

[2] Defendants make the odd argument that under Dr. Meriwether's view, a professor could refer to white students by name but minority students as "affirmative action students" and women students as "unfit mothers." Defs.' Br. 29. Such racist and sexist practices are not like Dr. Meriwether's practice—shared by nearly every person that has ever lived—of using pronouns and titles that reflect an individual's sex. It also

Finally, use of pronouns and titles based on objective sex rather than subjective beliefs is not mere pedagogy because their usage touches on issues of fundamental importance: the recognition of sex (or gender) either as immutable or as fluid and self-identified. Nat'l Ass'n of Scholars' *Amicus Curiae* Br. 27–31. And Defendants have demonstrated they will silence as harassment any speech that supports the immutable view. After all, Dr. Meriwether offered to use Doe's preferred first or last name and asked about trying no pronouns or titles for any student if he could explain his beliefs in his syllabus. It was Defendants who demanded that he use the wrong pronoun or stay silent.

At the pleadings stage, Defendants' actions are enough to infer that Dr. Meriwether's speech communicates something profound, not merely which student he is addressing. This Court should hold that a public-university professor's classroom speech is protected citizen speech. FIRE *Amicus* Br. 14–17.

---

makes no sense. Whereas the hypothetical professor must make an unwarranted, hostile assumption about minority and female students, professors who believe that the human body is sexually gendered and determined based on biology are using language based on objective, biological facts.

## C.    Dr. Meriwether addressed an issue of public concern.

Defendants repackage the same arguments when asserting that Dr. Meriwether's speech does not address a public concern. Defs.' Br. 30–33; *accord* Intervenors' Br. 35–40. But Defendants recognize that "gender identity is a matter of public concern." Defs.' Br. 33 (citing *Janus*, 138 S. Ct. at 2476). And their arguments fail for the reasons just noted. After all, if Dr. Meriwether's speech were merely "completing his ministerial function of identifying which student should answer the question," *id.* at 32, Intervenors' Br. 36, why did Defendants prohibit him from discussing his views in a non-offensive way in his syllabus?

Defendants say that Dr. Meriwether's position would require viewing speech so expansively that all speech would be a matter of public concern. Defs.' Br. 33. That's false; for example, gratuitous use of offensive language, intended to sexually harass students, does not address a matter of public concern. *Bonnell*, 241 F.3d at 803, 820; *accord Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019). But sex- versus identity-based titles and pronouns "concern[ ] a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." Profs.' *Amicus* Br. 1. And given the "'essence of a teacher's role [ ] to prepare students for their place in society,'" the teacher who can instruct without conveying messages of public concern "is rare indeed, perhaps non-existent." *Evans-Marshall*, 624 F.3d at 339 (quoting *Hardy*, 260 F.3d at 679).

Intervenors argue that there is a difference between classroom gender debates and what one person's private transgender status is. Intervenors' Br. 36–37. But that line does not hold. To begin, there's nothing "private" when a student demands, with threats, to be addressed by gendered pronouns and titles that do not reflect the student's sex. And if this debate were merely about a single person's private status, Defendants would have allowed Dr. Meriwether to use preferred first or last names *and* to explain his position on gender identity in his philosophy syllabus. They adamantly refused.

Defendants ignore that this is not just a semantics game. Among others, science and medicine depend on a rigorous recognition of sex as binary, innate, and immutable. Br. of *Amicus Curiae* Dr. Paul R. McHugh, M.D., and Other Medical and Scientific Experts 7–15. Deliberately obfuscating or outright hiding that reality causes harm. *Id.* at 20; Br. of *Amicus Curiae* Women's Liberation Front 11–26. It matters a great deal whether we identify each other with reference to biological fact or subjective profession.

### D. If this Court engages in a *Pickering* analysis, Dr. Meriwether satisfies its balancing test.

The district court never reached the balancing test in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). Under it, a court "balances" the "interests of the teacher, as a citizen, in commenting upon matters of public concern," against "the interest of the State, as an employer, in promoting the efficiency of the

public services it performs through its employees." *Id.* at 568. This is a fact-intensive inquiry, *Evans-Marshall*, 624 F.3d at 339, one the district court should conduct first, after discovery. On a motion to dismiss, Defendants cannot allege, much less prove, that they have any interest worth protecting. But any balancing at this juncture necessarily weighs in Dr. Meriwether's favor.

Start with Dr. Meriwether's interests. This Court "must take into account the robust tradition of academic freedom in our nation's post-secondary schools," something "of transcendent value to all." *Hardy*, 260 F.3d at 680 (quoting *Keyishian*, 385 U.S. at 603). The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," and the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* (quoting *Keyishian*, 385 U.S. at 603). That freedom includes use of language that influences thought. Nat'l Ass'n of Scholars' *Amicus* Br. 22–24.

Defendants say the University has an interest in "maintaining its nondiscrimination policy and federal anti-discrimination law." Defs.' Br. 34; *accord* Intervenors' Br. 40–42. Regarding the latter, they point to the Supreme Court's recent expansion of Title VII to prohibit an employer from firing an employee "simply for being . . . transgender." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1753 (2020). But Dr. Meriwether is not firing anyone, and *Bostock* distinguished situations where First Amendment rights are at stake. *Id.* at 1753–54.

Moreover, the use of standard English pronouns does not discipline nor deny any educational opportunity to any student. Title IX actually *requires* recognition of sex. *E.g.*, *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (public college's admission of women would "undoubtedly require alterations" in accommodations to account for sex). And any decision that requires Dr. Meriwether "to refer to gender-dysphoric [individuals] with pronouns matching their subjective gender identity" would conflict with the Fifth Circuit. *Varner*, 948 F.3d at 254–55.

Regarding anti-discrimination policies, *Hardy* weighed the same interest and found it insufficient to overcome the importance of upholding a classroom instructor's First Amendment rights. There, a college professor solicited and used racially and sexually derogatory terms in his classroom. 260 F.3d at 675. In concluding that the *Pickering* balancing favored the professor, this Court noted that, as Dr. Meriwether has plausibly alleged, the professor's speech did not adversely impact his classroom performance, and he received positive feedback on his instruction from all students other than the one who complained. *Id.* at 681.

And as for the alleged disruption in the college's operations—and even its enrollment—from any perceived discrimination, this Court reiterated that a First Amendment function "is to invite dispute." *Id.* "Speech is often provocative and challenging. It may strike at prejudices

and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Id.* (quoting *Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949)). "That is why freedom of speech," explained the Court, "though not absolute, is nevertheless protected against censorship or punishment." *Id.* (quoting *Terminiello*, 337 U.S. at 4). Any classroom speech "that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk." *Id.* at 682 (quoting *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 508–09 (1969)); *accord Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001) (requiring officials to make a "particularly strong showing" that speech on a public concern "interfered with workplace functioning before taking action").

In sum, this Court concluded, the professor's "rights to free speech and academic freedom outweigh the College's interest in limiting that speech." *Hardy*, 260 F.3d at 682. Accordingly, the *Pickering* test was satisfied "in successfully alleging a First Amendment violation by a public employee." *Id.* That analysis applies with full force here, particularly at the motion-to-dismiss stage.

Conversely, if the Court credits Defendants' purported interests over the First Amendment, there will be irreparable damage to our higher-education system. A medical school could prohibit its faculty from calling cadavers "male" and "female" based on their biological sex. It could even require its faculty to teach that "men who get pregnant

and give birth are men." ACLU, 11/19/19 Tweet, https://bit.ly/3lJz4CU.

Defendants' purported interest in "'avoid[ing] the discomfort and unpleasantness that always accompany' a controversial subject" cannot justify compelled speech. *Hardy,* 260 F.3d at 682 (quoting *Tinker*, 393 U.S. at 509).

Defendants close this subject by asserting that Dr. Meriwether's position—that Defendants "required him to speak against his sincerely held belief that gender is immutable"—is contradicted by his willingness to change his practice of always using gendered pronouns and titles in accord with someone's sex. Defs.' Br. 35–36. Nonsense. He was willing to use Doe's preferred first or last name out of courtesy to Doe, and doing so did not require him to say something he believed untrue. He even asked about the virtually impossible task of avoiding pronouns or titles with *all* students if he could explain his beliefs about sex and gender identity in his syllabus. Defendants rejected that.

In sum, Dr. Meriwether has been just as consistent in trying to speak his beliefs as Defendants have been in compelling his speech and silencing his views.

### E. Defendants' treatment of Dr. Meriwether would chill a person of ordinary firmness.

Defendants' final free-speech defense is that a warning letter is not an adverse employment action. Defs.' Br. 36–39. To begin, this defense affects only his retaliation claim, not his compelled-speech or other free-speech claims. *Id.* at 36. Even on retaliation, Defendants make two dispositive missteps.

To begin, whether a public employer's acts were serious enough to be retaliation turns not on the form of punishment but its effect. The *sine qua non* of First Amendment retaliation is whether the government's actions "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quotation omitted). Here, Dr. Meriwether plausibly alleged that the warning letter chilled his speech. Compl. ¶¶ 246, 324, R.34, PageID.1487, 1496. Any person of ordinary firmness would feel the same way given the letter's instruction that he change his speech "to avoid further corrective actions." *Id.* ¶ 248, PageID.1487.

Next, ignoring the context—a warning letter's chilling effects on speech—causes Defendants to rely on four inapposite cases. The first involved an internal investigation into whether an employee engaged in wrongdoing, followed by an exoneration and the employee's return to her position with full pay. *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004). That context has no obvious long-term chilling effect on the exercise of constitutional rights. *Id.* The second case cited *Peltier*

and made the same point, adding helpfully that whether an employment action "is 'adverse' will depend on context." *Harris v. Detroit Pub. Schs.*, 245 F. App'x 437, 442 (6th Cir. 2007) (quoting *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)). The third, *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017), simply cited *Peltier* and *Harris* and provided no meaningful analysis.

The fourth case, *Sensabaugh v. Halliburton*, 937 F.3d 621 (6th Cir. 2019), supports Dr. Meriwether. This Court began by emphasizing the importance of context in discerning whether an employment action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* at 628 (quoting *Benison*, 765 F.3d at 659). It concluded that a Letter of Guidance and Letter of Reprimand did not chill the plaintiff. The Letter of Reprimand "amounted to a suspension with pay pending investigation by outside counsel," like *Peltier*. The Letter of Guidance "permitted Sensabaugh *to maintain his First Amendment activities*, by keeping [his] posts on Facebook, and notified Sensabaugh that he could post comments on social media in the future." *Id.* at 628–29 (emphasis added). The implication is that if either letter had threatened punishment for Sensabaugh's future First Amendment activities, the Court would have concluded it constituted an adverse action supporting a free-speech retaliation claim. So too here.

**F. Defendants fail to respond to Dr. Meriwether's unconstitutional-conditions and content- and viewpoint-discrimination arguments.**

Because Dr. Meriwether has First Amendment protection for the titles and pronouns he uses in and out of class, and for the views he wishes to express in his syllabus, he has stated plausible claims on his remaining free-speech theories. Appellant's Br. 38–44. Defendants' and Intervenors' arguments all depend on whether his expression is constitutionally protected at the outset. Defs.' Br. 16–30; Intervenors' Br. 42–46. So all those claims should be reinstated.

Defendants' silence on these claims confirms that Dr. Meriwether's words were not just pedagogical but communicated a substantive message on a matter of public concern. For example, Defendants do not contest, and thus concede, that:

- They punished Dr. Meriwether because of the idea or message he expressed, which violates *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015), Appellant's Br. 40;

- They acted based on a student's *reaction* to Dr. Meriwether's speech, a non-content-neutral basis for regulation that violates *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992), Appellant's Br. 41; and

- They engaged in unconstitutional viewpoint discrimination, violating *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1183 (6th Cir. 1995), Appellant's Br. 41.

All this shows that Defendants' enforcement of their anti-discrimination policies is inherently content- and viewpoint-based. And that should surprise no one. After all, "[h]ostile-environment regulations are inherently content-based and viewpoint discriminatory." Br. of the Bader Family Found. & Hans Bader as *Amici Curiae* 22 (discussing cases). That is doubly true when the hostile-environment determination "turns on listeners' reaction to speech, and whether they find it offensive enough to create a hostile environment," *id.* at 23, as here. Defendants cannot avoid the constitutional problems inherent when they act as speech police.

## II.    Dr. Meriwether stated a plausible due-process claim.

Defendants accuse Dr. Meriwether of "not mention[ing] the district court's decision to dismiss his [d]ue [p]rocess claim," and of failing to explain in sufficient detail why that ruling was erroneous. Defs.' Br. 39–40; *accord* Intervenors' Br. 54. Not so. He explained with citation to the record that the district court concluded Defendants' policies were not vague and would not chill his speech. Appellant's Br. 15–16. He showed the ruling was erroneous because Defendants' vague policies failed to give fair notice of prohibited conduct and lacked explicit standards. *Id.* at 54 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *City of Chi. v. Morales*, 527 U.S. 41, 56 (1999)). He highlighted that "nothing in the policies require University faculty to refer to students by identity-based pronouns," yet that is how

Defendants interpreted and applied them *post hoc*. *Id.* at 54–55. Those policies also do not prohibit a professor from discussing gender views in a syllabus, yet that is how Defendants interpreted and applied them.

Defendants also misunderstand their policies' scope. As Dr. Meriwether explained, Defendants' policies are vague and vest officials with unbridled discretion because they extend beyond the classroom and the campus to circumstances Defendants determine, in their discretion, "could reasonably create a hostile environment or be detrimental to the University.'" Appellant's Br. 44 (quotation omitted). The policies "regulate all interactions professors have with students, whether in the classroom or out of it." *Id.* (quotation omitted). (Dr. Meriwether made these points to support his First Amendment claims, but they apply equally to his due-process claim, as Defendants recognized when they addressed them in their due-process arguments. Defs.' Br. 41–42.)

Defendants say that "Meriwether is simply incorrect in his related assertion that Shawnee State has unbridled discretion to sanction employees for [actions or speech] that happen[ ] off-campus." Defs.' Br. 43. But the district court rejected Defendants' view when analyzing those same policies. R.&R., R.49, PageID.2135.

Defendants try to elide these problems by arguing that the term "gender identity" is sufficiently definite. Defs.' Br. 41–42. If only that were true. When a subject can only be defined by someone's "innermost concept of self," by how someone "perceive[s] themselves," and as something that "can be the same or different" than sex, *id.*, it is hard to say there is no vagueness or room for administrative discretion.

Anyway, that's not Dr. Meriwether's "chief contention." *Contra id.* at 41. His primary problem is Defendants' vague and shifting definition of what it means to *discriminate* based on gender identity, as outlined above. Indeed, when he proposed the compromise of using Doe's last name rather than any title or pronoun, Defendants initially approved, Compl. ¶¶ 158, 160–61, R.34, PageID.1477, presumably because they believed that this did not violate their policies. Yet when Doe objected, Defendants changed course and said it was unacceptable. *Id.* ¶ 163. A public university policy that fluctuates based on students' demands fails to give "fair notice" of prohibited conduct and lacks "explicit standards for those who apply" it. *Grayned*, 408 U.S. at 108–09, 112.

In sum, there was no waiver, and the Court should hold that Dr. Meriwether pled a plausible due-process violation.

### III.  Dr. Meriwether stated a plausible free-exercise claim.

Dr. Meriwether has explained that Defendants violated the Free Exercise Clause in at least five ways, by: (1) curtailing his right to communicate consistent with his faith, Appellant's Br. 45–47, (2) requiring him to renounce his religious beliefs to preserve his job, *id.* at 47–48, (3) punishing him based on hostility toward his beliefs, *id.* at 48–49, (4) doing so in a non-neutral way, *id.* at 49–53, and (5) employing a system of individualized assessments, *id.* at 53–54. Defendants largely duck these claims.

Defendants first argue that it does not violate Dr. Meriwether's religious beliefs to force him to use female pronouns and titles when referring to a male student. Defs.' Br. 46–47. They highlight how this Court said that employing a transgender person did not necessarily endorse the mutability of sex. Defs.' Br. 46–47 (citing *EEOC v. R.G. & G.R. Harris Funeral Homes*, 884 F.3d 560, 588 (6th Cir. 2018)). But *Harris* is inapplicable factually and legally.

Factually, forcing someone to choose between abandoning basic, English-language building blocks like pronouns and titles or using those building blocks exclusively based on self-profession rather than biological sex *does* force an endorsement about the mutability of sex. And legally, after *Harris*, the Supreme Court reminded us that "it is not for [courts] to say that [someone's] religious beliefs are mistaken or insubstantial." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2390 (2020) (Alito, J., concurring) (quoting

*Burwell v. Hobby Lobby*, 573 U.S. 682, 725 (2014)). Defendants cannot prevail on Dr. Meriwether's free-exercise claim by arguing he is wrong about his own religious beliefs.

Next, Defendants defend their policies as facially neutral and generally applicable. Defs.' Br. 48–49; *accord* Intervenors' Br. 47–49. But Dr. Meriwether's first two free-exercise theories assume the same. Dr. Meriwether's right to communicate consistently with his faith is based on our nation's long history and tradition of prohibiting the state from forcing an individual to say things that violate his religious beliefs. Appellant's Br. 45–47. This core liberty soars above—and mandates an exception to—the "neutral and generally-applicable" rule stated in *Employment Division v. Smith*, 494 U.S. 872 (1990), as the Supreme Court explained in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 190 (2012), and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). And though Dr. Meriwether highlighted the importance of *Hosanna-Tabor* and *Trinity Lutheran* in his opening brief, Appellant's Br. 45–46, Defendants chose to ignore them altogether. (The fact that *Hosanna-Tabor* and *Trinity Lutheran* involved different kinds of government compulsion, *see* Intervenors' Br. 48, does not diminish the Supreme Court's directive that courts consider our nation's religious history and traditions when evaluating claims under the Religion Clauses or that the *Smith* test does not govern all free-exercise claims.)

Similarly, Dr. Meriwether's claim that Defendants have required him to renounce his religious beliefs to preserve his job states a religious-penalty claim of a type that the Supreme Court recognized in *Trinity Lutheran*, 137 S. Ct. at 2024. Again, Dr. Meriwether explained *Trinity Lutheran*'s straightforward application to this case, Appellant's Br. 47–48, and Defendants ignored it. This theory, too, is unrebutted.

The rest of Defendants' free-exercise argument is devoted to Dr. Meriwether's three additional theories, which turn on hostility, non-neutrality, and individualized assessments. Here, Defendants overlook the standard they must satisfy to prevail on a motion to dismiss.

For example, Defendants say there is no suspicion they acted with hostility because they gave Dr. Meriwether the option to speak without pronouns, Defs.' Br. at 50–51, *i.e.*, contrary to the way the English language has been spoken since its inception. This was hardly a realistic option; even a minor slip would have led to more punishment, possibly termination.

More important, Dr. Meriwether's students would have wondered why he was speaking so strangely unless he explained why he was *not* using pronouns. Yet when he respectfully asked about providing an explanation in his syllabus, Defendants turned him down. This was the exact opposite of giving "respectful consideration" to Dr. Meriwether's views. Defs.' Br. 51. Indeed, by characterizing Dr. Meriwether's modest request to explain his views as seeking "carte blanche authority to

disobey laws or policies for non-religious reasons," *id.*, Defendants continue to show in this appeal their hostility and disdain for Dr. Meriwether's religious beliefs.

Defendants also discount Department Chairperson Pauley's derision of Christian teachings as "harmful" because she purportedly played no role in the disciplinary process, Defs.' Br. 52, and they excuse Provost Bauer's laughter as unconnected to Dr. Meriwether's views, *id.* at 53. But the Complaint plausibly alleges that Pauley was involved, noting that she was the one who reported Dr. Meriwether to Dr. Scott and highlighted Dr. Meriwether's use of sex-reflecting terms. Compl. ¶ 146, R.34, PageID.1476 & Ex. 13, R.34-13, PageID.1720. Discovery will shed further light on Pauley's participation, but Rule 8(a) requires nothing more for now.

As for that laugh, at the motion-to-dismiss stage, it supports the plausible inference that Provost Bauer was "showing lack of due consideration for [Dr. Meriwether's] free exercise rights and the dilemma he faced." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018). And that's even before considering the Provost's comparison of Dr. Meriwether's beliefs to those who espouse racist and sexist views. Compl. ¶ 279, R.34, PageID.1490. Defendants ignore that comment altogether.

Finally, Defendants claim their policies have no individualized exceptions, are neutrally applied, and are not too subjective. Defs.' Br. 49–50, 55–56; *accord* Intervenors' Br. 53–54. That claim is belied by Defendants' conduct. When Dr. Meriwether suggested that he could refer to Doe by preferred first or last name while using pronouns and titles with other students, Defendants accepted that compromise. It was only when Doe insisted that Dr. Meriwether had to use pronouns and titles associated with the opposite sex when addressing Doe that officials changed course and labeled the compromise they had accepted "discriminatory."

And when Dr. Meriwether asked if he could express his views in his syllabus, Defendants said no. It is unclear how that expression "harassed," much less deprived any student of educational opportunities—a necessary prerequisite to a harassment finding under Defendants' policy. All this shows that Defendants' policies had individualized exceptions, were not applied neutrally, and were subjective.

Defendants' appellate arguments buttress that conclusion. Defendants accuse Dr. Meriwether of discrimination for merely suggesting that he could "refrain[ ] from using sex-based titles when referring to [Doe] while continuing to use sex-based titles when referring to all other students." Defs.' Br. 56. But Defendant Milliken did not think Dr. Meriwether's proposed compromise was discriminatory until Doe objected. Compl. ¶¶ 158, 160–61, R.34, PageID.1477. Her initial position shows

that individualized exceptions existed, and that Defendants applied those exceptions in non-neutral, subjective ways. There is no other way to interpret this conduct. Certainly, it *must* be interpreted this way at the motion-to-dismiss stage.

## CONCLUSION AND REQUESTED RELIEF

Dr. Meriwether offered to refer to Doe by Doe's preferred first or last name and even inquired about trying the difficult task of foregoing use of pronouns and titles altogether if he could explain his views in his syllabus. Defendants rejected any compromise and forced Dr. Meriwether to speak the wrong pronouns and titles, both on and off campus, or stay silent about his beliefs, even in that syllabus.

This Court should follow its precedents—and those of the Fourth and Ninth Circuits—and reaffirm that a faculty member's "rights to free speech and academic freedom outweigh [a] College's interest in limiting that speech," even when that interest is motivated by a desire to avoid offending students. *Hardy*, 260 F.3d at 682. The Court should also follow the Fifth Circuit's *Varner* decision and hold that no government official can compel an individual to use pronouns and titles based on someone else's professed gender identity.

Accordingly, Dr. Meriwether asks that the Court reverse, reinstate all his claims (except his equal-protection claim), and remand for further proceedings.

October 15, 2020

David A. Cortman
Travis C. Barham
Alliance Defending Freedom
1000 Hurricane Shoals Road N.E.,
    Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

Thomas W. Kidd, Jr.
Kidd & Urling, LLC
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone: (513) 733–3080
Facsimile: (513) 577–7393
tkidd@kiddurlinglaw.com

*/s/ John J. Bursch*
Kristen K. Waggoner
John J. Bursch
Alliance Defending Freedom
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

Tyson C. Langhofer
Alliance Defending Freedom
20116 Ashbrook Place, Suite 250
Ashburn, Virginia 20147
Telephone: (480) 388–8205
Facsimile: (202) 347–3622
tlanghofer@ADFlegal.org

*Attorneys for Plaintiff-Appellant*

## RULE 32(G)(1) CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 6th Cir. R. 32(b), this document contains 6,385 words according to the word count function of Microsoft Word 365.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ John J. Bursch*
John J. Bursch
Alliance Defending Freedom
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
jbursch@ADFlegal.org

*Attorney for Plaintiff-Appellant*

Date: October 15, 2020

## CERTIFICATE OF SERVICE

Under FED. R. APP. P. 31 and 6th Cir. R. 31, I hereby certify that on October 15, 2020, a digital copy of the brief was filed electronically with the Court using the its electronic filing system, which automatically sends an electronic notification to all attorneys of record.

*/s/ John J. Bursch*
John J. Bursch

*Attorney for Plaintiff-Appellant*

Date: October 15, 2020