No. 20-3289

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

NICHOLAS K. MERIWETHER,

*Plaintiff-Appellant*,

v.

THE TRUSTEES OF SHAWNEE STATE UNIVERSITY—Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra Hash, Robert Howarth, George White, and Wallace Edwards—in their official capacities; JEFFREY A. BAUER, ROBERTA MILLIKEN, JENNIFER PAULEY, TENA PIERCE, DOUGLAS SHOEMAKER, and MALONDA JOHNSON, in their official capacities,

*Defendants-Appellees*,

JANE DOE AND SEXUALITY AND GENDER ACCEPTANCE,

*Intervenors-Appellees*.

---

On Appeal from the United States District Court for the Southern District of Ohio, Western Division
Case No. 1:18-cv-753—Hon. Susan J. Dlott

---

## PETITION FOR PANEL REHEARING OR REHEARING EN BANC
## BY DEFENDANTS-APPELLEES AND INTERVENORS-APPELLEES

---

Paul Kerridge
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
(513) 579-6400
pkerridge@kmklaw.com

*Counsel for Defendants-Appellees*

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Avenue, NW #900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

(Additional counsel below)

Shannon P. Minter
Asaf Orr
Christopher F. Stoll
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street Suite 370
San Francisco, California 94102
(415) 392-6257
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

*Counsel for Intervenors-Appellees*

# FRAP 35(B) STATEMENT

1. The panel decision conflicts with *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332, 343 (6th Cir. 2010); *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005); *Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012); and *Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989).  Consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions.

2. This proceeding involves multiple questions of exceptional importance:

- Whether the rule of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), has an academic-freedom exception, and if so, whether that exception encompasses a professor's challenge to a university's nondiscrimination policy.

- Whether the use of an honorific to address a particular student during class constitutes speech on a matter of public concern under the First Amendment.

- Whether a university has an interest in preventing intentional discrimination against a student on the basis of gender identity.

- Whether a university's refusal to create religious exceptions to a generally-applicable policy creates an inference of religious hostility under the Free Exercise Clause.

# TABLE OF CONTENTS

FRAP 35(B) STATEMENT ....................................................................i

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT ..................................................................................1

ARGUMENT ..................................................................................2

I.  The Panel's Application of *Garcetti* Warrants Rehearing. ............................2

    A.  *Garcetti* should have applied.................................................3

    B.  The panel's recognition of an academic-freedom exception to *Garcetti* conflicts with circuit precedent.................................3

    C.  The panel's conclusion that an academic-freedom exception applies here conflicts with circuit precedent........................................7

II.  The Panel's "Public Concern" Holding Warrants Rehearing. ......................10

III.  The Panel's *Pickering* Holding Warrants Rehearing. ...................................13

IV.  The Panel's Free Exercise Holding Warrants Rehearing............................16

CONCLUSION ................................................................................18

# TABLE OF AUTHORITIES

## CASES

*Adams v. Trustees of the University of North Carolina-Wilmington*, 640
  F.3d 550 (4th Cir. 2011) .........................................................................9

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ...............................15

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir.), *cert. denied*, 140 S.
  Ct. 432 (2019) ...................................................................................9, 10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520
  (1993) ..................................................................................................17

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................2

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)....................................10

*Employment Division v. Smith*, 494 U.S. 872 (1990). ........................2, 16

*Evans-Marshall v. Board of Education of Tipp City Exempted Village
  School District*, 624 F.3d 332 (6th Cir. 2010) .....................4, 5, 6, 7, 9

*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) ......................................10

*Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668 (6th Cir. 2013) .................15

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...........................................2, 3

*Hardy v. Jefferson Community College*, 260 F.3d 671 (6th Cir. 2001)....................5

*Johnson-Kurek v. Abu-Absi*, 423 F.3d 590 (6th Cir. 2005) ...............4, 5, 9

*Keyishian v. Board of Regents*, 385 U.S. 589 (1967) ...............................4

*Lane v. Franks*, 573 U.S. 228 (2014).....................................................10

*Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989) .......................................9

*Pickering v. Board of Education*, 391 U.S. 563 (1968)............................2

*Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012)...........................................8

*Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234 (1957) .............4

**STATUTES**

20 U.S.C. § 1681(a) ...............................................................................................14

## STATEMENT

Shawnee State University is a public university. It maintains a nondiscrimination policy that bars its employees from discriminating on the basis of gender identity while on the job.

Nicholas Meriwether is a professor at Shawnee. Jane Doe, a transgender woman, was a student in his class. During the first class, Meriwether referred to Doe as "sir." After class, Doe requested that Meriwether refer to her with female honorifics, but Meriwether refused. In subsequent class sessions, Meriwether singled out Doe for differential treatment by using honorifics (like "sir" and "ma'am") for all students *except* Doe while referring to Doe by her last name only.

After Doe complained to Shawnee, Shawnee offered Meriwether an accommodation: treat all students equally by referring to all of them, not just Doe, by their last names only. Meriwether refused, insisting on treating Doe differently from all other students. Shawnee therefore concluded that Meriwether violated Shawnee's nondiscrimination policy.

Meriwether sued Shawnee under, *inter alia*, the Free Speech and Free Exercise Clauses. The district court granted the motion of Doe and SAGA (a campus LGBT students organization) to intervene on Shawnee's side, and granted Doe's motion to proceed pseudonymously.

The district court dismissed Meriwether's claims.  It concluded that Meriwether's speech was unprotected employee speech under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and alternatively that Meriwether's speech was not on a matter of public concern under *Connick v. Myers*, 461 U.S. 138 (1983).  The court further concluded that the nondiscrimination policy was neutral and generally applicable, and hence constitutional under *Employment Division v. Smith*, 494 U.S. 872 (1990).

A panel of this Court reversed.  The panel held that *Garcetti* did not apply because Meriwether's speech implicated academic freedom.  It further held that Meriwether's speech was on a matter of public concern, and that Meriwether plausibly alleged sufficient facts that he could prevail under the balancing test of *Pickering v. Board of Education*, 391 U.S. 563 (1968).  Finally, the panel held that Meriwether plausibly alleged a Free Exercise Clause claim.

## ARGUMENT

The Court should grant panel rehearing or rehearing en banc because the panel decided multiple questions of exceptional importance in conflict with Supreme Court and Sixth Circuit precedent.

### I.    The Panel's Application of *Garcetti* Warrants Rehearing.

The panel ruled that Meriwether's challenge to Shawnee's nondiscrimination policy implicated "academic freedom," warranting an exception to *Garcetti*.  That decision was incorrect and conflicts with circuit precedent.

2

### A. *Garcetti* should have applied.

In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  547 U.S. at 421.  *Garcetti* controls here.  Meriwether's speech is pursuant to his official duties: it occurred during in-class discussions.   Because Meriwether's status as facilitator of classroom discussions "owe[d] its existence to [Meriwether's] professional responsibilities," Shawnee's enforcement of a nondiscrimination code placing certain limits on that interaction "does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22.

Applying *Garcetti* here is particularly warranted because Meriwether exercised authority over Doe as a direct result of his position.  In his capacity as professor, Meriwether decides which students may speak, what questions they must answer, and how the student's participation will affect the student's grade.  Public institutions that confer authority are entitled to regulate the exercise of that authority, including to ensure that students are treated respectfully in the classroom.

### B. The panel's recognition of an academic-freedom exception to *Garcetti* conflicts with circuit precedent.

The panel concluded that *Garcetti* has an academic-freedom exception that applies to universities' regulation of professors' in-class speech.  That holding

conflicts with *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332, 343 (6th Cir. 2010), and *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005).

First, the panel concluded that Supreme Court precedent *already* establishes an academic-freedom exception to *Garcetti*, citing *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234 (1957), and *Keyishian v. Board of Regents*, 385 U.S. 589 (1967). The panel stated that it must "apply Supreme Court precedent unless it is expressly overruled." Op. 14.

In *Evans-Marshall*, however, this Court held that Supreme Court precedent did *not* dictate an academic-freedom exception to *Garcetti*. This Court declined to recognize such an exception and pointed out that the *Garcetti* majority "disclaimed any intent to resolve the point." 624 F.3d at 343.

*Evans-Marshall* was right: Supreme Court precedent does not dictate an academic-freedom exception to *Garcetti*. *Sweezy* and *Keyishian* do not such create an exception because they involved state laws imposed *on* universities and their professors, rather than policies imposed *by* universities on their employee-professors. *Keyishian*, 385 U.S. at 597, 602-04, 609-10 (striking down state-law provisions obligating school authorities to dismiss teachers with "subversive" views); *Sweezy*, 354 U.S. at 249-50 (rejecting state legislature's attempt at coercing disclosure in legislative investigation of professor under loyalty statute). These

4

cases, which involved legislative intrusion into school administration, have nothing to do with the question here: whether a *university* may regulate how *its own employees* refer to students in the classroom to ensure that all students are treated respectfully.

Second, the panel concluded that under *Hardy v. Jefferson Community College*, 260 F.3d 671, 680 (6th Cir. 2001), professors can assert a First Amendment academic freedom claim against a university. Op. 16. That conclusion squarely conflicts with *Evans-Marshall* and *Johnson-Kurek*.

In *Johnson-Kurek*, this Court held: "[T]o the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors." 423 F.3d at 593 (quotation marks omitted). While the panel here relied on Justice Frankfurter's *Sweezy* concurrence, Op. 12, *Johnson-Kurek* cited that very concurrence for the proposition that academic freedom was the *university's* freedom. 423 F.3d at 593.

*Evans-Marshall* confirms that the panel erred in its reliance on pre-*Garcetti* circuit precedent. *Evans-Marshall* explained that *Garcetti* overruled prior panel precedents protecting in-class curricular speech. 624 F.3d at 343 (explaining that pre-*Garcetti* Sixth Circuit precedent was inapplicable because *Garcetti* "established a new threshold requirement in this area"). *Evans-Marshall* further held that under

*Garcetti*, a teacher *lacked* an academic freedom right to challenge school rules on in-class content, emphasizing that permitting such challenges would "transform run-of-the-mine curricular disputes into constitutional stalemates." *Id.* at 341.

The panel distinguished *Evans-Marshall* in a footnote by claiming that *Evans-Marshall*'s holding was "limited to schoolteachers." Op. 13 n.1. But *Evans-Marshall* also addressed academic freedom in universities:

> It is the educational institution that has a right to academic freedom, not the individual teacher. Academic freedom implicates the freedom of a university to make its own judgments as to education, requiring deference to a university's academic decisions. In the context of in-class curricular speech, this court has already said in the university arena that a teacher's invocation of academic freedom does not warrant judicial intrusion upon an educational institution's decisions: "The First Amendment concept of academic freedom does not require that a nontenured professor be made a sovereign unto himself." *Parate*, 868 F.2d at 827. A school "may constitutionally choose not to renew the contract of a nontenured professor" when that professor's "pedagogical attitude and teaching methods do not conform to institutional standards." *Id.* Just so here.

624 F.3d at 344 (internal quotation marks and alterations omitted). The panel should not have ignored this reasoning while reaching the opposite conclusion.

Moreover, *Evans-Marshall* and *Johnson-Kurek* are right. If a professor can challenge a university's content-based restrictions on in-class education, then the university's academic freedom is dead. *Every* decision by a university on course content is, by definition, content-based. If the Physics Department requires physics

professors to include physical demonstrations in their lectures, a recalcitrant professor can now cast this policy as an unconstitutional content-based restriction. *Evans-Marshall*'s concern about "transform[ing] run-of-the-mine curricular disputes into constitutional stalemates," *id.* at 341, is just as applicable in college as in high school. The panel should have followed *Evans-Marshall* and *Johnson-Kurek*.

### C. The panel's conclusion that an academic-freedom exception applies here conflicts with circuit precedent.

Even if there was an academic-freedom exception to *Garcetti*, it would not apply here. The panel's contrary decision contradicts circuit precedent.

Shawnee's nondiscrimination policy does not prevent Meriwether from conducting any research or publishing any article on any topic. Nor does it affect how Meriwether refers to transgender people in his published work or when he is not doing his job. It simply requires professors to treat transgender students in class the same way that the professor treats other students. Such a policy does not inhibit his academic freedom.

Meriwether alleges that Shawnee's nondiscrimination policy conflicts with his personal beliefs. But that claim does not sound in *academic* freedom. Academic freedom protects the intellectual exchange of ideas that distinctively occurs in the classroom. Here, however, the utterances at issue—"Mr. Doe" and "he"—could be made in *any* workplace setting. Indeed, university secretaries and custodians may

have equally sincere personal beliefs, yet under the panel opinion, Shawnee could enforce its nondiscrimination policy against them when they address Doe on campus, but not against Meriwether.  It does not make sense that professors—and *only* professors—have a constitutional right to refer to transgender women as men while on the job, particularly when those individuals are students over whom they exercise authority.

The panel concluded that professors should have this right because "choices about how to lead classroom discussion shape the *content* of the instruction enormously."  Op. 15.  But when students hear a *particular student* referred to as "Sir" or "Ma'am" in the classroom, their education is no more enriched than when they hear "Sir" or "Ma'am" outside the classroom setting.

The panel's expansive understanding of academic freedom is irreconcilable with *Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012).  In *Savage*, the plaintiff was a member of a committee charged with selecting books for freshmen.  He alleged that he was retaliated against for commenting on a book recommendation and sued under the First Amendment.  The panel held that no academic-freedom exception to *Garcetti* would apply because his comment "was only loosely, if at all, related to academic scholarship."  *Id.* at 739.  It cannot be that substantive commentary on what books should be taught *does not* implicate "academic freedom," but referring to a transgender woman as "he" and "sir" *does* implicate "academic freedom."

Even if "Sir" or "Ma'am" reflected Meriwether's "choices about how to lead classroom discussion," the panel's opinion would still conflict with circuit precedent. In *Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989), the Court held that a university could sever ties with a professor whose "pedagogical attitude and teaching methods do not conform to institutional standards." *Id.* at 827; *see Evans-Marshall*, 624 F.3d at 344 (reaffirming *Parate*). Likewise, in *Johnson-Kurek*, the Court stated that the First Amendment "does not require that the university permit" a professor "to teach classes in accordance with" her "ideas about pedagogy." 423 F.3d at 595. These holdings squarely conflict with the panel's conclusion that Meriwether's "choices about how to lead classroom discussion" are constitutionally protected speech.

The panel insisted that the Fourth, Fifth, and Ninth Circuits have recognized "academic freedom" claims, Op. 13, but this case is worlds apart. *Adams v. Trustees of the University of North Carolina-Wilmington*, 640 F.3d 550 (4th Cir. 2011), held that *Garcetti* did not apply because "the scholarship and teaching … was intended for and directed at a national or international audience on issues of public importance unrelated to any of Adams' assigned teaching duties." *Id.* at 563-64. That could not be more different from Meriwether's speech addressing a particular student in class. *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir.), *cert. denied*, 140 S. Ct. 432 (2019), did not address *Garcetti* and instead concluded that a professors "profanity and

discussion of her sex life and the sex lives of her students" was constitutionally unprotected. *Id.* at 853. Finally, *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) involved quintessential academic speech—a proposal that "would have substantially altered the nature of what was taught at the school." *Id.* at 415. No court has ever extended "academic freedom" to a remotely comparable context.

## II. The Panel's "Public Concern" Holding Warrants Rehearing.

The panel's conclusion that Meriwether spoke on a matter of "public concern," Op. 17-19, warrants rehearing.

When determining whether speech is on a matter of public concern, "the pertinent question is not *why* the employee spoke, but *what* he said." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004). Hence, the inquiry focuses not on whether Meriwether was motivated by his views about gender, but instead the utterances themselves.

The speech at issue here—utterances made when addressing a particular student in class—is not on a matter of public concern. The purpose of that speech is merely to alert a private citizen that she was being called upon to answer a question. Utterances like "he" and "sir," directed to one student, are not "a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quotation marks omitted).

Indeed, the primary effect of Meriwether's speech was not to convey any social opinions, but to disclose that Doe is a transgender woman to other students. Whether a person is transgender is intensely private information, as the district court acknowledged in granting Doe's motion to proceed pseudonymously. Conveying that information does not transform Meriwether's speech into information of public concern merely because Meriwether is motivated by opinions about gender, any more than publicly disclosing that a specific unmarried student is pregnant is of "public concern" because the speaker intends to send a message about unwed mothers or premarital sex.

What is more, Shawnee required only that Meriwether adopt a uniform practice when calling upon students, not that he must use particular terms. Shawnee stated that Meriwether's proposed accommodation—referring to Jane Doe simply as "Doe"—was acceptable *as to Doe*. Hence, there was no dispute that Meriwether could refer to Doe as "Doe."

Shawnee merely told Meriwether that he must treat other students the same way. Meriwether demurred, asserting he has a constitutional right to use honorifics when referring to all *other* students. Hence, the speech that Meriwether insists he has the constitutional right to utter consists of references to *non-transgender*

students.  But no reasonable listener would infer any political message from referring to a *non-transgender* student with pronouns or honorifics.[1]

Even if Shawnee's policy required Meriwether to use female pronouns and honorifics for Doe, which it does not, it would still not compel speech conveying a political message.  The listener might not know that Doe is transgender—and therefore draw no inference from his use of female pronouns.  Even if the listener knew that Doe is transgender, the listener would understand that a transgender woman would find it offensive to be referred to as "sir" or be singled out for discrimination, particularly in an environment where participation is compulsory and class grades depend on it.  In that context, the use of female pronouns reflect ordinary civility, not a philosophical statement.[2]

---

[1] The panel asserted that Shawnee's proposed accommodation—under which he could refer to Doe without honorifics, so long as he referred to other students the same way—was unacceptable because "when Meriwether slipped up, which he inevitably would … he could face discipline." Op. 30.  This assertion contradicts Shawnee's written warning, which explicitly addressed that concern by advising Meriwether that "excusable, innocent mistakes" were "not a violation of policy." *See* D. Ct. Dkt. 34-27, PageID.1799.

[2] The panel pointed out that Shawnee refused to allow Meriwether to declare his views on the nondiscrimination policy in the course syllabus. Op. 19.  However, this lawsuit does not challenge that decision, but instead seeks to enjoin *the nondiscrimination policy itself*—and confer on Meriwether a constitutional right to discriminate against Doe and call her a man.

12

The panel compared Meriwether to feminists who used pronouns as a mechanism of restructuring gender relations. Op. 18. That analogy highlights the troubling implication of the panel's decision: if the panel's opinion is allowed to stand, professors will have free rein under the First Amendment to address particular students differently than others to convey an implicit message. For instance, a professor who believes that women should not pursue higher education or certain careers could call men by their surnames and refer to all women by their first names. Or a professor hostile to a student's religion could refuse to use names associated with a particular religion in class. These utterances implicitly convey attitudes about social issues at least as much as Meriwether's speech, so under the panel's reasoning, they implicate "academic freedom" and are on a "matter of public concern." The First Amendment does not require that result.

### III.    The Panel's *Pickering* Holding Warrants Rehearing.

The panel concluded that, "on the allegations in the complaint," Meriwether plausibly alleged that the *Pickering* balancing test weighed in his favor. Op. 21; *see id.* The outcome of that balancing test following fact-finding on remand remains an open question. Nevertheless, the panel's *Pickering* discussion warrants rehearing.

The panel appeared to endorse the view that explicitly differential treatment of transgender students is permissible. Op. 21 (referring to such a scenario as a "win-win"). Meriwether's proposed "compromise" was to "keep using pronouns to

address most students in class" but "refer to Doe using only Doe's last name." Op. 5. Such a policy would openly discriminate against transgender students—permitting professors to refer to them, and no one else, by their last names only. Worse, by conspicuously treating those students differently, such a policy would risk disclosing that a particular student is transgender, regardless of the student's wish to keep that information private. Yet, the panel asserted that this was a "win-win" because "Doe would not be referred to using pronouns Doe finds offensive." Op. 21. The panel then opined that, based on the complaint's allegations, "Shawnee State's purported interest in complying with Title IX is not implicated by Meriwether's decision to refer to Doe by name rather than Doe's preferred pronouns." Op. 22.

These statements are misguided. As a threshold matter, Shawnee's interests go beyond "complying with Title IX." Shawnee has an interest in protecting its transgender students from discrimination regardless of whether federal law requires it to maintain its nondiscrimination policy.

In any event, Title IX does bar differential treatment of transgender students in the classroom. Title IX prohibits students, "on the basis of sex," from being "subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under Supreme Court precedent, discrimination against transgender individuals is a form of sex

discrimination.  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020).  When a professor intentionally treats transgender students differently from all others, those students are, "on the basis of sex," "subjected to discrimination."  While the panel identified certain immaterial differences between Title VII and Title IX, Op. 20 n.4, the pertinent statutory text—"discrimination" "on the basis of sex"—is identical in Title VII and Title IX.  And, this circuit has looked to Title VII when interpreting Title IX.  *See, e.g.*, *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 & n.2 (6th Cir. 2013).  Hence, a transgender student subjected to explicit intentional discrimination is "subjected to discrimination" under Title IX.

The panel posited that such discrimination might not violate Title IX because it does not inhibit students' "equal access" to an education.  Op. 21-22.  But when transgender students are repeatedly treated differently than all other students in class, they lack equal access to an education.  If a professor singled out the sole female student in a class by referring to her by her last name only while using "Sir" for all other students, and declared that this implicitly conveyed the professor's attitudes about the role of women in our society, the student plainly would lack equal access to an education.  The same conclusion should follow for transgender students.

To be sure, the panel stated only that "there is no indication *at this stage of the litigation* that Meriwether's speech inhibited Doe's education or ability to succeed in the classroom."  Op. 22.  Doe intends to show, on a full record, that

15

Meriwether's speech inhibited her education and ability to succeed in the classroom. This would warrant ruling in Shawnee's favor, regardless of the applicability of Title IX. Nevertheless, the panel's troubling suggestion that explicit discrimination could be a "win-win" warrants rehearing.

## IV.    The Panel's Free Exercise Holding Warrants Rehearing.

While Petitioners disagree with the panel's Free Exercise analysis in numerous respects, this Petition will focus on one particularly troubling aspect: its conclusion that a university's adherence to principles of religious neutrality created an inference of religious hostility.

Meriwether sought a religious exemption to Shawnee's anti-discrimination policy. Shawnee denied it, observing that "it is conceivable that SSU employs or may in the future employ faculty members with sincerely held religious beliefs that, *e.g.*, one national origin is superior to another national origin, or one sex is inferior to the other sex." D. Ct. Dkt. 34-27, PageID.1799; Op. 9 (quoting this document).

Shawnee's conclusion was a correct statement of Free Exercise law. Under existing law, the government may maintain a neutral and generally applicable policy without offending the Free Exercise Clause. *Employment Division v. Smith*, 494 U.S. 872 (1990). But neutrality requires that the State not favor some religions over others. If Shawnee gave Meriwether a religious exemption, the nondiscrimination policy would cease to be neutral. Hence, Shawnee would be required to give

exemptions for *all* sincerely-held religious beliefs. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). Shawnee's statement accurately recognized this reality.

Yet, the panel held that Shawnee's statement of viewpoint-neutrality actually created an inference of religious hostility. The panel characterized this statement as reflecting the view that "Meriwether's convictions were no better—and no more worthy of tolerant accommodation—than religiously motivated racism or sexism." Op. 25. According to the panel, this statement supported an inference of "religious hostility." *Id.*

This reasoning turns the Free Exercise Clause upside down. The Free Exercise Clause *bans* the State from finding that some religious convictions are "better" than others. If Shawnee offered Meriwether a religious exemption but denied a religious exemption to someone who believed that women should be not study certain subjects, on the theory that Meriwether's convictions *were* "better … than religiously motivated … sexism," *id.*, *that* would be a textbook Free Exercise violation. The only constitutional way to enforce the policy against *some* religious believers was to enforce it against *all* religious believers (and non-believers). Shawnee's recognition of this fact did not create an inference of "religious hostility."

The panel's opinion will put universities in a bind. A non-neutral nondiscrimination policy—where some religions were exempted but not others—

would of course violate the Free Exercise Clause. But if a *neutral* nondiscrimination policy is defended on the ground that all religions should be treated the same way, then, according to the panel, that also reflects religious hostility under the Free Exercise Clause. Rehearing is warranted to protect universities from this Catch-22.

## CONCLUSION

The petition for panel rehearing or rehearing en banc should be granted.

May 7, 2021

/s/ Paul Kerridge

Paul Kerridge
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
(513) 579-6400
pkerridge@kmklaw.com

*Counsel for Defendants-Appellees*

Respectfully submitted,

/s/ Adam G. Unikowsky

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Avenue, NW #900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

Shannon P. Minter
Asaf Orr
Christopher F. Stoll
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street Suite 370
San Francisco, California 94102
(415) 392-6257
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

*Counsel for Intervenors-Appellees*

## CERTIFICATE OF COMPLIANCE

1.      This Petition complies with type-volume limitation of Rule 35(b)(2)(A) of the Federal Rules of Appellate Procedure because, according to the word count function of Microsoft Word 2013, the Petition contains 3,881 words excluding the parts of the Petition exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2.      This Petition complies with the typeface and type style requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure because this Petition has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font for the main text and 14-point Times New Roman font for footnotes.

Dated: May 7, 2021

/s/ Adam Unikowsky
Counsel for Intervenors-Appellees

## CERTIFICATE OF SERVICE

I, Adam Unikowsky, hereby certify that on May 7, 2021, I electronically filed the foregoing document through the court's electronic filing system, and that it has been served on all counsel of record through the court's electronic filing system.

Dated: May 7, 2021

/s/ Adam Unikowsky
Counsel for Intervenors-Appellees