No. 20-3289

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

NICHOLAS K. MERIWETHER,
*Plaintiff-Appellant*,

v.

FRANCESCA HARTOP, JOSEPH WATSON, SCOTT WILLIAMS, DAVID FURBEE, SONDRA HASH, ROBERT HOWARTH, GEORGE WHITE, AND WALLACE EDWARDS, TRUSTEES OF SHAWNEE STATE UNIVERSITY, IN THEIR OFFICIAL CAPACITIES; JEFFREY A. BAUER, ROBERTA MILLIKEN, JENNIFER PAULEY, TENA PIERCE, DOUGLAS SHOEMAKER, AND MALONDA JOHNSON, IN THEIR OFFICIAL CAPACITIES,
*Defendants-Appellees*,

JANE DOE AND SEXUALITY AND GENDER ACCEPTANCE,
*Intervenors-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO AT CINCINNATI
NO. 1:18-CV-00753 (HON. SUSAN J. DLOTT)

**BRIEF OF *AMICI CURIAE*, THE TREVOR PROJECT, INC. AND AMERICAN ASSOCIATION OF SUICIDOLOGY, IN SUPPORT OF DEFENDANTS-APPELLEES AND INTERVENORS-APPELLEES' PETITION FOR PANEL REHEARING OR REHEARING *EN BANC***

Shireen A. Barday
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
sbarday@gibsondunn.com
Telephone:  (212) 351-2621
Facsimile:  (212) 817-9421

*Counsel for Amici Curiae*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 20-3289            Case Name: Meriwether v. Hartop et al.

Name of counsel: Shireen A. Barday

Pursuant to 6th Cir. R. 26.1, The Trevor Project, Inc.

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ May 14, 2021 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Shireen A. Barday
200 Park Avenue
New York, NY 10166

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 20-3289             Case Name: Meriwether v. Hartop et al.

Name of counsel: Shireen A. Barday

Pursuant to 6th Cir. R. 26.1, American Association of Suicidology
                              *Name of Party*

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
        identity of the parent corporation or affiliate and the relationship between it and the named
        party:

No.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
        in the outcome?  If yes, list the identity of such corporation and the nature of the financial
        interest:

No.

## CERTIFICATE OF SERVICE

I certify that on _____ May 14, 2021 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Shireen A. Barday
200 Park Avenue
New York, NY 10166

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Page(s)

IDENTITY & INTEREST OF *AMICI CURIAE* .......................................................1

ARGUMENT .........................................................................................................2

   I.   THE ANTI-DISCRIMINATION POLICIES PROMULGATED AND
ENFORCED BY DEFENDANTS-APPELLEES REDRESS SIGNIFICANT
HARMS TO THE HEALTH AND SAFETY OF YOUNG TRANSGENDER
ADULTS. ..................................................................................................... 3

      A.  SOCIAL SCIENCE OVERWHELMINGLY CONFIRMS THE
SIGNIFICANT MENTAL HEALTH DISTRESS TRANSGENDER
YOUTH EXPERIENCE WHEN TREATED DIFFERENTLY THAN
THEIR PEERS. ........................................................................................4

      B.  THE PANEL MISAPPLIED THIS COURT'S FIRST AMENDMENT
PRECEDENTS AUTHORIZING SCHOOLS TO PROTECT
STUDENTS FROM HOSTILE TREATMENT LIKE PROFESSOR
MERIWETHER'S...................................................................................7

CONCLUSION..................................................................................................12

CERTIFICATE OF COMPLIANCE...................................................................13

CERTIFICATE OF SERVICE ...........................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonnell v. Lorenzo,*
    241 F.3d 800 (6th Cir. 2001) ..............................................................8, 9, 10, 12

*Dambrot v. Cent. Mich. Univ.,*
    55 F.3d 1177 (6th Cir. 1995) .......................................................................9, 10

*Fowler v. Bd. of Educ. of Lincoln Cty.,*
    819 F.2d 657 (6th Cir. 1987) ...............................................................................8

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006)...........................................................................................11

*Hill v. Colorado,*
    530 U.S. 703 (2000)..............................................................................................8

*Johnson-Kurek v. Abu-Absi,*
    423 F.3d 590 (6th Cir. 2005) ...............................................................................9

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967)..............................................................................................9

*Kluge v. Brownsburg Cmty. Sch. Corp.,*
    432 F. Supp. 3d 823 (S.D. Ind. 2020)................................................................11

*Meriwether v. Trs. of Shawnee State Univ.,*
    2019 WL 4222598 (S.D. Ohio Sept. 5, 2019) ...................................................11

*Parate v. Isibor,*
    868 F.2d 821 (6th Cir. 1989) .............................................................................10

*Smock v. Board of Regents of the University of Michigan,*
    353 F. Supp. 3d 651 (E.D. Mich. 2018) ............................................................10

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969)..............................................................................................8

**Other Authorities**

Ashley Austin et al.,  *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, J. Interpersonal Violence (2020). ....................................................5

Ellen Bara Stolzenberg & Bryce Hughes, *The Experiences of Incoming Transgender College Students: New Data on Gender Identity*, Liberal Educ., (Spring 2017) ...................................6

Maren Greathouse et al., Tyler Clementi Ctr., Rutgers Univ., *Queer-Spectrum and Trans-Spectrum Student Experiences in American Higher Education* (2018) .....................................6

Myeshia Price-Feeney et al., The Trevor Project, *Understanding the Mental Health of Transgender and Nonbinary Youth*, 66 J. Adolescent Health 64 (2020) ..............................3

Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* (2016) .....................................7

Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth* 63 J. Adolescent Health 503 (2018). .......................5

Trevor Project, *National Survey on LGBTQ Youth Mental Health* 1 (2020)..................................................5

**Rules**

FRAP 29(a)(3).........................................................2

**Constitutional Provisions**

U.S. Const. amend. I ..........................................2, 7, 8, 10, 11

## IDENTITY & INTEREST OF *AMICI CURIAE*[1]

The Trevor Project, Inc. ("The Trevor Project") is the world's largest suicide prevention and crisis intervention organization for lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ") young people. The Trevor Project offers the only accredited, free, and confidential phone, instant message, and text messaging crisis intervention services for LGBTQ youth, which are used by thousands of youth each month. Through these services and national surveys, The Trevor Project also produces innovative research that brings new knowledge, with clinical implications, to issues affecting LGBTQ youth.

The American Association of Suicidology ("AAS") is a nationally recognized organization comprised of public health and mental health professionals, researchers, suicide prevention and crisis intervention centers, survivors of suicide loss, attempt survivors, and others, that promotes the prevention of suicide through research, public awareness programs, education and training. In addition to advancing suicidology as a science, AAS promotes public education and training for professionals and volunteers on suicide prevention and intervention.

*Amici* have a special interest in this litigation as well as familiarity and knowledge of the significant harms that transgender youth endure as a result of

---

[1] No party's counsel authored this brief in whole or in part. No party, its counsel, or other person contributed money intended to fund the brief's preparation or submission.

1

disparate treatment and disrespect of their gender identity. *Amici* are deeply concerned that the Panel's opinion in this case will place young adults at an increased and substantial risk of suicidality, a risk that is strongly and consistently associated with experiencing disparate treatment based on gender identity. For these reasons, The Trevor Project and AAS have a substantial interest in this litigation.

The authority of *amici* to file this brief in support of Defendants-Appellees and Intervenors-Appellees' Petition is pursuant to FRAP 29(a)(3) and the accompanying Motion for Leave to File.

## ARGUMENT

The Panel's opinion merits rehearing both because it is at odds with this Court's and Supreme Court precedent regarding the ability of state universities to maintain and enforce anti-discrimination policies, and because the question it presents is one of exceptional importance—whether colleges may protect vulnerable transgender students from disrespectful differential treatment by their professors that puts young transgender adults at increased risk of suicidality. Young transgender adults subjected to the use of incorrect pronouns in the classroom are at risk of harm to their mental health, including an increased risk of suicide. The Panel's distortion of the First Amendment to support discrimination against transgender individuals warrants rehearing *en banc* because of the serious harms associated with the disparate treatment of young transgender adults: its holding that a government may

not act to ensure that transgender students are addressed with their proper pronouns, because pronouns are spoken words, is an unprecedented incursion on an area of traditional authority for public institutions of higher learning. Such an important issue warrants rehearing by the full Court.

## I. THE ANTI-DISCRIMINATION POLICIES PROMULGATED AND ENFORCED BY DEFENDANTS-APPELLEES REDRESS SIGNIFICANT HARMS TO THE HEALTH AND SAFETY OF YOUNG TRANSGENDER ADULTS.

Transgender students are much more likely to suffer from mental health distress and suicidality than their cisgender peers.[2] The existence and severity of suicidality among young transgender adults is closely correlated with the extent to which people treat them like any other young person: identifying them by their proper name and with their proper pronouns is associated with lower suicide risk. Shawnee State's lawful policy prohibiting discrimination "because of . . . gender identity," Panel Op. at 3, is essential to the mental health and, in turn, academic success of its transgender students.

---

[2]  Myeshia Price-Feeney et al., The Trevor Project, *Understanding the Mental Health of Transgender and Nonbinary Youth*, 66 J. Adolescent Health 684, 687–88 (2020) ("[T]ransgender and nonbinary youth reported significantly higher rates of depressive mood (83%), having seriously considered suicide (54%), and having attempting suicide (29%) compared with cisgender youth.").

**A. SOCIAL SCIENCE OVERWHELMINGLY CONFIRMS THE SIGNIFICANT MENTAL HEALTH DISTRESS TRANSGENDER YOUTH EXPERIENCE WHEN TREATED DIFFERENTLY THAN THEIR PEERS.**

The Trevor Project regularly hears from transgender youth who seek out the organization's crisis intervention and suicide prevention services. While some of these transgender youth discuss the mental health benefits they experience when teachers or professors use their correct pronouns, or when their pronouns are changed in school records, many others call to discuss the stress or dysphoria they feel when an educator uses incorrect pronouns.[3] For example, one college student told a counselor that they felt hopeless when a professor used the wrong pronouns in front of their entire class and feared they would never be seen for who they are. Other transgender youth ask crisis counselors for advice about how to ask educators to use their correct pronouns. One college student seeking such advice explained that they hoped professors would use their correct pronouns because they wanted to be treated the same as their classmates, and not be seen as different or freakish.

The correlation between suicidality and gender affirmation is well-documented. In July 2020, The Trevor Project released the results of a cross-

---

[3] This information is derived from anonymized data that The Trevor Project has collected, compiled, and reviewed on its platforms. In order to protect the privacy of the youth using its services, The Trevor Project does not make this data publicly available. The pronoun "they" is used to anonymize this and other anecdotes.

sectional survey of more than 40,000 LGBTQ respondents between the ages of 13 and 24, which showed that "[t]ransgender and nonbinary youth who reported having [their] pronouns respected by all or most people in their lives attempted suicide at half the rate of those who did not have their pronouns respected."[4]  A recent study demonstrated that for each additional context (*e.g.*, at home, school, or work, or with friends) in which a transgender youth's chosen name is used, their risk of suicidal behavior is reduced by more than half.[5]

The opposite correlation is also evident:  of LGBTQ youth respondents who attempted suicide in the last year, the highest incidence of suicide attempts were found in those for whom no one respected their pronouns.[6]  Those who reported that that "all or most" of the people in their lives respected their pronouns, by contrast, reported the lowest incidence of suicide attempts.[7]  For transgender youth, experiencing these and other types of indignities makes a statistically significant contribution to lifetime suicide attempts.[8]

---

[4]    The Trevor Project, *National Survey on LGBTQ Youth Mental Health* 1 (2020), https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf.

[5]    Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health 503, 503–05 (2018).

[6]    The Trevor Project, *supra* note 4, at 9.

[7]    *Id.*

[8]    Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, J. Interpersonal Violence 13–14 (2020) (advance online publication at https://doi.org/10.1177/0886260520915554).

Policies prohibiting differential treatment of transgender students can mitigate and at times prevent these harms. Such policies are crucial given the extreme rates at which transgender young adults suffer from mental distress and suicidality. Indeed, the Tyler Clementi Center at Rutgers University collected the results of a number of studies of LGBTQ college students and found that 56% of transgender students felt so depressed that they struggled to function and 26% seriously considered suicide.[9] And an analysis of data from the Cooperative Institutional Research Program Freshman Survey similarly found that "47.2 percent of transgender students reported feeling depressed frequently, as compared to 9.5 percent of the national sample."[10]

The rates at which transgender college students experience discrimination on campus may help explain these alarming statistics. The National Center for Transgender Equality's 2015 U.S. Transgender Survey found that nearly one-quarter of respondents who were out or perceived as transgender experienced verbal,

---

[9] Maren Greathouse et al., Tyler Clementi Ctr., Rutgers Univ., *Queer-Spectrum and Trans-Spectrum Student Experiences in American Higher Education* 26 (2018), https://tcc-j2made.s3.amazonaws.com/uploads/2018/09/White-Paper-Final.pdf.

[10] Ellen Bara Stolzenberg & Bryce Hughes, *The Experiences of Incoming Transgender College Students: New Data on Gender Identity*, Liberal Educ., Spring 2017, at 38, 40, https://www.aacu.org/liberaleducation/2017/spring/stolzenberg_hughes.

physical, or sexual harassment on campus.[11]  Of respondents who experienced some

form of harassment, "16% left college or vocational school because the harassment

was so bad."[12]  This impact on educational attainment is particularly worrisome

given that transgender individuals also experience triple the rate of unemployment

of the population, high rates of poverty, and significant housing instability.[13]

**B.   THE PANEL MISAPPLIED THIS COURT'S FIRST AMENDMENT PRECEDENTS AUTHORIZING SCHOOLS TO PROTECT STUDENTS FROM HOSTILE TREATMENT LIKE PROFESSOR MERIWETHER'S.**

In holding that Professor Meriwether stated a plausible First Amendment free

speech claim, the Panel erred by imposing improperly restrictive standards on anti-

discrimination policies adopted to protect transgender students from precisely the

type of disparate treatment and negative mental health outcomes discussed above.

Its decision is contrary to precedents from both this Court and others affording public

schools broad latitude to ensure their faculty and staff adhere to policies intended to

protect at-risk students, while simultaneously ensuring robust protection of

academic freedom.

---

[11]     Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 136 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.
[12]     *Id.*
[13]     *See generally id.*

The Panel opinion took the position that Meriwether could "call on Doe using Doe's last name alone" as an "accommodation" for Doe in Meriwether's class. Panel Op. at 21. But such an "accommodation" is the essence of discrimination, and disregards this Court's precedents recognizing public universities' broad authority— and indeed, responsibility—to enforce policies that foster a "hostile-free learning environment," so long as the utterances regulated by those policies are "not germane to the subject matter" of a professor's class. *Bonnell v. Lorenzo*, 241 F.3d 800, 820, 823–24 (6th Cir. 2001). This reflects the principle that a student's right to learn includes protection from discrimination harmful to their mental health.

Indeed, First Amendment rights must be "applied in light of the special characteristics of the school environment." *Fowler v. Bd. of Educ. of Lincoln Cty.*, 819 F.2d 657, 661 (6th Cir. 1987) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). In the "unique context" of a college classroom, a professor speaks to a "*captive audience* of students who cannot 'effectively avoid further bombardment of their sensibilities simply by averting their [ears].'" *Bonnell*, 241 F.3d at 820–21 (quoting *Hill v. Colorado*, 530 U.S. 703, 716 (2000)) (emphasis added) (internal citation omitted). Of course, educators should and do have the opportunity to express a wide range of ideas to their students without fear of censorship. But there is a difference between conveying an idea—including an idea about gender identity—and targeting particular students with discriminatory

8

treatment in a way that "compromis[es] a student's right to learn." *Id.* at 823–24. Empowering Meriwether's discrimination against Doe through a so-called "accommodation" would be contrary to the school's powerful interest in preventing teachers from using their "unique and superior position" to disrupt students' learning experiences, irrespective of the mental health consequences to students or whether a professor's statements legitimately contribute to academic discourse. *Id.* at 824.

Meriwether's "accommodation" "does not rise to the level of protected expression," as that method "advance[s] no academic message" and only serves to harm his transgender students. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1190–91 (6th Cir. 1995) (citation omitted); *accord Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 595 (6th Cir. 2005) ("The freedom of a university to decide what may be taught and how it shall be taught would be meaningless if a professor were entitled to refuse to comply with university requirements whenever they conflict with his or her teaching philosophy."). While educators have the right to engage in a "robust exchange of ideas," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967), that protection is implicated only when their speech "advances an idea transcending personal interest," *Dambrot*, 55 F.3d at 1189; *accord Bonnell*, 241 F.3d at 812 (explaining that a professors' speech on "matters only of personal interest" is unprotected).

Guided by these principles, this Court has repeatedly upheld school sanctions imposed on staff members who used offensive, discriminatory, or crude language that disturbed students' academic experiences and did not advance their education. *E.g.*, *Bonnell*, 241 F.3d at 820 (finding that professor had no right to use profanities and vulgar language that was "not germane to the subject matter" of his class and upholding his suspension for violating sexual harassment policy); *Dambrot*, 55 F.3d at 1187, 1190 (holding that "[t]he University has the right to disapprove of the use of [the N-word]" by a basketball coach since his use of the slur was "incidental to the message conveyed"). The panel's decision is at odds with these clear precedents.

A court in this Circuit upheld the sanction of a professor who made inappropriate comments to students, based on these decisions. In *Smock v. Board of Regents of the University of Michigan*, the court explained that the First Amendment "does not bar a public university from requiring that its faculty treat each other and their students with civility" and instead places "the task of calibrating" the balance between "[c]ivility of discourse and openness of discourse" in the hands of schools. 353 F. Supp. 3d 651, 659–60 (E.D. Mich. 2018). Universities may sanction professors "whose pedagogical attitudes and teaching methods do not conform to institutional standards" and fail to align with a school's mission of promoting "trust, openness, civility, and respect." *Id.* at 659 (quoting *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989)).

And the district court in this case relied on these principles in finding that the First Amendment afforded Professor Meriwether no protection for his refusal to comply with Shawnee State's anti-discrimination policies. It rightly held that Professor Meriwether's disparate treatment of Doe did not entail "sharing ideas or inviting discussion" but merely involved "directing his personal beliefs toward Doe, who objected to his speech, and other members of a captive audience who were not free to leave his class or decline to participate in class," despite lacking any "admitted academic purpose or justification" for doing so. *Meriwether v. Trs. of Shawnee State Univ.*, 2019 WL 4222598, at *15 (S.D. Ohio Sept. 5, 2019); *accord Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020) (dismissing teacher's First Amendment claims because his refusal to use transgender students' names and pronouns "add[ed] little to the public discourse on gender identity issues, and therefore [was] not the kind of speech that is valuable to the public debate" under *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006)). The district court's decision reflects the fundamental underlying truth: disparate treatment of transgender students causes harm, and that harm is a legitimate basis for schools to dictate policy and sanction discriminating professors.

This Court should rehear this case *en banc* and reaffirm its own precedents upholding policies at public universities—like the one at Shawnee State—that promote a "hostile-free learning environment" for students by enforcing policies that

prevent professors from targeting particular students for discriminatory treatment.

*See Bonnell*, 241 F.3d at 823–24.

## CONCLUSION

For the reasons stated above, rehearing *en banc* is warranted.

Respectfully submitted,

DATED:  May 14, 2021

*/s/ Shireen A. Barday*
Shireen A. Barday
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
sbarday@gibsondunn.com
Telephone:  (212) 351-2621
Facsimile:  (212) 817-9421

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation, as provided in Fed. R. App. P. 32(g), Fed. R. App. P. 29(b)(4), and 6th Cir. R. 35, because, exclusive of the exempted portions of the brief, the brief contains 2,517 words.

2.     This brief complies with the type-face requirements, as provided in Fed. R. App. P. 32(a)(5), and the type-style requirements, as provided in Fed. R. App. P. 32(a)(6), because the brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

3.     As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  May 14, 2021

*/s/ Shireen A. Barday*
Shireen A. Barday

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
sbarday@gibsondunn.com
Telephone:  (212) 351-2621
Facsimile:  (212) 817-9421

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Sixth Circuit by using the

appellate CM/ECF system on May 14, 2021, which will cause notice of filing to be

sent to all counsel of record.

Dated: May 14, 2021

*/s/ Shireen A. Barday*
Shireen A. Barday

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
sbarday@gibsondunn.com
Telephone: (212) 351-2621
Facsimile: (212) 817-9421

*Counsel for Amici Curiae*